**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION**

| | | |
|---|---|---|
| **NORTHERN BOTTLING CO., INC.,** | ) | Case No. 4:15-CV-00133 |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Judge Daniel L. Hovland |
| | ) | Magistrate Judge Charles S. Miller, Jr. |
| | ) | |
| **PEPSICO, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM IN SUPPORT OF PEPSICO, INC.'S MOTION FOR PROTECTIVE
ORDER REGARDING PLAINTIFF'S RULE 30(b)(6) DEPOSITION NOTICE**

PepsiCo, Inc. ("PepsiCo"), by its attorneys, hereby files this Memorandum in Support of its Motion for Protective Order Regarding Topics 1, 2, and 8 of Plaintiff's Rule 30(b)(6) Deposition Notice.[1]

**INTRODUCTION**

Plaintiff Northern Bottling Co., Inc. ("Northern") seeks information far beyond the proper scope of discovery in this case. Northern's lawsuit relates solely to transshipment of Pepsi carbonated soft drink ("CSD") products in Northern's own exclusive sales territory and PepsiCo's efforts to prevent those transshipments. But Topics 1, 2, and 8 of its Rule 30(b)(6) Notice to

---

[1] In its July 14, 2017 email to the Court, Northern indicated that only Topics 1 and 2 of the Notice were at issue for purposes of the discovery teleconference with the Court. Jul. 14, 2017 Email with Notice, attached as Ex. 1. But Northern also stated that it had highlighted the disputed Topics in its attached Notice and highlighted an additional topic, Topic 8, seeking testimony about any litigation PepsiCo initiated to enforce contractual restrictions on resale outside of a defined territory. *Id.* Accordingly, out of an abundance of caution, PepsiCo seeks a protective order limiting the scope of Topics 1, 2, and 8. Based on Northern's July 14, 2017 email, PepsiCo understands that Northern has acceded to PepsiCo's objections and has withdrawn Topics 5 and 6 from the Notice, and therefore does not seek a protective order as to those topics. PepsiCo reserves the right to do so if Northern subsequently attempts to pursue deposition testimony with respect to these two Topics.

PepsiCo (the "Notice") are not limited to transshipments into Northern's territory. Instead, these Topics also seek testimony about transshipments into the territories of other, non-party bottlers and PepsiCo's efforts to deter those transshipments. In addition, Northern seeks information about PepsiCo's nationwide operations going all the way back to 2003, even though the events giving rise to its claims did not begin until 2015. In particular, Northern seeks to require PepsiCo to produce a corporate representative to testify about the following:

> Topic No. 1: All aspects of the PepsiCo Transshipment Enforcement Program, including its administration, documentation, amendments and modifications thereto, and including, for each year, the amount of fines imposed by name of payee. Time period: January 2003 through the present.
>
> Topic No. 2: Other than the Transshipment Enforcement Program, any and all policies, procedures, rules, regulations plans, and actions promulgated and/or implemented by PepsiCo, Inc. for the purpose of preventing transshipment. Time period: January 2010 through the present.
>
> Topic No. 8: Litigation initiated by PepsiCo wherein PepsiCo was attempting to enforce a contractual restriction regarding sales of PepsiCo soft drink products outside of an exclusive territory. Time period: January 2010 to the present.

Ex. 1.

As PepsiCo explains below, this Court should preclude Northern from seeking testimony about geographic areas and time periods that have nothing to do with its claims. This is not a class action challenging PepsiCo's efforts to protect bottlers' territories anywhere in the United States, or asserting claims by other bottlers that they have been damaged by transshipments. Northern is the only plaintiff and its claims depend on proving PepsiCo's purported breach of an alleged duty to protect *Northern's* territory. PepsiCo has agreed to prepare a representative to testify fully on all matters related to transshipment in Northern's territory. But transshipments into other bottlers' territories and PepsiCo's efforts to stop them are not relevant and are not proper subjects for representative testimony (or any other discovery). Moreover, Northern's attempt to expand the

geographic scope of discovery in this case from Northern's territory to the entire country is plainly disproportionate to the needs of the case.

Northern's request for information dating back to 2003 is likewise both irrelevant and entirely disproportionate to the needs of this case. The violations of Northern's sales territory for which it seeks damages started in February of 2015. Before that time, Northern experienced virtually no infringement of its territory. Despite the absence of pertinent incidents before 2015, PepsiCo nevertheless agreed to extend the time period for discovery three years earlier, to 2012. There is no basis to impose on PepsiCo the additional burden of providing discovery going back an additional nine years, particularly given the irrelevance of that earlier time period to the issues in the case, and the relatively low amount in controversy.

## BACKGROUND

### I. Northern's Claims Focus Solely on Transshipments into Northern's Sales Territory.

This case is a breach of contract action between PepsiCo and Northern.[2] Northern distributes Pepsi CSD products under a series of agreements between Northern and PepsiCo called Exclusive Bottling Appointments ("EBAs"). Each of the EBAs gives Northern the exclusive right to distribute and sell a specific Pepsi CSD product within a defined geographic territory: nine North Dakota counties and three South Dakota counties. See Complaint and Demand for Jury Trial ("Compl."), Dkt. 1, ¶¶ 6-7, Ex. 1.

In February 2015, Northern filed its Complaint alleging that PepsiCo breached the EBAs by "fail[ing] and refus[ing] to take the necessary steps" to protect Northern's exclusive sales territory. Id. ¶ 12. Specifically, Northern alleges that PepsiCo has an affirmative duty to prevent "transshipment" – that is, the resale of another bottler's Pepsi products "in[] Northern's exclusive

---

[2] Northern asserts other causes of action but each one is predicated on PepsiCo's purported breach of its agreements with Northern. See Compl. ¶¶ 18, 20, 22, 27, 30, and 32.

sales territory." *See id.* ¶¶ 11-12. Northern further claims that PepsiCo breached this alleged obligation by selling certain Pepsi CSD products to distributors "with knowledge, actual or implied, that those distributors are … selling the products to Northern's customers." *Id.* ¶¶ 11-12.

PepsiCo has denied Northern's allegations, including the allegation that PepsiCo sold any Pepsi CSD products to distributors who then transshipped the products into Northern's territory.[3] PepsiCo has further answered that it promptly responded to each of Northern's transshipment complaints and compensated it for the infringements. Specifically, PepsiCo has used its own data to ascertain which bottler was the source of the transshipped product in Northern's territory, assessed fines against the source bottler, and credited those payments to Northern. *See* PepsiCo's Answer to Plaintiff's Complaint, Dkt. 12.

## II. The Transshipments at Issue in This Case Account for Less than 1% of Northern's Sales of Pepsi CSD Products.

Although the Complaint does not identify the specific infringements of Northern's exclusive sales territory that are at issue, Northern admitted in discovery that the dispute relates to transshipments of Pepsi CSD products to only four of Northern's customers by a third-party distributor, Core-Mark International, Inc. ("Core-Mark"). *See* Pl. Ans. to 1st Interrogs., attached as Ex. 2, at 4-5. Furthermore, Northern only claims that these transshipments caused approximately $440,000 in lost sales between February 2015 and March 2017. Pl. 2nd Supp. Resp. to 1st Set of RFP at 9, attached as Ex. 3; NB 0000587, attached as Ex. 4. Northern does not claim damages for any transshipment before 2015. *Id.* In fact, before 2015, Northern had almost

---

[3] PepsiCo distributes CSD products through its company-owned bottling operation, Pepsi Beverages Company ("PBC"), as well as through independent bottlers such as Northern. As discussed below, however, the evidence adduced in discovery indisputably establishes that PBC did not sell any Pepsi CSD products to distributors who transshipped the products into Northern's territory. *See infra* at 7.

no instances of transshipment in its territory. A *total* of ▮ cases of Pepsi CSD products were transshipped in Northern's territory between 2012 and 2014. *See* Van Houten Decl. at ¶ 3, attached as Ex. 5.

The transshipments that are the subject of Northern's Complaint also affected only a tiny fraction of Northern's business. At its peak in 2015, only ▮ cases were transshipped in Northern's territory; in 2016, it was ▮ cases, and through July 19 of this year it is ▮ cases. *See* Van Houten Decl., ¶ 3. In the highest year—2015—the number of cases of transshipped Pepsi CSD product in Northern's territory amounted to less than ▮% of the *over* ▮ cases that Northern sold in that year. *See* Bowers Declaration ¶¶ 2-3, attached as Ex. 6; Ex. 5 ¶ 3. And the four customers Northern temporarily lost to Core-Mark represented less than *one half of one percent* of Northern's customer base of approximately 2000 customers. Dep. Tr. of Langer Gokey at 70:18-24, attached as Ex. 7.

Moreover, three of the four customers who purchased products from Core-Mark testified that they sought out other sources of Pepsi product because of deep dissatisfaction with Northern's service and business practices. *See, e.g.*, Dep. Tr. of Tony Bernhardt at 44:9-45:23, attached as Ex. 8 ("[T]his is our store and you can't tell us what to do."); Dep. Tr. of Steve Dockter at 29:10-22, attached as Ex. 9 ("[Northern] dealt with us with a degree of arrogance … that's not a good sales tool."); Dep. Tr. of Tom Haahr at 31:17-23, attached as Ex. 10 ("I had to remind [Northern] who owned the store and that the store is ours."). Finally, as discussed further below, the evidence adduced in discovery has definitively established the falsity of Northern's allegation (Compl. ¶ 11) that PepsiCo sold any Pepsi CSD products to distributors (including Core-Mark) who transshipped the products into Northern's territory. Northern's contrary assertion in its July 16, 2017 letter to this Court (*see* Jul. 16, 2017 Ltr. at 4) is false.

### III. The Parties Have Conducted Significant Discovery Related to Transshipment in Northern's Territory.

Consistent with the transshipment claims Northern placed at issue, the Parties initially tailored their discovery to transshipments occurring in Northern's territory between 2012 and 2017. Northern issued discovery requests "relating to transshipment of PepsiCo beverage products *into Northern Bottling's territory*" and Pepsi's investigation of "*Northern Bottling's* transshipment complaints." PepsiCo's Resp. to Pl. 1st Combined Disc. Req. at 9, attached as Ex. 11 (emphases added). In response, PepsiCo agreed to provide information related to transshipment in Northern's territory from January 1, 2012 to the present. *See id.* at 2-9; Dec. 19, 2016 Email to Pl. Counsel, attached as Ex. 12.

Among other things, PepsiCo provided discovery relating to all transshipments into Northern's territory during this time period, no matter where the transshipped product was originally produced or sold. For example, PepsiCo produced information from its Pepsi Transshipment Enforcement Program ("PTEP")[4] database relating to each and every one of Northern's transshipment complaints between 2012 and 2017. *See* Northern Transshipment Origination Spreadsheet, attached as Ex. 14. The data identifies each Pepsi bottler, wherever located in the United States (including an independent bottler in Puerto Rico), that manufactured products reported as transshipped into Northern's territory. *See id.* PepsiCo also furnished documents and testimony about its efforts, using PTEP data, to investigate entities believed to be potential sources of transshipped product in Northern's territory. *See* Ex. 13 at 171:13-172:17; 221:10-222:18. In all, PepsiCo has produced thousands of pages of documents and made six

---

[4] PepsiCo uses the PTEP acronym to refer to both: (1) the program PepsiCo developed to investigate complaints of unauthorized sales in bottlers' territories, compensate the infringed bottler, and penalize the bottler whose product was sold in another territory; and (2) the database used to administer the program. *See* Dep. Tr. of Darrin Morris at 82:15-83:9; 106:7-18, attached as Ex. 13.

6

witnesses available for deposition. Those six witnesses – all current and former PepsiCo employees and executives – included the employee in charge of PepsiCo's transshipment prevention efforts between 2011 and 2016.

Furthermore, both Northern and PepsiCo have conducted significant discovery to determine how Core-Mark obtained the Pepsi CSD products that it sold to Northern's customers. That discovery categorically establishes that neither PepsiCo nor its bottling division (PBC) sold any transshipped product to Core-Mark, as Northern alleged. Nor did any customer of PepsiCo or PBC sell such product to Core-Mark. *See* Dep. Tr. of Core-Mark 30(b)(6) Rep. at 48:1-7, attached as Ex. 15. Instead, Core-Mark bought the Pepsi CSD products in the open market using a multi-level network of brokers located in Missouri, Florida, and elsewhere. *Id.* at 46:24-47:6; 51:12-52:1; *see, e.g.*, Distinct Company LLC Purchase Orders, attached as Ex. 16; Dep. Tr. of Vincent Frisone at 4:7-5:5; 6:23-7:8; 8:2-9:11, attached as Ex. 17. The circuitous path of the transshipped Pepsi product from PBC to Core-Mark looks something like this:



PepsiCo also produced materials concerning its efforts to cut-off Core-Mark's supply by placing limits on Pepsi CSD sales to customers in Florida and Wisconsin. *See* Vistar Allocation Letter, attached as Ex. 18; Master Wholesale Allocation Letter, attached as Ex. 19.

IV. **Northern Issued a Sweeping Rule 30(b)(6) Notice.**

In the aftermath of the discovery referenced above—which disproved a central allegation in the Complaint—Northern issued a sweeping Rule 30(b)(6) Notice that sought to shift the focus of discovery from transshipments into Northern's territory since 2015 (which are the subject of its claims) to Pepsi's efforts to address transshipments into the territories of other bottlers,

7

anywhere in the country, going back to 2003. Ex. 1. In particular, Topic 1 of the Notice asked for testimony about the administration of the PepsiCo Transshipment Enforcement Program in bottler territories *all over the country*, for the 14-year period from *2003 to the present*. *Id.* at 2. Topic 2 sought testimony about any actions PepsiCo has taken to try to prevent transshipment *in any bottler territory* since 2010. *Id.* Topic 8 requested information about any litigation PepsiCo initiated *in any United States jurisdiction* to enforce a contractual restriction on the resale of its products since 2010. *Id.* at 4.[5]

PepsiCo sent Northern's counsel a letter setting forth its objections to the Notice. Jun. 6, 2017 Ltr., attached as Ex. 21. PepsiCo expressed its willingness to produce a witness to testify regarding information pertinent to any transshipment of Pepsi beverage products into Northern's territory between 2012 and 2017, but objected to Northern's attempt to expand the geographic and temporal scope of discovery. *Id.* at 2-5.

The Parties had two meet and confer telephone conferences and were able to resolve their issues, except as to Notice Topics 1-2, 5-6, and 8. Northern later indicated in its counsel's email to this Court that it was no longer challenging PepsiCo's objections to Topics 5-6. Ex. 1. The Parties submitted letter briefs to the Court and then participated in a teleconference that did not resolve the dispute. *See* PepsiCo Jul. 14, 2017 Discovery Ltr. Br. Accordingly, PepsiCo now asks the Court to enter a protective order limiting the scope of Topics 1, 2, and 8, as set forth below.

---

[5] The Notice was just one part of Northern's attempt to dramatically expand both the geographic and temporal scope of this case. Plaintiff also issued sweeping document requests seeking information about transshipment nationwide since 2008, and issued a supplemental Rule 26(a)(1) disclosure identifying nearly every independent bottler in the United States as a potential witness at trial. *See* Pl. 2nd Suppl. Rule 26(a)(1)(A) Discl., attached as Ex. 20. PepsiCo will address the proper scope of Northern's requests for production in its responses to Northern's motion to compel.

## ARGUMENT

The Federal Rules impose two significant limits on discovery. First, discovery may be obtained only as to matters that are "relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). This language is intended to focus the parties and courts on limiting discovery to "the actual claims and defenses involved in the action." Fed. R. Civ. P. 26, Advisory Committee Note to 2000 amendments. Second, discovery must be "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). When deciding whether a particular request is proportional, courts should examine, among other considerations, "the amount in controversy, … the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). The Rules further provide that "the court must limit" any discovery request that "is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C)(iii).

The challenged topics of Northern's Notice violate both the relevance and proportionality requirements of the Federal Rules. Entry of a protective order limiting the scope of those topics to information that is relevant to Northern's claims is therefore appropriate. *See* Fed. R. Civ. P. 26(c)(1) (court may issue an order to protect a party or person from oppression, undue burden or undue expense by, among other things, forbidding challenged discovery or "limiting the scope of disclosure or discovery to certain matters").

**I. Nationwide Discovery of Transshipments into the Territories of Other Bottlers Is Not Relevant to Northern's Claims.**

Courts have uniformly refused requests for nationwide discovery when the allegations concern one specific territory. For example, in *Monohon v. BNSF Ry. Co.*, -- F. Supp. 3d --, NO. 4:14-cv-00305-JAJ-SBJ, 2015 WL 12856122, (S.D. Iowa Oct. 9, 2015), the court denied plaintiff's request for "unfettered, company-wide discovery during the Rule 30(b)(6) deposition"

9

where the plaintiff's allegations only concerned the company's Nebraska division. *Id.* at *7-9. The court concluded that company-wide information was not relevant to the plaintiff's claims and that "preparing representatives to testify as to the subject matters in the Notice across all divisions [and] locations … company-wide will subject [defendant] to undue burden and expense which outweighs any likely benefit." *Id.* at *9.

Likewise, in *Heller v. HRB Tax Grp., Inc.*, 287 F.R.D. 483 (E.D. Mo. 2012), the court granted a motion for protective order limiting the scope of a Rule 30(b)(6) deposition to the defendant's one office in Missouri because the complaint "show[ed] no factual allegations to substantiate [p]laintiff's claims to be national in scope and to justify nationwide discovery." *Id.* at 486. Other courts have imposed similar geographic limitations on discovery where the allegations related to just one part of the country. *See Hightower v. Grp. 1 Automotive, Inc.*, No. 15-1284, 2016 WL 3511720, at *2 (E.D. La. Apr. 27, 2016) (denying motion to compel production of documents related to company's practices in offices across the Eastern United States on relevance and burden grounds because "[t]he focus and needs of the case d[id] not include all of defendant's 36 to 44 locations outside of the New Orleans market") (emphasis original); *Krantz v. State Farm Fire & Cas. Co.*, No. 15-56-JJB-RLB, 2016 WL 320148, at *4 (M.D. La. Jan. 25, 2016) (limiting Rule 30(b)(6) notice topics to Louisiana claims only where plaintiff's claim originated in Louisiana).

Applying this reasoning to the circumstances of this case, the proper geographic focus for the Notice is Northern's territory. All of Northern's claims stem from PepsiCo's alleged breach of a purported duty to prevent transshipments into Northern's territory, not the territories of other bottlers. Compl. ¶¶ 6-7, 11-12. Indeed, as it must, Northern only asserts damages stemming from sales to customers in its territory. Ex. 3 at 9; Ex. 4. Whether or not this case is "of interest" to 84 other independent bottlers in the Pepsi system—as Plaintiff's counsel suggested in a moment of

candor during the teleconference with this Court—does not matter. Northern is the only plaintiff in this lawsuit. Information concerning transshipment in other bottlers' territories has no bearing on Northern's claims.

In its July 16, 2017 letter to the Court, Northern sought to justify its attempt to expand the geographic scope of discovery in this case from Northern's territory to the entire country by asserting that "hundreds of thousands of customers purchase PepsiCo CSD products without a contract, and highly organized and systematic transshipments – *truckloads* of product placed into commerce at cheap prices by PBC – allow third-party distributors to regularly supply customer chains in the exclusive territories of independent bottlers such as Northern."  Northern's attempt to create a specter of rampant transshipment into its territory is nothing but a red herring because the uncontroverted record evidence establishes that *ninety percent* of transshipping of Pepsi product occurs in the Northeastern U.S., primarily in New York and New Jersey areas.  *See* Ex. 13 at 91:4-17; Tr. of Dep. Tr. of Tim Trant at 181:14-19, attached as Ex. 22.  The volume of transshipping in the Northeast is attributable to a combination of factors particular to that region. Ex. 22 at 182:23-183:25. That transshipping – and PepsiCo's efforts to combat it – simply has nothing to do with Northern's claims.

Furthermore, the uncontroverted evidence in this case is that very little transshipping has historically occurred in Northern's territory. *See supra* at 5. During the three-year period before the transshipment that gave rise to Northern's claim (*i.e.*, 2012 through 2014), Northern complained about a *total* of only ▇ cases of Pepsi CSDs transshipped in its territory.  Even at its peak in 2015, the number of cases transshipped into Northern's territory was less than ▇% of Northern's sales of Pepsi CSD products. *See* Bowers Declaration ¶¶ 2-3.  Nor are there "hundreds of thousands" of customers transshipping Pepsi CSD product into Northern's territory.  In this case, Northern has focused its complaints on transshipments by *one* distributor—Core-Mark—

which obtained Pepsi CSD products in the open market and then sold these Pepsi products to *four* of Northern's customers.[6]

In short, the transshipping that occurs in territories other than Northern's, regardless of its volume, is simply beside the point. Given its lack of relevance to the claims in this case, requiring PepsiCo to collect information and prepare witnesses to testify about transshipment incidents across the country would go well beyond the appropriate scope of discovery under the Rules. PepsiCo should not be required to produce a corporate representative to testify about transshipment in any bottler territory other than Northern's.

**II.     Nationwide Discovery of Transshipments into the Territories of Other Bottlers Is Not Proportional to the Needs of the Case.**

Because transshipments in other bottler territories are not relevant to Northern's claims, the requested Rule 30(b)(6) testimony is plainly not "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Discovery of geographic areas unrelated to plaintiff's claims does not satisfy the proportionality requirement. *See Hightower*, 2016 WL 3511720, at *2 (holding that responses limited to one market were "proportional to the needs of this case" because "the burden of responding to Requests for Production … outside of the New Orleans market outweighs the likely benefit"); *Krantz*, 2016 WL 320148, at *4 (limiting Rule 30(b)(6) deposition to claims in Louisiana only where limitation was "proportional to the needs of the case"). This is especially true here where the burden of educating a witness about transshipment in all bottler territories in the United States since 2010 (or 2003) would be substantial. To accomplish this task, PepsiCo would need to (1) search for documents and evidence related to transshipments in every bottler territory; (2) review the documents for responsiveness and privilege; (3) supply the appropriate

---

[6] Core-Mark's corporate representative confirmed that the company obtained Pepsi CSD products for resale in Northern's territory from third party middlemen. *See supra* at 7.

documentation to a representative witness; and (4) allow the witness an appropriate amount of time to review the voluminous information and competently testify regarding the circumstances of any such transshipments. Such an effort would take weeks of work to complete. The Court should not order PepsiCo to perform this work just so Northern can obtain information of no consequence to its claims.

### III. Discovery Dating Back Before January 1, 2012 Is Likewise Irrelevant and Disproportionate to the Needs of the Case.

Northern's attempt to extend the discovery period to before 2012 – indeed, to extend it by an additional nine years to 2003 in Topic 1 – also seeks information that is irrelevant to Northern's claims, and would impose a disproportionate burden on PepsiCo. Each factor courts use to assess whether a party must shoulder the burden of additional discovery weighs against extending the time period for discovery any further.

#### A. Pre-2012 discovery would yield little or no information that would be pertinent to Northern's claims.

Northern has no need for information before January 2012 because, as Northern itself has stated, it cannot point to transshipment of any consequence into its territory before 2015. *See* July 16, 2017 Letter at 3 ("Northern kept its customers from purchasing" transshipped Pepsi product "for several years" after 2010). The only incidents of transshipment at issue began in February 2015, the first time Northern experienced any significant infringement of its territory. Ex. 3 at 9; Ex. 4. During the three years leading up to 2015 – 2012 through 2014 – Northern complained about a total of only ▆ cases of transshipped product in its territory.[7]

---

[7] Specifically, there were ▆ transshipped cases of Pepsi CSD products in 2012 (▆% of Northern's total case sales for that year), ▆ cases in 2013 (▆% of Northern's total case sales), and ▆ cases in 2014 (▆% of Northern's total case sales). Ex. 5 ¶ 3; Ex. 6 ¶ 3.

13

Further, information about transshipment before 2012 would be of little help to Northern in proving its claims. Northern only faults PepsiCo for transshipments beginning in 2015. Ex. 3; Ex. 4. Evidence of miniscule transshipments five years before the incidents at issue have no bearing on PepsiCo's alleged liability for Northern's alleged damages.

Requiring Pepsi to prepare and produce witnesses to testify about Pepsi's efforts to combat transshipment even in Northern's territory, much less throughout the country, before 2012 would impose additional expense on PepsiCo while providing Northern with no meaningful additional information relating to its claims.

**B.     The amount in controversy favors maintaining the current temporal scope.**

As the Court noted during the discovery teleconference, the dollar amount at issue in this case supports keeping the temporal lines where the Parties originally drew them. Northern's claim of lost sales to its four customers (assuming that this is the proper measure of damages) totals a few hundred thousand dollars. *See* Ex. 4. Further, the transshipment incidents at issue comprise just a tiny fraction of Northern's overall business. *See supra* at 5. PepsiCo should not be required to bear the additional burden and expense of preparing and presenting a Rule 30(b)(6) witness to discuss irrelevant matters in a case with relatively low financial stakes. *See Snyder v. Fred Meyer Stores, Inc.*, No. C12-1397JLR, 2013 WL 3089405, at *4-6 (W.D. Wash. Jun. 18, 2013) (limiting request for deposition testimony to three years before incident at issue where "[t]here [wa]s relatively little at stake in this case compared to the average case" and the "[p]laintiff is requesting a substantial amount of discovery in light of this relatively small amount in controversy").

## **CONCLUSION**

For the foregoing reasons, PepsiCo respectfully requests that the Court grant its Motion for Protective Order and limit the scope of Plaintiff's Rule 30(b)(6) Notice Topics 1, 2, and 8 to those subjects relating to transshipment in Northern's territory between 2012 and the present.

Dated: July 28, 2017    /s/ *Thomas B. Quinn*
Patrick J. Ward
John E. Ward
ZUGER KIRMIS & SMITH
316 North 5th Street
P.O. Box 1695
Bismarck, ND 58502-1695

Thomas B. Quinn (*pro hac vice*)
Sondra A. Hemeryck (*pro hac vice*)
Kevin Reidy (*pro hac vice*)
Riley Safer Holmes & Cancila LLP Three First National Plaza
70 West Madison Street, Suite 2900
Chicago, IL 60602
*Attorneys for Defendant PepsiCo, Inc.*

**CERTIFICATE OF SERVICE**

    I hereby certify that on July 28, 2017, the following document:

MEMORANDUM IN SUPPORT OF PEPSICO, INC.'S MOTION FOR PROTECTIVE ORDER REGARDING PLAINTIFF'S RULE 30(b)(6) DEPOSITION NOTICE

was filed via CM/ECF which automatically generated notice of this filing to the following counsel of record:

| | |
|---|---|
| James Ragain<br>Ragain & Cook, PC<br>3936 Avenue B, Suite A-2<br>Billings, MT 59102<br>(406) 651-8888<br>jim@ragaincook.com | Michelle M. Sullivan<br>Sullivan Miller Law PLLC<br>3860 Avenue B, Suite C East<br>Billings, MT 59102<br>(406) 403-7066<br>michelle.sullivan@sullivanmiller.com |

Rodney Pagel
Pagel Weikum, PLLP
1715 Burnt Boat Dr., Madison Ste
Bismarck, ND  58503
(701) 250-1369
rpagel@pagelweikum.com

Patrick J. Ward
John E. Ward
ZUGER KIRMIS & SMITH
316 North 5th Street
P.O. Box 1695
Bismarck, ND 58502-1695
(701) 223-2711
(Telephone)
pward@zkslaw.com
jward@zkslaw.com

Dated this 28th day of July, 2017.

                                                     */s/ Thomas B. Quinn*
                                                   Thomas B. Quinn (*pro hac vice*)
                                                   Riley Safer Holmes & Cancila LLP
                                                   Three First National Plaza
                                                   70 West Madison Street, Suite 2900
                                                   Chicago, IL 60602
                                                   Tel: 312-471-8700