## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| Northern Bottling Co., Inc., | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER RE MOTIONS TO COMPEL** |
| | ) | **AND FOR A PROTECTIVE ORDER** |
| vs. | ) | |
| | ) | |
| PepsiCo, Inc. | ) | Case No.: 4:15-cv-133 |
| | ) | |
| Defendant, | ) | |

Before the court are two motions that address objections made by defendant PepsiCo, Inc. ("PepsiCo") to certain discovery sought by plaintiff Northern Bottling Co., Inc. ("Northern"). One is Northern's Motion to Compel in which it seeks an order requiring PepsiCo to produce documents it has objected to producing. The other is PepsiCo's Motion for a Protective Order seeking to limit the scope of a Rule 30(b)(6) deposition of PepsiCo noticed by Northern.

## I.     BACKGROUND

PepsiCo has objected to certain discovery sought by Northern on various grounds including overbreadth, lack of relevancy, lack of proportionality, and undue burden. Given these objections, some discussion of the contentions of the parties as well as what the discovery has disclosed so far is necessary.

### A.     The parties

PepsiCo is a long-time leading seller of beverage products herein referred to as PepsiCo branded beverages or products. This includes trademark-protected carbonated soft drinks ("CSDs"), *e.g,* Pepsi, Mountain Dew, and their various iterations.

Northern is one of PepsiCo's dwindling number of independent bottlers. In 1955, PepsiCo

granted Northern an "Exclusive Bottling Appointment" ("EBA") pursuant to which Northern acquired exclusive rights to sell "Pepsi" and "Pepsi-Cola" in a territory compromised of all or parts of nine counties located in north-central North Dakota. The largest city within this nine county area is Minot, North Dakota, where Northern's headquarters is located. In 1972, Northern acquired exclusive rights to an additional three counties in South Dakota.[1]

### B.     The problem of transshipping and PepsiCo's creation of the PTEP

Initially, almost all of the bottling and distribution of PepsiCo branded products was done by independent bottlers, like Northern, who were granted exclusive sales territories. PepsiCo officials have acknowledged in the past the critical role independent bottlers played in the company growing to what it has become today.

There has always been a problem to some degree of product distributed by one bottler finding its way into and being sold in the exclusive territory of another bottler, resulting in that bottler losing the sale. The taking of product produced for sale in one bottler's territory and transporting it for sale in another bottler's territory is referred to in the beverage industry as "transshipment."

One of the things that PepsiCo did in 1984 to address the problems of transshipment was to establish the Pepsi Transshipment Enforcement Program ("PTEP"). Under the PTEP, any bottler who finds another bottler's product in its territory can report the "offense" to PepsiCo by submitting a formal complaint. PepsiCo then hires investigators to verify the existence and quantity of the transshipped product, if any. If transshipped product is discovered, PepsiCo levies a fine and

---

[1] The EBA granted in 1955 makes specific reference to "Pepsi" and "Pepsi-Cola." The present record is unclear as to what exclusive territorial rights were granted to Northern, if any, for other PepsiCo branded CSDs such as Diet Pepsi and Mountain Dew or non-carbonated beverages such as Gatorade. It may be that there are other EBAs that have not yet been made a part of the record.

assesses the costs of the investigation against the originating bottler, even if the product it originated was transshipped without its knowledge. In other words, the "liability" of the originating bottler is strict. For example, an originating bottler sells PepsiCo branded product to Party A within the originating bottler's exclusive territory, Party A resells the product to Party B still within the originating bottler's exclusive territory, and Party B transships the product for sale to someone within the territory of another bottler. Under the PTEP, the originating bottler is liable for both a fine and the costs of the investigation even if it was unaware of Party B's conduct.

As recounted elsewhere, in the later part of the 1980's and the 1990's, a combination of (1) changes in the market place, including the emergence of large national retailers (*e.g.*, Walmart, Target, and club stores like Sam's Club and Costco) wanting national sales agreements, and (2) PepsiCo embarking upon a program to begin amassing control of the bottling and distribution network for its beverages, including obtaining control (directly or indirectly) of a number of independent bottlers, led to increased complaints by the remaining independent bottlers and in some cases litigation. See, e.g., Pepsi-Cola Bottling Co. of Pittsburgh, Inc. v. PepsiCo, Inc., 431 F.3d 1241, 1248-52 (10th Cir. 2005) ("Pepsi-Cola Bottling Co. of Pittsburgh"); Mahaska Bottling Co. v. PepsiCo, Inc., __ F. Supp. 3d __, 2017 WL 4128563, at **2-3 (S.D. Iowa Sept. 15, 2017) ("Mahaska Bottling Co."). One of the complaints was that PepsiCo was not doing enough to protect the independent bottlers from transshipping and one of the purported reasons for its lack of diligence was that it was financially benefitting from the transshipment with its ever increasing control of the bottling and distribution of its products even if these bottling operations had to pay some fines after-the-fact under the PTEP. See Pepsi-Cola Bottling Co. of Pittsburgh, Inc., 431 F.3d at 1252-65.

In 2010, PepsiCo made additional acquisitions of bottling operations that resulted in: (1) a

substantial increase in PepsiCo's market share of beverage sales through company-owned bottling and distribution operations to almost 80%, leaving only about 20% of the market to a shrinking number of independent bottlers; and (2) the creation of a new wholly-owed subsidiary of PepsiCo, *i.e.*, Pepsi Beverages Company ("PBC"), to own and operate all of its company-acquired bottling and distribution operations. As discussed in more detail in a moment, Northern contends this has made the problems of transshipment worse for it and other independent bottlers.

The PTEP as established in 1984 still exists. However, there has been a significant change resulting from PepsiCo's acquisition of upwards of 80% of the distribution market. This is the fact that PBC does not fine itself (nor would it make any sense for it to do so) for product that is transshipped from a geographic area served by one of its company-owned bottling operations to a geographic area served by another of its company-owned bottling operations. The only time that PBC is fined and pays investigation costs is when the product is transshipped and sold in the territory of an independent bottler. The net result is that, for product entering into what at one time were exclusive territories of independent bottlers but are now company-owned operations, there is a significantly less chance of that product being the subject of fines if its leaks out of the intended distribution channels. In other words, there is no financial penalty if that product sloshes around the country in "grey markets" providing a source for transshipped product, except in the odd chance it finds its way into and is sold in the exclusive territory of one of the dwindling number of independent bottlers - and only then if the independent bottler is vigilant enough to catch it.

C.     **The contentions of parties in this case**

Northern contends that problems of transshipment for independent bottlers worsened after PepsiCo acquired ownership of almost 80% of the distribution of its products in 2010. Northern

claims that, with these acquisitions, (1) PepsiCo has even less incentive to curb transshipment into territories of independent bottlers, since most of the offending transhipped product now comes from its company-owned PBC bottling and distributing operations for which it gets the revenue generated by sales of product leaching into the territories of the independent bottlers instead of that revenue going to them, and (2) the PepsiCo controlled PTEP is no longer effective in combating transhipment.  Northern claims these changes, coupled with PepsiCo not taking reasonable steps to address transshipment, created an environment in which certain wholesalers of food, beverages, and other products to convenience and gas stores (C&G's) located in Northern's territory were able to offer transhipped PepsiCo branded beverages to its C&G customers and that, beginning in early 2015, resulted in it losing several of its C&G customers to one or more of these wholesalers.

Northern claims that PepsiCo has a contractual obligation to protect it from unauthorized sales of transhipped PepsiCo branded product within its territory -  if not absolutely, then by taking reasonable steps to prevent encroachment upon its territory of offending product.  In support, Northern cites to <u>Pepsi-Cola Bottling Co. of Pittsburgh</u>, <u>supra</u>, wherein the Tenth Circuit held with respect to PepsiCo's obligations to an independent headquartered in Pittsburgh, Kansas:

> We conclude - based on the EBA's text, the parties' subsequent actions, and the implied covenant of good faith and fair dealing - that PepsiCo had a duty to take reasonable steps to prevent competing bottlers from encroaching upon Pittsburgh Pepsi's exclusive territory.

431 F.3d at 1259.  In reaching this conclusion, the Tenth Circuit held that the Kansas bottler's breach of contract claims were governed by New York's version of the UCC, including its implied covenant of good faith and fair dealing.  Northern contends in this case that its EBA is virtually identical to that of the Kansas bottler's in <u>Pepsi-Cola Bottling of Pittsburgh</u>, including the same choice-of-law provision which states that New York law applies.

 PepsiCo disputes Northern's allegations, claiming it takes the problems of transshipment

seriously and vigorously pursues and addresses through the PTEP any claims of transshipment that are reported. At the same time, however, PepsiCo does not agree with the Tenth Circuit's decision or its applicability to this case. PepsiCo contends it has no obligation, contractual or otherwise, to prevent transshipment that is done by others and that the PTEP is a voluntary accommodation that it makes to the independent bottlers - not an acknowledgment of any responsibility for third-party transshipment that may be occurring. PepsiCo further contends that Northern's lost sales were principally the result of Northern (1) employing sales tactics that were too aggressive and that upset its customers, and/or (2) charging prices that were too high (thereby creating a situation where transshipment becomes profitable)[2] and not the result of any inadequacy of PepsiCo's efforts to reasonably deal with transshipment, even assuming it has such an obligation. PepsiCo further contends that the amount of product transshipped into Northern's territory was de minimus prior to 2015 when Northern started losing sales to a wholesaler, which, according to PepsiCo, was due to Northern's own conduct. For all of these reasons, PepsiCo contends this case is a lot to do about nothing and, relevant now, does not warrant all of the discovery that Northern is seeking.

### D. Northern's claims of lost sales resulting from transshipping

Most of the damages that Northern is seeking in this case flow from three different

---

[2] In several of the depositions taken in this case, counsel for PepsiCo suggests one of the reasons for Northern's loss of sales was that it was being piggish, *i.e.*, if Northern had charged less, there likely would not have been a problem because at lesser prices any margin for transshippers and their customers attempting to compete at those prices would have been eaten up by the costs of the additional handling and transportation required to get the product to Northern's territory. While there is obvious logic to the point that lower prices would provide less incentive for transshipment, it is not clear why PepsiCo wants to go down this road. This is because the same logic calls into play the price at which PBC was placing product into the chains of distribution since that is the other side of the coin in terms of whether there is sufficient margin to make transshipment profitable for the product that originated from PBC, which was most of it. And, if price is a substantial factor (and it may very well be the biggest), then there may be a question of whether PepsiCo is required to take this into account and not price its product at price points that facilitate transshipment into the territories of its independent bottlers.

In this case, one of the C&G customers that ceased doing business with Northern had C&G outlets in both Northern's territory and the adjoining territory of a company-owned PBC bottling operation.

cooperatives (each owning multiple C&G outlets) who terminated their relationship with Northern. When they terminated their relationship, each of the three cooperatives (Enerbase, Envision, and Farmers Union of Devils Lake) turned to Core-Mark for their supply of PepsiCo branded product. Core-Mark is a national wholesaler of products sold by convenience stores, including tobacco products, beverages, and grocery and snack items. When the switch was made by each of the cooperatives, Core-Mark was their primary supplier for other products sold in their convenience stores.

The PepsiCo branded product that Core-Mark started supplying the cooperatives was all transshipped product. While the price that Core-Mark was charging was less than Northern's, there is evidence from which a factfinder could conclude that the three cooperatives switched to Core-Mark primarily (if not exclusively) because they were dissatisfied with Northern for reasons other than its higher prices. The managers for each of the cooperatives have been deposed and they all have testified they were upset with what they perceived to be Northern's overly aggressive sales tactics. The tactics they considered to be objectionable included Northern's requirement that the cooperatives devote a higher percentage of shelf space to PepsiCo branded products than they were devoting to Coke and other competitive offerings before they could take advantage of Northern's rebates. The cooperatives believed the rebates should be based on volume - not on their making more shelf space available than to PepsiCo's competitors, which they considered to be unfair and unduly intrusive of how they wanted to allocate their shelf space. Also, there is evidence of other issues with respect to one or more of the cooperatives, including dissatisfaction over service, pricing for particular stores, and the manner in which Northern was handling its promotions.

On the other hand, there is also evidence from which a factfinder might conclude that the

three cooperatives would not have left Northern if transshipped PepsiCo branded product had not been readily available from Core-Mark, as well as other competing wholesalers, and that they would have come to some accommodation with Northern despite their differences. This is because, in the absence of another supplier of PepsiCo branded product, the only other alternative for the cooperatives would have to become Coke-only shops for CSD bottle sales and there is evidence which suggests that the cooperatives may not have been willing to go that far and lose sales to customers who preferred PepsiCo product - particularly Mountain Dew, which was by far their largest selling CSD among all of the PepsiCo and Coke offerings.[3]

Of the three cooperatives who switched to Core-Mark, two have returned to Northern as their source of supply for most of the PepsiCo branded products, albeit on a probationary status and with more limited shelf space, at least initially. The reasons articulated by one or both of the cooperatives for why they returned included a willingness on the part of Northern to change it sales policies,[4]

---

[3] Notwithstanding this evidence, it does appear that Northern's own conduct creates substantial proximate cause issues for both its contract and tort claims. Also, in Pepsi-Cola Bottling Co. of Pittsburgh, the Tenth Circuit concluded that, while New York law applied to the breach-of-contract claims of the Kansas bottler due to a choice-of-law clause in the EBA, Kansas law applied to the tort claims brought by the bottler that are similar to those brought in this case by Northern. 431 F.3d at 1255. Under North Dakota tort law, Northern's acts or failures to act not only go to the issue of proximate cause but also are likely the subject of comparing fault. This is because fault under North Dakota law is expansively defined such that all fault is compared, regardless of whether it is negligent or intentional. Also, under North Dakota law, Northern is foreclosed from any recovery if its fault is 50% or more of all fault that is the proximate cause of the claimed damages. See, e.g., Redford v. Willbros Group, Inc., No. 4:13–cv–014, 2014 WL 3547393, at *12 (D.N.D. July 17, 2014) (citing North Dakota cases).

If one of the objectives here is to make new law with respect to PepsiCo's obligations to its independent bottlers, this may not be the best case for either party and both may want to consider whether there is a business solution to the current dispute.

[4] Arguably, this reason lends further support to PepsiCo's claim that the lost sales to these cooperatives was not because of the availability of product from other sources at cheaper prices but rather Northern's sales tactics. Also evidence of this point is the fact that none of the three cooperatives switched to Core-Mark for supply of their Coke offerings despite Core-Mark also having this product available and its pricing being lower than that of the Coke distributor. But complicating the latter is the evidence which suggests that the cooperatives were unlikely to switch away from both Northern and the competing Coke bottler because Core-Mark did not have product to support the cooperatives' fountain sales, so they needed to maintain a relationship with either Northern or the competing Coke distributor in order to make fountain sales.

concerns about Core-Mark's reliability as a supplier, and a preference to deal more locally with Northern. Also, another consideration for one of the cooperatives was the fact that Northern bought fuel for its trucks from the cooperative.

Northern's claim for damages in this case is limited to the sales it lost to the three cooperatives along with a loss of sales for approximately five months to one other standalone convenience store. The first instance of lost sales was in about February 2015 when the first of the three cooperatives terminated its relationship with Northern. PepsiCo points to (1) this fact, (2) its contention that the loss of sales was due to Northern's own conduct, (3) its contention that the total volume of lost sales is a small percentage of Northern's total sales, and (4) evidence which suggests that, prior to February 2015, Northern's problems with transshipment appear to have been de minimus as supporting it argument that this case is much to do about nothing in terms the allegations being made against it and unworthy of the expansive discovery being sought.

The total loss of sales claimed by Northern as of March 31, 2017, is $439, 936. This is after a setoff for fine recovery under the PTEP of $110,395. Northern contends that its losses are continuing. At least as to the time of the filing of the present motions, one of the cooperatives (Enerbase) had not returned as a customer. Although Enerbase too had concerns about Core-Mark as a supplier, it was contemplating switching to Henry's Foods (another wholesaler like Core-Mark) for its supply of PepsiCo branded CSDs. Also, apart from Enerbase, Northern lost the sale of fountain products in several of the convenience stores of the two returning customers that had sold PepsiCo branded fountain product but switched to Coke when the cooperatives stopped doing business with Northern and those stores have not switched back in terms of their fountain offerings.

In addition to seeking general damages, Northern states it will be pursuing punitive damages

as well as injunctive relief.  Northern's complaint also asks for attorney's fees and costs.

**E.      Evidence of the availability of transshipped product from Core-Mark and other wholesalers**

While Core-Mark did not begin selling to the three cooperatives who terminated their relationship with Northern until early 2015 when the first cooperative left Northern, there is evidence that Core-Mark was offering to sell PepsiCo branded products in Northern's territory at least as far back as 2012 and that one or more of the cooperatives were aware of that.  Also, there is evidence that Core-Mark was not the only wholesaler who was willing to sell transshipped PepsiCo product.  There is evidence that at least two other wholesalers had PepsiCo branded product available for sale in Northern's territory, specifically Henry's Foods and AMCON Distributing.

**F.      Evidence as to the origin of the transshipped products**

The evidence indicates that the Pepsico branded product transshipped into Northern's territory from 2012[5] through March 2017 originated from over 25 different bottling operations, including bottling operations located in New York, New Jersey, Pennsylvania, Maryland, Ohio, Illinois, Florida, Texas, Wisconsin, Utah, and even Puerto Rico.  The evidence also indicates that most of the transshipped product originated from PBC company-owned bottling operations as opposed to independent bottlers.  That being said, there is no credible evidence that the court has seen in the record which indicates that PBC itself transshipped product into Northern's territory.  Rather, it appears the product originating from PBC bottlers was transshipped after it was resold one

---

[5]  While Northern is claiming damages only for lost sales beginning in February 2015, it had uncovered and reported to PepsiCo instances of transshipment that had occurred earlier.  The data before the court goes back only to 2012 and, as to the uncovered and reported instances of transshipment between 2012 and the beginning of 2015, the quantities do appear to be de minimus.

or more times following its initial distribution in an authorized channel.

### G.    Northern's use of the PTEP

Northern was able to recover from the PTEP $137,828 in fines during the period from 2012 to the beginning of April 2017. Northern contends that its PTEP recoveries do not include compensation for lost sales for transshipments it did not initially discover or that were between complaints. Also, the employment of the PTEP requires an expenditure of substantial resources on Northern's part to ferret out the transshipment, since PepsiCo only initiates an investigation upon complaint. In fact, to recover the above amount of transshipment fines, it appears Northern had to make 34 separate formal complaints. Further, Northern has to be assured of its ability to prove that some transshipment occurred to avoid incurring the costs of PepsiCo's investigation.

## II.    MOTION TO COMPEL

### A.    Request for Production No. 12

REQUEST FOR PRODUCTION NO. 12: For the subject time period, please produce documents or ESI sufficient to show all disciplinary actions taken against any employees of PepsiCo where the discipline resulted from the employee's violation of any policy or procedure designed to deter transshipping.

RESPONSE: Pepsi objects to Request No. 12 on the grounds that requesting all Pepsi's disciplinary actions taken against any PepsiCo employee related to any violation of policies and procedures designed to deter transshipping without any geographical limitation and over a multiyear period is overbroad, seeks information that is not relevant to the claims or defenses in this case, and is not proportional to the needs of the case. Subject to and without waiving these objections, Pepsi searched for documents or ESI related to any disciplinary actions taken against PepsiCo employees related to the employee's violation of any policy or procedure designed to deter transshipping in connection with transshipments into Northern Bottling's territory for the years 2012-2017 and has not identified or located any such documents.

COURT RULING:  PepsiCo argues that this request is overbroad in that seeks information related to discipline that may have been imposed for transshipment outside of Northern's territory, which it contend is irrelevant to this action.  The court disagrees.  First, imposing discipline on

employees who violate company policies or procedures against transshipment is arguably one of a number of actions that reasonably could be taken to address the problem of transshipment. Second, it is beyond dispute that most of the PepsiCo branded product transshipped into Northern's territory came from PBC company-owned bottling operations. And, while some PBC employees are responsible only for product from PBC bottling operations for which there is no evidence (at least so far) of being the originating bottling operation for product transshipped into Northern's territory, that is not true for upper management who have responsibility for either all of PBC's bottling operations or for multiple PBC bottling operations located in a region. Certainly, for these individuals, whether any of these persons have ever had any discipline imposed against them is relevant. Third, even for employees who are only responsible for product produced by bottling operations for which there is no evidence so far that product has been transshipped into Northern's territory, the fact that discipline has been imposed on other employees may have a deterrent effect on those employees. Finally, as discussed later, company-owned PBC bottling operations for which there is no evidence so far being a source of product that was transshipped into Northern's territory may be a source of transshipped product that created (and still creates today) a reliable source of supply for those relying upon transshipped product to make sales to their customers (such as Core-Mark, Henry's Foods, and AMCON) and that allows the sale of contraband product to flourish. Consequently, the court will not limit the scope of discovery with respect to this request simply to those bottling operations for which it has been demonstrated that product they have produced has been transshipped into Northern's territory.[6]

---

[6] In its briefing, PepsiCo cites to a number of cases where courts have held that nation-wide discovery was not warranted on grounds of lack relevancy or lack of proportionality. The court has reviewed the cases and concludes that they are not on point with respect to the differing circumstances of this case. This holds true for the other discovery requests at issue.

PepsiCo also contends that the requested discovery is unduly burdensome because it would be required to examine the personnel files of thousands of employees. The court views this contention as somewhat of a "red herring." First, the court is not convinced that PepsiCo actually searched the personnel files for PBC executives and its lower level employees responsible for the production of product that was transshipped from numerous PBC bottling operations into Northern's territory when it made the limited response to the document request that it made. Second, while the court agrees that searching individual personnel files for thousands of employees in a hunt for any disciplinary action that may have been taken would be unduly burdensome, the court does not agree that this should insulate PepsiCo from having to make any effort to respond.

If curbing transshipping is as big a priority for PepsiCo as it claims and if it considered imposing discipline upon employees as one means of curbing transshipping, one would think that somewhere within PepsiCo (including PBC) it would keep track of discipline imposed upon PBC employees for violating policies against transshipping separate from what might be contained in the personnel files for individual employees. And, if so, at least those files should be examined and responsive documents produced.[7]

The court also believes that it would not be unduly burdensome to query present PBC management down to the level of the managers and assistant managers of individual bottling operations for: (1) their recollection of any discipline having been imposed upon a PBC employee for violating company policies against transshipment, which then can lead to an examination of the personnel file for that employee; and (2) inspecting any file that collects that information at the bottling operation level and then, if there are any responsive documents, produce them.

---

[7] Whether PepsiCo (including PBC ) bothers to track this type of information and keep it in a central location is fair game for Northern's Rule (30)(b)(6) deposition of PepsiCo.

Finally, PepsiCo objects to the timeframe encompassed by this discovery request. The court agrees that the timeframe specified in this document request is overbroad. The court limits PepsiCo's obligation to produce responsive documents to the period from 2012 through 2017 but, since so limited, Pepsico will not be permitted to offer evidence of any discipline imposed on Pepsico employees outside of this timeframe.

## B.     Request for Production No. 13

REQUEST FOR PRODUCTION NO. 13: For the subject time period, please produce all documents or ESI that refer or relate to a loss or decrease in compensation or bonus for any PepsiCo employee where the compensation or bonus decrease was due to the violation of a policy or procedure designed to deter transshipping.

RESPONSE: Pepsi objects to Request No. 13 on the grounds that requesting all of Pepsi's reductions in compensation or bonus due to any violation of a policy or procedure designed to deter transshipping without any geographical limitation and over a multi-year period is overbroad, seeks information that is not relevant to the claims or defenses in this case, and is not proportional to the needs of the case. Subject to and without waiving these objections, Pepsi searched for documents or ESI related to a loss or decrease in compensation or bonus related to a PBC employee's violation of PBC's Transshipment Policy for Employees in connection with transshipments into Northern Bottling's territory for the years 2012-2017 and has not identified or located any such documents.

COURT RULING: Reducing compensation, including bonuses, of employees who violate PepsiCo's policies and procedures against transshipment is a form of discipline, which, as already indicated, is arguably one of any number of things that reasonably could be done to address the problems of transshipment by PBC. To this extent, this request is duplicative of Request No. 12 and the court expects that any documents reflecting any direct reduction in compensation or bonus because of a violation of company policies against transshipment will be covered by the response to Request No. 12.

That being said, Document Request No. 13 is broader than Request No. 12 to the extent it seeks information about those instances when compensation and bonuses are indirectly affected by PTEP fines imposed upon PBC because the fines impact the numbers used in calculating

14

compensation and bonuses. An example is where a PBC employee enjoys the benefit of additional compensation based on either the overall profitability of PBC or the profitability of one of its cost centers and the PTEP fines impact that profitability. The problem this creates in terms of discovery is the volume of information that could come into play. Consequently, with respect to information that falls within this category, the court will limit what must be produced to any documents that (1) state that the imposition of transshipment fines upon PBC or one of its bottling operations upon compensation or bonuses is a strategy that is being or has been employed to combat transshipment, (2) describe the details of that strategy, including what levels of employees are included or otherwise affected, or (3) describe or otherwise summarize the results of the imposition of any such strategy. Further, the time period for the response will be for the years 2012-2017.

In so limiting the response and not requiring PepsiCo to turn over detailed information with respect to any particular employee whose pay or bonus may be indirectly affected by transshipment fines imposed by PBC, PepsiCo shall be prohibited from offering at trial any evidence with respect to impacts on pay or bonuses by transshipment fines imposed upon PBC unless it has first produced documents sufficient for Northern to be able to fairly calculate the magnitude of any impact on pay or bonuses. In other words, it would be unfair for PepsiCo to offer evidence of any employee from Ms. Nooyi on down having had his or her compensation affected by transshipment fines without affording Northern discovery with respect to whose compensation and bonuses are or have been so affected and sufficient detail to be able to calculate the amount of the pain to insure it is not simply de minimus and mere arm-waving on the part of PepsiCo.

Finally, given the limited time period that PepsiCo contends is relevant, "what is sauce for the goose is sauce for the gander." It will not be permitted to offer evidence of any increases or decreases of compensation or bonuses prior to 2012.

## C.    Request for Production No. 14

REQUEST FOR PRODUCTION NO. 14: For the subject time period, please produce documents or ESI sufficient to show the amount of annual transshipping fines charged to PBC owned bottlers compared to annual transshipping fines charged to independent bottlers.

RESPONSE: Pepsi Objects to Request No. 14 on the grounds that the annual transshipping fines charged to PBC owned bottlers and independent bottlers nationwide over a multi-year period is overbroad, seeks information that is not relevant to the claims or defenses in this case, and is not proportional to the needs of the case. Subject to and without waiving these objections, Pepsi will produce documents related to the amount of annual transshipping fines charged to PBC owned bottlers and independent bottlers in connection with transshipments into Northern Bottling's territory for the years 2012-2017.

COURT RULING:  PepsiCo contends it has provided the amount of transshipping fines imposed as a result of product being transshipped into Northern's territory for the years 2012-2017 and that anything else is simply not relevant.  The court disagrees but the reasons require some explanation.

As discussed earlier, PepsiCo came up with the PTEP in 1984 as means of addressing the problems of transshipment.  This was back when almost all of its beverage products were distributed by independent bottlers and before PepsiCo got into the distribution business.  The discovery the court has reviewed to date makes clear that PepsiCo believed the PTEP was a reasonable measure to address transshipment because it did two things.   First, it provided some modicum of compensation to the "victim."  Second, it also punished the originating bottler by the assessment of fines as well as the costs investigation thereby creating incentive for the originating bottler not only to itself not transship but also to police its customers and others in the stream of distribution within its territory not to transship.  In other words, the assessment of fines and costs was for purposes of deterrence as well as for providing reimbursement.

As noted earlier, one of the Northern's contentions in this case is that, with PepsiCo's acquisition of almost 80% of the distribution network by volume culminating with its major bottling

operation acquisitions in 2010, the PTEP is no longer as effective as it once may have been in combating transshipment. Or to state it another way, if PepsiCo is obligated to take reasonable measures to combat against transshipment, it can no longer rely upon the existence of the PTEP as fulfilling that responsibility.[8] Northern contends that, with PepsiCo now owning 80% of the distribution, the deterrent aspect of the program has been substantially weakened because the bottling operations acquired by PBC that once had to pay fines for virtually any transshipment that occurred because the victims were all independent bottlers, no longer have to pay fines for transshipment into the market of another PBC company-owned bottler, which now may be roughly 80% of the time, since PBC does not fine itself. Northern contends that this lack of deterrence (coupled, perhaps, by PBC employees being incentivized to sell as much product as possible) has led to PBC over-stuffing its supply chains with product with the result that this oversupply creates the market for product that is transshipped elsewhere. That is, it is the sloshing around of this excess product in distribution channels as far away as New York, New Jersey, Pennsylvania, Maryland, Ohio, Illinois, Florida, Texas, Wisconsin, Utah, and even Puerto Rico (all places from where product transshipped into Northern's territory originated) that creates the opportunity for third-party diverters to make available sufficient product in a grey market that allows wholesalers, like Core-Mark, to feel confident that they can obtain enough product to offer it for sale on a sustained basis to its customers.

After considering the arguments of the parties and upon further reflection, the court agrees

---

[8] In <u>Pepsi-Cola Bottling Co. of Pittsburgh</u>, the Tenth Circuit addressed the relevancy of the effectiveness or lack of it to what it concluded was PepsiCo's obligation to take reasonable measures to prevent competing bottlers from encroaching upon exclusive territory of the plaintiff in that case. While the court refrained from concluding that PepsiCo had an obligation to ensure that the PTEP was operating effectively to prevent transshipment, the court did state that "evidence that PepsiCo failed to enforce the PTEP, while simultaneously taking no other action to prevent transshipment, would tend to prove that PepsiCo failed to perform its contractual obligation." 431 F.3d at 1262.

that Northern should be permitted the discovery that it seeks because it may be possible to draw some conclusions from the information that would support its contention that the PTEP is not effective in combating transshipment and cannot be relied upon by PepsiCo as a reasonable measure to curb it if it is determined that PepsiCo owes such a duty.   As for PepsiCo's contention that it has already provided the information for the product that was transshipped into Northern's territory, that does not address the broader picture.   While it just so happens that the product that Core-Mark sold to Northern's former customers happened to come from the bottling operations that PepsiCo identified, which included bottling operations as far away as New York, New Jersey, Pennsylvania, Maryland, Ohio, Illinois, Florida, Texas, Wisconsin, Utah, and even Puerto Rico, there is no reason to believe that these were the only points of origination of product that Core-Mark acquired and had available to sell to its customers, including the cooperatives who were Northern's former customers. That is, Core-Mark may have had product in its warehouses that originated from other bottling operations as well and it was luck of the draw in terms of which ones ended up in Northern's territory,  and, it was the totality of the product that was available in the grey markets that made feasible it being able to offer transshipped product to its customers on a sustained basis.[9]

Also,  it is doubtful that Core-Mark and the other wholesalers would acquire transshipped PepsiCo branded  product only to serve a few customers in Northern's territory; more probably they

_____

[9]   The court observes that, when it is to PepsiCo's advantage, it (quite correctly) points to the fact that its bottling operations are now one company, PBC.  However, when it wants to limit the scope of discovery in other areas, it suggests that its bottling operations (most of which were at one time individual independent operations) should still be treated like the separate entities they once were.

With PepsiCo having acquired upwards of 80% of the distribution market, the apparent ease with which the product can be repackaged and shipped, and the complexity of the distribution channels, the problems of transshipment (if they exist to the extent Northern contends) may have simply become intractable.  If that is the case and if it his held that PepsiCo has some obligation to protect its independent bottlers from third-party transshipments, possibly a better solution would be to devote the resources now being employed and that may have to be employed in the future to address transshipment (together with the indirect costs resulting from the lack of flexibility of having to operate with dual distribution systems, including having to deal with problems like those raised in Mahaska Bottling Co., supra) to buyouts of the remaining independent bottlers or renegotiating to make them contract distributors.

needed a broader outlet to make it worth their while. This is another reason why the problem is national in scope and what efforts PepsiCo is taking or not taking in other areas of the country is relevant, assuming, for the moment, PepsiCo has an obligation to take reasonable steps to combat transshipment by third parties into the territories of its independent bottlers or, at least, not to unreasonably engage in conduct that facilitates such transshipment.

As for the time period, there is enough to create the question as to whether PepsiCo's large acquisitions in 2010 that resulted in it owning approximately 80% of the distribution market has impacted the effectiveness of the PTEP as a curb against transshipment for the reasons posited by Northern and that, even though Northern's problems did not develop until later, it was the changes in 2010 that created the environment that allowed wholesalers, like Core-Mark, to make transshipped product available in territories as remote as Northern's from large population centers. Also, apart from what the data might show (if anything) with respect to the effectiveness of the PTEP or lack of it, the data may give some indication of whether the problems with respect to transshipment have increased, decreased, or stayed the same over time for independent bottlers such as Northern. Consequently, the court will require production of information back to and including 2008 for all bottling operations, whether PepsiCo owned or independent (even though this request seeks only information with respect to PBC which did come into existence until 2010) to address subsequent document requests and items delineated for the Rule 30(b)(6) deposition. However, with respect to the 30(b)(6) deposition, the court will not require that PepsiCo answer as far back as 2003.[10]

---

[10] While the court concludes that PepsiCo should produce the information back to 2008 for the reasons stated above, it notes with some amusement (given PepsiCo's insistence on narrowly focusing the discovery) PepsiCo's deposition of Northern's owner, Langer Gokey. In that deposition, PepsiCo's attorney inquired at some length about

(continued...)

Finally, it appears from other material the court has reviewed that the information that will be ordered produced is readily available as part of PepsiCo's administration of the PTEP program. In any event, PepsiCo has not provided a sufficient explanation for why production of this information would be an undue burden.

In summary, for these and other reasons articulated by Northen in it briefing, PepsiCo shall produce with respect to Request No. 14 and other document requests set forth below: (1) documents sufficient to disclose directly (or that enable the calculation of) the annual amounts of transshipping fines that PepsiCo imposed upon each entity or bottling operation fined for the period from 2008 to 2017 as well as (2) documents sufficient for Northern to able to identify for each such year which of the entities or bottling operations were owned by PepsiCo and/or PBC and which were independent bottlers. PepsiCo shall also include in the information produced documents sufficient to show the amount of product that was determined to have been transshipped in the assessment of the fines since that, along with the other information, would allow for the determination of any change in the amount of the fines and possibly address the significance of the change in the percentage of PepsiCo ownership of bottling operations in 2010.[11]

---

[10](...continued)

the number and location of Gokey's vacation homes as well as what airplanes he or Northern owned dating back to the late 1970's. At one point, after the use of older planes was discussed, PepsiCo's attorney persisted:

> Q.  Okay. Let's just take the last ten years then, the last two planes. Have you also used the airplane for your personal use?

(Doc. No. 59-7, pp. 10-11). The point of all of this questioning is unclear. Maybe PepsiCo hopes to later use the information to imply that things cannot be too bad for Northern, notwithstanding the problems of transshipment, if Mr. Gokey can afford to puddle around between his several vacation condos and Northern's office in Minot in a pressurized twin-turboprop Beechcraft King Air 200. Or maybe the point that PepsiCo seeks to make is that, if Northern's revenue stream can support several vacation condos and an airplane, it had to have more than enough room to charge less for its PepsiCo branded product and avoid the incentive for others to transship into its territory. What is clear, however, is that the information that Northern seeks in Request No. 14 is more relevant to the issues in this case.

[11]  At the end of the day, it may not be possible to draw any meaningful conclusions from the data the court is ordering be produced given the complexity of the transshipment issues. That is likely to be a matter for experts, unless

(continued...)

Finally, given PepsiCo's insistence that any earlier information would not be relevant, it may not itself offer evidence of the amounts of fines imposed and who paid them for any period prior to 2008.

### D.     Request for Production No. 18

REQUEST FOR PRODUCTION NO. 18: For the subject time period, please produce all documents that refer or relate to notices or warnings given to customers or persons or entities distributing PepsiCo products that they are believed to be selling product outside of the territory or channel in which the product is authorized to be sold.

RESPONSE: Pepsi Objects to Request No. 18 on the grounds that all documents that refer or relate to notices or warnings given to any customers or entities distributing PepsiCo products regarding the sale of product outside the appropriate territory or channel without geographic limitation and over a multi-year period is overbroad and burdensome, seeks information that is not relevant to the claims or defenses in this case, and is not proportional to the needs of the case.  Subject to and without waiving these objections, Pepsi will produce responsive documents in connection with transshipments into Northern Bottling's territory for the years 2012-2017. Pepsi also refers Plaintiff to previously produced documents including those beginning with the Bates labels NB BP 0001034, PEPSI-NB000028, PEPSI-NB000036, PEPSI-NB000038, PEPSINB000095, PEPSI-NB000193, PEPSI-NB000208, PEPSI-NB000214, PEPSI-NB000215, PEPSI-NB000445, PEPSI-NB000458, PEPSI-NB000463, and PEPSI-NB000475.

COURT RULING:  The information sought here, like the information sought with respect to Requests No. 12 & 13, goes to the reasonableness of the efforts made by PepsiCo to curb transshipment.  On the other hand, there is also the similar burden of possibly having to inspect every customer file to make a response if this information is not centrally collected as part of PepsiCo's efforts to combat transshipment, which, if it is not, may itself may call into question the reasonableness of PepsiCo's efforts.

The court will require responsive documents be produced from any centrally located information within PepsiCo (including PBC) and also that can be produced upon querying the management in place at each PBC bottling operations within the United States for information that

[11](...continued)
the import of the data is clear.  What the court concludes now is that the subject of the discovery is relevant.

is (1) within the recollections of the management in place or (2) is located in any file or document that keeps track of any notices or warnings separate from placement of documents in individual customer files, and then producing any responsive documents that can be located based upon these queries, including those from customer files when, after the inquires the court will require, reasonably suggests that such information may be in an individual customer file. Finally, the time period shall be limited to the years 2012-2017. But, given the limited time period and PepsiCo's contention that information prior to this time is not relevant, it may not offer evidence of any warnings or actions taken prior to 2012.

### F.   Request for Production No. 19

REQUEST FOR PRODUCTION NO. 19: For the subject time period, please produce documents or ESI sufficient to identify all lawsuits filed by PepsiCo against any persons or entities wherein the subject of the lawsuit included selling product outside of the territory or channel in which it was authorized to be sold.

 RESPONSE: Pepsi objects to Request No. 19 on the grounds that all lawsuits filed by PepsiCo against any persons or entities where the subject of the lawsuit included selling product outside of the authorized territory or channel without geographic limitation and over a multi-year period is overbroad, seeks information that is not relevant to the claims or defenses in this case, and is not proportional to the needs of the case. Subject to and without waiving these objections, Pepsi has searched for documents or ESI related to any lawsuits filed by PepsiCo against any persons wherein the subject of the lawsuit included selling product into Northern Bottling's territory for the years 2012-2017 and has not identified or located any such documents.

COURT RULING: During the court hearing on the pending motions, PepsiCo represented that there were no lawsuits. Consequently, PepsiCo shall amend its response to reflect that or prepare its Rule 30(b)(6) deponent to make that representation.

### G.   Request for Production No. 22

REQUEST FOR PRODUCTION NO. 22: For the subject time period, please produce documents or ESI sufficient to show the amount of PBC product transshipped into exclusive territories of independent bottlers.

RESPONSE: Pepsi objects to Request No. 22 on the grounds that any PBC product

transshipped into any independent bottler territory nationwide over a multi-year period is overbroad, seeks information that is not relevant to the claims or defenses in this case, and is not proportional to the needs of the case. Subject to and without waiving these objections, Pepsi will produce documents related to PBC product transshipped into Northern Bottling's territory for the years 2012-2017.

COURT RULING: PepsiCo shall produce documents to the extent required by the court's

ruling with respect to Document Request No. 14.

### H.    Request for Production No. 23

REQUEST FOR PRODUCTION NO. 23: For the subject time period, please produce documents or ESI sufficient to show the amount of PBC product transshipped into exclusive territories of other PBC bottlers.

RESPONSE: Pepsi objects to Request No. 23 on the grounds that any PBC product transshipped into exclusive territories of other PBC bottlers is overbroad, seeks information that is not relevant to the claims or defenses in this case, and is not proportional to the needs of the case. No documents will be produced.

COURT RULING: PepsiCo shall produce documents to the extent required by the court's

ruling with respect to Document Request No. 14.

### I.    Request for Production No. 24

REQUEST FOR PRODUCTION NO. 24: For the subject time period, please produce documents or ESI sufficient to show the amount of independent bottler product transshipped into exclusive territories of PBC bottlers.

RESPONSE: Pepsi objects to Request No. 24 on the grounds that any independent bottler product transshipped into exclusive territories of PBC bottlers is overbroad, seeks information that is not relevant to the claims or defenses in this case, and is not proportional to the needs of the case. No documents will be produced.

COURT RULING: PepsiCo shall produce documents to the extent required by the court's

ruling with respect to Document Request No. 14. The court agrees this information is required to

obtain the full picture for the reasons articulated with respect to Request No. 14.

### J.    Request for Production No. 26

REQUEST FOR PRODUCTION NO. 26: For the subject time period, please produce documents or ESI sufficient to show, on an annual basis, the ten PBC bottlers that transshipped the highest volume of product.

RESPONSE: Pepsi Objects to Request No. 26 on the grounds that the ten PBC bottlers that happen to have the most of their product transshipped in a particular year over a multi-year period is overbroad, seeks information that is not relevant to the claims or defenses in this case, and is not proportional to the needs of the case. Subject to and without waiving these objections, Pepsi will produce documents related to the PBC bottlers that have been the source of PBC product transshipped into Northern Bottling's territory for the years 2012-2017.

COURT RULING: PepsiCo shall produce documents to the extent required by the court's

ruling with respect to Document Request No. 14.

### K.    Request for Production No. 28

REQUEST FOR PRODUCTION NO. 28: Please produce all contracts entered into between PepsiCo and Core-Mark International during the subject time period.

RESPONSE: Pepsi objects to Request No. 28 on the grounds that all contracts entered into between PepsiCo and Core-Mark International over a multi-year period is overbroad, seeks information that is not relevant to the claims or defenses in this case, and is not proportional to the needs of the case. Subject to and without waiving these objections, Pepsi will produce contracts entered into between PepsiCo and Core-Mark International for the years 2012-2017.

COURT RULING: No additional contracts need be produced as Northern has not

demonstrated the relevancy of any agreements prior in time to what PepsiCo has already agreed to

produce.

### L.    Request for Production No. 29

REQUEST FOR PRODUCTION NO. 29: For the subject time period, please produce documents or ESI sufficient to identify all independent bottlers that reported transshipping of PBC product into their exclusive territories.

RESPONSE: Pepsi objects to Request No. 29 on the grounds that all independent bottlers that reported transshipping of PBC product without geographic limitation and over a multi-year period is overbroad, seeks information that is not relevant to the claims or defenses in this case, and is not proportional to the needs of the case. Subject to and without waiving these objections, Pepsi will produce non-privileged documents in its possession, custody, or control related to reports of transshipping into Northern Bottling's territory. Responding further, Pepsi refers Plaintiff to documents previously produced related to Northern Bottling's reports of transshipping into its territory.

COURT RULING: PepsiCo shall produce documents to the extent required by the court's

ruling with respect to Document Request No. 14.

### M. Request for Production No. 30

REQUEST FOR PRODUCTION NO. 30: For the subject time period, please produce documents sufficient to identify for each year every PBC bottler that has switched in whole or in part from returnable shells to shells for which return is not required.

RESPONSE: Pepsi objects to Request No. 30 on the grounds that the year that every PBC bottler has switched from returnable shells to shells for which return was not required is overbroad, seeks information that is not relevant to the claims or defenses in this case, and is not proportional to the needs of the case. No documents will be produced.

COURT RULING: The court will require that the requested information be produced for the time period from 2012 through present time based on the representation that Northern expert(s) consider the use of returnable shells to be a reasonable measure to monitor who ends up with transshipped product and, for that reason, is an effective tool in helping to curb transshipment. In the alternative to producing documents, PepsiCo may provide a sworn affidavit that provides the information.

## III. MOTION FOR PROTECTIVE ORDER

### A. Topic No. 1

Topic No. 1: All aspects of the PepsiCo Transshipment Enforcement Program, including its administration, documentation, amendments and modifications hereto, and including, for each year, the amount of fines imposed by name of payee. Time period: January 2003 through the present.

COURT RULING: The time period is overbroad and unduly burdensome to the extent that it seeks information all the way back to 2003. Initially, the court contemplated limiting the timeframe from 2010 to the present. However, upon further reflection and for the reasons articulated in the court's ruling with respect to Document Request No. 14, the court will require PepsiCo to produce one or more persons to testify generally about the administration of the PTEP program, the types of documentation that are kept or not kept (individual documents do not need to be

memorized), and any changes to the PTEP program. The timeframe that PepsiCo will have to cover will be from 2008 to 2017. Also, it is unreasonable for a Rule 30(b)(6) deponent to be able to memorize the amount of fines by name of payee. That information presumably will be coming with respect to the documents provided pursuant to the court's ruling with respect to Document Request No. 14 and need not be memorized.

**B.      Topic No. 2**

Topic No. 2: Other than the Transshipment Enforcement Program, any and all policies, procedures, rules, regulations, plans, and actions promulgated and/or implemented by PepsiCo, Inc. for the purpose of preventing transshipment. Time period: January 2010 through the present.

COURT RULING:  PepsiCo contends that this request is overbroad and unduly burdensome in part because of the problems of transshipment in the Northeast United States are sui generis given the large population centers, the small geographic area of the relevant territories, and the location of the territories of the independent bottlers relevant to the geographic areas that obtain product from company-owned PBC bottling operations.  The court agrees some balance should be struck. Consequently, the court will require that PepsiCo produce one or more persons to be able to testify about any policies, procedures, rules, regulations, plans, and actions promulgated and/or implemented by PepsiCo during the specified time period that (1) are for the purpose of preventing transshipment into the territories of independent bottlers who are outside of the Northeastern United States or (2) that will otherwise be offered by PepsiCo at trial.  This includes any policies, procedures, rules, regulations, plans, and action that are promulgated or implemented with respect to bottling operations and persons located in the Northeastern United States that are for the purpose of preventing product originating there to be transshipped into territories of independent bottlers located outside of the Northeast.  What it is excluded are things and actions that are only for the

specific purpose of addressing the transshipment of product into the territories of independent bottlers located in the Northeast.

### C.     Topic No. 8

Topic No. 8: Litigation initiated by PepsiCo wherein PepsiCo was attempting to enforce a contractual restriction regarding sales of PepsiCo soft drink products outside of an exclusive territory. Time period: January 2010 to the present.

COURT RULING:  As noted above, PepsiCo has stated that there are no lawsuits.  PepsiCo can either affirmatively state that in response to the discovery request addressing that issue so that the point can later be used at trial to the extent it may be relevant (which is questionable) or produce a witness to state that in the Rule 30(b)(6) deposition.

### D.     Timing of the Rule 30(b)(6) deposition

Unless the parties otherwise mutually agree, the Rule 30(b)(6) deposition of PepsiCo shall not be taken until the documents that the court orders be produced have been produced.

**IT IS SO ORDERED.**

Dated this 21st day of November, 2017.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr., Magistrate Judge
United States District Court