**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **NORTHERN BOTTLING CO., INC.,** | ) | **Case No. 4:15-CV-00133** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Judge Daniel L. Hovland** |
| | ) | **Magistrate Judge Charles S. Miller, Jr.** |
| | ) | |
| **PEPSICO, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT PEPSICO, INC.'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION AND SUMMARY OF THE ARGUMENT .................................................. 1

STATEMENT OF UNDISPUTED FACTS ........................................................................ 3

I.      The Parties and Their Contractual Relationship. ................................................. 3

II.     PepsiCo and PBC's Transshipment Enforcement Policies. ................................. 5

        A.     PepsiCo's Transhipment Enforcement Program (PTEP) ....................... 5

        B.     PBC's Transshipment Enforcement Policies ........................................ 6

III.    Northern's Customer Relationships, Sales Tactics and Transshipment Claims. .............. 10

        A.     Enerbase Decides to Cease Purchasing from Northern ........................ 11

        B.     Three Other Northern Customers Decide to Stop Purchasing from Northern ...... 13

IV.    PepsiCo and PBC Take Additional Steps to Stop Core-Mark's Transshipping ............... 15

ARGUMENT ............................................................................................................... 18

I.      Summary Judgment Standard ............................................................................ 18

II.     Choice of Law ................................................................................................... 19

        A.     New York Law Governs Northern's Claim for Breach of Contract (Count One) 19

        B.     North Dakota Law Governs Northern's Tort Claims (Counts Two, Three, Four and Five) ....................................................................................... 19

III.    PepsiCo Is Entitled to Summary Judgment on Count One of Northern's Complaint Because PepsiCo Has No Obligation Under the EBAs to Stop Third Parties from Selling PepsiCo CSD Products in Northern's Territory .............................. 21

        A.     The EBAs Do Not Impose A Duty on PepsiCo to Prevent Third-Party Sales of PepsiCo CSDs in Northern's Territory ................................... 21

        B.     The Implied Covenant of Good Faith and Fair Dealing Does Not Create a Duty for PepsiCo to Prevent Third-Party Sales in Northern's Territory ...... 24

        C.     The Tenth Circuit's Decision in *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.* Does Not Support the Imposition of a Duty on PepsiCo to Prevent Third Party Transhipping into Northern's Territory. .......................... 25

IV.    Even Assuming a Duty Exists, PepsiCo is Entitled to Summary Judgment on Count One Because Northern Cannot Establish Any Breach by PepsiCo ........................ 29

V.      PepsiCo is Entitled to Summary Judgment on Count Two of the Complaint. .................. 33

VI.     PepsiCo Is Entitled to Summary Judgment on Count Three of the Complaint. ............... 34

VII.    PepsiCo Is Entitled to Summary Judgment on Count Four of the Complaint. ................. 36

VIII.   PepsiCo Is Entitled to Summary Judgment on Count Five of the Complaint. ................. 37

IX.     PepsiCo Is Entitled to Summary Judgment on Counts Six and Seven of the
        Complaint. .................................................................................................................... 38

CONCLUSION ................................................................................................................. 40

## TABLE OF AUTHORITIES

**CASES**

*A & R Fugleberg Farm, Inc. v. Triangle Ag, LLC*,
  828 F. Supp. 2d 1045 (D.N.D. 2011) .......................................................................... 39

*Alesayi Beverages Corp. v. Canada Dry Corp.*,
  947 F. Supp. 658 (S.D.N.Y. 1996) ..................................................................... 26, 27, 28

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .................................................................................................. 18

*ARI & Co v. Regent Int'l Corp.*,
  273 F. Supp. 2d 518 (S.D.N.Y. 2003) ......................................................... 24, 33, 34

*Bourgois v. Montana-Dakota Utilities Co.*,
  466 N.W.2d 813 (1991) ............................................................................................. 35

*Broder v. Cablevision Sys. Corp.*,
  418 F.3d 187 (2d Cir. 2005) ..................................................................................... 24

*Buchl v. Gascoyne Materials Handling & Recycling, L.L.C.*,
  No. 1:17-CV-48, 2018 WL 3267151 (D.N.D. Mar. 23, 2018) ................................. 39

*Burris Carpet Plus, Inc. v. Burris*,
  785 N.W.2d 164 (N.D. 2010) .................................................................................... 37

*CDI Energy Servs., Inc. v. W. River Pumps, Inc.*,
  Case No. 1:07-CV-085, 2007 WL 4395703 (D.N.D. Dec. 13, 2007) ...................... 39

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ....................................................................................... 18, 21, 32

*Chapman v. Hiland Partners GP Holdings, LLC*,
  862 F.3d 1103 (8th Cir. 2017) .................................................................................. 19

*Coca-Cola Bottling Co. of Elizabethtown, Inc. v. Coca-Cola Co.*,
  696 F. Supp. 57 (D. Del. 1988) ................................................................................ 26

*Coca-Cola N. Am. v. Crawley Juice, Inc.*,
  No. 09 CV 3259(JG)(RML), 2011 WL 1882845 (E.D.N.Y. May 17, 2011) ..................... 24, 33

*Compania Embotelladora del Pacifico, S.A. v. Pepsi Cola Co.*,
  650 F. Supp. 2d 314 (S.D.N.Y. 2009) .............................................................. passim

*Cruz v. FXDirectDealer, LLC*,
  720 F.3d 115 (2d Cir. 2013) ..................................................................................... 33

*Dahl v. ConAgra, Inc.*,
 998 F.2d 619 (8th Cir. 1993) ................................................................. 35

*Deutsche Bank Sec., Inc. v. Rhodes*,
 578 F. Supp. 2d 652 (S.D.N.Y. 2008) .................................................... 33

*Erickson v. Brown*,
 747 N.W.2d 34 (N.D. 2008) .................................................................... 35

*Gianelli v. RE/MAX of New York, Inc.*,
 41 N.Y.S.3d 273 (N.Y. App. Div. 2016) ................................................ 33

*Holland Loader Co., LLC v. FLSmidth A/S*,
 313 F. Supp. 3d 447 (S.D.N.Y. 2018) ...................................... 21, 22, 23

*Huber v. Oliver Cty.*,
 602 N.W.2d 710 (N.D. 1999) .................................................................. 39

*Interstate Companies, Inc. v. Kress Corp.*,
 No. A1-03-73, 2003 WL 22282300 (D.N.D. Sept. 30, 2003) ................ 33

*John T. Jones Constr. Co. v. Hoot Gen'l Const. Co.*,
 613 F.3d 778 (8th Cir. 2010) .................................................................. 19

*Lockheed Martin Corp. v. Retail Holdings, N.V.*,
 639 F.3d 63 (2d Cir. 2011) ..................................................................... 21

*Mailing & Shipping Sys., Inc. v. Neopost USA, Inc.*,
 937 F. Supp. 2d 879 (W.D. Tex. 2013) .................................................. 23

*Molzahn v. Allstate Ins. Co.*,
 305 F. Supp. 2d 1113 (D.N.D. 2004) ...................................................... 19

*Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*,
 861 F. Supp. 2d 344 (S.D.N.Y. 2012) .................................................... 33

*Nodak Mut. Ins. Co. v. Wamsley*,
 687 N.W.2d 226 (N.D. 2004) .................................................................. 20

*O'Grady v. BlueCrest Capital Mgmt. LLP*,
 646 Fed. App'x 2 (2d Cir. Apr. 14, 2016) .............................................. 22

*Oglala Sioux Tribe v. C & W Enters., Inc.*,
 542 F. 3d 224 (8th Cir. 2008) ................................................................. 38

*Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*,
 431 F.3d 1241 (10th Cir. 2005) ...................................................... passim

*Postlewaite v. McGraw-Hill, Inc.*,
411 F.3d 63 (2d Cir. 2005) ................................................................... 21

*Raaum Estates v. Murex Petroleum Corp.*,
Case No. 4:14-cv-024, 2017 WL 2870070 (D.N.D. July 5, 2017) ........................................... 39

*RIJ Pharm. Corp. v. Ivax Pharm., Inc.*
322 F. Supp. 2d 406 (S.D.N.Y. 2004) ................................................................... 21

*Sura v. Nat'l Oilwell Varco, L.P.*,
No. 1:15-cv-127, 2016 WL 4217766 (D.N.D. Apr. 6, 2016) ................................................ 20

*Swire Pac. Holdings, Inc. v. Dr. Pepper/Seven-Up Corp.*,
No. 05-95-01525-CV, 1997 WL 153794 (Tex. App. Apr. 3, 1997) .................................. 26, 28

*Thimjon Farms P'ship v. First Int'l Bank & Trust*,
837 N.W.2d 327 (N.D. 2013) ................................................................... 36

*Torgerson v. City of Rochester*,
643 F.3d 1031 (8th Cir. 2011) ................................................................... 18

*Trade 'N Post L.L.C. v. World Duty Free Americas, Inc.*,
628 N.W.2d 707 (N.D. 2001) ................................................................... 36, 37

*Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P.*,
936 F. Supp. 2d 376 (S.D.N.Y. 2013) ................................................................... 25

*Vanlex Stores, Inc. v. BFP 300 Madison II, LLC*,
887 N.Y.S.2d 576 (N.Y. App. Div. 2009) ................................................................... 25

*Vt. Teddy Bear Co. v. 538 Madison Realty Co.*,
1 N.Y.3d 470 (N.Y. 2004) ................................................................... 23

*Ward v. TheLadders.com, Inc.*,
3 F. Supp. 3d 151 (S.D.N.Y. 2014) ................................................................... 24

**STATUTES**

N.D.C.C. § 9-03-09 ................................................................... 35

N.D.C.C. § 32-03.2-11 ................................................................... 39

N.D.C.C. § 32-03.2-11(1) ................................................................... 38

N.D.C.C. § 32-03.2-11(4) ................................................................... 38

N.D.C.C. § 32-03.2-11(5) ................................................................... 38

N.D.C.C. § 51-10 ................................................................... 38

**RULES**

Fed. R. Civ. P. 56 ...................................................................................................................... 18

Defendant PepsiCo, Inc. ("PepsiCo"), by and through its undersigned attorneys, hereby submits this Memorandum of Law in Support of its Motion for Summary Judgment.  For the reasons stated below, PepsiCo respectfully requests that the Court grant its Motion for Summary Judgment as to all of Plaintiff's asserted claims.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

PepsiCo is a global food and beverage company that makes, markets, distributes and sells foods, snacks and a wide variety of beverages, including carbonated soft drinks in bottles and cans ("CSDs").  PepsiCo and Northern Bottling Co., Inc. ("Northern") are parties to a series of agreements, called Exclusive Bottling Appointments ("EBAs"), each of which gives Northern the exclusive right "to bottle and distribute" a specific PepsiCo CSD product within a defined geographic territory in return for Northern's agreement to comply with specified terms and conditions.

In February of 2015, Northern filed a Complaint against PepsiCo alleging that PepsiCo had breached the EBA for Pepsi Cola trademarked beverages by failing to prevent "transshipment" of Pepsi Cola CSDs into Northern's territory by third-party distributors.  Indeed, Northern alleged that PepsiCo actually sold the Pepsi Cola CSDs to the distributors who were doing the transshipping.  Based on these allegations, Northern asserted claims against PepsiCo for breach of contract (Count One), tortious breach of implied covenant of good faith and fair dealing (Count Two), constructive fraud (Count Three), tortious interference with contract and economic advantage (Count Four), unfair competition and deceptive trade practices (Count Five), punitive damages (Count Six), and injunctive relief (Count Seven).

In its Answer, PepsiCo denied Northern's claims – including the allegation that PepsiCo was selling CSDs to transhippers – and stated that its EBA with Northern does not impose a duty upon PepsiCo to prevent third-party transshipment of PepsiCo CSDs.  PepsiCo further stated that,

despite the absence of any contractual duty to do so, it had created and implemented a program, the PepsiCo Transshipment Enforcement Program ("PTEP"), to deter transshipment and compensate injured bottlers, and had fully complied with the terms of the PTEP in connection with each of Northern's transshipment complaints.

Discovery in this case is now complete.  The parties have produced thousands of pages of documents, and have collectively deposed almost twenty fact witnesses, including multiple current and former PepsiCo employees, Northern's owner, certain Northern employees, a transshipping distributor, and Northern customers who purchased and sold the transshipped products.

The documents produced by PepsiCo include its EBAs with Northern pertaining to the CSDs – Pepsi Cola, Diet Pepsi Cola, Mountain Dew and Diet Mountain Dew – that were the subject of Northern's transshipment complaints.  None of these EBAs includes any reference whatsoever to any duty on the part of PepsiCo to prevent transshipment of PepsiCo beverages by third parties into Northern's territory.

Moreover, the evidence incontrovertibly established that neither PepsiCo nor its bottling and sales subsidiary, Pepsi Beverages Company ("PBC"), ever sold PepsiCo CSDs to the transshipping distributors, and Northern's own witnesses admitted that PepsiCo complied with the PTEP in connection with every transshipment complaint that Northern reported.  Finally, the evidentiary record established that Northern's customers who sought out alternative sources of PepsiCo CSDs did so because of their deep dissatisfaction with Northern's service and business practices, not because of anything that PepsiCo did or did not do with respect to transshipment.

As the remainder of this Memorandum will demonstrate, there is no genuine dispute as to any fact material to Northern's claims and PepsiCo is entitled to judgment on each of those claims as a matter of law.  The facts in this case fail to establish that PepsiCo breached any duty owed to

Northern, that PepsiCo "misled" Northern as required for Northern to prevail on its constructive fraud claim, that PepsiCo caused any third party to breach a contract with Northern or intentionally interfered with any business relationship of Northern's, or that PepsiCo engaged in "unfair competition" under North Dakota law.  PepsiCo respectfully requests that the Court grant summary judgment in favor of PepsiCo on each of Northern's claims.

## STATEMENT OF UNDISPUTED FACTS

### I.     The Parties and Their Contractual Relationship.

[1]   Plaintiff Northern is an independent bottler operating out of Minot, North Dakota. (Compl. (Dkt. 1) ¶¶ 1, 6-7.)  Northern sells beverage and snack products to more than 2000 customers in a variety of channels, including convenience and gas outlets, in North and South Dakota.  (L. Gokey Dep. Tr. (Dkt. 59-7) at 72:10-16, 74:12-16.)  The beverage products that Northern sells include PepsiCo CSDs, other PepsiCo products such as Gatorade, and many non-PepsiCo products, including Dr. Pepper, Klarbrunn Sparkling Water, brewed coffee, brewed tea, cappuccino, and slushies.  (T. Hillestad Dep. Tr. (attached as Ex. 1) at 100:10-101:3; T. Hillestad Dep. Ex. 6 (attached as Ex. 2) at NB TB 0000143.)

[2]   PepsiCo is a global food and beverage company.  (PepsiCo 2017 Annual Report (Form 10-K) (excerpts attached as Ex. 3).)  Among other things, PepsiCo distributes and sells PepsiCo CSDs through its own bottling subsidiary, PBC, as well as through independent bottlers, such as Northern.  (D. Lewis Dep. Tr. (attached as Ex. 4) at 19:17-20:4, 23:2-10; T. Trant Dep. Tr. (Dkt. 59-22) at 25:2-9.)  PBC accounts for approximately 75-80% of PepsiCo CSD sales in the United States, and independent bottlers account for the remaining 20-25% of such sales.  (D. Lewis 25:2-9; T. Trant Dep. Tr. at 25:10-20.)

[3]   The manufacture, sale and distribution of each PepsiCo CSD product is the subject of a separate EBA between PepsiCo and Northern.  (Supplemental Declaration of Larry Bowers

3

(attached as Ex. 5, hereafter "Bowers Supp. Decl."), ¶ 2.)  Although Northern's Complaint only relies upon the Pepsi Cola EBA to support its claims (*see, e.g.*, Compl. ¶¶ 6-7 and Ex. 1), Northern apparently asserts similar claims with respect to other PepsiCo CSDs – specifically, Diet Pepsi, Mountain Dew and Diet Mountain Dew.  Each of these products is the subject of a separate EBA with terms similar to the Pepsi Cola EBA.  (*See* Bowers Supp. Decl., Exs. A-C.)

[4]  Each EBA appoints Northern as PepsiCo's "exclusive bottler, to bottle and distribute" the specified PepsiCo CSD product in a designated geographic territory, and "nowhere else." (Compl. ¶¶ 6-7 and Ex. 1; Bowers Supp. Decl., Exs. A-C; *see also* L. Gokey Dep. Tr. at 102:23-103:21.)  Each EBA provides that PepsiCo will sell Northern its requirements of concentrate or syrup for the particular CSD product and protect the trademark for that product, that Northern will produce and bottle the finished product from the concentrate or syrup, and that Northern will then sell the product at its own price in its designated territory.  (*See, e.g.,* Compl. Ex. 1, ¶¶ 4-7, 14.)

[5]  In addition, each EBA sets forth various terms and conditions with which Northern must comply.  These terms and conditions include the following duties, among others:

- To maintain sufficient productive capacity to enable Northern "to fully meet" its obligations under the EBA (*e.g.*, Compl. Ex. 1, ¶ 1; Bowers Supp. Decl., Ex. B, ¶ 3);[1]

- To follow PepsiCo's instructions and standards in the use, handling and processing of PepsiCo concentrate or syrup, as well as the filling, packaging, labeling and selling of the finished product (*e.g.*, Compl. Ex. 1, ¶ 6; Bowers Supp. Decl., Ex. B, ¶ 7); and

- To "push vigorously" the sale of the particular CSD product throughout its territory, "fully meet and increase the demand" for the product, "secure full distribution up to the maximum sales potential" of the product, and actively advertise and vigorously promote the product throughout its territory (*e.g.*, Compl. Ex. 1, ¶ 8; Bowers Supp. Decl., Ex. B, ¶ 9).

---

[1] Northern has delegated its obligations with respect to production and bottling of PepsiCo CSD products to Wis-Pak, a bottling cooperative of which Northern is part owner.  (B. Peterson Dep. Tr. (attached as Ex. 6) at 23:19-24, 26:21-27:5.)

4

[6]  Each EBA provides that it "shall be governed by and interpreted under the laws of the State of New York," that the EBA "expresses fully the [parties'] understanding," that "all prior understandings are hereby cancelled," and that "no future changes in the terms of this Appointment shall be valid, except when and if reduced to writing and signed by both" Northern and PepsiCo. (*See, e.g.*, Compl. Ex. 1, ¶¶ 19 and 21; Bowers Supp. Decl., Ex. B, ¶¶ 20 and 22.)

[7]  Significantly, none of the EBAs mentions transshipment of PepsiCo CSDs, much less imposes an obligation upon PepsiCo to prevent transshipment of CSDs into Northern's territory by third parties.  (*See* Compl. Ex. 1; Bowers Supp. Decl., Exs. A - C.)

## II.     PepsiCo and PBC's Transshipment Enforcement Policies.

### A.     PepsiCo's Transhipment Enforcement Program (PTEP)

[8]  Notwithstanding the absence of any contractual obligation to do so, Pepsi created and implemented the PTEP to address the transshipment of PepsiCo CSDs into a bottler's exclusive territory.  (*See* Declaration of D. Morris (attached as Ex. 7, hereafter "Morris Decl."), ¶ 3 and Ex. A (PTEP Guidelines Eff. 2012); PepsiCo's Answer to Plf's Compl. (Dkt. 12), ¶ 11.)  Under the PTEP, if a bottler discovers or suspects PepsiCo CSDs have been transshipped into its territory, it can report the transshipment to the PepsiCo Transshipment Department.  (D. Morris 3/22/2018 Dep. Tr. (attached as Ex. 8) at 6:23-7:10; Morris Decl., Ex. A ¶ 1.)  PepsiCo then assigns an independent investigator to verify the presence of transshipped product in the bottler's territory. (D. Morris 3/22/2018 Dep. Tr. at 6:23-7:10; D. Morris 4/4/2017 Dep. Tr. (Dkt. 59-13) at 105:19-106:18; Morris Decl., Ex. A ¶ 2.)  The appointed investigator visits the store location, checks the production codes that appear on the PepsiCo CSDs in the store, and identifies the quantity of the potentially transshipped PepsiCo CSDs.  (D. Morris 3/22/2018 Dep. Tr. at 6:23-7:10; Morris Decl., Ex. A ¶ 3.)

[9]  Once PepsiCo identifies the bottler who produced the transshipped product (based on the production codes), a fine is imposed and collected from this "source bottler."  (D. Morris 4/14/2017 Dep. Tr. at 106:19-107:9; D. Morris 3/22/2018 Dep. Tr. at 6:23-7:10; E. Van Houten Dep. Tr. (attached as Ex. 9) at 10:7-19.)  The fine amount – which is based on the number of transshipped cases discovered by the investigator – is paid to the bottler in whose territory the transshipped product was discovered.  (D. Morris 4/4/2017 Dep. Tr. at 106:19-107:2, 178:20-179:2; D. Morris 3/22/2018 Dep. Tr. at 7:5-10; E. Van Houten Dep. Tr. at 10:7-19.)  The source bottler is also required to pay the investigation costs.  (D. Morris 4/14/2017 Dep. Tr. at 83:4-9; E. Van Houten Dep. Tr. at 10:16-19; Morris Decl., Ex. A ¶¶ 3-7.)  The fine and investigation costs are assessed whether or not the source bottler initiated, knew about, or condoned the transshipment; in other words, the penalty is imposed on a no fault/strict liability basis.  (D. Morris 4/4/2017 Dep. Tr. at 106:19-107:9, 124:4-19; Morris Decl., Ex. A ¶¶ 3-7.)

[10]  The frequency with which an investigator visits a location suspected of selling transshipped product is determined by the bottler whose exclusive territory is being infringed.  (D. Morris 4/4/2017 Dep. Tr. at 225:3-9.)  There are no limitations on the number of transshipment investigations a bottler may request.  (*Id.*)  PepsiCo encourages bottlers to request that an investigator be dispatched with the same frequency at which a bottler services a customer account.  (*Id.* at 225:9-13.)  As a result, a bottler such as Northern can choose to have an investigator check the stores to which it distributes Pepsi CSD products every week, or even multiple times per week, if it believes such frequency is necessary to detect the presence of transshipped product in its territory.  (*Id.* at 225:3-13.)

**B.    PBC's Transshipment Enforcement Policies**

[11]  The PTEP applies to PBC (PepsiCo's bottling and sales subsidiary), just as it does to independent bottlers.  (D. Morris 3/22/2018 Dep. Tr. at 11:5-23.)  As a result, PBC must pay fines

to infringed independent bottlers when PBC is the source of transshipped product and it must also absorb the substantial cost of the independent investigators.  (*Id.*; D. Morris 4/4/2017 Dep. Tr. at 83:4-9, 165:8-13, 178:9-15.)

[12]  To prevent and curtail transshipping, therefore, PBC put in place a series of internal policies and procedures beginning in 2010, which were updated in 2016.  (Declaration of T. Eveland (attached as Ex. 10, hereafter "Eveland Decl."), ¶¶ 3-4 and Exs. A and B; *see also* D. Lewis Dep. Tr. at 27:23-28:9.)  PBC's written transshipment policy (the "PBC Transshipment Policy") clearly states that PBC employees should not sell or distribute any PBC product outside of the intended PBC Territory for that product.  (Eveland Decl., Ex. B at 4; *see also id.* Ex. A at 4.)  The PBC Transshipment Policy also provides that any PBC employee found to have violated the Policy, whether directly or through retaliation against another employee who reports a violation, is subject to discipline up to and including termination of employment on the first offense.  (Eveland Decl., Ex. A at 2, Ex. B at 2.)

[13]  The PBC Transshipment Policy requires PBC employees to educate customers regarding PBC's territorial boundaries and the potential consequences to customers if they resell PBC products outside of the PBC Territory.  (Eveland Decl., Ex. A at 1, ¶ 2, Ex. B at 1, ¶ 3.)  To that end, PBC's customer agreements expressly prohibit PBC's customers from reselling PepsiCo CSD products to unauthorized accounts or to parties outside the territory of purchase.  (Eveland Decl., ¶ 5 and Exs. C - E; D. Morris 4/4/2017 Dep. Tr. at 84:12-16; D. Lewis Dep. Tr. at 34:13-20.)

[14]  The PBC Transshipment Policy provides for a variety of actions that PBC may take if it discovers that a PBC customer is violating the provision restricting CSD resales outside the territory of purchase.  (Eveland Decl., Ex. A at 7-9, Ex. B at 7-9; E. Van Houten Dep. Tr. at 12:19-

13:14; D. Morris 4/4/2017 Dep. Tr. at 117:17-118:12.)  For example, the Policy includes a three-step customer communication protocol, which provides recommended steps of increasing severity to follow when a customer is identified as a source of transshipped product.  (Eveland Decl., Ex. A at 7-9, Ex. B at 7-9.)  First, there is an initial notice to the customer advising it of transshipped product and discussing how to stop such sales.  (*Id.*)  Second, if the notice does not curtail unauthorized sales, a customer meeting and remedial actions take place.  (*Id.*)  The remedial actions can include placing a customer on "allocation" (*i.e.,* reducing the quantity of PepsiCo CSDs the customer can purchase) and/or reducing the funding that the customer receives from PBC, thereby effectively raising the price of the product.  (*Id.*; *see also* Eveland Decl., Exs. C - E.)  Finally, if the remedial actions are unsuccessful, PBC can suspend or terminate sales of PepsiCo CSDs to the customer.  (Eveland Decl., Ex. A at 7-9, Ex. B at 7-9, and Exs. C - E.; *see also* E. Van Houten Dep. Tr. at 17:13-18:2, 18:23-19:17, 20:12-16.)

[15]  It is very difficult to discover whether a PBC customer has sold product outside of the territory of purchase.  As noted above, PepsiCo's PTEP group learns, through product code information reported by independent investigators, when a PBC bottling plant (or an independent bottler) is the source – *i.e.* the original manufacturer – of product found to be transshipped.  (*See* ¶¶ 8-9, *supra.*)  If PBC is the source bottler, PBC attempts to determine, through its Lot Tracing Transshipment System ("LTTS"), the identity of the PBC customer purchasing the product that was ultimately transshipped into another bottler's territory.  (D. Morris 4/4/2017 Dep. Tr. at 111:4-17; D. Morris 3/22/2018 Dep. Tr. at 10:3-10, 19:5-20:3.)  The LTTS system, however, can only identify the customer who purchased the transshipped CSD product from PBC if (i) the purchaser has purchased a full pallet of the product and (ii) all the product codes on the pallet are properly sequential.  (D. Morris 4/4/2017 Dep. Tr. at 210:18-211:15, 212:1-213:3; D. Morris 3/22/2018

Dep. Tr. at 22:1-15, 41:20-42:6.)   As Darrin Morris, PepsiCo's former Director of Franchise Strategy responsible for administering the PTEP has testified, the LTTS system cannot trace approximately 40-60% of PBC's CSD sales to a particular PBC customer due to product commingling or purchases of less than full pallets.  (D. Morris 3/22/2018 Dep. Tr. at 20:18-22:15.)

[16]   Moreover, even in those instances where PBC can determine the identity of its customer that purchased a CSD product that was subsequently transshipped, PBC frequently cannot determine whether that customer properly sold the product within the designated territory (or not) because PBC's customers typically do not keep sales records, by PepsiCo product code, showing the identity of the parties to whom they subsequently sold the PepsiCo CSDs.  (D. Morris 3/22/2018 Dep. Tr. at 38:20-39:8, 39:14-40:18, 41:20-42:6; D. Morris 4/4/2017 Dep. Tr.  at 186:13-18, 213:11-20, 216:20-217:10; E. Van Houten Dep. Tr. at 15:20-16:2.)  As a result, there is no transparency in the chain of custody after PBC sells its CSDs to customers; indeed, PBC's customers typically deny selling product outside the designated territory when put on notice that a PepsiCo CSD product sold to them has been transshipped.  (D. Morris 3/22/2018 Dep. Tr. at 38:20-39:8, 39:14-40:18, 41:20-42:6; D. Morris 4/4/2017 Dep. Tr. at 186:13-18, 213:11-20, 216:20-217:10; E. Van Houten Dep. Tr. at 15:20-16:2.)  PBC cannot simply disregard such customer denials because CSDs can be bought and sold in the open market several times before landing in the hands of the entity that actually transships the product.[2]  (*See* V. Frisone Dep. Tr (Dkt. 59-17) at 10:6-15, 11:11-12; P. Lippe Dep. Tr. (Dkt. 59-15) at 46:19-47:6.)

_____

[2] Diverters purchase and sell CSD products in the open market to take advantage of price arbitrage opportunities created when a bottler, such as Northern, charges higher prices for PepsiCo CSD products than the prices charged by bottlers in other territories.  (D. Morris 4/4/2017 Dep. Tr. at 217:11-218:24.)

[17]  As a result, PepsiCo and PBC must typically develop evidence – such as LTTS reports showing that a customer has repeatedly purchased material amounts of CSDs that are subsequently transshipped into another bottler's territory or evidence that a customer has actually sold product to a known diverter – before triggering the remedial measures provided for in PBC's customer agreements.  (D. Morris 4/4/2017 Tr. at 214:2-17.)

[18]  In Northern's case, as explained in Section IV below, PepsiCo and PBC ultimately were able to identify certain PBC customers who were the primary sources of the PepsiCo CSDs that were transshipped into Northern's territory through a combination of LTTS data and information learned through discovery in this litigation.  Once those customers had been identified, PBC took appropriate steps to implement remedial measures to curtail transshipment by those customers.  (*See infra* ¶¶ 31-32.)

### III.    Northern's Customer Relationships, Sales Tactics and Transshipment Claims.

[19]  Northern sells beverage and snack products, including PepsiCo CSDs, to more than 2000 customers in a variety of channels, including convenience and gas ("C&G") outlets.  (L. Gokey Dep. Tr. at 72:10-16, 74:12-16.)  In order to obtain Northern's most favorable pricing, C&G customers must accept Northern's annual Customer Development Agreement ("CDA").  (*Id*. at 74:21-25; T. Hillestad Dep. Tr. at 90:14-91:6.)  The pricing that Northern offers to its C&G customers, per the CDA, depends on the amount of shelf space they are willing to devote to Northern products: the more shelf space they allocate to Northern, the greater the discount they receive.  (T. Hillestad Dep. Tr. at 58:15-59:15; B. Peterson Dep. Tr. at 52:2-53:13.)

[20]  Prior to 2015, almost none of Northern's customers purchased PepsiCo CSD products from transshippers.  (Declaration of E. Van Houten (Dkt. 60-1, hereafter "Van Houten Decl."), ¶ 3.)  For example, during the entire three-year period from 2012 through 2014, a *total* of ▇ transshipped cases of PepsiCo CSD products were found in Northern's territory.  (*Id.*)  Over that

same three-year period, Northern sold over ███████ cases of PepsiCo products, including ███████ cases of PepsiCo CSDs.  (Declaration of L. Bowers (Dkt. 60-2, hereinafter "Bowers Decl."), ¶¶ 2-3.)  In other words, transshipped products represented less than .003% of Northern's case sales of PepsiCo CSDs during that period.

[21]  In late 2014, however, Northern began asking its C&G customers to sign a new CDA for 2015 that aggressively sought to gain additional shelf space for Northern products in its customers' stores.  (T. Hillestad Dep. Tr. at 58:13-59:15, 109:1-22, 111:3-15, 112:24-114:1; B. Peterson Dep. Tr. at 51:13-22; L. Gokey Dep. Tr. at 74:25-75:4, 99:18-101:9.)  For the 2015 CDA, Northern increased the minimum number of shelves required for a customer to receive a price discount on products sold by Northern.  (T. Hillestad Dep. Tr. at 109:1-22; B. Peterson Dep. Tr. at 59:3-13; *see also* T. Bernhardt Dep. Tr. (Dkt. 59-8) at 43:5-20 (testifying that Northern's 2015 program required customers to double the amount of shelf space provided to Northern in order to receive the same level of funding as in 2014).)  Northern also reduced the amount of that discount, resulting in an effective price increase for Northern's customers.  (T. Hillestad Dep. Tr. at 111:3-15, 112:24-113:4.)  Northern took these actions despite its own recognition that its customers were facing increasing competitive pressure.  (T. Hillestad Dep. Ex. 6 at NB TB 0000144; Hillestad Dep. Tr. at 102:13-103:3, 104:8-15, 104:24-106:4.)

### A.      Enerbase Decides to Cease Purchasing from Northern

[22]  Northern's aggressive sales tactics did not sit well with some of its customers.  One such customer was Enerbase, an agriculture-based cooperative that owns ten C&G stores, including several in Minot.  (T. Bernhardt Dep. Tr. at 9:3-18, 11:21-12:22.)  Enerbase refused to sign the 2015 CDA, concluding that it could not acquiesce to Northern's demands for additional shelf space.  (*Id.* at 41:2-11, 45:7-12, 46:20-24.)  In February of 2015, Enerbase notified Northern that it would no longer purchase beverage products from Northern.  (B. Peterson Dep. Tr. at 102:2-

8; T. Bernhardt Dep. Tr. at 45:7-12, 47:3-4.)  Enerbase's CEO, Tony Bernhardt, testified that Northern's aggressive sales tactics "drove" him "to the decision." (T. Bernhardt Dep. Tr. at 32: 11-19, 37:2-16, 43:15-21, 45:3-12, 45:18-23.)  Enerbase was also dissatisfied with Northern's "deteriorating" customer service in late 2014 and early 2015.  (*Id.* at 36:13-18, 39:6-40:12; *see also* T. Hillestad Dep. Tr. at 145:23-146:4 (Enerbase's decision to terminate its relationship with Northern was "based on a dissatisfaction of pricing and servicing").)

[23]  Enerbase informed Northern that it would begin purchasing its PepsiCo CSDs from Core-Mark International ("Core-Mark").  (T. Hillestad Dep. Tr. at 132:9-135:20; B. Peterson Dep. Tr. at 104:1-9.)  Core-Mark is a national distributor of a variety of products – including cigarettes, candy, snacks, fast food, dairy and beverages – to convenience and other stores.  (P. Lippe Dep. Tr. at 29:16-24.)  Enerbase had used Core-Mark as its supplier for various non-CSD products since 2010 or 2011.  (T. Bernhardt Dep. Tr. at 10:21-11:20, 18:11-19:6.)  Core-Mark could only sell Enerbase a small, core group of PepsiCo CSD products – Pepsi, Diet Pepsi, Mountain Dew and Diet Mountain Dew – that it was able to obtain in the open market.  (T. Bernhardt Dep. Tr. at 46:1-47:20; B. Peterson Dep. Tr. at 105:1-10; P. Lippe Dep. Tr. at 46:24-47:6, 51:12-52:1.)

[24]  After learning that Enerbase planned to buy PepsiCo products from Core-Mark, Northern filed claims with PepsiCo pursuant to the PTEP requesting an investigation into transshipped Pepsi CSD products delivered by Core-Mark to Enerbase.  (B. Peterson Dep. Tr. at 106:12-108:18, 109:23-110:10; L. Gokey Dep. Tr. at 151:16-152:3.)  PepsiCo sent investigators to Enerbase's stores per the PTEP, assessed and collected fines from each bottler whose product was found in those stores, and credited those fine payments to Northern.  (L. Gokey Dep. Tr. at 152:13-20; B. Peterson Dep. Tr. at 106:12-110:10, 110:24-111:16.)  PepsiCo also sent a letter to Core-Mark demanding that it cease and desist its unauthorized sale of PepsiCo CSD products to

Northern's customers.  (L. Gokey Dep. Tr. at 163:5-164:8; March 26, 2015 Letter from David Yawman to Thomas B. Perkins (attached as Ex. 11); P. Lippe Dep. Tr. at 23:18-24:1.)

[25]  Although Core-Mark is an authorized distributor of certain PepsiCo products – including Tropicana juice products, Naked Juice smoothies, Izze beverages, Quaker food and snack products, and Gatorade recovery shakes – neither PepsiCo nor PBC has sold PepsiCo CSDs to Core-Mark.  (J. Doyle Dep. Tr. (attached as Ex 12) at 10:3-24; P. Lippe Dep. Tr. at 48:1-7; D. Morris 4/4/17 Dep. Tr. at 166:11-168:1; D. Lewis Dep. Tr. at 130:14-18.)  So when PepsiCo learned that Core-Mark was transshipping PepsiCo CSDs into Northern's territory, PepsiCo and PBC took steps to try to determine how Core-Mark was acquiring the transshipped products in order to shut off Core-Mark's source of these products.  (D. Morris 4/4/2017 Dep. Tr. at 161:7-18; 170:5-172:17, 221:3-223:6; D. Morris 3/22/2018 Dep. Tr. at 30:15-34:17; T. Trant Dep. Tr. at 171:14-172:8.)  Although those efforts were initially unsuccessful (*see* D. Morris 4/4/2017 Dep. Tr. at 221:3-222:18), as explained in Section IV below, PepsiCo was finally able to determine the identity of the diverters supplying Core-Mark with PepsiCo CSD products during discovery in this case, and thereafter PBC was able to implement corrective measures to shut down Core-Mark's sources.

### B.     Three Other Northern Customers Decide to Stop Purchasing from Northern

[26]  Enerbase was not the only C&G customer who reacted negatively to Northern's increasingly aggressive sales tactics.  In approximately June or July of 2016, FUO Cenex Devil's Lake ("Devil's Lake") notified Northern that it would no longer purchase products from Northern. (T. Haahr Dep. Tr. (Dkt. 59-10) at 25:4-14.)  Devil's Lake's CEO, Tom Haahr, explained that he made that decision in response to Northern's demands for increased shelf space, as well as a dispute with Northern about how to calculate the share of shelf-space allocated to Northern in a

large, newly opened Devil's Lake travel center.  (*Id.* at 25:4-8; 31:17-23; 32:9-15; 33:6-35:18, 38:10-39:11; B. Peterson Dep. Tr. at 96:4-8.)

[27]  In late 2016 a third customer, Envision, also decided to stop buying beverage products from Northern.  (S. Dockter Dep. Tr. (Dkt. 59-9) at 40:20-23.)  Envision's CEO, Steve Dockter, testified that Northern's salespeople were "too pushy," that they "dealt with [Envision] with a degree of arrogance" with respect to shelf and floor space in Envision's stores, and that Northern stood out among Envision's suppliers for its inflexibility with respect to its CDA requirements. (*Id.* at 28:8-32:23, 33:6-38:21, 40:20-23.)

[28]  Finally, a fourth customer—Cenex Harley's ("Harley's")—terminated its relationship with Northern for a few months in 2017 because of Northern's poor customer service, as well as the fact that the Harley's store manager thought "that Coca-Cola products were better and that there was little use for Pepsi products" in the store.  (B. Peterson Dep. Tr. at 99:10-20, 100:10-101:5.) [3]

[29]  After terminating their business relationships with Northern, Devil's Lake, Envision and Harley's each turned to Core-Mark to supply them with Pepsi, Diet Pepsi, Mountain Dew and Diet Mountain Dew.  (S. Dockter Dep. Tr. at 41:3-42:9; T. Haahr Dep. Tr. at 13:25-14:6, 22:8-11; P. Lippe Dep. Tr. at 63:20-64:23; P. Lippe Dep. Ex. 6 excerpt (attached as Ex. 13).)  Envision and Devil's Lake, like Enerbase, had existing relationships with Core-Mark as a supplier of non-CSD

---

[3] During fact discovery in this case, Northern calculated its purported damages based on its claimed lost sales to Enerbase, Devil's Lake, Envision and Harley's, and limited its discovery responses to those four customers.  (B. Peterson Dep. Tr. at 126:11-127:1; Northern Bottling Co. Sched. of Margin Losses (Dkt. 59-4).)  After fact discovery closed, however, Northern provided a new calculation prepared by its retained damages expert that included purported lost profits on a small amount of lost sales to three additional customers: J&S Vending, Tesoro Dakota, and Utter Stop.  Because Northern never asserted any claim relating to these customers prior to the submission of its expert's report, PepsiCo had no opportunity to take discovery about those customers, and there is consequently almost no evidence in the record concerning them.

products.  (S. Dockter Dep. Tr. at 24:6-25:1, 26:1-12; T. Haahr Dep. Tr. at 9:23-10:5, 23:1-25.)

The CEOs of Envision and Devil's Lake had been aware for several years before terminating their

relationships with Northern that PepsiCo CSD products were available from Core-Mark, but had

not previously chosen to purchase those products from Core-Mark.  (T. Haahr Dep. Tr. at 39:12-

24; S. Dockter Dep. Tr. at 41:3-42:9.)  Although these customers were unable to get from Core-

Mark the full line of PepsiCo CSD products – or anything close to it – after terminating their

relationships with Northern, they (like Enerbase) decided they would rather offer only a limited

selection of PepsiCo CSDs than continue to deal with Northern.  (T. Haahr Dep. Tr. at 41:8-17,

54:15-17; S. Dockter Dep. Tr. at 41:13-24.)

[30]  As it had done with respect to Enerbase, Northern filed claims with PepsiCo pursuant

to the PTEP requesting an investigation into Core-Mark's transshipping of PepsiCo CSD products

to Northern's other customers.  (B. Peterson Dep. Tr. at 114:22-115:22, 117:18-118:1, 119:18-

120:2.)  PepsiCo again investigated each complaint, ascertained the identity of the bottler whose

product had been transshipped in Northern's territory, assessed and collected fines from each such

bottler, and credited those payments to Northern.  (*Id.* at 106:12-110:10, 110:24-111:10, 114:22-

115:22, 116:16-22, 117:18-118:1-7, 119:18-120:8.)  Northern concedes that PepsiCo followed the

PTEP with respect to each and every transshipment claim submitted by Northern.  (*See* L. Gokey

Dep. Tr. at 153:22-155:20; B. Peterson Dep. Tr. at 110:11-111:10.)

## IV.   **PepsiCo and PBC Take Additional Steps to Stop Core-Mark's Transshipping**

[31]  Discovery in this case confirmed that Core-Mark had obtained the PepsiCo CSD

products that it sold to Northern's customers in the open market from brokers and diverters, not

from PepsiCo or PBC.  (P. Lippe Dep. Tr. at 46:24-47:6, 51:12-52:1; D. Morris 3/22/2018 Dep.

Tr. at 30:15-23.)  In fact, the PepsiCo CSD products at issue had been purchased and sold *multiple*

times in the open market before reaching Core-Mark's hands.  (V. Frisone Dep. Tr. at 10:6-15; P.

Lippe Dep. Tr. at 46:13-47:6.)   Through a combination of information learned in discovery –

including in particular the testimony of Vincent Frisone (a diverter who disclosed his sources of

and customers for diverted PepsiCo CSD products) and documents produced by Core-Mark – and

information provided by its LTTS, PBC was able to identify three customers of its Midwest Region

that had made material amounts of unauthorized sales of PepsiCo CSD products that ultimately

ended up in Core-Mark's hands.   (D. Morris 3/22/2018 Dep. Tr. at 30:15-23; E. Van Houten Dep.

Tr. at 14:4-16:17, 21:12-17.)   These PBC customers were Master Wholesale, Chicago Vending

and M&P Vending.   (E. Van Houten Dep. Tr. at 16:4-21.)

[32]   PBC then took specific steps to curtail further transshipment by those customers.   (*Id.*

at 17:13-18:2, 19:3-20.)   PBC suspended sales of Pepsi, Diet Pepsi, Mountain Dew and Diet

Mountain Dew in 20-ounce and one-liter bottles to Master Wholesale for several months, and cut

the sales of these products to Chicago Vending and M&P Vending by fifty percent.   (*Id.* at 17:19-

18:2.)   PBC took these steps even though doing so ultimately cost PBC millions of dollars in lost

sales that otherwise would have occurred in authorized portions of PBC's territory.   (M. Mercurio

Dep. Tr. (attached as Ex. 14) at 10:10-17; Eveland Decl., ¶ 6.)   Since those steps were taken, these

entities have not shown up as possible sources of transshipped PepsiCo CSDs in Northern's

territory.   (E. Van Houten Dep. Tr. at 22:13-23.)

[33]   PepsiCo also took affirmative steps to help Northern address the concerns of the

customers who had terminated their relationships with Northern between February of 2015 and

early 2017.   (M. Mercurio Dep. Tr. at 15:18-17:1.)   PepsiCo personnel visited the Enerbase and

Envision stores and talked to the store managers to understand their concerns about Northern's

sales practices and service issues.   (*Id.* at 11:16-12:23.)   Mario Mercurio, a PepsiCo Senior Vice

President, also put together a "comprehensive program" aimed at assisting Northern in recapturing

the lost customer accounts.  (*Id.* at 15:18-16:20.)  Although Northern declined to accept the program offered by PepsiCo (*id.*), it did take other steps to address the issues that had caused its customers to refuse to do business with Northern.  (T. Hillestad Dep. Tr. at 142:21-143:4, 144:4-24, 153:1-154:14, 162:2-14, 183:9-19, 230:9-18; B. Peterson Dep. Tr. at 67:21-68:14, 78:16-25, 94:13-95:7, 96:9-97:3, 99:23-101:14.)

[34]  The efforts of PepsiCo and PBC to curtail Core-Mark's transshipping into Northern's territory, coupled with Northern's own efforts to improve its business practices, were largely successful.  Since 2015, the quantity of transshipped PepsiCo CSD products into Northern's territory has dropped substantially.  (Van Houten Decl., ¶ 3; Supplemental Declaration of E. Van Houten (attached as Ex. 15, hereafter "Van Houten Supp. Decl."), ¶ 4.)  The sale of transshipped PepsiCo CSD products in Northern's territory fell by more than 23 percent in 2016, by 33 percent in 2017, and is on track to fall by another 44% in 2018.  (*Id.*)  In addition, three of the four customers who stopped doing business with Northern – Enerbase, Envision and Harley's – have now resumed purchasing PepsiCo CSD products from Northern.  (L. Gokey Dep. Tr. at 198:3-23, 213:1-4, 216:20-25; T. Bernhardt Dep. Tr. at 57:17-20; B. Peterson Dep. Tr. at 83:16-20; S. Dockter Dep. Tr. at 43:18-21.)[4]

[35]  It should also be noted that, Northern's protestations aside, transshipping has *never* had a material impact on Northern's business operations.  Even in 2015 – the high-water mark of

---

[4] Devil's Lake stopped buying PepsiCo CSD products from Core-Mark after PepsiCo's efforts to hinder Core-Mark's ability to source PepsiCo CSD products "weakened [CM's] supply significantly."  (T. Haahr Dep. Tr. at 43:15-25; 47:22-48:3.)  To date, however, Northern has not been able to convince Devil's Lake to return to buying those products from Northern; Devil's Lake has instead been purchasing certain core PepsiCo CSDs, as well as the other categories of products it previously purchased from Core-Mark, from another food service distributor, Henry's Foods. (T. Hillestad Dep. Tr. at 230:9-18, 231:14-232:8; T. Haahr Dep. Tr. at 47:22-48:14.)  PepsiCo and PBC's efforts to identify Henry's source of PepsiCo CSDs have so far been unsuccessful.

transshipment in Northern's territory – the total number of transshipped cases of PepsiCo CSDs into Northern's territory amounted to *less than one percent* of the more than ▮▮▮▮▮ cases of PepsiCo CSD products that Northern sold that year.  (Van Houten Decl., ¶ 3; Bowers Decl., ¶¶ 2-3.)  In 2017, a total of ▮▮▮ transshipped cases of Pepsi CSDs where PBC was the source bottler were found in Northern's territory.  (Van Houten Supp. Decl., ¶ 4.)  That represented less than half a percent of Northern's total Pepsi CSD case sales for that year.  (*See* Bowers Supp Decl., ¶ 7.)  And the four customers who terminated their business relationships with Northern (three of them only temporarily) represented less than one half of one percent of Northern's customer base.  (L. Gokey Dep. Tr. at 70:18-24.)

## ARGUMENT

### I.     Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Where the moving party has made that showing, the party opposing summary judgment must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Rule 56); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-52 (1986) (opposing party may not rest on "mere allegations or denials," and a mere "scintilla" of evidence is insufficient to defeat a properly supported motion).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial" and summary judgment should be entered.  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (internal citation and quotation omitted).

## II.   Choice of Law.

### A.   New York Law Governs Northern's Claim for Breach of Contract (Count One)

Because this Court is sitting in diversity jurisdiction, North Dakota choice-of-law rules apply in this case.  *Chapman v. Hiland Partners GP Holdings, LLC*, 862 F.3d 1103, 1108 (8th Cir. 2017).  Each of the EBAs that is the subject of Northern's claims provides that "this Appointment and all of its terms and conditions shall be governed by and interpreted under the laws of the State of New York."  (SOF ¶ 6.)  North Dakota courts honor contractual choice-of-law provisions with respect to questions of interpretation or construction of a contract unless doing so would violate a fundamental public policy of North Dakota.  *Chapman*, 862 F.3d at 1108; *John T. Jones Constr. Co. v. Hoot Gen'l Const. Co.*, 613 F.3d 778, 782-83 (8th Cir. 2010).  No such policy is implicated here, so New York law governs the interpretation and construction of the EBAs.

### B.   North Dakota Law Governs Northern's Tort Claims (Counts Two, Three, Four and Five)

North Dakota courts use a "significant contacts test" to determine what law governs a tort claim.  *Molzahn v. Allstate Ins. Co.*, 305 F. Supp. 2d 1113, 1115 (D.N.D. 2004).  That test "authorizes a court to look at all of the significant factors which might logically influence it in deciding which law to apply and choose the law of the state that has the greatest contacts with the case."  *Id.* (internal quotations omitted).  The specific contacts considered in tort cases are (1) the place where the injury occurred, (2) the place where the conduct causing the injury occurred, (3) the domicile, nationality, residence, place of business, or place of incorporation of the parties, and (4) the place where the relationship, if any, between the parties is centered.  *Id.* at 1115-16.

The first contact points toward North Dakota, where Northern allegedly sustained its injuries.  The second contact is less clear, because the conduct alleged by Northern – that PepsiCo "is selling Pepsi-Cola Trademark Beverages to distributors" who are transshipping those products

into Northern's territory (Compl. ¶ 11), and that PepsiCo "has failed and refused to take the necessary steps to stop the transshipment of its products into Northern's exclusive sales territory" (*id.* ¶ 12) – has no obvious geographic locus.  The purported impact of that alleged conduct, however, would occur primarily in North Dakota, where Northern's customers purchased transshipped PepsiCo CSD products.

The third contact is a wash.  Northern is located in North Dakota, while PepsiCo is incorporated in North Carolina and has its principal place of business in New York.  The fourth contact could arguably be either New York (because the parties' relationship is governed by a contract that is subject to New York law) or North Dakota, because the essence of the parties' relationship is the distribution of PepsiCo CSDs in Northern's territory, which is primarily North Dakota.

Although North Dakota has abandoned the *lex loci delicti* doctrine, the location of the injury "remains an important consideration in a choice of law analysis."  *Sura v. Nat'l Oilwell Varco, L.P.*, No. 1:15-cv-127, 2016 WL 4217766, at *4 (D.N.D. Apr. 6, 2016).  Thus, on balance, North Dakota's significant contacts test weighs in favor of applying North Dakota law to Northern's tort claims.[5]

---

[5] In addition, the North Dakota Supreme Court has adopted the use of five "choice-influencing considerations" to determine what jurisdiction has the more significant interest with the issues in the case.  *See Nodak Mut. Ins. Co. v. Wamsley*, 687 N.W.2d 226, 230-232 (N.D. 2004).  Given that Northern is a North Dakota business that sustained its alleged injury in North Dakota, analysis of these factors supports the application of North Dakota law to Northern's tort claims.  *See, e.g.*, *Sura*, 2016 WL 4217766, at *3-5 (finding in tort case that "the significant contacts with North Dakota are of a sufficient quantity and quality that it is clear the advancement of North Dakota's governmental interest trumps any other interest put forth by" other states, supporting application of North Dakota law).

**III.    PepsiCo Is Entitled to Summary Judgment on Count One of Northern's Complaint Because PepsiCo Has No Obligation Under the EBAs to Stop Third Parties from Selling PepsiCo CSD Products in Northern's Territory.**

To establish a *prima facie* case for breach of contract under New York law, a plaintiff must prove: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach.  *RIJ Pharm. Corp. v. Ivax Pharm., Inc.* 322 F. Supp. 2d 406, 412 (S.D.N.Y. 2004).  On a summary judgment motion, where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial," there can be no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  *Celotex*, 477 U.S. at 322-23.  In this case, Northern cannot establish any contractual duty owed by PepsiCo to Northern that PepsiCo breached.  In particular, PepsiCo does not have any contractual obligation to prevent third parties from transhipping PepsiCo CSD products into Northern's territory.  The Court should accordingly grant summary judgment in favor of PepsiCo on Count One of Northern's Complaint.

**A.    The EBAs Do Not Impose A Duty on PepsiCo to Prevent Third-Party Sales of PepsiCo CSDs in Northern's Territory**

Under New York law, "if a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence." *Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005) (internal quotation marks omitted); *Compania Embotelladora del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 323 (S.D.N.Y. 2009) (hereafter, "*CEPSA*") (quoting *Postlewaite*).  Extrinsic evidence of the parties' intent may be considered only where an agreement is ambiguous, and is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous on its face. *Holland Loader Co., LLC v. FLSmidth A/S*, 313 F. Supp. 3d 447, 466 (S.D.N.Y. 2018); *see also Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 71 (2d Cir. 2011) ("Because the

contract is unambiguous, it was error for the district court to consider extrinsic evidence of the parties' post-contract conduct."); *O'Grady v. BlueCrest Capital Mgmt. LLP*, 646 Fed. App'x 2, 4-5 (2d Cir. Apr. 14, 2016) (rejecting plaintiff's claim that he was entitled to receive a performance bonus based on the parties' course of performance where the parties' agreement unambiguously provided that the awarding of bonuses was subject to the defendant's discretion).   When an agreement is unambiguous, it must be enforced according to the plain meaning of its terms. *Holland Loader Co.*, 313 F. Supp. 3d at 466-67.

Each of the EBAs between PepsiCo and Northern "appoints" Northern as PepsiCo's exclusive bottler, "to bottle and distribute" a specific carbonated beverage within the described territory.   (SOF ¶ 4.)   That appointment language is followed by a series of terms and conditions, set forth in numbered paragraphs, almost every one of which either imposes an obligation or limitation on Northern (not PepsiCo) or grants rights to PepsiCo.   (*See, e.g.*, Compl. Ex. 1, ¶¶ 1-3, 5-9, 13, 15-16 (imposing obligations or limitations on Northern); Compl. Ex. 1, ¶¶ 10-11 (granting rights to PepsiCo).)   These provisions include an express prohibition on Northern's use of beverage concentrate or syrup purchased from PepsiCo pursuant to the EBA for any purpose other than the bottling of the applicable CSD "in the Territory."   (SOF ¶ 4.)

The only obligations that the EBAs impose on PepsiCo are (1) that PepsiCo will sell to Northern its requirements of concentrate or syrup, and (2) that PepsiCo will defend and protect its trademarks.   (SOF ¶ 4.)   The EBAs do not include any provision that, by its plain language, obligates PepsiCo to take affirmative steps to prevent third parties from selling PepsiCo CSD products in Northern's exclusive territory.   Each EBA does, however, include an integration clause stating that it "expresses fully" the parties' understanding.   (SOF ¶ 6.)

Given the absence of any express language in the EBAs obligating PepsiCo to prevent third parties from selling PepsiCo CSD products in Northern's territory, the overall structure of the EBAs, and the presence of the integration clause, it would be improper for the Court to read into the unambiguous EBAs an obligation for PepsiCo to take affirmative steps to prevent third parties from selling PepsiCo CSDs in Northern's territory. *See, e.g.*, *CEPSA*, 650 F. Supp. 2d at 323 (finding that the EBA between PepsiCo and its exclusive bottler for certain parts of Peru did not "contain any express language" requiring PepsiCo to take affirmative steps "to prevent other bottlers and third-parties" from selling PepsiCo products in that territory, and declining "to read such obligations into the EBA"); *Mailing & Shipping Sys., Inc. v. Neopost USA, Inc.*, 937 F. Supp. 2d 879, 887 (W.D. Tex. 2013) (holding that language in defendant's dealer policy manual prohibiting dealers from selling products in any territory other than that described in the dealer's sales agreement "place[d] a contractual obligation on Defendant's dealers," but that "nothing about this language suggest[ed] that Defendant was therefore obligated to police the boundaries of these designated territories on behalf of the dealers," and declining to imply such an obligation); *Holland Loader Co.*, 313 F. Supp. 3d at 466-67 (the omission of a term from a contract does not itself create an ambiguity); *Vt. Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (N.Y. 2004) ("[C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include.") (internal citation omitted).

At most, the exclusivity provisions of the EBAs might be interpreted as prohibiting PepsiCo from appointing another bottler to operate in Northern's territory, or from selling the products that are the subject of the EBAs in that territory. *See, e.g.*, *CEPSA*, 650 F. Supp. 2d at 323 (finding that EBA "prohibited PepsiCo from appointing another bottler to serve CEPSA's exclusive territory or selling PepsiCo product directly into that territory"). But there is no evidence

whatsoever that PepsiCo either appointed another bottler to operate in Northern's territory, or sold PepsiCo CSD products into Northern's territory.  (*See* SOF ¶¶ 25, 31.)  Instead, Northern claims that PepsiCo breached the EBAs by failing to prevent third parties such as Core-Mark from selling PepsiCo CSDs to customers in Northern's territory.  (Compl. ¶ 12.)  Because the EBAs do not impose on PepsiCo any obligation to take affirmative steps to prevent such third-party sales, Northern cannot prevail on this claim and PepsiCo is entitled to judgment in its favor as a matter of law.

### B.   The Implied Covenant of Good Faith and Fair Dealing Does Not Create a Duty for PepsiCo to Prevent Third-Party Sales in Northern's Territory

Northern alleges in Count One of its Complaint that the "contractual obligations" PepsiCo has purportedly breached include "PepsiCo's duty of good faith and fair dealing implied in the EBA." (Compl. ¶ 15.)  The implied covenant of good faith and fair dealing, however, cannot save Northern's claim.  Although an implied covenant of good faith and fair dealing inheres in every contract under New York law, the scope of potential liability for breach of the covenant is "quite narrow."  *Coca-Cola N. Am. v. Crawley Juice, Inc.*, No. 09 CV 3259(JG)(RML), 2011 WL 1882845, at *9 (E.D.N.Y. May 17, 2011).  In particular, the implied covenant cannot be used "to impose 'obligations that were not explicitly part of the agreement' . . .  or to create, in essence, new affirmative duties (such as a duty to stop third-party transshipping) that were not expressly set forth in the contract." *CEPSA,* 650 F. Supp. 2d at 324, quoting *ARI & Co v. Regent Int'l Corp.*, 273 F. Supp. 2d 518, 523 (S.D.N.Y. 2003); *see also Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 198-99 (2d Cir. 2005) (the implied covenant "can only impose an obligation consistent with other mutually agreed upon terms in the contract.  It does not add to the contract a substantive provision not included by the parties.") (internal quotations and citation omitted); *Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151, 164 (S.D.N.Y. 2014) ("The implied covenant of good

faith and fair dealing 'cannot be used to create terms that do not exist in the writing.'") (quoting

*Vanlex Stores, Inc. v. BFP 300 Madison II, LLC*, 887 N.Y.S.2d 576, 577 (N.Y. App. Div. 2009));

*Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P.*, 936 F. Supp. 2d 376, 409 (S.D.N.Y. 2013)

("The scope of potential liability is narrow; the covenant does not create new contractual rights or

impose additional duties.").  Because the implied covenant of good faith and fair dealing cannot

be used to impose on PepsiCo an obligation to stop third-party transshipping in Northern's territory

that is not set forth in the EBAs, Northern cannot establish that PepsiCo breached any duty owed

to Northern and PepsiCo is accordingly entitled to summary judgment on Count One.

> **C.     The Tenth Circuit's Decision in *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.* Does Not Support the Imposition of a Duty on PepsiCo to Prevent Third Party Transhipping into Northern's Territory.**

Northern has argued in this litigation that PepsiCo has a duty to take "reasonable steps" to

prevent third parties from transshipping Pepsi CSD products into Northern's territory, despite the

absence of any such language in the EBAs, based primarily on the decision of the Tenth Circuit in

*Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241 (10th Cir. 2005)

(hereafter, "*Pittsburg Bottling*").  (*See, e.g.*, Plf. Mem. in Support of Mot. to Compel Responses

to Written Discovery (Dkt. 61), at 9-10.)  That decision is not binding on this Court, however, and

its finding that PepsiCo owed a contractual duty to prevent transshipment is incorrect under New

York law.

In *Pittsburg Bottling*, an independent bottler, Pepsi-Cola Bottling Co. of Pittsburg, Inc.

("Pittsburg Pepsi"), brought suit against PepsiCo and one of its "anchor bottlers," Bottling Group,

LLC, alleging among other claims that PepsiCo had breached Pittsburg Pepsi's EBAs by refusing

to extend new product appointments, denying funding, and failing to enforce the PTEP (referred

to in that decision as the "TEP") against transshipment.  431 F.3d at 1252-54.  In reversing the

district court's entry of summary judgment in favor of the defendants on Pittsburg Pepsi's

transshipment claim, the Tenth Circuit held that PepsiCo "had a duty to take reasonable steps to prevent competing bottlers from encroaching on Pittsburg Pepsi's exclusive territory." *Id.* at 1259. In reaching that conclusion, however, the Tenth Circuit expressly relied on its finding that the Uniform Commercial Code ("UCC"), rather than New York common law, governed the Pittsburg Pepsi EBA. *Id.* at 1255 n.7. In particular, the Tenth Circuit held that, under the UCC, the court could consider the parties' post-contract conduct "[i]n analyzing the obligations and rights the [EBA's] exclusive dealings clause imposed," without regard to whether the contract was ambiguous. *Id.* at 1258.

The *Pittsburg Bottling* decision, however, is an outlier. Other cases that analyze whether the UCC governs soft drink bottler agreements like the PepsiCo EBAs have held that it does not, and that such agreements are instead governed by common law. *See Alesayi Beverages Corp. v. Canada Dry Corp.*, 947 F. Supp. 658, 667 (S.D.N.Y. 1996), *aff'd,* 122 F.3d 1055 (2d Cir. 1997) (holding that a contract for the bottling and sale of Canada Dry soft drinks was not subject to the UCC); *Coca-Cola Bottling Co. of Elizabethtown, Inc. v. Coca-Cola Co.*, 696 F. Supp. 57, 84-85 (D. Del. 1988)*, aff'd,* 988 F.2d 386 (3d Cir. 1993) (holding that Coca-Cola bottling appointment was not subject to the UCC); *Swire Pac. Holdings, Inc. v. Dr. Pepper/Seven-Up Corp.*, No. 05-95-01525-CV, 1997 WL 153794, at *5 (Tex. App. Apr. 3, 1997) (finding that the UCC did not apply to agreements for bottling and distribution of Seven-Up soft drinks); *see also CEPSA*, 650 F. Supp. 2d at 323 (applying New York common law in interpreting agreement appointing plaintiff as PepsiCo's exclusive bottler in certain parts of Peru). This Court should likewise hold that the provisions and structure of the EBAs do not trigger application of the UCC.

Under New York law, the test for determining whether a contract is governed by common law or the UCC is whether the contract is "predominantly" one for the sale of goods or for the

provision of services.  *Alesayi Beverages Corp.*, 947 F. Supp. at 667.  If the provision of services or rendering of other performance predominates and is not merely incidental or collateral to the sale of goods, then the UCC does not apply.  *Id.*

When the EBAs between Northern and PepsiCo are considered in their entirety, it is clear that the provision of services predominates and is not merely incidental or collateral to the sale of goods.  Indeed, the very title of the agreements – "*Bottling* Appointment" – refers to the provision of a service, not the sale of a good.  Accordingly, while it is true that each EBA provides that PepsiCo will sell Northern the concentrate, syrup "or other beverage base" for the CSD that is the subject of that EBA, each EBA then requires Northern to produce and bottle the finished product from the concentrate or syrup, and to perform many other duties, including:

- To maintain sufficient productive capacity to enable Northern "to fully meet" its obligations under the EBA;

- To follow PepsiCo's instructions precisely and comply with PepsiCo's standards in the use, handling and processing of PepsiCo concentrate or syrup, as well as the filling, packaging, labeling and selling of the finished product; and

- To "push vigorously" the sale of the particular CSD product throughout its territory, "fully meet and increase the demand" for the product, "secure full distribution up to the maximum sales potential" of the product, and "actively advertise . . . and vigorously engage in sales promotion" of the product throughout its territory.

(SOF ¶¶ 4-5.)

The *Alesayi Beverages Corp.* case, like this case, involved a contract for the bottling and sale of soft drinks with a New York choice of law provision.  947 F. Supp. at 666-67.  The court found that, while the contract provided for "the sale of extracts" – *i.e.*, Canada Dry flavor extracts used to make the soft drinks – it also provided "for services that were not incidental to the sale of goods."  *Id.* at 660, 667.  The court pointed in particular to a provision stating that the bottler "agrees to establish and commence operation of a plant for the production of 'CANADA DRY'

beverages, at Bottler's expense" and that "[w]hen the demand for 'CANADA DRY' beverages in the territory shall necessitate additional facilities, the Bottler agrees to establish such additional facilities." *Id.* at 667. As noted above, the Northern EBAs contain very similar provisions. (*See, e.g.*, Compl. Ex. 1, ¶ 1.)

The court in *Alesayi Beverages Corp.* found that these provisions indicated "the purpose behind the agreement was the establishment of a bottling business by Alesayi, not just the sale of extracts from Canada Dry to Alesayi." 947 F. Supp. at 667. The court concluded that "the sale of extracts did not predominate" and that therefore the agreement was not subject to the UCC. *Id.*; *see also Swire Pac. Holdings, Inc.*, 1997 WL 153794, at *5 (finding that although agreements for bottling and distribution of Seven-Up soft drinks provided for sale of the syrups used to make soft drinks, the "essence" of the agreements was "services, not goods," and consequently the UCC did not apply).

In contrast to the careful analysis in *Alesayi Beverages Corp.* and similar cases of the actual terms of the bottling appointments at issue, the court in *Pittsburg Bottling* addressed the applicability of the UCC only in a footnote, and failed to discuss a single decision involving soft drink bottler agreements, relying instead on cases involving traditional distributorship agreements pursuant to which the manufacturer of a product sells the completed product to the distributor for re-sale. 431 F.3d at 1255 n. 7. The court also mischaracterized the PepsiCo bottling appointment, stating that its purpose "was to provide for and regulate PepsiCo's sale of products to Pittsburg Pepsi and Pittsburg Pepsi's resale *of those items*." *Id.* (emphasis added). As previously discussed, however, bottlers such as Northern do not simply "resell" the CSD products that they purchase from PepsiCo; rather, those products (syrups and concentrates) are used as inputs to create a new product – carbonated soft drinks – which is what the bottlers actually sell. In short, the court failed

to undertake the detailed analysis of the particular terms of the PepsiCo EBAs that is required to determine whether a contract is or is not "predominantly" for the sale of goods.  When that analysis is properly conducted, the only reasonable conclusion – and the one that this Court should reach – is that the sale of goods does not predominate and the EBAs are accordingly not within the scope of the UCC.

The Tenth Circuit likewise erred in finding that the implied covenant of good faith and fair dealing "reinforce[d] Pittsburg Pepsi's transshipment claim."  *Id.* at 1259.  Under New York law, as previously discussed, the implied covenant cannot be used to create new contractual rights or impose additional duties that do not exist in the parties' written agreement.  *See supra* at 24-25.  Thus, in the *CEPSA* case, a federal court sitting in New York and applying New York law held that the implied covenant of good faith and fair dealing could *not* be used to impose a duty on PepsiCo to prevent third parties from selling Pepsi products in a bottler's exclusive territory.  *CEPSA*, 650 F. Supp. 2d at 324.  This Court should follow *CEPSA* and reach the same result.

**IV.     Even Assuming a Duty Exists, PepsiCo is Entitled to Summary Judgment on Count One Because Northern Cannot Establish Any Breach by PepsiCo.**

Even if this Court were to follow *Pittsburg Bottling* and hold that PepsiCo had a duty to take "reasonable steps" to prevent third parties from encroaching on Northern's exclusive territory, PepsiCo would still be entitled to summary judgment because Northern cannot establish that PepsiCo breached such a duty.  In *Pittsburg Bottling* itself, the Tenth Circuit observed that whether there was sufficient evidence to create a question of material fact as to this issue presented a "difficult question."  431 F.3d at 1259.  In concluding that the evidence in that case was sufficient, the court placed particular emphasis on PepsiCo's "alleged failure to enforce" the PTEP with respect to Pittsburg Pepsi.  *Id.*  As the court explained, "although the EBAs do not mention the [P]TEP, evidence that PepsiCo failed to enforce the [P]TEP, while simultaneously taking no other

action to prevent transshipment, would tend to prove that PepsiCo failed to perform its contractual obligations." *Id.*

Northern has proffered no evidence in this case from which a reasonable jury could conclude that PepsiCo "failed to enforce" the PTEP or otherwise took "no action to prevent transshipment." Indeed, Northern concedes that PepsiCo fully followed the PTEP with respect to each of Northern's transshipment claims. (SOF ¶ 30.) Pursuant to the PTEP, PepsiCo investigated each of Northern's complaints, ascertained the identity of the bottler whose product was sold in Northern's territory, assessed and collected fines from each such bottler, and credited those payments to Northern. (SOF ¶¶ 24, 30.) In fact, unlike in *Pittsburg Bottling* – where the court found the question of whether PepsiCo responded to Pittsburg Pepsi's transshipping complaints to be "unclear" (*see Pittsburg*, 431 F.3d at 1260) – Northern representatives testified that they were satisfied with PepsiCo's handling of their transshipment claims under the PTEP. (SOF ¶¶ 24, 30.)

The additional actions taken by PepsiCo and PBC beyond PepsiCo's enforcement of the PTEP further demonstrate the reasonableness of PepsiCo's efforts to prevent third parties from transshipping into Northern's territory. PepsiCo was ultimately able to trace the path by which Core-Mark had obtained the transshipped product through a combination of its LTTS data and information obtained during discovery in this litigation. (SOF ¶¶ 18, 25, 31.) Once PBC learned the identities of its customers who had sold material amounts of CSDs to the diverters who actually sold the transshipped product to Core-Mark, PBC (in keeping with the terms of its own Transshipment Policy) reduced the volume of product sold to such customers or suspended CSD shipments altogether. (SOF ¶¶ 31-32.) PBC took these steps to deter transshipments into Northern's territory, even though such measures resulted in significant financial losses to PBC that far outweighed any financial impact on Northern caused by transshipments. (SOF ¶¶ 31-32.)

Furthermore, Northern has presented no evidence whatsoever to support its reckless allegation that that PepsiCo actually sold CSDs directly to Core-Mark.  To the contrary, the deposition testimony by Core-Mark's representative and documents produced by both PepsiCo and Core-Mark confirmed that neither PepsiCo nor PBC sold CSDs to Core-Mark.  (SOF ¶ 25.)  In fact, PepsiCo sent a cease and desist letter to Core-Mark demanding that it stop transshipping CSDs into Northern's territory.  (SOF ¶ 24.)  There was no comparable evidence in the *Pittsburg Bottling* case of PepsiCo's adherence to the PTEP and diligent efforts to curtail transshipment into the complaining bottler's territory (at great cost to PepsiCo and PBC).

Moreover, the evidence that the Tenth Circuit found sufficient in *Pittsburg Bottling* "to create a question of material fact that PepsiCo did not protect Pittsburg Pepsi's territory," 431 F.3d at 1259-60, bears no resemblance to the facts of this case.  For example, the court in *Pittsburg Bottling* identified as "most damaging to PepsiCo" evidence that the PepsiCo transshipment enforcement director during the relevant time period was also leading Bottling Group, LLC's "efforts to acquire dysfunctional bottlers."  *Id.*  As the court explained, there was "no dispute that PepsiCo had classified Pittsburg Pepsi as a dysfunctional bottler and that PepsiCo had decided it would 'invest in [Pittsburg Pepsi] only to prevent dysfunction.'"  *Id.* at 1260.  The court concluded that one could infer from these facts "that PepsiCo had little interest in protecting Pittsburg Pepsi's territory, which PepsiCo admittedly was working to acquire."  *Id.*  There is no such evidence – or even allegations – in this case.

The court in *Pittsburg Bottling* also relied on certain decisions made by PepsiCo that allegedly "had the effect of encouraging Pittsburg Pepsi's customers to purchase Pepsi product from sources outside Pittsburg Pepsi's territory."  431 F.3d at 1260.  For example, the court focused on PepsiCo's use of customer development agreements (CDAs) and marketing investment

agreements (MIAs) "to increase sales to major national chains such as Sam's Club," while at the same time working with its anchor bottlers (including Bottling Group, LLC) "to develop business with these national chains." *Id.* Thus, according to the Tenth Circuit, "as PepsiCo nationalized its marketing strategy and moved toward alignment, Pittsburg Pepsi's customers began going to Bottling Group's territory to obtain (and transship) discounted Pepsi products from national customers." *Id.* The Tenth Circuit concluded that it could be inferred from these facts that PepsiCo "created incentives for Pittsburg Pepsi's customers to purchase product from larger chains, but then took inadequate steps to police the anticipated transshipment that followed." *Id.*

Here, by contrast, there is no evidence (or even allegation) that the spike in transshipment of PepsiCo CSD products into Northern's territory in 2015 resulted from decisions by Northern's customers to purchase product from national chains, rather than from Northern, or that PepsiCo did anything to encourage or incentivize Northern's customers to purchase PepsiCo CSDs from sources other than Northern. Instead, the undisputed record shows that Northern's own actions caused its customers to seek out an alternative source of PepsiCo CSD products, and that the alternative source to which they turned was not one of PepsiCo's national customers, but a third party who had purchased the product in the open market. (SOF ¶¶ 18, 21-23, 25-29, 31.)

In short, whether or not PepsiCo had a duty to take reasonable steps to prevent third parties from transshipping PepsiCo CSDs into Northern's territory, PepsiCo is entitled to summary judgment on Count One of Northern's Complaint because no reasonable jury could find from the evidence in this case that PepsiCo breached that duty. *See Celotex*, 477 U.S. at 322-23 (holding that where the nonmoving party on summary judgment "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial" there can be no genuine issue of material fact, and the moving party

is entitled to judgment as a matter of law); *Gianelli v. RE/MAX of New York, Inc.*, 41 N.Y.S.3d 273, 274 (N.Y. App. Div. 2016) ("A breach of contract cause of action fails as a matter of law in the absence of any showing that a specific provision of the contract was breached.").

V.   **PepsiCo is Entitled to Summary Judgment on Count Two of the Complaint.**

Count Two of Northern's Complaint purports to assert a claim for "tortious breach of implied covenant of good faith and fair dealing." (Compl. at p. 6.) As previously discussed, under North Dakota choice-of-law rules Northern's tort claims are governed by North Dakota law. *See supra* at pp. 19-20. North Dakota courts, however, have "declined to recognize a tort action for breach of an obligation of good faith in a commercial context." *Interstate Companies, Inc. v. Kress Corp.*, No. A1-03-73, 2003 WL 22282300, at *7 (D.N.D. Sept. 30, 2003). PepsiCo is accordingly entitled to summary judgment on Count Two of Northern's Complaint under North Dakota law.

PepsiCo would likewise be entitled to summary judgment on Count Two even if it were governed by New York law. Under New York law, a party may maintain a claim for breach of the implied covenant of good faith and fair dealing only if the claim is based on allegations different from the allegations underlying an accompanying breach of contract claim. *Deutsche Bank Sec., Inc. v. Rhodes*, 578 F. Supp. 2d 652, 664 (S.D.N.Y. 2008). Where a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant. *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013); *see also Coca-Cola N. Am.*, 2011 WL 1882845, at *9 (breach of the implied covenant cannot give rise to liability if it "merely replicates the liability for breach of the underlying contract"); *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 365 (S.D.N.Y. 2012) (a claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of an express provision of the underlying contract); *ARI & Co. v. Regent Intern. Corp.*, 273

F. Supp. 2d 518, 522 (S.D.N.Y. 2003) ("[A] breach of the implied covenant of good faith claim can survive a motion to dismiss only if it is based on allegations different than those underlying the accompanying breach of contract claim.") (internal quotation marks omitted).

Moreover, where the relief sought by the plaintiff in claiming a breach of the implied covenant of good faith is "intrinsically tied to" the damages allegedly resulting from the breach of contract, there is "no separate and distinct wrong that would give rise to an independent claim." *ARI & Co.*, 273 F. Supp. 2d at 522-23 (internal quotation marks omitted). Consequently, under New York law, "claims for breach of the implied covenant of good faith which seek to recover damages that are intrinsically tied to the damages allegedly resulting from the breach of contract must be dismissed as redundant." *Id.* at 523.

In this case, Count Two of Northern's Complaint is based on exactly the same alleged facts as its claim for breach of contract. (*See* Compl. ¶ 17 (incorporating the allegations of paragraphs 1 through 16 of the Complaint, including the allegations contained in Count One).) In addition, Northern has not identified any damages that it seeks to recover in respect to this claim other than the purported lost profits on lost sales that allegedly resulted from the claimed breach of contract. The implied covenant claim is therefore redundant and PepsiCo is entitled to summary judgment on Count Two.

**VI.     PepsiCo Is Entitled to Summary Judgment on Count Three of the Complaint.**

Count Three of Northern's Complaint purports to assert a claim against PepsiCo for "constructive fraud." (Compl. at pp. 6-7.) North Dakota defines constructive fraud as follows:

  i.   In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault or anyone claiming under that person, by misleading another to the other's prejudice or to the prejudice of anyone claiming under the other; or

  ii.  In any such act or omission as the law specially declares to be fraudulent without respect to actual fraud.

N.D.C.C. § 9-03-09.[6]  This case does not involve an act or omission that "the law specially declares to be fraudulent without respect to actual fraud," so to prevail on this claim Northern must show both that PepsiCo breached a duty to Northern and that in doing so it misled Northern to Northern's prejudice.  It cannot establish either.

The North Dakota Supreme Court has held that constructive fraud "arises from the breach of a duty which is owed ordinarily because of a fiduciary or confidential or other special relationship between the parties."  *Bourgois v. Montana-Dakota Utilities Co.*, 466 N.W.2d 813, 819 (1991).  As the Supreme Court stated in that case, "[w]e have identified a fiduciary or confidential relationship as 'something approximating business agency, professional relationship, or family tie impelling or inducing the trusting party to relax the care and vigilance he would ordinarily exercise.'"  *Id.*, quoting 37 C.J.S. Fraud § 2.  "A fiduciary or confidential or other special relationship does not ordinarily exist when businesspersons deal with each other at arm's length."  *Id.*; *see also Dahl v. ConAgra, Inc.*, 998 F.2d 619, 620-22 (8th Cir. 1993) (same, citing *Bourgois*, and affirming entry of summary judgment in favor of defendant on constructive fraud claim).

Northern has adduced no evidence that its relationship with PepsiCo is anything other than "businesspersons deal[ing] with each other arm's length," and PepsiCo is therefore entitled to judgment in its favor on this claim.  *See, e.g.*, *Bourgois*, 466 N.W.2d at 819 (summary judgment properly granted on plaintiff's constructive fraud claim).  Nor has Northern identified any way in

---

[6] Notably, this definition of "constructive fraud" appears in the section of the Century Code relating to contracts, not torts, and there appears to be some doubt about whether constructive fraud is in fact an independent tort for which damages can be awarded, or merely a claim "arising in contract" that negates consent and allows the defrauded party to rescind the contract.  *See, e.g.*, *Erickson v. Brown*, 747 N.W.2d 34, 53-58 (N.D. 2008) (Crothers, J., concurring in part and dissenting in part).  This Court need not resolve that issue, however, because even if constructive fraud is an independent tort in North Dakota, Northern cannot establish any of the elements of such a claim.

which it was misled by PepsiCo; indeed, it does not even allege a "misleading" statement in its Complaint.  For that reason as well, the Court should enter summary judgment in favor of PepsiCo on Count Three of Northern's Complaint.

**VII.    PepsiCo Is Entitled to Summary Judgment on Count Four of the Complaint.**

Count Four of Northern's Complaint asserts a claim against PepsiCo for "tortious interference with contract and economic advantage." (Compl. at p. 7.)  To succeed on a claim for intentional interference with contract under North Dakota law, a plaintiff must prove (1) a contract existed, (2) the contract was breached, (3) the defendant instigated the breach, and (4) the defendant instigated the breach without justification.  *Thimjon Farms P'ship v. First Int'l Bank & Trust*, 837 N.W.2d 327, 333 (N.D. 2013).  A claim of unlawful interference with business requires (1) the existence of a valid business relationship or expectancy, (2) knowledge by the defendant of the relationship or expectancy, (3) an independently tortious or unlawful act of interference by the defendant, (4) proof that the interference caused the harm sustained, and (5) actual damage.  *Trade 'N Post L.L.C. v. World Duty Free Americas, Inc.*, 628 N.W.2d 707, 717 (N.D. 2001).

Northern's Complaint alleges that PepsiCo has interfered with Northern's relationships with its current and prospective customers by selling PepsiCo CSD products to those customers. (Compl., ¶¶ 23, 25.)  Northern has proffered no evidence, however, to support this allegation; to the contrary, the evidence is undisputed that neither PepsiCo nor PBC sold the PepsiCo CSDs at issue to Northern's customers.  (SOF ¶ 25.)  There is also no evidence that any Northern customer breached its contract with Northern, much less that PepsiCo "instigated" such breach, as required for a tortious interference with contract claim.  In fact, the evidence is undisputed that PepsiCo made efforts to assist Northern in regaining the customers who terminated their relationships with Northern in response to Northern's sales tactics and service issues.  (SOF ¶ 33.)

Nor is there evidence that PepsiCo committed an "independently tortious or otherwise unlawful act of interference."  The North Dakota Supreme Court has explained that, "[b]y independently tortious … we mean … that the plaintiff must prove that the defendant's conduct would be actionable under a recognized tort.… Conduct that is merely 'sharp' or unfair is not actionable and cannot be the basis for an action for tortious interference with prospective relations." *Trade 'N Post L.L.C.*, 628 N.W. 2d at 720.  Northern cannot establish this element of the claim it purports to assert in Count Four.  Finally, Northern cannot prove that PepsiCo caused the harm it allegedly sustained.  Northern's customers ceased buying PepsiCo CSDs and other products from Northern because of their deep unhappiness with their treatment by Northern, not because of any conduct by PepsiCo.  For all these reasons, PepsiCo is entitled to summary judgment on Count Four.

**VIII.  PepsiCo Is Entitled to Summary Judgment on Count Five of the Complaint.**

Count Five of Northern's Complaint purports to assert a "state common law" claim for unfair competition and deceptive trade practices.  (Compl. at pp. 7-8.)  The only common law unfair competition claim that North Dakota has recognized is akin to a claim under the Lanham Act.  *Burris Carpet Plus, Inc. v. Burris*, 785 N.W.2d 164, 177-78 (N.D. 2010).  As the North Dakota Supreme Court observed in that case, "[b]oth common law and the Lanham Act require the plaintiff to have a valid and protectable mark." *Id.* at 178.  There are no allegations or evidence in this case that PepsiCo infringed a valid and protectable trade- or service mark of Northern, or engaged in any other conduct that North Dakota has found to constitute "unfair competition."[7]  PepsiCo is entitled to summary judgment on Count Five of the Complaint.

---

[7] North Dakota does have a statutory Unfair Trade Practices Law, but it is irrelevant here because (1) Northern expressly identified Count Five as a *common law* claim, (2) the Unfair Trade

IX.   **PepsiCo Is Entitled to Summary Judgment on Counts Six and Seven of the Complaint.**

Counts Six and Seven of Northern's Complaint seek, respectively, punitive damages and injunctive relief.  (Compl. at pp. 8-9.)  Because PepsiCo is entitled to judgment as a matter of law on each of Northern's substantive claims, Northern is not entitled to relief of any kind, including punitive damages or injunctive relief, on those claims.  *See* N.D.C.C. § 32-03.2-11(1), (4) and (5) (providing that punitive damages may be awarded in an action "for the breach of an obligation not arising from contract" when the defendant "has been guilty by clear and convincing evidence of oppression, fraud, or actual malice" and further providing that "no award of exemplary damages may be made if the claimant is not entitled to compensatory damages"); *Oglala Sioux Tribe v. C & W Enters., Inc.*, 542 F. 3d 224, 229 (8th Cir. 2008) ("A permanent injunction requires the moving party to show actual success on the merits ….").

In addition, summary judgment should be entered in favor of PepsiCo on Northern's claim for punitive damages because (1) Northern failed to comply with North Dakota law when it sought punitive damages in its Complaint, (2) punitive damages are not available on Counts One and Two of the Complaint, which purport to allege claims for "breach of an obligation arising from contract," and (3) Northern has no evidence, much less "clear and convincing" evidence, that PepsiCo acted with "oppression, fraud, or actual malice."[8]  *See Buchl v. Gascoyne Materials Handling & Recycling, L.L.C.*, No. 1:17-CV-48, 2018 WL 3267151, at *2-3 (D.N.D. Mar. 23,

---

Practices Law regulates advertising, which is not at issue, and (3) the Unfair Trade Practices Law does not provide a private right of action for damages.  *See* N.D.C.C. § 51-10.

[8] Indeed, Northern does not even allege that PepsiCo acted with "oppression, fraud, or actual malice," but only that PepsiCo's alleged actions were "committed with conscious disregard or indifference to the high probability of injury and damage to Northern." (Compl. ¶ 31.)  Northern does not allege any facts to support even that conclusory allegation.

2018) (discussing requirements for seeking punitive damages pursuant to N.D.C.C. § 32-03.2-11 and holding that, because the statute "provides a substantive right," it applies in a federal diversity action); *A & R Fugleberg Farm, Inc. v. Triangle Ag, LLC*, 828 F. Supp. 2d 1045, 1051 (D.N.D. 2011) (holding that punitive damages may not be awarded for a breach of contract, "even if intentional, malicious, and in bad faith," but require "an independent tort separate and distinct from the contract breach"); *Raaum Estates v. Murex Petroleum Corp.*, Case No. 4:14-cv-024, 2017 WL 2870070, at *26 (D.N.D. July 5, 2017) (discussing definitions of "oppression," "actual malice," and "fraud" under North Dakota law).

Finally, PepsiCo is entitled to summary judgment on Count Seven of Northern's Complaint for the additional reason that Northern has failed to show that "no adequate remedy at law exists and irreparable injury will result if relief is not granted." *Huber v. Oliver Cty.*, 602 N.W.2d 710, 716 (N.D. 1999); *see also CDI Energy Servs., Inc. v. W. River Pumps, Inc.*, Case No. 1:07-CV-085, 2007 WL 4395703, at *5 (D.N.D. Dec. 13, 2007) ("The basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.") (internal quotation marks omitted).  To demonstrate irreparable harm, Northern must show "that the harm is not compensable through monetary damages." *CDI Energy Servs.*, 2007 WL 4395703, at *4. Northern plainly cannot meet that burden here, because monetary damages are potentially available to a prevailing plaintiff on each of the claims Northern has asserted, and Northern has in fact proffered a purported calculation of its claimed monetary damages in this case.[9]

---

[9] Although PepsiCo intends to argue if this case proceeds past summary judgment that Northern cannot sustain its burden of proof with respect to its claimed damages, that failure cannot justify an award of injunctive relief.

## **CONCLUSION**

For the reasons set forth above, Defendant PepsiCo respectfully requests that the Court grant its Motion for Summary Judgment and enter a final judgment in favor of PepsiCo as to all claims asserted by Northern in this case.

Dated:  October 19, 2018     Respectfully submitted,

            /s/ *Thomas B. Quinn*

            Thomas B. Quinn
            Sondra A. Hemeryck
            Patricia T. Mathy
            RILEY SAFER HOLMES & CANCILA LLP
            Three First National Plaza, Suite 2900
            70 West Madison Street
            Chicago, IL 60602
            312-471-8700
            tquinn@rshc-law.com
            shemeryck@rshc-law.com
            pmathy@rshc-law.com

            Patrick J. Ward
            John E. Ward
            ZUGER KIRMIS & SMITH
            316 North 5th Street
            P.O. Box 1695
            Bismarck, ND  58502-1695
            701-223-2711
            pward@zkslaw.com
            jward@zkslaw.com

            *Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of Defendant PepsiCo's Memorandum of Law in Support of its

Motion for Summary Judgment was served upon the following counsel on October 19, 2018, via

electronic mail:

James M. Ragain - jim@lawmontana.com
Michelle M. Sullivan - michelle.sullivan@sullivanmiller.com

***Attorneys for Plaintiff Northern Bottling Co., Inc.***

Dated: October 19, 2018                              */s/ Thomas B. Quinn*