# Exhibit 4

**Page 1**

```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NORTH DAKOTA
2                    NORTHWESTERN DIVISION
3                        CASE NO.:  4:150-cv-133
4
   NORTHERN BOTTLING CO., INC.,
5
        Plaintiffs,
6
   v.
7
   PEPSICO, INC.,
8
        Defendant.
9    _____/
   VIDEOTAPED
10 DEPOSITION OF:    DEREK LEWIS
11 DATE:             JUNE 19, 2017
12 TIME:             8:33 A.M. - 11:53 A.M.
13 TAKEN BY:         PLAINTIFF
14 PLACE:            PEPSICO, INC.
                     7380 SAND LAKE ROAD
15                   ORLANDO, FLORIDA  32819
16 REPORTED BY:      DAYNA JONES, FPR, NOTARY PUBLIC,
                     STATE OF FLORIDA
17
18
19
20
21
22
23
24
25
```

**Page 2**

```
1  A P P E A R A N C E S:
2
   JAMES M. RAGAIN, ESQUIRE
3  OF: Ragain & Cook, P.C.
        3936 Avenue B, Suite A-2
4       Billings, Montana 59102
        jim@lawmontana.com
5
        Counsel for the Plaintiff
6
7  THOMAS B. QUINN, ESQUIRE
   OF:  Riley, Safer, Holmes & Cancila, LLP
8       70 West Madison Street, Suite 2900
        Chicago, Illinois 60602
9       tquinn@rshc-law.com
10      Counsel for the Defendant
11
12
13 ALSO PRESENT:
14 Erik Nelson, Videographer
15 Langer Gokey, Northern Bottling Representative
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1               I N D E X
2  TESTIMONY OF DEREK LEWIS
3     Direct Examination by Mr. Ragain................5
4     Cross-Examination by Mr. Quinn................138
5     Redirect Examination by Mr. Ragain............142
6  CERTIFICATE OF REPORTER...........................144
7  ERRATA SHEET......................................145
8
9                * * * * * *
10              E X H I B I T S
11              (None marked.)
12
13
14               * * * * * *
15              S T I P U L A T I O N S
16      It is hereby stipulated and agreed by and
17 between counsel present for the respective parties, and
18 the deponent, that the reading and signing of the
19 deposition are hereby RESERVED.
20
21
22
23
24
25
```

**Page 4**

```
1           P R O C E E D I N G S
2              * * * *
3      THE VIDEOGRAPHER:  This is Disc No. 1 to the
4  video recorded deposition of Derek Lewis in the
5  matter of Northern Bottling Company, Incorporated
6  versus PepsiCo, Incorporated being heard before the
7  United States District Court for the District of
8  Northern -- of Dakota, Northern -- Northwestern
9  Division, Case No. 4:150-cv-133.
10     This deposition is being held at 3780 [sic]
11 Sand Lake Road, Orlando, Florida 32819 on June 19,
12 2017 at 8:33 a.m.  My name is Erik Nelson and I'm
13 the videographer.  The court reporter is Dayna
14 Jones.
15     Counsel, will you please introduce yourselves
16 and affiliations and then the witness will be
17 sworn?
18     MR. RAGAIN:  Jim Ragain, I represent the
19 plaintiff Northern Bottling.
20     MR. QUINN:  Tom Quinn, I represent PepsiCo,
21 the defendant in the case, as well as Mr. Lewis,
22 the witness.
23     And let me state for the record that pursuant
24 to the protective order that has been entered by
25 the court in this case, we're designating the
```



DEREK LEWIS  Confidential
NORTHERN BOTTLING vs PEPSICO

June 19, 2017
5—8

Page 5

1   transcript of this deposition, the contents of the
2   deposition, as confidential until such time as
3   Mr. Lewis has the opportunity to review the
4   transcript and make specific designations.
5       (A discussion was held off the record.)
6           DEREK LEWIS,
7       was examined and testified as follows:
8           DIRECT EXAMINATION
9 BY MR. RAGAIN:
10   Q.   Good morning, Mr. Lewis.
11   A.   Good morning.
12   Q.   My name is Jim Ragain.  I represent --
13       MR. RAGAIN:  Thank you very much, Tom.
14   Q.   -- Northern Bottling.  How long have you
worked for PepsiCo?
16   A.   Twenty-nine years.
17   Q.   And could you please tell me what positions
18 you've held there and how long you were in each of those
19 positions?
20   A.   I've held a variety of sales and general
21 management roles throughout my career.  I started out as
22 a management trainee back in 1988 and progressed my way
23 through the organization, again, through --
24       THE COURT REPORTER:  I'm sorry, can you slow
25       down a little bit, please.  Thank you.

Page 6

1       THE WITNESS:  Okay.  I started in 1988 as a
2       management trainee and progressed through a variety
3       of selling and general management roles throughout
4       my career throughout the country up until my
5       current role, which is SVP/GM of North America
6       field operations.
7 BY MR. RAGAIN:
8   Q.   For PepsiCo, PBC --
9   A.   PBC.  I run -- yeah, I'm the lead sales GM for
10 PBC.
11   Q.   And they stuck you here in Orlando?
12   A.   I previously served in the southeast BUGM role
13 prior to the role I was in, so I was already located in
14 Orlando.  So taking on the new assignment five and a
15 half years ago, there was no need for me to have to
16 relocate.
17   Q.   Are you familiar with Northern Bottling?
18   A.   Uh-huh.
19   Q.   How so?
20   A.   Just a franchise organization, Pepsi Bottling
21 organization.
22   Q.   Have you ever been to Northern Bottling's
23 facility?
24   A.   I have not.
25   Q.   Do you know Mr. Gokey?

Page 7

1   A.   I know who he is, yes.
2   Q.   Okay.  And how do you know Mr. Gokey?
3   A.   Through the relationship of Franchise Bottlers
4 and PBC.
5   Q.   Have you met him before?
6   A.   Uh-huh.
7   Q.   And you mentioned that you -- your title is
8 with respect to PBC.  What's the difference between PBC
9 and PepsiCo?
10   A.   PBC is the distinct direct, the DSD
11 organization for North America Beverages.
12   Q.   And what is PepsiCo?
13   A.   The parent company, oversees the sector of
14 North America Beverage.
15   Q.   And do you know what this case is about, sir?
16   A.   Yes.
17   Q.   What is it about?
18   A.   An alleged transshipment issue in the Northern
19 Bottling territory.
20   Q.   And you say "alleged," why do you say
21 "alleged"?  Are -- is it your understanding that the
22 transshipment may not be happening?
23   A.   Alleged in the fact that I know the situation
24 has been under investigation for quite some time.  I'm
25 not intimate with all the specific facts of it, but my

Page 8

1 understanding of it, it's alleged.  And I know that, you
2 know, we, to this point, don't tranship product in his
3 area.  I don't have any facts that suggests that I had a
4 vehicle or asset in Northern Bottling territory.
5   Q.   And when you use the word "I," you mean PBC?
6   A.   PBC, correct.
7   Q.   Do you know, from January 2015 to the present
8 time, a third-party distributor by the name of Core-Mark
9 International has been selling PepsiCo CSD products into
10 Northern Bottling's exclusive territory?
11   A.   I heard that was alleged or heard that was
12 certainly brought to our attention, yes.
13   Q.   Have you heard any statements or evidence or
14 recitations that that is not occurring?
15   A.   Say that again.
16   Q.   Have you heard any statements, evidence,
17 recitations, representations that -- that that, in fact,
18 is not occurring?
19   A.   I have not -- I've -- I -- I know through
20 talking to my people we have not shipped any product
21 into Northern Bottling territory.
22   Q.   Tell me what you did to prepare for this
23 deposition today, sir.
24   A.   I had a series of meetings with our legal
25 counsel.



Page 9

1    Q.   How many?

2    A.   How many meetings?

3    Q.   (Nods head.)

4    A.   Several.

5    Q.   More than five?

6    A.   Two to three.  No, less than five.

7    Q.   What documents did you review, if any?

8        MR. QUINN:  Let me just instruct the witness

9    to the extent that I selected items to give you to

10   review, that's covered by the attorney-client

11   privilege and the work product, so you should not

12   disclose anything that -- that your attorney has

13   selected for you to review.

14       Aside from that, you may answer Mr. Ragain's

15   question.

16       THE WITNESS:  We reviewed a variety of

17   documents to prepare for my discussion.

18 BY MR. RAGAIN:

19   Q.   Okay.  Did you review any documents, other

20 than documents shown to you by Mr. Quinn?

21   A.   Relative to this?  Not that I'm aware of.

22   Q.   Any digital documents or -- or digital

23 materials, e-mails, things like that?

24   A.   That I reviewed prior to today's discussion?

25   Q.   Yes.

Page 10

1    A.   That were not part of what we may have

2 discussed?  I'm not aware.

3    Q.   All right.  Mr. Lewis, what's an independent

4 bottler?

5    A.   A bottler that is not company owned.  It owns

6 an operation, independently owned operation outside of a

7 company-owned bottling operation.

8    Q.   And when you say "company-owned," do you mean

9 PBC --

10   A.   Correct.

11   Q.   -- PepsiCo or both?

12   A.   PBC.

13   Q.   PBC?

14       Northern Bottling, would they then be an

15 independent bottler?

16   A.   My assumption.

17   Q.   What's an EBA?

18   A.   It's a bottling agreement.

19   Q.   Between?

20   A.   Pepsi -- Pepsi and independent bottling

21 organizations, independent bottlers.

22   Q.   Do you know what the acronym or what the

23 initials stand for?

24   A.   Executive bottling agreement.

25   Q.   What's an exclusive territory?

Page 11

1    A.   A territory -- exclusive territory in terms of

2 what?

3    Q.   In terms of an EBA.

4    A.   All my assumptions would be the boundaries of

5 where that independent bottler has the rights to

6 distribute the portfolio.

7    Q.   The exclusive rights?

8    A.   For certain portions, yes.

9    Q.   And do you know what products Northern

10 Bottling has the exclusive rights to --

11   A.   I'm not familiar with the -- with their EBA,

12 what the extent of the details of their EBA would be.

13   Q.   Are you aware -- aware of any exceptions to

14 their EBA or conditions?

15   A.   Not --

16       MR. QUINN:  Object to form of the question.

17       THE WITNESS:  Okay.

18       MR. QUINN:  You may answer.

19       THE WITNESS:  I'm not -- I'm not that intimate

20   with the details of those arrangements.

21 BY MR. RAGAIN:

22   Q.   To your knowledge, does Northern Bottling have

23 an exclusive territory for the distribution of PepsiCo

24 bottle and can CSD products?

25       MR. QUINN:  Object to the form of the

Page 12

1    question.

2    THE WITNESS:  Rephrase that again, please.

3 BY MR. RAGAIN:

4    Q.   To your knowledge, does Northern Bottling have

5 an exclusive territory within which it has the exclusive

6 rights to distribute PepsiCo bottle and can CSD

7 products?

8    A.   To the extent -- to the extent that all the

9 legalities you're stating, my understanding would be

10 they have -- they have a boundary, which they're allowed

11 to sell certain PepsiCo products they're designated for

12 their geography.  That -- that's -- that's the extent.

13 I'm not sure what you want to know, want me to answer

14 beyond that.  I don't -- I don't have a feel for what

15 you're asking.

16     Did it have a boundary?  Is there a boundary?

17 Yes, there's a boundary.  Are there products that are

18 tied to their boundary?  Yes.  To what extent the

19 products are, I don't have the intimacy of all those

20 details.  I don't know.

21   Q.   Okay.  How does an independent bottler obtain

22 an exclusive territory for the sale of PepsiCo bottle

23 and can CSD products?

24   A.   I wouldn't -- I would not be aware of the

25 legal process of obtaining franchise rights for



---

Page 13

1  distribution of products of PepsiCo.

2      Q.   Well, aside from -- are you an attorney, sir?

3      A.   Not even close.

4      Q.   Okay.  I'm -- I'm not going to ask you any

5  questions that require a legal opinion.  All I want to

6  know is what your knowledge is as a lay person in your

7  executive position with PBC?

8      A.   Okay.

9      Q.   Fair enough?

10     A.   Uh-huh.

11     Q.   So, to your knowledge, how does an independent

12 bottler obtain an exclusive territory for the sale of

13 bottle and can --

14     A.   I'm -- I'm not aware of that process.  I've

15 worked in the company on operations for 29 years.  I've

16 not spent any of my career working on franchise

17 agreements or anything thereof.

18     Q.   How does an independent bottler for the -- in

19 the PepsiCo system keep its exclusive territory?  What

20 does it have to do to maintain that relationship?

21     A.   Similar answer.  I'm not necessarily aware of

22 all the legal components.  I know you asked me -- I'm

23 not a lawyer and I'm not trying to suggest it was a

24 legal question, but I would imagine that you have an

25 agreement and as long as you comply with your agreement,

---

Page 14

1  you know, you can maintain your status as a -- as a

2  bottler.

3      Q.   Have you ever read any of the EBAs --

4      A.   No, sir.

5      Q.   For how long, to your knowledge, has PepsiCo

6  utilized a network of independent bottlers to distribute

7  bottle and can CSD products?

8      A.   Throughout the entire time I worked for the

9  company.

10     Q.   Do you know if that preceded your time with

11 the company?

12     A.   I would assume it did.  When I started with

13 the company, there were already franchise bottlers in

14 place, so I would assume, yes, before 1988 we were doing

15 business with -- the company was doing business with

16 franchise bottlers, yes.

17     Q.   Do you know, has the number of franchise

18 bottlers increased or decreased since 1988?

19     A.   I haven't kept score on that, to be honest

20 with you.

21     Q.   And when -- when I use the phrase, as -- as

22 you have, franchise bottlers, is that the same, in your

23 mind, as independent bottlers?

24     A.   Correct.  There certainly have been a number

25 of transactions between 1988 and 2017, but I haven't

---

Page 15

1  kept score on exactly the pluses or minuses.

2      Q.   Could you tell me, sir, what you know about

3  the history of PepsiCo and its independent bottler

4  network?

5      A.   What do you mean "history"?  What do you mean

6  when you say "history"?

7      Q.   Any- -- anything that's occurred prior to

8  today with respect to the relationship between

9  independent bottlers and PepsiCo?

10         MR. QUINN:  I'm going to object to the form of

11    that question.  That's so broad and vague.  I don't

12    know how anyone can answer.

13 BY MR. RAGAIN:

14     Q.   You know what I mean by the word "history,"

15 don't you?  Do you know what the --

16     A.   I'm not sure I know what -- I know what you

17 mean by history the way you phrase the question.  I

18 don't --

19     Q.   Do you know how many -- do you know what year

20 PepsiCo first started using an independent bottler

21 network?

22     A.   I don't.  I mean, I assume back when it was

23 discovered, but I -- I -- I don't have that -- I assume

24 that's how we -- PepsiCo -- Pepsi grew its sales,

25 starting through a franchise network.  So yeah, if you

---

Page 16

1  want to go back to the late 1800s, I would assume that's

2  where -- that's where things got started, yes.

3      Q.   And I want -- and that's what I'd like to

4  know.  What do you know about that relationship over

5  time between independent bottlers and PepsiCo?

6      A.   The extent that the independent bottlers were

7  a vital component of building the company -- the

8  Pepsi-Cola brand throughout the network, throughout the

9  country over the years, that's about all I would be able

10 to tell you.

11     Q.   And why do you say "a vital component"?  What

12 do you mean by that?

13     A.   Well, 'cause -- I mean, that's how it started.

14 My -- my sense is that's how the business got started,

15 how Pepsi became -- became available throughout most of

16 the territories in the U.S. and, you know, over time

17 it evolved and migrated to different type of

18 relationships, different type of operations and

19 consolidations well before I got in the business.  But

20 that would be the extent of, if you talk about history,

21 my recollection of it.

22     Q.   And since you've been with the company, can

23 you tell me what consolidations have occurred with --

24 with respect to PepsiCo and the independent bottler

25 network?

---



Page 17

1    A.  Well, I mean, you know, it's obvious we
2  were -- I was with PBG, we were a bottler, publicly
3  traded bottler, so we were a publicly traded bottler,
4  along with PepsiAmericas and we were both acquired by
5  PepsiCo.  That was obviously a major transaction that
6  occurred in the last, you know, six or seven years.
7  Other than that, there could have been some other
8  territory swaps that have happened in that window of
9  time.  And there's been some, you know, selling of
10  franchises back to the corporation in some cases, from
11  what I recall.  So again, there's been a number of
12  transactions, the most notable one was the merger and
13  acquisition of PBG and PAS.
14    Q.  And when did that occur?
15    A.  About 2010.
16    Q.  And you said you were an employee of PBG --
17    A.  Correct.
18    Q.  -- at the time?
19        Okay.  Tell me about, I mean, if you can, just
20  the formation of PBC from -- it's my understanding, PBC
21  was formed via PAS and PBG; is that correct?
22    A.  Yeah.
23    Q.  Okay.  How did the transaction -- just
24  generally speaking, I'm not asking for a legal opinion,
25  but what occurred to form --

Page 18

1    A.  Oh, it was a lot of work.  I mean, it was a
2  lot of work.  It was a lot of complexity, you know, when
3  you -- when you bring these entities together.  I mean,
4  it was a fair amount of work put across the organization
5  and -- but the fact that we -- you know, we worked
6  closely with the PAS executives at the time, so, you
7  know, while -- while complex, the transition was done
8  well.  The integration was done well and we adopted a
9  lot of systems and started working on synergies.
10        Because as you imagine, they had some things
11  that were different, we had some things that were
12  different.  The goal was to try to pull it all together,
13  operate as one unit and that was really the work in the
14  first, you know, 365 day- -- first year of the merger
15  was all about just making sure we were, you know,
16  working towards the same system, getting on the same
17  page, integration was job one and -- but, you know, we
18  did a great job of doing that.
19    Q.  So PAS, if my recollection is correct, is
20  PepsiAmericas?
21    A.  Yes.
22    Q.  And -- and what was PepsiAmericas prior to the
23  formation of PBC?
24    A.  They were a publicly traded bottler, yes.
25    Q.  Who owned the majority of PAS?

Page 19

1    A.  From my understanding, Pohlad.
2        THE COURT REPORTER:  What was the name?
3        THE WITNESS:  Bob Pohlad.
4  BY MR. RAGAIN:
5    Q.  The Pohlad family?
6    A.  Family, yes.
7    Q.  And -- and PBG was what kind of an entity
8  prior to the formation of PBC?
9    A.  PBG was a publicly traded bottler,
10  independent, publicly traded bottler.
11    Q.  Okay.  And it's my understanding, generally
12  speaking, again, not speaking in terms of legalities,
13  that those two entities were purchased by PepsiCo?
14    A.  Uh-huh.
15    Q.  And -- and a new company was formed by the
16  name of PBC?
17    A.  PBC is the -- PBC is the -- that's our --
18  that's the vision of North America Beverage.  We all
19  came into North America Beverage.  North America
20  Beverage is the sector that reports into PepsiCo.  NAB
21  is what we refer ourselves to.  PBC is a component of
22  NAB.
23    Q.  North America Beverage --
24    A.  It's the DSD arm of North America Beverage.
25    Q.  And do you know who -- is -- is PBC a publicly

Page 20

1  traded company?
2    A.  No.
3    Q.  Is it owned by PepsiCo?
4    A.  Yes.
5    Q.  And is it controlled by PepsiCo?
6        MR. QUINN:  Object to the form of the
7  question.
8        THE WITNESS:  When you say "controlled by
9  PepsiCo," what do you mean?
10  BY MR. RAGAIN:
11    Q.  Who's the head person at PBC?
12    A.  I would be the GM of PBC and then I report
13  into Kirk Tanner, who is the president and COO of North
14  America Beverage.
15    Q.  And is -- is North America Beverage a division
16  of PepsiCo?
17    A.  Yes.
18    Q.  So would you say that you ultimately report to
19  PepsiCo personnel?
20    A.  I report in to Kirk Tanner, who was NAB who
21  reports in to Al Carey, who is PepsiCo, yes.
22    Q.  What's Pepsi Food Service, sir?
23    A.  Food service is a sales function within North
24  America Beverage and within PepsiCo for that matter.
25  It's not a standalone, but it's a -- it's a component of



Page 21

1 the sales organization.

2    Q.   Is it also a component of PBC?

3    A.   Uh-huh.  Yes.

4    Q.   So Pepsi Food Service is a unit or division

5 or --

6    A.   It's not a division.  It's not -- it's not a

7 division.  It's a -- it's a component.  It's a sales

8 function.  Just like retail sales, there's food service

9 sales.  So there are food service sales as part of the

10 sales component of the company.

11    Q.   And are all of the employees, to your

12 knowledge, at Pepsi Food Service employees of PepsiCo?

13    A.   They would have the same reporting

14 relationship that I would have.  They report in to Kirk

15 Tanner, Kirk Tanner reports into Al Carey, Al Carey

16 reports into Indra Nooyi.

17       THE COURT REPORTER:  What was the name?

18       THE WITNESS:  Indra Nooyi.

19       MR. QUINN:  N-O-O-Y-I.  And the first name is

20    I-N-D-R-A.

21 BY MR. RAGAIN:

22    Q.   So to your understanding, does PepsiCo control

23 the employees of Pepsi Food Service?

24       MR. QUINN:  Object to the form of the

25    question.

Page 22

1       THE WITNESS:  Again, "controlled" being?  What

2    does controlled mean in your -- what are you

3    looking for in terms of control?

4 BY MR. RAGAIN:

5    Q.   Hires and fires them.

6    A.   No, that would be -- that would be North

7 America Beverage that hires and fires the food service

8 salespeople.

9    Q.   And is North America Beverage a separate

10 company from PepsiCo, sir?

11    A.   No, it's -- it's part of sector.  But we

12 have -- North America Beverage has its own management

13 structure and operates the business independently, makes

14 its own -- we make our own decisions on who to hire and

15 fire in sales personnel and call on customers and

16 everything else.

17    Q.   To your knowledge, though, do the employees of

18 NAB work for PepsiCo?

19    A.   Yes.

20    Q.   Who's the head person at Pepsi Food Service?

21    A.   Anne Fink.

22    Q.   And does Anne Fink report to anyone at

23 PepsiCo?

24    A.   She reports to Kirk Tanner who is the

25 president of North America Beverages, who reports in to

Page 23

1 Al Carey, who's the CEO of PepsiCo North America.

2    Q.   Is PBC a bottler and distributor of PepsiCo

3 bottle and can CSD products?

4    A.   Yes.

5    Q.   Is PBC an independent bottler?

6    A.   No.

7    Q.   Using your terminology that you've used

8 today --

9    A.   I would -- I would characterize us, we're a

10 company-owned bottling operation.

11    Q.   Thank you.

12       To your knowledge, is Northern Bottling a

13 bottler and distributor of PepsiCo bottle and can CSD

14 products?

15       MR. QUINN:  Object to the form of the

16    question.

17       THE WITNESS:  Yeah, rephrase that.  Or can you

18    state it again, please?

19 BY MR. RAGAIN:

20    Q.   To your knowledge, is Northern Bottling a

21 bottler and distributor of PepsiCo bottle and can CSD

22 products?

23    A.   Of PBC products, DSD products?

24    Q.   PepsiCo bottle and can CSD products.

25    A.   I'm not sure when you say "PepsiCo."  What's

Page 24

1 your --

2    Q.   Pepsi, Mountain Dew, Diet Pepsi, Diet Mountain

3 Dew --

4    A.   Are they the distributor of those brands?

5    Q.   Yes.

6    A.   My understanding is they are a distributor of

7 those brands, yes.

8    Q.   Thanks.

9       And that's a good point, you know, this is my

10 first foray into the soft drink industry, so if I ask

11 you a question that's just makes no sense whatsoever, be

12 sure to tell me.

13    A.   Okay.

14    Q.   Don't fumble around trying to answer stuff

15 that --

16    A.   Okay.

17    Q.   -- doesn't make sense.

18    A.   Thank you.

19    Q.   Thank you.

20       Is PBC the largest bottler and distributor of

21 PepsiCo bottle and can CSD products in the United

22 States?

23    A.   PBC sells the majority of, yes, bottle and can

24 products to customers in the -- in U.S., yes, represent

25 the largest part of the business, the PBC organization



Page 25

1 does, yes.

2     Q.   And about what percentage of the -- of the

3 business is PBC?

4     A.   Approximately, you know, high 70s.

5     Q.   One witness, Mr. Trant, characterized it as

6 essentially 80/20.  80 PBC and 20 for the 85 independent

7 bottlers --

8     A.   High 70s.  80 is pretty close in my mind,

9 yeah.

10     Q.   Okay.  So in terms of sales of PepsiCo bottle

11 and can CSD products, PBC, if I understand you

12 correctly, is larger than all of the independent

13 bottlers combined?

14     A.   PBC is the largest, yes, bottling organization

15 inside of North America, yes.

16     Q.   And would be larger than all of the

17 independent bottlers --

18     A.   Combined?

19     Q.   -- combined?

20     A.   Uh-huh, yes.

21     Q.   And do you know how many independent bottlers

22 there are in the system, sir?

23     A.   I mean, there are dozens and dozens, you know,

24 close to a hundred.

25     Q.   What is transshipping?

Page 26

1     A.   Transshipment is -- my -- my understanding of

2 it is, it's when product leaves one boundary, one

3 geographical area and crosses over into another boundary

4 area that's not permittable [sic].  So product from a

5 authorized territory shipped to a product in a

6 nonauthorized territory.

7     Q.   Does PepsiCo attempt to prevent transshipping?

8     A.   Yes.

9     Q.   Why?

10     A.   Because it's disruptive to our business.

11 It's -- it's against company policy and there's nothing

12 good about it.

13     Q.   How is it disruptive to -- to the business?

14     A.   It's disruptive in that it takes time,

15 investigations, the complexities of all the

16 investigations.  There are fines.  People are pulled off

17 of their day job to have to go deal with the matters at

18 hand and it takes time away from really taking care of

19 customers and taking care of the front line, those type

20 of things.  So it's -- it's disruptive, yeah, it is.

21 But it's a part of the -- it's -- it's part of the

22 business.  It happens and we have to react -- when it

23 happens, we have to react responsibly and swiftly.

24     Q.   But if Pepsi didn't have a policy against

25 transshipping, none of those things would occur.  People

Page 27

1 wouldn't have to take time away from their other jobs,

2 et cetera.  So my question is:  Do you know why Pepsi

3 has a policy against transshipping?

4     MR. QUINN:  Objection to the form of the

5     question.  The first half is speculative, your

6     statement.  And asked and answered.

7     THE WITNESS:  Sorry.  Can you repeat that

8     again?  I want to be clear on what you're asking.

9 BY MR. RAGAIN:

10     Q.   Why does Pepsi have a policy against

11 transshipping?

12     MR. QUINN:  Objection.  Asked and answered.

13     THE WITNESS:  It's a policy that's been in

14     place as long as I can remember.  And it's, you

15     know, again, designed to make sure that product

16     does not leave an authorized territory into an

17     unauthorized territory.

18 BY MR. RAGAIN:

19     Q.   While you've been an employee of PepsiCo, have

20 you ever been informed that PepsiCo had a contractual

21 obligation to attempt to prevent transshipping?

22     A.   I'm sorry, say that again.

23     Q.   While you've been an employee of PepsiCo, have

24 you ever been informed that PepsiCo had a contractual

25 obligation to attempt to prevent transshipping?

Page 28

1     A.   A contract- -- have I ever been informed?

2 It's always been a policy that I've operated under as --

3 so all the time I've been operating the business, it's

4 always been a policy for us to enforce that so we

5 prevent it where we can prevent it and then react

6 swiftly and accordingly when issues are brought to our

7 attention, and that's always been an ongoing practice

8 that I've been affiliated with the time I've been in,

9 you know, the management roles I've been in.

10     Q.   While you've been an employee of PepsiCo, sir,

11 were you -- have you ever been informed that PepsiCo had

12 a legal obligation or duty of any kind to attempt to

13 prevent transshipping?

14     A.   Again, the way I would answer this is, it's

15 always been the practice for us to sign off on

16 transshipment policies, react swiftly and responsibly to

17 cases that are brought up.  And, you know, it's --

18 it's -- we've operated with a very consistent mindset on

19 this topic for a number, number of years.  And this --

20 had somebody informed me or not informed me, all I know

21 is every year we want to make sure that all employees

22 are aware so that new employees join the organization,

23 they're brought up to speed and aware of our policy on

24 transshipment and that we have strict adherence to it,

25 and again, that we act swiftly and responsibly when



DEREK LEWIS  Confidential
NORTHERN BOTTLING vs PEPSICO

June 19, 2017
29–32

Page 29

1 matters are brought to our attention.

2      Q.   Well, while you've been an employee of
3 PepsiCo, Mr. Lewis, what, if anything, have you been
4 told about whether PepsiCo had any type of obligation to
5 prevent transshipping?

6      A.   The obligation that I operate under is that
7 it's our jobs, the responsibility of any employee of the
8 organization to honor the policy that was developed
9 many, many years ago and obviously continues to be
10 updated.  But that all employees adhere, strict
11 adherence to the policy, reinforcement of that policy to
12 customers and acting responsibly and swiftly to matters
13 when they're brought to our attention and that's how
14 I've always operated from day one.  So I want to -- I
15 want to tell you, once you get into roles, this is part
16 of your job and it's always part of your job, so there's
17 no -- I didn't sit in some meeting halfway through my
18 career and they said, hey, we're going to have a meeting
19 on transshipment from the company.  Like, this has,
20 again, always been part of our responsibility in the
21 field.  So I'm not aware of some enlightening moment
22 where it was a -- some, you know, theater around
23 creating this.  This is something we do day in and day
24 out.  This is something we do year in and year out.

25      Q.   I guess, what I'm asking is:  Do you know why

Page 30

1 PepsiCo has a policy against transshipping?

2      MR. QUINN:  Objection --

3 BY MR. RAGAIN:

4      Q.   Do you know what -- do you know what the
5 policy is based upon?

6      MR. QUINN:  Objection.  Asked and answered.

7      THE WITNESS:  Well, again, I'm going to go
8 back to policy put in place to present -- prevent
9 product from an authorized -- authorized territory
10 to go into an unauthorized territory.  So I would
11 imagine the policy is in place to prevent that from
12 happening.  And if that happens, again, it creates
13 disruption within the entire family that would be
14 in the authorized territory and the unauthorized
15 territory.  So it's our job to prevent that from
16 occurring whatsoever so that business operations
17 can be maintained smoothly in an authorized selling
18 area or nonauthorized selling area.  That's why we,
19 you know, focus on the policy as it is today to --
20 to keep smooth business operations going so we can
21 sell to customers, take care of our front line
22 every day and do the things we have to do to grow
23 our businesses respectively.

24 BY MR. RAGAIN:

25      Q.   Does PepsiCo have any rules designed to keep

Page 31

1 purchasers of bottle and can CSD products from reselling
2 those products where they're not supposed to be sold?

3      A.   Yes.

4      MR. QUINN:  Did you say PepsiCo or PBC, Jim?

5      MR. RAGAIN:  Both.

6      MR. QUINN:  Sorry.

7 BY MR. RAGAIN:

8      Q.   My question -- in my view, PBC is PepsiCo.  Is
9 that -- is that different than what your understanding
10 is, sir?

11      A.   PepsiCo does not operate our business day to
12 day.  PBC operates the business day in and day out.  So
13 I think a lot of times when you're saying "PepsiCo," you
14 assume that somebody inside of PepsiCo is making
15 decisions on our business.  They are in some areas
16 probably strategically, but the day-to-day operations of
17 selling product in the authorized trade area,
18 maintaining good customer relationships, doing the
19 things that we do as bottlers every day, that is a
20 PBC-controlled activity.  So any time you say "PepsiCo,"
21 I'm not sure of your intent of, are you asking about
22 somebody inside of purchase or are you asking about
23 somebody inside the PBC organization or the NAB
24 organization for that matter, considering Anne Fink and
25 various people do sit -- they don't necessarily sit on

Page 32

1 PBC -- they don't sit on top of PBC, but they do sit
2 inside NAB.

3      So to me, this is a North America Beverage or
4 PBC type of question, not a PepsiCo question, in my
5 opinion.  So when you say "PepsiCo," I think it does
6 draw concern of what your -- so I don't know why we just
7 can't operate with PBC or NAB because that's who I work
8 for.  That's who I -- that's my responsibility day in
9 and day out is PBC.  It's not PepsiCo.

10      Q.   Well, the reason why I ask the questions this
11 way, it's my understanding, based on all of the
12 testimony in this case and your testimony, that PBC is
13 controlled by PepsiCo.

14      MR. QUINN:  Object to the form of the
15      question.

16 BY MR. RAGAIN:

17      Q.   Is that not true, sir?

18      A.   PBC falls under NAB, which falls under
19 PepsiCo, yes.

20      Q.   And I can word the questions, if you would
21 prefer me to, by using all the different labels.  I use
22 PepsiCo because if everybody is a part of PepsiCo, it's
23 easier to say "PepsiCo" than it is PepsiCo, NAB, PBC,
24 PFS; do you see what I'm saying?

25      MR. QUINN:  Object to the form of the question



Page 33

1    in light of the witness's answers.
2  BY MR. RAGAIN:
3      Q.  Do you understand what I'm saying, sir?
4      A.  It's easier if I can relate to what I'm
5  responsible for.
6      Q.  And -- and any time if I ask a question that
7  creates that, for lack of a better word, confusion or
8  concern on your part, will you try and bring it to my
9  attention?
10     A.  You got it.
11     Q.  Thank you.
12         Does PepsiCo and/or PBC have any rules
13  designed to keep purchasers of PepsiCo bottle and can
14  CSD products from reselling those products in
15  territories where they are not supposed to be sold?
16         MR. QUINN:  Object to the form of the
17     question.
18         You may answer.  It's compound.
19         THE WITNESS:  One more time.
20  BY MR. RAGAIN:
21     Q.  He's the rule ninja.
22         MR. QUINN:  Well --
23  BY MR. RAGAIN:
24     Q.  Go ahead, Mr. Lewis.
25         MR. QUINN:  -- when you say and/or, Jim,

Page 34

1  that's a compound question.
2         MR. RAGAIN:  Thank you, Tom.  And -- and if
3  I -- if I need any more grammar advice, I'll call
4  you.
5  BY MR. RAGAIN:
6      Q.  Go ahead and answer the question, Mr. Lewis.
7         MR. QUINN:  And I'll object when it's
8  appropriate to object and this will go smoothly.
9         THE WITNESS:  Okay.  So now, I've lost --
10    like, I've lost the question again.  Can you hit me
11    one more time?
12  BY MR. RAGAIN:
13     Q.  Does PepsiCo and/or PBC have any rules
14  designed to keep purchasers of PepsiCo bottle and can
15  CSD products from reselling those products in
16  territories where they are not supposed to be sold?
17         MR. QUINN:  Same objection.
18         THE WITNESS:  PBC does have stipulation in its
19     customer agreements to prevent product from leaving
20     an authorized area to a nonauthorized area.
21  BY MR. RAGAIN:
22     Q.  Do those rules appear in writing anywhere,
23  other than in the customer agreements?
24     A.  In the transhipping policy for employees.
25     Q.  Anywhere else?

Page 35

1      A.  I'm aware of the customer policies that get
2  presented to customers.  I'm aware of the front line or
3  the sales organization policy.  So there's an internal
4  component and an external component I'm very familiar
5  with in -- in executing against.  If there are other
6  communications out there, I'm not fully aware of them or
7  use them in my day-to-day operating agenda.
8      Q.  Is there a name for the contracts that you
9  refer to?
10         MR. QUINN:  You mean the customer contracts?
11         MR. RAGAIN:  Yes.
12         THE WITNESS:  Traditionally, they've been
13     called customer development agreements, but that's
14     evolved over the years.  So CDA, a very common term
15     that the industry probably would use, but again,
16     those have evolved over a number of years.  Some
17     stay that way, some not.  It's really an informal
18     term used, but it's the nature of a customer
19     development agreement or customer partnership.
20     Yes, those are synonymous on how we set up
21     agreements with customers to help drive the
22     business.
23         Bless you.
24  BY MR. RAGAIN:
25     Q.  And to your knowledge, sir, who are the

Page 36

1  parties to these customer agreements?  Obviously, the
2  customer would be one party.
3      A.  Uh-huh.
4      Q.  Is PBC or PepsiCo the other party?
5      A.  PBC.  The selling -- the selling entity, so
6  PBC in this case, yes.
7      Q.  And -- and what do those contracts say as far
8  as the rules about where you can resell the products?
9      A.  You know, product is restricted to our trading
10  area through our boundary area, which is, you know,
11  defined and it stipulates, you know, if for somehow,
12  some way that rule was broken, there are -- you know,
13  there are consequences for shipping product from an
14  authorized territory to a nonauthorized territory.
15     Q.  When you say "your boundary," it's my
16  understanding, correct me if I'm wrong, that PBC has
17  many territories.
18     A.  We have -- when you say "many terr-" -- we
19  have a lot of -- yeah, we cover -- since we cover almost
20  80 percent of the country, we would have a lot of
21  geography out there, yes.
22     Q.  Okay.  So does -- does the CDA restriction
23  you're talking about restrict the resale of the product
24  to anywhere within PBC's territories?
25     A.  No, just within -- within that -- within that



DEREK LEWIS  Confidential
NORTHERN BOTTLING vs PEPSICO

June 19, 2017
37—40

Page 37

1  current specific geography, so within a trading area
2  of -- if, like, say for example, let's say Florida,
3  Florida is all -- most of the Florida operation is PBC.
4  There is a part of Florida that's nonPBC, but let's
5  stick with the PBC area.  Florida, if an agreement was
6  done for a bottler or the outfit that distributes in
7  Central Florida, that outfit would be limited to trading
8  or selling only within the Central Florida limits.  And
9  a South Florida distributor would, therefore, only be
10  available -- eligible to distribute products in the
11  South Florida boundary area that we set up.  And north
12  Florida, et cetera, et cetera.
13      Q.   Who enforces these rules or these contracts?
14      A.   There are a number of people, but primarily
15  the selling agent for the customer.  So, you know,
16  there's a selling -- the selling arm and obviously,
17  there's a management arm.  So the people who directly
18  call on the customers and then the people that they
19  report in to would be, you know, essentially the second
20  arm of that.  And then, subsequently everybody -- all --
21  everybody is accountable, but the people that are
22  closest to the customer, obviously, have greater
23  accountability.
24      Q.   What's that accountability consist of for
25  those people closest to the customer?

Page 38

1      A.   Well, maintaining that -- are you talking in
2  general?  General elements of the contract?  Or are you
3  talking about -- give me -- give me a feel of what
4  you're looking for.
5      Q.   I'm sorry, I was talking about the rules
6  restricting where the products can be refilled.
7      A.   Okay.  So this is the authorized and
8  nonauthorized.  So in that case, they're responsible for
9  ensuring that that does not happen and, you know, there
10  are a number of ways to monitor that throughout the
11  course of the year.  And it's their responsibility if,
12  obviously, they were to flag any activity that would
13  lead to that authorized into a nonauthorized, then the
14  consequences of our policy would begin to be
15  implemented.
16      Q.   Do you have contracts that contain these rules
17  that you've been discussing with all customers?
18      A.   All customers are absolutely presented our
19  full language and extent on this policy, yes.  So all
20  customers would -- all customers that we sell to
21  understand our position on authorized area versus
22  nonauthorized area, yes.
23      Q.   So are you saying, though, that some have
24  actual written contracts that they sign that contain
25  those rules and others do not?

Page 39

1      A.   There's a contract in place, I would imagine,
2  for all customers.  When you refer to a contract being
3  signed, I don't have visibility to every contract, so I
4  can't sit here and say, yes, I've seen every contract
5  and every contract is signed.  What I can say is that
6  every customer that we do business with is presented our
7  policy as it relates to transshipment and they
8  understand that there are consequences for violation of
9  that agreement.
10      Q.   My question is:  Do all of these customers
11  sign a written contract that contains those terms or are
12  some of them simply informed of what your policy is?
13          MR. QUINN:  Object to the form of the
14      question.
15          You may answer.
16          THE WITNESS:  The customers are all presented,
17      with a high degree of consistency, our stance on
18      that -- on our policies as relates to transshipment
19      or authorized going into unauthorized.  I do not --
20      have not seen every contract.  I don't have -- I
21      don't look at every single contract.  The natural
22      course of business is to, yes, try to obtain a
23      signed contract.  In the cases where somebody
24      doesn't actually sign a contract, we want to a
25      hundred percent know that we've -- for them to

Page 40

1      agree to get product, they have to acknowledge and
2      understand the nature of our arrangement and,
3      again, our policy on moving from authorized to
4      unauthorized.
5          So yes, all customers, as we sell them
6      product, understand our position on transshipment
7      is a violation and there are consequences for it.
8  BY MR. RAGAIN:
9      Q.   But not all of them actually sign a contract
10  containing those restrictions --
11      A.   I have not seen --
12      Q.   -- is that true, sir?
13      A.   -- every contract, so I can't tell you, yes,
14  100 percent of our contracts are signed.  I can't tell
15  you that 100 percent of our contracts aren't signed.  I
16  haven't seen all the contracts.  What I can tell you is
17  that the customers all -- there's consistency in
18  articulating our position on transshipment, as there are
19  compliance on certain products, certain SKUs they have
20  to carry, certain promotional allowances they have to --
21  that they'll get if they meet compliance.  So there's an
22  agreement for us to do business with you.  We have
23  certain elements.
24          Transshipment is one element of the agreement.
25  It's not the only thing we talk to them about.  We talk



DEREK LEWIS  Confidential
NORTHERN BOTTLING vs PEPSICO

June 19, 2017
41—44

Page 41

1 to them about a number of things that help drive the
2 business and do it responsibly.  And transshipment is --
3 is absolutely one of those items that is on that list
4 with SKUs, service, you know, product quality, all the
5 things that are associated with driving a solid customer
6 agreement.
7    Q.   And who is responsible for informing customers
8 about those transshipment rules?
9    A.   The selling agent.  Likely, the first line is
10 the key account manager, the person he or she is
11 responsible for the individual ownership of that account
12 and sell that account.  And then subsequently, the
13 management of the selling people that go in there would
14 be the -- the next line of enforcement.
15    Q.   And are these customers -- to your knowledge,
16 sir, are they -- are they told where the actual
17 boundaries are in a geographic sense?
18    A.   They would know that, yes.  That's -- there's
19 no way for you -- you can't tell them
20 authorized/nonauthorized unless they have a sense of
21 what nonauthorized is.  So they have to know what
22 authorized is and they would have to know an example of
23 nonauthorized.  So you're stepping from one boundary to
24 another, that's not a -- our people, by the way, would
25 know or have a sense if they were -- even had direct

Page 42

1 business relationships in a nonauthorized area.  We
2 would -- we would likely know that in advance and can
3 properly do due diligence on both sides to ensure that
4 that policy is maintained in a very restrict manner.
5    Q.   Are there restrictions on reselling product by
6 channel as opposed to by geographic territory?
7    A.   Can you say that one more time, so I can --
8 please.
9    Q.   Do you have any restrictions on where product
10 can be resold that are based on sales channel as opposed
11 to geographic territory?
12    A.   I'm not sure when you say -- what you mean
13 when you say "resold."  We don't -- I'm not sure when
14 you say "resold."  What does that mean?  Does that mean
15 me selling to a channel or does that mean a channel is
16 selling to somebody else?  What does that -- what are
17 you trying to get at?
18    Q.   I -- my question assumes -- or my question is:
19 Re- -- reselling means by the purchaser from PBC.  So if
20 ABC Distributing purchases --
21    A.   Directly from me.
22    Q.   -- bottle and can products directly from
23 you --
24    A.   Okay.
25    Q.   -- then are there restrictions based on sales

Page 43

1 channel in addition to geographic-type restrictions?
2    A.   The nature of our relationship would be our
3 product sales to that outfit would then lead directly to
4 a consumer purchase intent, not to another customer.  So
5 if I sell to a vending operator, I would expect that the
6 vending machine I have here, you know, or in the break
7 room, that the product I sell to that third-party
8 operator is going to be used directly for the vending
9 asset that I have in this office building.  Not the
10 intent for them to go sell it to another customer.  That
11 would -- that would not make any sense to us to do that.
12 Our intent is, I want to capture sales in those assets
13 and those places of business that you have that I cannot
14 directly get to that you're selling directly to the
15 consumer.  That's our intent.  That's our focus.
16    Q.   Are you saying that PBC does not use
17 third-party distributors to resell bottle and can
18 products?
19    A.   I'm not going to say it doesn't happen.  Some
20 cases, yes, that -- that were to happen if the nature of
21 that business is -- is a wholesaler and customers either
22 come up directly and -- and buy from that customer or
23 there's cases where, I guess, they could sell and
24 distribute.  But mainly, our intent is for that business
25 to reach the consumer.  But yeah, there are cases where

Page 44

1 it -- it could be a resale factor.
2      So a Jetro is a -- is a wholesaler.  So
3 they're wholesalers, so they do sell to people coming
4 in, business people.  They operate like a club store, so
5 club stores sell to business owners.  So yeah, I guess,
6 you know, in this case, yeah, and in that case, that
7 would be correct.  In the case of a company that
8 operated vending machines, and I knew the nature of the
9 business was vending machines, when I sell to them, I
10 would expect most, if not all of my transactions --
11 really all of my transactions to go to the vending
12 machines that they own and operate.  So it depends
13 really on that customer and what assets they own and
14 what their -- their operation is set up to be.
15      So does that clarify?
16    Q.   I think so.
17    A.   Okay.
18    Q.   How does PBC -- in cases where there are not
19 written contracts, how does PBC inform those customers
20 about the restrictions, the geographical restrictions on
21 a resale of the product?
22    A.   I don't know of any specific nonsigned --
23 again, I haven't seen the landscape of what was signed
24 and what was not signed.  Again, what I will say is,
25 everybody is informed, when we -- when we set up the



Page 45

1 nature of the selling arrangement with the customer,
2 that is all outlined and presented to the customer.  And
3 if the customer, obviously, agrees to all of the
4 elements -- by the way, if they didn't agree to all of
5 the elements, then we don't have a contract, we don't
6 have an agreement, we don't -- we won't sell them
7 product.  They -- if they were to say, I'm not going to
8 carry these SKUs, I'm not going to be told where I can
9 sell to, not can sell to and, you know, I want you to
10 deliver on Sundays or anything else, then thank you
11 Mr. and Mrs. Customer, we, unfortunately, at this time
12 would not be able to have an agreement with you and
13 we'll move on.
14        So they have to -- if they -- if we ship them
15 product, then it's my understanding and I'm confident
16 that our team has presented all the elements of that
17 agreement, which include moving product from an
18 authorized area to a nonauthorized area.
19     Q.  And what I'm asking, sir, is -- is:  How your
20 team presents those in cases where you would not have a
21 written signed contract with that customer?
22     A.  There is -- there is -- there's going to be a
23 written contract.  We don't sit across the table and
24 just talk.  There is going to be a document with all of
25 our elements outlined, including the transshipment

Page 46

1 portion of that document that will be presented to the
2 customer.  Again, which ones sign, which ones don't
3 sign?  I assume all of them sign because, again, we sell
4 them product, I assume.  But I can't guarantee and
5 verify that I've seen all the contracts.
6     Q.  Who would I ask that at PBC, if I wanted to
7 know?
8     A.  I don't know who has looked at every single
9 contract.  The contracts are on file.  And I'm sure, if
10 somebody wanted to get all the contracts together, they
11 probably could get all the contracts together, but
12 that's not what I -- that's not what I do.
13     Q.  I understand you are the head person with
14 respect to sales of bottle and can products at PBC; is
15 that true?
16     A.  The DSD element and the retail component --
17 DSD retail, yes; and do I oversee the delivery of food
18 service sales volume?  Yes.  Do I oversee the selling of
19 food service?  No.
20     Q.  Do you know, sir, does PBC have a person who
21 is responsible for looking at all of those contracts --
22     A.  The key account managers would, yes.
23     Q.  Let me finish my question -- to see that they
24 are signed?
25     A.  The key account managers and the region -- the

Page 47

1 region would be responsible for that, yes.  So they
2 would -- they would know who has or who hasn't, yes.
3     Q.  And how many people are we talking about that
4 have that responsibility to make sure each customer has
5 a written contract and that it's signed?
6     A.  There are --
7        MR. QUINN:  Objection to the form of the
8 question.  That misstates his earlier testimony.
9        THE WITNESS:  Okay.
10 BY MR. RAGAIN:
11     Q.  Let's make sure it's clear.
12     A.  Go ahead.  Say it -- say it again.
13     Q.  Let's make sure it's clear.
14     A.  Yeah.
15     Q.  Would it be the key account managers' and the
16 region, as you call it, responsibility to see that each
17 customer of PBC has a written contract?
18        MR. QUINN:  Objection.  Misstates his
19 testimony.
20        THE WITNESS:  They would be responsible to
21 present fully if all the correct elements of the --
22 the outlined customer development agreements that
23 we develop and we -- we agree to and align to.  So
24 it's your job to present those elements and assure
25 they're holding the customer responsible for those

Page 48

1 elements.
2 BY MR. RAGAIN:
3     Q.  And is that in the form of a signed contract
4 from the customer?
5        MR. QUINN:  Objection.  Asked and answered
6 multiple times.
7        THE WITNESS:  At least a dozen.
8 BY MR. RAGAIN:
9     Q.  Please answer it again.
10     A.  Our teams are responsible for presenting a
11 fully executed CDA agreement with the customer that has
12 various elements of compliance for us to be able to sell
13 them product on a consistent basis or any basis.  If
14 they don't agree to the elements, we don't sell them
15 product.  So if we sell them product, it's my
16 understanding that they've agreed to comply with all the
17 elements.  At any point in time if they don't complete
18 or comply with any of the elements, we now have a right
19 to go in and restrict, rescind, act on consequences,
20 based on whatever noncompliance has been surfaced.
21     Q.  What do you mean when you say a fully executed
22 CDA?
23     A.  Executing against all the elements, A, B, C,
24 D.  I have sku.  I have product sku requirements,
25 meaning you have to carry a certain type of products.  I



DEREK LEWIS  Confidential
NORTHERN BOTTLING vs PEPSICO

June 19, 2017

49—52

Page 49

1  have pricing elements.  I have service elements.  I have
2  transhipping -- or diversion -- transhipping elements.
3  There are various elements of a contract that we want to
4  be adhered to for us to have a good business proposition
5  that work for both us and work for the customer, so that
6  we can both grow the business and profit responsibly.
7      Q.  If there is a customer that agreed to all of
8  the requirements, as you listed them out to be a
9  customer of PBC, but refused to sign a written document
10 to that effect, would you still -- would PBC still sell
11 to them?
12      MR. QUINN:  Object to the form of the
13      question.
14      THE WITNESS:  Say -- say that again.
15 BY MR. RAGAIN:
16      Q.  If they -- if -- if a customer says, I will
17 agree to do all of these things as you've outlined,
18 Mr. Sales Manager or whatever the person is, but I'm not
19 going to sign anything to that effect, would PBC still
20 sell the bottle and can products to them?
21      MR. QUINN:  Same objection.
22      You may answer.
23      THE WITNESS:  If we've presented a fully
24      executed document and the decision maker has agreed
25      to execute, understands all the elements of the

Page 50

1      contract and agreed to executing all the elements
2      of the contract, the decision maker, we would note
3      that as, customer has agreed, understands and
4      agrees to the agreement that has been outlined.
5      They have a copy.  And in that case, they likely
6      would -- we would likely sell to them because of
7      that acknowledgment and the decision maker agreeing
8      and signing and telling us they understand, they
9      agree without signing, but they have a copy and
10     have acknowledged that they're going to execute all
11     the elements of the contract, yes.
12 BY MR. RAGAIN:
13      Q.  And do you know, as we sit here today, how
14 many customers of PBC, for PepsiCo bottle and can CSD
15 products, are operating with a signed contract versus a
16 nonsigned contract?
17      A.  I don't -- I don't have the answer to that.
18      Q.  And who at PepsiCo or PBC would have the
19 answer to that that I can talk to?
20      A.  The food service sales group.
21      Q.  Just the food service sales group?
22      A.  That would be -- well, that would be the most
23 direct line, that's the food service -- they're signing
24 the contracts, yeah, or the -- or the regions.
25      Are you asking for food service or retail or

Page 51

1  both?  It doesn't matter?
2      Q.  PBC.
3      A.  PBC?  Regions, regions would have a -- the
4  regions would know what contracts have been -- and you
5  mean signed being not agreed to -- you mean agreed to --
6  let me ask you a question.  Because I take -- decision
7  maker agrees to comply with all the elements, you're
8  talking about just what I -- you're just talking about
9  somebody signing, something versus somebody agreeing to
10 something and are those mutually exclusive in your mind?
11      Q.  Perhaps.  My question is signed versus
12 unsigned agreement with the customer.
13      A.  And I -- I don't -- I don't have -- I
14 personally don't have an understanding of however many
15 contracts we have, how many deals have been signed.  I
16 know when we sell product to any customer that we have
17 an agreement on how we're going to go to market
18 together.  The products you're going to carry, the
19 pricing, the transshipment, all those things that we
20 just talked about, I know the customers agreed.  So I
21 know that all the customers that we sell to have agreed
22 to execute our contract, execute our agreement.
23      Q.  And my question is:  Is that agreement signed
24 and in writing in all cases?
25      MR. QUINN:  Objection.  Asked and answered

Page 52

1      repeatedly.
2      MR. RAGAIN:  No.
3      MR. QUINN:  You have, Jim.  You've asked the
4      very same question.
5      MR. RAGAIN:  Thank you.
6  BY MR. RAGAIN:
7      Q.  Go ahead and answer it one more time.
8      A.  I'm forgetting what I'm answering now.  I
9  mean, this is...
10      Q.  I don't see how you can forget when I've asked
11 it so many times.
12      MR. QUINN:  Well, maybe it's because --
13 BY MR. RAGAIN:
14      Q.  Do you --
15      MR. QUINN:  This has been hammered over and
16      over.
17      Go ahead.
18 BY MR. RAGAIN:
19      Q.  Do you know how many of these contracts that
20 PBC has with customers are signed --
21      A.  And I said --
22      Q.  -- versus not signed?
23      A.  I said I don't have a -- I don't have the
24 information with me right now.  No, I don't.
25      Q.  All right.  Any time you need to take a break,



Page 53

1 Mr. Lewis, just let us know.

2    A.   Okay.  Thanks.

3       MR. QUINN:  We've been going about an hour,

4    so --

5       THE WITNESS:  Okay.

6       MR. QUINN:  -- would you like to take a

7    five-minute break or keep going?

8       THE WITNESS:  No, I'm good.

9       MR. QUINN:  Okay.  Let's keep going.

10       THE WITNESS:  I'll let you know.

11 BY MR. RAGAIN:

12    Q.   What's the transshipment enforcement program?

13    A.   For customers?

14    Q.   Well, it's my --

15    A.   That's a -- that's a broad statement.  What --

16 what specifically -- to who, to whom, I guess is what

17 I'm trying to understand.

18    Q.   It's my understanding that PepsiCo has a

19 program called the PepsiCo transshipment enforcement

20 program.  Can you tell me what that is?

21    A.   The transshipment program is designed to,

22 again, maintain control over authorized product in an

23 authorized area versus authorized product in a

24 nonauthorized area.  And there's a multistep process

25 where -- if that arrangement is violated, there's a

Page 54

1 multistep process where we engage with the customer and

2 take action accordingly throughout the multistep

3 process.

4    Q.   And who handles those multisteps?

5    A.   It would start with the key account manager

6 and if needed to be, management would be brought in to

7 assist in cases where it had to be dealt with the higher

8 levels within that customer's organization.

9    Q.   Who's in charge -- is there -- is there a

10 person at PepsiCo that's in charge of the PepsiCo

11 transshipment enforcement program?

12       MR. QUINN:  Jim, can I just ask for a

13    clarification?  And I -- I think we don't want to

14    get confused between the PBC policy for its

15    employees and the transshipment enforcement program

16    that applies to all bottlers.

17       MR. RAGAIN:  Don't you be telling him answers

18    in this discussion.

19       MR. QUINN:  I'm not going to tell him answers,

20    but we're going to have a messy record if the -- if

21    it isn't --

22       MR. RAGAIN:  My record will be just fine for

23    my purposes.

24       MR. QUINN:  Well, I can tell because it is

25    ambiguous.

Page 55

1       THE WITNESS:  And I -- I specifically asked

2    about -- I asked that upfront, what were you

3    asking.  It's a broad statement, so I'm talking to

4    you about what we talked to our customers about and

5    our employees about.

6 BY MR. RAGAIN:

7    Q.   Do you know, sir, what the PepsiCo

8 transshipment enforcement program or PTEP is?

9    A.   I don't know of what you refer to as a PepsiCo

10 enfor- -- PTEP, I don't -- I don't know of that specific

11 legality of what that is.  I know we have a PBC

12 transshipment program in a document in a multistep

13 process that we deal with customers on and we manage our

14 employees in a very, very similar manner.  Anything

15 beyond that, relative to outside of the entity of a

16 customer or one of my employees, I am not aware of what

17 the specifics are of that program.

18    Q.   And when you say one of your employees,

19 what -- is there a policy or a written set of rules that

20 apply to the employees --

21    A.   Yes.

22    Q.   -- with respect to transshipment?

23    A.   Yes.

24    Q.   Okay.  And -- and what is that called?

25    A.   It's -- it's all part of the transshipment

Page 56

1 policy, PBC transshipment policy.

2    Q.   Have you ever seen a copy of it?

3    A.   Yeah, we have -- I have to sign it.  Everybody

4 has to sign it.

5    Q.   How often do you sign it?

6    A.   Annually.

7    Q.   Is it what's also referred to as the code of

8 conduct?

9    A.   We have the -- the transshipment policy is a

10 separate distinct, but it would -- it would certainly

11 apply to, in my opinion, the code of conduct.  But it's

12 its own standalone policy that is administered in a

13 standalone way.  The code of conduct training is

14 separate and apart as well, that we go through annually.

15 So they're -- they're complementary.  They're certainly

16 related, but the transshipment one is a -- one that we

17 go outside of the code of conduct training window to

18 administer.

19    Q.   And is it a -- is it a physical document

20 that's signed or is it something that is signed online

21 or via a computer?

22    A.   Both.  But it's signed -- it's something that

23 has to be signed by all employees.

24       MR. RAGAIN:  Has that been produced?

25       MR. QUINN:  Yeah.



DEREK LEWIS  Confidential
NORTHERN BOTTLING vs PEPSICO

June 19, 2017
57–60

Page 57

1 BY MR. RAGAIN:
2      Q.   Does PepsiCo have a policy whereby bottlers
3 are -- if a -- if a bottler's product is found in
4 another bottler's territory, that the offending bottler
5 pays a fine?
6      A.   Are you talking about bottler, independent
7 bottler to independent bottler?
8      Q.   I'm talking about bottler to bottler.
9      A.   Bottler to bottler?  I would assume that the
10 policy -- authorized and unauthorized is a consistent
11 application, I would imagine, around the system.
12      Q.   What I'm asking, sir, is:  Does PepsiCo have
13 such a policy where a -- a bottler is fined if its
14 product is found in the territory of another bottler?
15      A.   I don't know if PepsiCo -- I don't know when
16 you say, does PepsiCo have a policy.  If a bottler ships
17 unauthorized product -- ships authorized into a
18 nonauthorized bottler area, I'm assuming the bottler
19 would deal with that the way they would deal with it if
20 it occurred if it happened with PBC.
21      Q.   And how would that be?
22      A.   They would have to have an investigative unit
23 come in, trace back where the -- the codes and find the
24 source and then from there, report it and process will
25 be administered for there.

Page 58

1      Q.   And what is that process?
2      A.   The process of what?  The transshipment
3 process?
4      Q.   The process that you just --
5      A.   The investigators go --
6      Q.   -- referred to, sir?
7      A.   The investigators go out, they find codes and
8 if the codes are deemed to be traced back to a sourced
9 area, those -- those products are, you know, now
10 potentially linked to fines that -- you know, you have
11 to pay transshipment fines on.
12      Q.   Does PBC pay transshipment fines?
13      A.   PBC does.
14      Q.   Is PBC the largest payer of transshipment
15 fines in the system?
16      A.   Being the largest bottler, yes.
17      Q.   Do you know, say for the year 2015, what -- or
18 any recent year that you're familiar with, what the
19 percentage of the total fines for transshipping are paid
20 by PBC versus all other bottlers?
21      A.   Not aware of the percentages, the exact
22 percentages.
23      Q.   Is it your understanding that it is less than
24 or equal to or more than 80 percent of the transshipment
25 fines paid?

Page 59

1      A.   I don't know.
2      Q.   Do you -- do you receive that information from
3 anyone?
4      A.   Not that I -- not that I recall.  Uh-uh.
5      Q.   Have you ever asked for it?
6      A.   Not that I recall.
7      Q.   Does it not concern you how much the
8 transshipment --
9      A.   I'm concerned -- I'm concerned about --
10      Q.   Sir, let me finish my question.
11           MR. QUINN:  Well, hold on.  Jim, you dropped
12      your voice and the witness thought you were done,
13      so there's a misunderstanding.  Don't get angry
14      with him.  Just ask the question.
15           MR. RAGAIN:  It's the tenth misunderstanding
16      so far and I did not drop my voice.
17           MR. QUINN:  Well, the record will --
18 BY MR. RAGAIN:
19      Q.   Mr. Lewis --
20           MR. QUINN:  -- reflect it.
21 BY MR. RAGAIN:
22      Q.   Mr. Lewis, would you -- would you read back
23 what I started to say, please.
24           (The reporter read back the requested portion
25      of testimony.)

Page 60

1           MR. QUINN:  Let me just, Mr. Lewis, make sure
2      that Mr. Ragain is finished with his question --
3           THE WITNESS:  Absolutely.
4           MR. QUINN:  -- and then answer, so that we
5      don't have this misunderstanding.
6           THE WITNESS:  Absolutely.
7           MR. RAGAIN:  I'm sorry, read it back again.
8           (The reporter read back the requested portion
9      of testimony.)
10 BY MR. RAGAIN:
11      Q.   Are you not concerned, sir, with the amount of
12 transshipping fines paid on an annual basis by PBC?
13      A.   I am concerned.
14      Q.   How much in transshipment fines did PBC pay in
15 the year 2015?
16      A.   Millions.
17      Q.   More than three million?
18      A.   Lots of millions.
19      Q.   More than 10 million?
20      A.   Material, yes.
21      Q.   More than 10 million, sir?
22      A.   Yes.
23      Q.   More than 15 million?
24      A.   Material.
25      Q.   Who would be able to tell me, at PBC, how much



Page 61

1 the transshipping fines were in a given year?

2    A.  A lot would be able to because it -- it's --

3 it's in the P and L item.  It's a big P and L item.

4    Q.  Why can't you tell me, sir?

5       MR. QUINN:  Objection to the form of the

6 question.

7       THE WITNESS:  My point is it's material, so

8 that's all I'm --

9 BY MR. RAGAIN:

10    Q.  Why didn't you tell me, sir?

11       MR. QUINN:  Objection to the form of the

12 question.  It's argumentative.

13 BY MR. RAGAIN:

14    Q.  The objection is made.  Go ahead and answer.

15    A.  It's substantial.

16    Q.  Is PBC the largest transshipper of PepsiCo

17 bottle and can CSD products?

18    A.  PBC, we're not a -- we're not -- we don't

19 tran- -- we're not a transshipper.  So when you say,

20 "transshipper," we're not -- we don't wake up and say,

21 let's figure out how to move product from an authorized

22 area to a nonauthorized area.  So we're not a

23 transshipper.  That -- that's -- you know, I don't -- I

24 wouldn't -- when you say, PBC's a transshipper, we're

25 not a transshipper.  It's not what we do.

Page 62

1    Q.  What do you call when -- when you're talking

2 about this transshipment issue in the company -- inside

3 your company, what do you call the offending bottler,

4 the bottler whose product ends up in someone else's

5 territory?  If not the transshipper, what do you call

6 them?

7    A.  If -- if it happens in our -- from our product

8 source, obviously it happens with customers that we sell

9 to and it's those customers who, in turn, are the ones

10 that move it from an authorized territory to a

11 nonauthorized territory.  Those are the -- those are the

12 real transshippers in the scheme of things because I

13 don't have assets that take product made in our

14 territory and shipped over to launch into independent

15 bottling lines, so we are not transshippers.

16       It happens with the customers and people that

17 we sell to, product will move from authorized to

18 unauthorized and we -- we have to deal with that swiftly

19 and responsibly as I said earlier.

20    Q.  For purposes of discussion, though, what do

21 you refer to the bottler whose product ends up where

22 it's not supposed to?  I'm just trying to put a label on

23 it, so we can talk about it today, sir.

24    A.  I would call it transhipped product.  I

25 wouldn't say transhipper.  That's a different

Page 63

1 orientation.

2    Q.  Then, that's fine.  All I'm trying to do is --

3 what can I call them so that you'll know what I'm

4 talking about?

5    A.  I want to focus on the product.  The product

6 is transshipped product, yes.

7    Q.  Should I call them the transshipping bottlers?

8 Should I call them the offending bottlers?  I've seen

9 it -- I've seen it referred to in different ways in this

10 case.  So I'm just trying to say, we're going to be

11 talking about --

12    A.  I would say the source of the transship- --

13    Q.  Please let me finish, sir.

14    A.  Sorry.

15       MR. QUINN:  Do you want him to answer now?

16       MR. RAGAIN:  No, I want him to let me finish

17 my questions before he answers.

18       MR. QUINN:  But if I can just --

19 BY MR. RAGAIN:

20    Q.  Mr. Lewis --

21       MR. QUINN:  -- say for the record, you --

22 you're -- it's not a question when you start to

23 provide a stream of consciousness --

24       MR. RAGAIN:  This record will speak for

25    itself.

Page 64

1       MR. QUINN:  -- thought of what it is that

2 you're trying to do.  The question should be simple

3 and direct and that's why I object.

4       MR. RAGAIN:  Are you done?

5       MR. QUINN:  I am.

6 BY MR. RAGAIN:

7    Q.  Mr. Lewis, I'm going to be asking you

8 questions that involve activities by the bottler, that

9 is the source of the transshipped product, the customers

10 and the bottler whose territory the product ends up in.

11 I just want to make sure we can effectively communicate.

12       So what would you like me to call those

13 various parties?

14    A.  May I speak now?

15    Q.  Yes.

16    A.  The way you just said it, source of bottler

17 product, you outlined three distinct entities.

18    Q.  Okay.  Is PBC the largest source of

19 transshipped PepsiCo bottle and can CSD products?

20    A.  To my knowledge, yes.

21    Q.  Has PBC been the largest source of

22 transshipped PepsiCo bottle and can CSD products for

23 several years?

24    A.  To my knowledge, yes.

25    Q.  How many?

DEREK LEWIS  Confidential
NORTHERN BOTTLING vs PEPSICO

June 19, 2017
65–68

Page 65

1   A.  As many years as I've been in this job and so
2  I'd call it -- let's say, at least, you know, the last
3  10 years.
4      Q.  In terms of payment of transshipment fines,
5  how does the amount of transshipment fines paid by PBC
6  compare to the amount of transshipment fines paid by the
7  independent bottlers?
8      A.  I don't have specific information on what the
9  independent bottler group is paying on fines, so I -- I
10  can't make that distinction.  But I would, obviously,
11  say that what the source product from PBC's territory
12  has obviously been, you know, material and -- and much
13  higher that than the independent bottling system.
14      Q.  Why is that, sir?
15      A.  Our size.
16      Q.  Any other reasons?
17      A.  Complexity.
18      Q.  What do you mean by "complexity"?
19      A.  Complexity of -- geographical complexity,
20  competitive complexity, customer complexity, bills,
21  bottle bills, those type of things that can come into
22  play, certain geographies.  Taxes, now, are something
23  that grow -- create another level of complexity in some
24  cases that's being instituted now.
25      Q.  Do you know how much Northern Bottling paid

Page 66

1  last year in transshipment fines?
2      A.  No, sir.
3      Q.  Are you aware of any bottler, independent
4  bottlers that paid zero last year in transshipment
5  fines?
6      A.  I'm not aware of who those bottlers were that
7  did not pay any fines, no.
8      Q.  Are you aware that there are independent
9  bottlers that paid zero last year in -- in transshipment
10  fines?
11      A.  I don't -- I'm not aware of the specific
12  bottlers.  I would like -- I would imagine that -- of
13  the bottlers that we have, that some probably would not
14  incur fines, so I would be reasonable enough to
15  determine that as well, yes.
16      Q.  Does the transshipment enforcement program
17  apply to PBC in connection with transshipment of
18  PepsiCo -- scratch that, please.  I'm going to start
19  over.
20      Am I correct, for the transshipment fine
21  process to begin, the bottler in whose territory the
22  product is found needs to make a report of some kind?
23      A.  Yes.
24      Q.  Do PBC facility managers report transshipment
25  of other PBC facility's product into their territories?

Page 67

1      THE COURT REPORTER:  I'm sorry, into their
2  what?
3      MR. RAGAIN:  Territories.
4      THE WITNESS:  If product was found outside,
5  again, of the selling area, that would be -- it
6  would be communicated internally, yes.
7  BY MR. RAGAIN:
8      Q.  And does the source bottler, if it -- if it is
9  transshipment of PBC product from one territory into
10  another PBC territory, does the source bottler in that
11  situation get fined?
12      A.  That is investigated internally and -- no,
13  we've not had a practice of that.
14      Q.  Why not?
15      A.  Doesn't happen -- first of all, it doesn't
16  happen often, a lot at all.  And circumstances we --
17  that we look at, investigate, you know, we deem that
18  either are nonmaterial or, you know, we -- we have
19  clarity on what happened and we're able to put
20  preventative measures in place to make sure that didn't
21  happen again.
22      Q.  Is there a reason, to your knowledge, sir, why
23  PBC would be the source bottler responsible for paying
24  the largest amount of fines for transshipping of its
25  product into its independent bottlers' territory, but

Page 68

1  that, as you put it, it rarely happens that PBC is the
2  source bottler of transshipped product into other PBC
3  territories?  Why would that be?
4      A.  Well, I'd say when it happens, sometimes
5  people -- it could be gray in some cases.  Some people
6  don't report it, but in the cases that you find it, it
7  tends to be a small amount, you know, small amounts and
8  it's quickly traced back -- because again, we move
9  swiftly on these things, so our ability once somebody
10  finds out something, you call and say, hey, I found --
11  I'm in -- I'm in Virginia and I see product from
12  Philadelphia, maybe, in the market.  I'd say, how did
13  this product make it to the market?  We trace it back.
14  We do an investigation on it and most of the time we're
15  able to find out what happened in this particular
16  instance and then put a correct-and-solve in place, and
17  most of the time going forward, it doesn't happen again.
18      So transshipping fines or the time it takes,
19  the investigative costs, the time it takes your people,
20  it's very disruptive.  So if I found a few cases in
21  Maryland, Virginia from Philadelphia, you know, smaller
22  quantity that I deem to happen when I investigated it
23  happened from a very rare circumstance.  Somebody brings
24  something down in a van, I'm not going to put a lot of
25  people and a lot of time against something that we have



DEREK LEWIS  Confidential
NORTHERN BOTTLING vs PEPSICO

June 19, 2017
69–72

Page 69

1 under control.  And these things are very, very costly.
2 These investigations, the time spent on this, we
3 understand the importance of it, but it's very, very
4 time consuming and very costly.  We don't like
5 transshipping fines at all.  It's something that
6 absolutely hurts the P and L for our people.  It's a
7 complete negative in our business.  So our goal is to
8 you know, prevent it and where it comes up, quickly stop
9 it and prevent it from happening again.
10    Q.   Thank you.
11        I'd like to go back to -- just so we're clear,
12 go back to talking about PBC product being transshipped
13 into the territories of independent bottlers now.
14        Since 2010, has the amount of PBC product
15 transshipped into the territories of independent
16 bottlers increased, decreased each year or stayed about
17 the same each year?
18    A.   My understanding is there's been some
19 variation throughout the years, but it still remains a
20 very, very high amount and not -- not decreasing.
21        MR. RAGAIN:  I need to take a break.
22        THE WITNESS:  Okay.
23        THE VIDEOGRAPHER:  We're going off the record
24    at 10:00 a.m.  And this is the end of Disc 1.
25        (Brief recess.)

Page 70

1        THE VIDEOGRAPHER:  We're back on the record at
2    10:11 and this is the beginning of Disc 2.
3 BY MR. RAGAIN:
4    Q.   Mr. Lewis, if PBC transshipment fines for
5 bottle and can CSD product transshipped into the
6 territories of independent bottlers has not decreased
7 over the years, would you agree with me that the
8 transshipment enforcement program is not working to
9 prevent transshipment?
10        MR. QUINN:  Object to the form of the
11    question.
12        THE WITNESS:  What I believe, the program
13    needs work because we're not at all happy with
14    escalating fines; however, what's happened in the
15    marketplace again, this increasing complexity,
16    complexity -- geographical complexity, competitive
17    complexity, you know, pricing complexity, all those
18    type of things have made the situation much harder,
19    so it's really incumbent upon -- what -- this Blue
20    Council System [sic], I know, are looking at a
21    number of different things to drive improvement.
22    There's no doubt we have to improve where we are,
23    but the marketplace is getting more and more
24    complex.  We have to recognize that complexity in
25    all of our efforts, the system efforts to get this

Page 71

1 to a place where it's going down or eliminate it,
2 which, you know, very, very hard to do at this
3 stage.
4        Most of the complexity, most of the issue is
5 in the northeast of the United States, by the way,
6 so that -- that's where the -- the majority of this
7 problem exists and challenge exists in our company.
8 And if we're able to, in the northeast, start to
9 get it under control, it would -- it would benefit
10 the system holistically.  But -- but so there is --
11 there is certainly more work to do.  We absolutely
12 have more work to do here.
13 BY MR. RAGAIN:
14    Q.   Do you know where the product is coming from
15 that's being transshipped into Northern Bottling's
16 territory, sir?
17    A.   Do I know where the product is -- say that
18 again.  I'm sorry.
19    Q.   Do you know where the PBC source is for the
20 product that's being transshipped into Northern
21 Bottling's territory?
22    A.   The product source I thought -- I believe I
23 did know where it was traced back to.
24    Q.   Where is that?
25    A.   I think it was Florida.

Page 72

1    Q.   And that's not in the northeast, is it, sir?
2    A.   That's not the northeast.  I said the
3 majority.  I didn't say all the problem was in the
4 northeast.  I said the majority of the problem was in
5 the northeast.
6    Q.   Would you agree with me that the product we're
7 dealing with in this lawsuit is not product being
8 transshipped from the northeast into North Dakota?
9    A.   The product that you just referenced -- the
10 example you just referenced was not from the northeast.
11    Q.   And do you know, is the product that's
12 being -- that has been transshipped into Northern
13 Bottling's territory, has it come from more than one
14 source around the country, more than one PBC source
15 around the country?
16    A.   I'm not -- I'm familiar with that.  If that's
17 been outlined, I'm not familiar with -- I'm not familiar
18 with more than one source.
19    Q.   So if I ask you if you knew how many different
20 PBC sources the product was coming from, you wouldn't
21 know the answer to that?
22        MR. QUINN:  Object to the form of the
23    question.
24        THE WITNESS:  You asked me in this case of the
25    product that was reported sourced in the -- in



Page 73

1  the -- did I know where the product was sourced
2  from, and I referenced it was sourced from the
3  Southeastern United States and that's what I would
4  say, yeah.  I'm not -- I'm not familiar with it
5  from other products from other parts of the
6  country, going into that specific reference you
7  just made a few minutes ago.
8  BY MR. RAGAIN:
9     Q.  Have you ever received discipline from PBC or
10  PepsiCo because the transshipping -- transshipment fines
11  paid by PBC have not decreased over the years?
12     A.  Have I personally received discipline?
13     Q.  Yes.
14     A.  I have not received any discipline, but I have
15  received and been on the receiving end of conversations
16  around the need to improve our outlook there because it
17  is an item in the controlled cost line of the P and L.
18  And so anything in controllable costs that go up on any
19  given year get identified as opportunistic and are
20  put -- bucketed in discussions as we get, you know,
21  throughout -- throughout the parts of the year as we go
22  into the new year, that along with, you know, maybe over
23  time or waste or other items get bucketed and here's
24  some items that need to be focused upon, what are we
25  doing to get a handle on this and get this thing under

Page 74

1  control and what's driving it and what are we doing to,
2  more importantly, course correct for the future.  So if
3  we see the type of improvement we need to see, not only
4  with just the improvement on the cost line, but also the
5  improvement in process to sustain efforts going forward.
6     Q.  Has your compensation, Mr. Lewis, ever been
7  decreased because the amount of transshipping fines paid
8  by PBC have not decreased over the years?
9     A.  Transshipping fines have a negative effect on
10  my compensation.  That they -- they hurt the P and L and
11  being that the P and L -- delivering the profit and loss
12  statement plan is an important component of my
13  compensation.  The fact that that has a negative effect
14  on the profit, does affect my compensation, yes, it
15  does.
16     Q.  Has your compensation ever been decreased
17  because the amount of transshipping fines paid by PBC
18  has not decreased over the years?
19     A.  I don't know if I would ever look at it and
20  specifically say transshipping fines have directly the
21  one factor that hurt my compensation.  It's always a
22  number of things that would contribute to that.  Again,
23  we're looking at the profit and loss statement.  If that
24  was the only thing that stood out as a negative in the
25  profit and loss statement that decreased my

Page 75

1  compensation, then I can answer that and say yes, it was
2  the transshipment fines.
3     But yes, there are a myriad of things that
4  are, you know, pluses and minuses that go into the
5  profit and loss statement.  So I cannot specifically say
6  that that's been the one factor, but it's a negative.
7  There's nothing positive about transshipping fines on my
8  compensation or my performance appraisal.  It is -- it
9  is a negative because it hurts the profit of the
10  organization.  It's -- it's a negative, complete
11  negative.
12     Q.  Since the year 2010, Mr. Lewis, has your
13  compensation ever been decreased?
14     A.  Yes.
15     Q.  Okay.  In what years?
16     A.  Maybe, was it -- let me ask you:  What do you
17  define by "compensation," by the way?  What do you mean,
18  like total --
19     Q.  What you're paid.
20     A.  What I'm paid?  Yeah, relative to year over
21  year, yeah, I've had -- I've had years where I didn't
22  make what I made the previous year, yes, that's
23  happened.
24     Q.  And were you told the reasons why?
25     A.  Well, I knew the reasons why.  I didn't have

Page 76

1  to be told.  I know what -- I know what goes into the
2  compensation structure, so I already -- nothing that --
3  no surprises here.
4     Q.  Were you ever told that your compensation was
5  being decreased because transshipment fines have not
6  decreased over the years?
7     A.  Not specifically because of transshipment
8  fines, but because of --
9     Q.  Thank you.
10     MR. QUINN:  Wait, let the witness finish his
11     answer, Mr. Ragain.
12     You may finish.
13     THE WITNESS:  Am I allowed to?
14     MR. RAGAIN:  His voice dropped off there.
15     MR. QUINN:  No, he said "because."  You know
16     that, Jim.  The tape will reflect -- finish your
17     answer, please.
18     THE WITNESS:  I was -- never discussed my
19     compensation -- when it had a variation and
20     decline, it was not explained to me it was declined
21     because of transshipping.  It was bucketed with
22     controllable cost performance in total, which
23     transshipping fines are part of controllable costs
24     as is labor, as is waste, utilities, supplies, all
25     those type of things.  So it's bucketed in



Page 77

1    controllable costs in total, which I would have
2    direct conversations over with the senior level.
3 BY MR. RAGAIN:
4    Q.   You mentioned the Blue System Council in
5 connection with, I think, efforts to improve the
6 transshipping policy or words to that effect.
7    A.   Uh-huh.
8    Q.   Is there something going on currently with
9 respect to -- well, what is the Blue System Council?
10    A.   It's a -- right now it's a committee of
11 independent bottlers and some members of the NAB
12 executive team who sit on a committee and work
13 towards -- you know, working towards business, growing
14 the business, business challenges, business issues,
15 progressiveness and so there are a number of topics that
16 the council is working against to move the businesses
17 forward, move the partnerships forward.
18    Q.   Is one of those topics how to prevent
19 transshipment?
20    A.   Yes.
21    Q.   And when did that topic get added to the Blue
22 System Council's agenda?
23    A.   Well, the Blue Council has only been assembled
24 now for a little bit over a year now.  So the minute
25 the -- once the Blue Council System [sic] came together,

Page 78

1 that was identified as one of the, you know, key topics
2 for advancement.
3    Q.   And -- and what is the blue -- is it Blue
4 Council or Blue System Council?  I can't remember.
5    A.   Blue System Council.
6    Q.   What is the Blue System Council doing right
7 now in connection with preventing transshipment?
8    A.   Well, there is committee, small sub --
9 subcommittee in place that is working on trying to
10 advance the -- technology in that regards to more
11 accurate tracking of product that moves throughout the
12 system, so that, again, we're, you know, more realtime,
13 faster speed and -- and certainly greater controls of
14 product exiting warehouses throughout the country, not
15 just in company-owned operations, but also in
16 independent-owned operations.
17    Q.   What else, if anything?
18    A.   That was the last -- that was the latest
19 update that we had even as early as, what, last -- last
20 Thursday.  There was an update on our technological
21 process where some of these testing things were and
22 there was going to be, now, even a smaller committee or
23 additions to the committee put in place to help navigate
24 that plus, you know, continued efforts to come up with
25 some ideas to help mitigate and, again, prevent

Page 79

1 activity.
2    Q.   How long have you been in your present
3 position, sir?
4    A.   Five and a half years.
5    Q.   And -- and what position were you in
6 immediately preceding your current position?
7    A.   I was responsible for the Southeastern United
8 States, same -- same capacity, just a smaller
9 geographical footprint.
10    Q.   So since 2010, what all has PepsiCo done to
11 try and stop PBC from being the largest source of
12 transshipped PepsiCo B and C CSD products into the
13 territories of independent bottlers?
14       MR. QUINN:  Object to the form of the
15 question.
16       THE WITNESS:  PBC has been very focused on
17 reducing and eliminating transshipment across the
18 territories.  Again, the majority of the challenge
19 resides in the Northeast United States.  We have,
20 obviously, recognized the complexities that have
21 occurred in the marketplaces as the marketplace
22 continues to evolve.  We have been certainly very
23 open and transparent working with independent
24 bottlers in a system as a whole to communicate
25 issues, resolve swiftly.

Page 80

1    There's been cases where we've had to cut
2 people off, you know, for long periods of time.
3 And we -- we end up losing business that way
4 because, you know, while they move territory from
5 authorized to unauthorized, there also was
6 legitimate business that those customers had
7 operated against, but we end up -- because we want
8 to send a statement and a signal that this policy
9 is -- is definitely enforceable on our end, you
10 know, sacrifice base business and gave up base
11 business losses to, you know, stand up the policy
12 for a whole because that's the right to thing to
13 do.
14 BY MR. RAGAIN:
15    Q.   When you say "cut people off for long periods
16 of time" --
17    A.   Uh-huh.
18    Q.   -- have you ever -- have you ever cut a
19 customer -- well, first of all, what customers are you
20 talking about that you've cut off for long periods of
21 time because they were transshipping product?
22    A.   Their products in the -- going back to when I
23 was in the southeastern days, the products -- the
24 customers were cut off.  There was -- just for an
25 example or two, Cromer was one.  It was in the



Page 81

1 Carolinas.  They were -- we cut them off for over a
2 year.  You know, we're going through this with Vistar
3 in -- in Florida right now, in South Florida.  So there
4 are -- there are examples where we've had to -- as you
5 go through the multistep process, as you get to that
6 last step and you don't see the customer working with
7 you and again, not agreeing to execute what they said
8 they would agree to, you have to take those extreme
9 measures and consequences to stand up your policy.  And
10 we've had to -- we've had to make those decisions.
11        And again, it's cost us business, but it also
12 has, you know, in our minds, restricted those customers
13 at least from the ability to ship product from
14 authorized to unauthorized, which they were doing.  And
15 that's -- you know, we had to stand behind some of those
16 things.  They're not -- none of -- none of this is easy.
17 It's difficult to have to experience that, but you have
18 to -- the policy is the policy and we intend to stand
19 behind it.
20        Q.   How much money has it cost you when you've cut
21 these customers off for periods of time?
22        A.   You know, over the course of a year, it can
23 cost you millions of dollars of revenue of lost business
24 to -- because all of the business goes to your
25 competition.

Page 82

1        Q.   On a percentage of your P and L, can you --
2 can you give me some idea of how much you're talking
3 about?
4        A.   Well, if you're inside the market, it could
5 be -- you know, it could be substantial.  It could be
6 material.  It could be, you know, several points of
7 revenue.  If you're inside a -- a market, you know, if
8 you're inside a region, it may go down a little bit
9 lower.  And then, obviously, if you're in a national
10 footprint, it's much smaller.  But if you're in the
11 local market, losing a Vistar for a year or more in
12 the -- in South Florida, is a -- you know, that's a
13 pretty big hit.  Losing a Cromer in the Carolinas, you
14 know, where you had a pretty good marketshare of their
15 existing business inside the market is a pretty
16 significant loss to that market.
17        So the -- the losses are certainly more
18 substantial locally and really do affect the P and L
19 where you have to make other cuts in the business.  You
20 may have to lay people off.  You certainly have to
21 eliminate routes in some cases or take other
22 cost-cutting measures to try to offset the losses that
23 you have on the -- on the sales that you were getting on
24 the -- on the business that was legitimate inside your
25 territory.

Page 83

1        Q.   Now, you mentioned Cromer?
2        A.   I believe that was the name of the operator
3 that -- that we had shut off going back to that window
4 of time you had mentioned.
5        Q.   But you're reselling to Cromer now?
6        A.   When they -- I don't know.  Yeah, I don't know
7 the nature of the relationship today with them, but I
8 know at that time after over a year had elapsed, we had
9 gone back in with them.  They wanted to come back in.
10 We went through the agreement procedures again.  You
11 know, they talked about their commitment not to move
12 product again to an unauthorized area ever again.  And
13 then we went back in on a very, very small basis to show
14 that they can prove that they weren't able to do that.
15 We put some, you know, again, you know, very focused
16 tracking on that and we got to a place where I don't
17 think the business ever got back to where it was, but we
18 were able to get some of our assets back in the market
19 that we had before.  And we also restricted any product
20 from moving out of that area.
21        So we were able to prove that, but the
22 business is certainly nowhere at -- at that time we got
23 back, it was nowhere near what it had been before.  But
24 again, our ability to reinforce the policy was more
25 important and show that we're not going to -- we're

Page 84

1 going to adhere to our contracts, so we did what we had
2 to do.  And at some point, the customer acknowledges
3 they did the wrong thing and we went back to the table
4 on a very limited basis to test the waters again with
5 them and to eventually where you get back to a somewhat
6 normal relationship, but usually those things never go
7 back to the way they were because competition has seized
8 a lot more of the assets that you had and you're just
9 not in a place where you were before, but at least
10 you're back in and hopefully can work, to some sort of
11 semblance, back to what you were, but it will take some
12 time.
13        Q.   Approximately, what year was it that you cut
14 Cromer off?
15        A.   That had to be around the -- the time you're
16 talking.  It had to be around '010, from what I recall.
17 That was -- that was about the time that that had
18 happened because we had that -- we had that issue bubble
19 up in the Carolinas and -- with that bottling group and
20 we had -- we took action swiftly and strongly to the
21 point where we said we're not going to just not sell
22 them and made the decision.
23        Q.   But transshipment fines as a whole have not
24 decreased since 2010?
25        A.   They did decrease in the Southeast United



Page 85

1 States.  At that time, they did.  But -- but nowhere
2 close to the business loss that we occurred [sic].
3 So -- so I go back to it, it was -- it's a losing deal
4 all the way around.  No one likes transshipping fines or
5 transshipping activity or things of that nature.  So
6 yeah, the fines in the southeast materially went down,
7 the sales declines were not offset by that decline in
8 fines and, you know, we -- we just had to live with it.
9 It was just one of those things where we had to stand
10 the policy and we -- you know, the -- the team took the
11 hit.  There was really nothing else to go do.  We
12 couldn't -- that was the only way around it.  You had to
13 stand up the policy.  So, you know, the good thing is
14 you -- you get through that one year and then now you
15 don't have to -- you know, now you can, kind of, build
16 from there going forward.  But it's painful in that --
17 that first year for the P and L, but the right thing to
18 do.  So nobody would debate that was the right thing to
19 go do.  We'd do it again the same way and we have done
20 it again.
21     Q.   Did you ever consider cutting them off
22 entirely forever, permanently, just to make an example
23 of how serious PepsiCo or PBC is about enforcing
24 transshipment rules?
25     A.   Forever seems to be pretty extreme.  Pretty

Page 86

1 extreme.  We felt in this case, you know, over a year's
2 time frame was a -- was a harsh penalty and a strong
3 signal.  Now, if there's a -- solely another repeat
4 effort, then you probably would be talking about a much
5 longer window of time to maybe include, you know, never
6 shipping to you again, if they were to do that again,
7 yeah.  So I think we would have to take a look at that.
8     Q.   To your knowledge, has PBC or PepsiCo ever
9 permanently cut off a customer due to transshipping?
10     A.   There have -- there have been some examples
11 that I can recall where we didn't ship people ever again
12 just because of their lack of compliance.  It could have
13 been diverting product to an unauthorized area.  It
14 could have been something else.  And because it happened
15 over and over again or to the degree that it happened
16 and the lack of, you know, alignment on executing your
17 agreement led to a place where we just walked away and
18 again, all the business would end up going to
19 competitors.  So there's cases where they are exclusive
20 Coke operators that are out there, yes, there are, the
21 ones that we've chosen to not do business with.
22     Q.   And my question was due to -- specifically,
23 due to transshipping problems with that customer?
24          MR. QUINN:  Objection.  Asked and answered.
25          THE WITNESS:  Can you, I'm sorry, one more

Page 87

1 time, please?
2 BY MR. RAGAIN:
3     Q.   My question was:  Have you ever permanently
4 cut off a customer because of transshipment problems
5 with that customer, not other problems, transshipment
6 problems?
7     A.   Transshipping, certainly, could have been one
8 of the reasons, not exclusively the reason, but could
9 have been one of the reasons.  Could it have been the
10 only reason in a case or two?  I don't know.  Maybe,
11 maybe not.  I don't -- I don't recall, but I know that
12 we've walked from certain customers due to various
13 reasons of noncompliance.
14     Q.   While employed at PepsiCo, sir, have you made
15 any specific suggestions as to what actions PepsiCo
16 should take to try and stop PBC from transshipping
17 PepsiCo bottle and can CSD products into the territories
18 of independent bottlers?
19          MR. QUINN:  Object to the form of the
20     question.
21          THE WITNESS:  Yeah, I would -- I would -- the
22     only thing I would -- so again, PBC is not a
23     transshipper of product into bottler territories.
24     Have I -- do I sit at the table as a willing
25     partner, an active partner to help come up with

Page 88

1     ideas to help limit, reduce, eliminate the source
2     product ending up in IBs, yes.
3          We take this, again, very seriously.  We don't
4     like the fines.  I don't like the disruption.  It's
5     not just about the fines.  Disruption is also a
6     very important part of that, not only for our
7     people, but also for the IBs who have to spend time
8     on those.  So eliminating disruption and the fines
9     would be an ideal place to be in.  And so sitting
10     at the table working with the Blue Council or
11     working with various teams to come up with better
12     ideas on tracking, on ways to eliminate -- reduce
13     the complexity or manage, quite frankly, through
14     the complexity because we're not going to be able
15     to eliminate the complexity here.  There's going to
16     be a competitor that wants to do business with
17     these folks that has legitimate business inside the
18     geography and we have to -- we're going to have to
19     acknowledge that.  And so the ability to put ideas
20     on the table that create solutions to drive system
21     success is -- is absolutely what I strive for with
22     this -- with this committee and what we try to do
23     inside our four walls.
24 BY MR. RAGAIN:
25     Q.   My question, Mr. Lewis, was:  Have you made



Page 89

1 any specific suggestions as to how to stop PBC from
2 transshipping into the territories of independent
3 bottlers?
4        MR. QUINN:  Same objection.
5 BY MR. RAGAIN:
6    Q.   Not whether you've sat at the table while
7 other people have, but have you personally made any
8 specific suggestions?
9        MR. QUINN:  Same objection.
10       THE WITNESS:  Relative to PBC is not a
11    transshipper of product, relative to stopping PBC
12    source product evolving into bottling --
13    independent bottling territories, yes.  I have sat
14    at the table.  I have sat on conference calls and
15    offered points of views, opinions, solutions, ideas
16    to help move this effort forward in a productive
17    manner for IBs and for our system.
18 BY MR. RAGAIN:
19    Q.   And IB is independent bottlers?
20    A.   Yes.
21    Q.   Okay.  So tell me what those specific
22 suggestions you have made are?
23    A.   There have been various suggestions.  They've
24 been suggestions on technology, the continuous
25 improvement of technology.  The improvement of

Page 90

1 communication.  Taking a holistic look at the
2 complexity, competitive elements, you know, so we can,
3 you know, understand more transparency around the
4 competitive environment.  That's something that, you
5 know, we -- we should look to get, you know, more
6 familiar with, so I think mainly technology,
7 communication and competitive landscape, understanding
8 those things.
9    Q.   Since 2010, Mr. Lewis, have you heard anyone
10 else make a specific suggestion as to what actions
11 PepsiCo could take to try and stop PBC from being the
12 largest source of transshipped product into independent
13 bottler territories that you particularly thought was a
14 good idea?
15    A.   Specifically inside our company or outside our
16 company or all of the above?
17    Q.   All of the above.  Whatever you've heard that
18 you thought was a good idea.
19    A.   Oh, I think the -- what we're talking about
20 now in terms of technology, in terms of being able to
21 get more precise on a greater number of products that
22 leave the warehouse, again, across our system and the IB
23 system is something that I think is a really, really
24 good idea.  We've got to be able to track more than just
25 full pallets.  We've got to be able to track, you know,

Page 91

1 really precise products.  I've heard this idea and I've
2 been supportive of the idea, competitive product, doing
3 competitive assessment, understanding the nuances and
4 understanding the competitive marketplace we -- we
5 operate in.  I think that's very, very important.  So
6 I've heard that idea surface by multiple people of
7 pulling that together.  Communication is essential.  A
8 tighter or quicker process by which people are brought
9 up to speed faster and can react faster to anything
10 that's involved in this area, not just the, hey, I've --
11 I've got product in my area now, I want an investigator,
12 but -- but the customers, the geography, you know, we
13 could look at specifics on the pricing elements of that.
14 So I've heard suggestions of that, as well, come from a
15 number of people sitting around the table over the
16 years.
17    Q.   While you've been at PBC, have you heard any
18 discussions or suggestions made as to changing where the
19 transshipment fines hit on the P and L as a means to
20 perhaps disincentivize PBC from being the largest source
21 of transshipped products?
22    A.   It's all one P and L at the end of the day
23 anyway.  So there's one PBC P and L that all the fines
24 drop into, so it adversely affects PBC's performance as
25 a whole.  So, you know, left pocket, right pocket, I

Page 92

1 don't, you know, know if there's any distinctive answer
2 than that.  At the end of the day, it hits my P and L,
3 what I'm responsible for.  And whether you're in a
4 regional market or headquarters, you're going to be held
5 equally responsible for any, you know, sort of
6 contributions or performance related to -- to the
7 manner -- to that matter.
8    Q.   My question, Mr. Lewis, was:  Have you heard
9 any discussions about changing where the fines hit on
10 the P and L?
11    A.   I'm sorry.  Am I allowed to speak?
12       I guess -- maybe I'm confused on your question
13 because there's only one P and L, so I don't know
14 what -- what you would change when it all hits one
15 P and L.  It's not -- this doesn't reside in multiple
16 P and Ls.  It's all in PBC now.  So changing it to what,
17 I don't know what it would change to.  It's in PBC now.
18    Q.   My question, sir, whether -- whether it would
19 make any difference or not, have you heard anyone make
20 that suggestion?
21       MR. QUINN:  Object to the form of the
22    question.  Asked and answered.
23       THE WITNESS:  Have I heard anyone make that
24    suggestion?  I'm confused by the question, to be
25    honest with you.  So I would say --



Page 93

1  BY MR. RAGAIN:
2     Q.   Okay.  I'm sorry, go ahead.
3     A.   No, go ahead.  I'm sorry.
4     Q.   All right.  If I make the suggestion right
5  here today that where the fines get charged on your
6  P and L should be changed, in order to disincentivize
7  PBC from being the largest source of transshipped
8  products, have you ever heard anyone else, before today,
9  make that suggestion?
10       MR. QUINN:  Object to the form of the
11    question.
12       THE WITNESS:  I'm just not --
13  BY MR. RAGAIN:
14     Q.   Yes or no, sir?  Have you ever heard anybody
15  make that suggestion?
16     A.   About changing the way it's reported in the P
17  and L?
18       MR. RAGAIN:  Read it back to him.
19       MR. QUINN:  Well, he just asked if you wanted
20    to know about changing where it's reported in the P
21    and L.  That's what he just asked.
22  BY MR. RAGAIN:
23     Q.   Did you not understand my question, sir?
24     A.   Yes, I don't understand it.
25  BY MR. RAGAIN:

Page 94

1     Q.   I'm going to suggest to you today that you
2  change, make a change as to how the transshipment fines
3  are charged on your P and L in order to disincentivize
4  or attempt to disincentivize PBC from being the largest
5  source of transshipped product into the territories of
6  independent bottlers.
7       Have you ever heard anyone else make that
8  suggestion?
9       MR. QUINN:  Object to the form of the
10    question.
11       THE WITNESS:  And that's what I don't
12    understand.  It's in PBC's P and L today incenting
13    [sic] a change to disincent [sic] -- I'm not making
14    the connection.  It's already in the P and L.  So
15    to pull it out of the PBC P and L to disincent,
16    I'm -- I'm just not tracking.
17  BY MR. RAGAIN:
18     Q.   Apparently you've never heard anybody else
19  make that suggestion, correct?
20     A.   That particular suggestion, no.
21     Q.   All right.  That's all I needed to know.
22  Thank you.
23       Mr. Lewis, do you -- do you know what the
24  "know your customer rule" is?
25     A.   Specifically as it relates to what?

Page 95

1     Q.   Well, eventually I'm going to ask you how --
2  if you know what -- what it is or if you've heard of
3  that, I'm going to ask you how it relates to the
4  transshipment problem, if that helps.
5     A.   I mean, if -- are you talking about know your
6  customer meaning -- I don't know what you mean when you
7  say "'know your customer' rule."  What are you talking
8  about?  You mean, just -- tell me what you mean by that
9  and then I'll go from there.
10     Q.   To your knowledge, is there something in your
11  business called the "know your customer" rule?
12     A.   A rule, like a policy?
13     Q.   Just a rule.  You know what a rule is, don't
14  you?
15       MR. QUINN:  Object to the form of the
16    question.
17       THE WITNESS:  I'm not sure what you're
18    referring to.
19  BY MR. RAGAIN:
20     Q.   Okay.  Thank you.
21       Does Pepsi -- scratch that.
22       Does PBC make money from PepsiCo bottle and
23  can CSD products that are transshipped into the
24  territories of independent bottlers?
25     A.   Does PBC make money from source product that

Page 96

1  moves from an authorized area to a nonauthorized area?
2     Q.   Yes.
3     A.   Does PBC make money with the transshipping
4  fines -- the answer is no.  Product is sourced from an
5  authorized to a nonauthorized and we pay transshipping
6  fines on it.  The answer is no, we lose money on the
7  transaction.
8     Q.   Does PBC pay PepsiCo for the concentrate used
9  to make PepsiCo bottle and can CSD products?
10     A.   It's one P and L.
11     Q.   So is that yes or no?
12     A.   The concentrate is part of the PBC -- part of
13  the P and L, so it's all one.  It's one and the same.
14     Q.   Is a charge on your P and L or is it a
15  revenue on your P and L?
16     A.   It would be a revenue.
17     Q.   So PBC, to your knowledge, does not purchase
18  the concentrate for bottle and can CSD products --
19     A.   Oh, it's a -- it's a charge, but then we
20  have -- there's also -- you're talking about the
21  independent bottling system, there's a concentrate
22  component to the IBs.  That, again, all goes under --
23  it's all one P and L, so it's both.  There's -- we -- we
24  certainly pay a concentrate on product that's -- that's
25  embedded into the P and L.  And then we have concentrate



Page 97

1  sales that extend to the balance of the system.  That is
2  also part of the PBC P and L.  There's different line
3  items, but when you get to the subtotal, it's all PBC
4  P and L.
5      Q.  My question is or was:  Does PBC pay PepsiCo
6  for the concentrate PBC uses --
7      A.  There's a charge, yes.  I'm sorry.  I got ya.
8  My bad.
9      Q.  Does PBC, Mr. Lewis, turn a blind eye to the
10 transshipment problem in part because it doesn't want to
11 make the diverting customers upset or angry?
12     MR. QUINN:  Object to the form of the
13     question.
14     THE WITNESS:  Our behaviors that I spoke about
15     earlier, in terms of shutting off supply completely
16     for extended periods of time, reflects our stance
17     on how important we feel adhering to the policy is
18     and taking those measures where even the case where
19     it's dilutive in the P and L.  Standing behind the
20     policy is the right thing to do for the enterprise.
21     So we have -- so we absolutely -- we've never
22     turned a blind eye, don't have intentions of ever
23     turning a blind eye on this topic.
24 BY MR. RAGAIN:
25     Q.  Mr. Lewis, do the employees at PBC benefit in

Page 98

1  any way from the -- from the fact that PBC is the
2  largest source of transshipped products into the
3  territories, exclusive territories of independent
4  bottlers?
5      A.  Well, it would be a very similar answer to
6  what I gave earlier myself in that the fines are a
7  negative.  So the P and L that comes back when you have
8  to pay fines ends up -- you end up losing profit on the
9  transactions.  And then if you have to cut people off
10 and when you do cut people off, that obviously restricts
11 future sales and it gives the competitors an advantage
12 in your geography and that's a negative.  So our
13 incentive is to ensure everybody conducts business in
14 our geographies, in our boundaries, in authorized
15 boundaries and do it in a legitimate way day in and day
16 out, so at the end of the day people do not, would not
17 benefit, ultimately, from any sale of a product from an
18 authorized area to a nonauthorized area because of
19 implications of fines, cutting customers off and
20 discipline where they could lose their jobs for it.  So
21 there is no inherent benefit of somebody wanting to ship
22 product from an authorized area to a nonauthorized area.
23     Q.  How does pricing of PepsiCo bottle and can CSD
24 products factor into the transshipment problem?
25     A.  Well, pricing is one of those complexities I

Page 99

1  talked about.  And the fact is, you know, the people
2  that we're selling to are customers, who most -- mostly
3  also do business with our primary competitor and even
4  other competitors in the market.  So you have to price
5  your products in a way that will solidify your business
6  position with those operators.  So we have a competitor,
7  I guess is what I'm saying, we have to be mindful of.
8  And retailers set their price, the marketplace pricing
9  is set.  The operators, you know, have their pricing
10 expectations.  Competition plays a role in how we
11 navigate that -- navigate trying to get business and
12 that obviously is going to vary a lot throughout the
13 country.  And that varies in company-owned bottling
14 operations and it varies in franchise-owned bottling
15 operations in the same manner.
16     Q.  The competitor that you spoke of is Coca-Cola?
17     A.  They're the primary competitor, but there are
18 others.  There's a White System, that we call it,
19 there's a 7-Up competitor and they're now, you know,
20 what we call Pure Place, you know, Red Bull and energy
21 products and there's so many different new products that
22 are on the market now.  Individual owners of the brands
23 call directly on some of these operators to sell their
24 business, whether in the water business, whether in the
25 tea business, whether in the energy business, you know,

Page 100

1  from a CSD perspective, it's primarily us, Coke and the
2  7-Up bottling system.
3      Q.  In your answers when you're referring to "a
4  competitor out there," were you referring to Coke?
5      A.  Primarily, yes.
6      Q.  In the case of Northern Bottling in this
7  lawsuit, do you know who the distributor is that's
8  selling PBC product into the exclusive territory of
9  Northern Bottling?
10     A.  I heard a reference it's Core-Mark.
11     Q.  And who is Core-Mark?
12     A.  The national distributor.  I mean, a pretty
13 large scale distributor.
14     Q.  Of?
15     A.  Distributor of packaged goods, consumer
16 packaged goods.
17     Q.  Am I correct that Coca-Cola would also be
18 Northern Bottling's primary competitor in its exclusive
19 territory --
20     A.  I can't make that --
21     Q.  -- on C and D products?
22     A.  I would -- if I'm making a bet, I would say
23 they could be, but I'm not -- you know, I don't live in
24 that marketplace or work in that marketplace, so it's
25 not up for me to determine who their primary competitors



Page 101

1  are.

2      Q.   If Northern Bottling is effectively competing

3  with Coke in its exclusive territory and its pricing is

4  in line with or lower than Coke's pricing, is there

5  something wrong, in your view, with Northern Bottling's

6  pricing structure?

7          MR. QUINN:  Object to the form of the

8  question.

9          THE WITNESS:  Yeah, I'm at all not -- bottlers

10       can set their own pricing, so I'm not -- I'm not at

11       all one to weigh in on what their pricing

12       strategies are and how they want to compete against

13       their competitors in their marketplace.  It's

14       not -- that's not something that I spend any time

15       against or would even be close to being the subject

16       matter on one or the other, whether it was -- so I

17       can't weigh in on that.

18  BY MR. RAGAIN:

19      Q.   How would you characterize or describe for me

20  the goal of a -- of an independent bottler in terms of

21  competing with Coke in its territory?

22      A.   How would I describe -- say that again, I'm

23  sorry.

24      Q.   How -- how would you describe what -- what is

25  the goal of an independent bottler in terms of competing

Page 102

1  with Coke in that independent bottler's exclusive

2  territory?

3      A.   Well, the goal, I believe, is to increase your

4  market share profitably as possible.

5      Q.   As compared to your Coke?

6      A.   As compared to your competitors, yes.

7      Q.   So, just looking at the pricing structure, if

8  Northern Bottling is effectively competing with Coke in

9  its exclusive territory and it's pricing is in line or

10  less than Coke's, would -- in your view, would Northern

11  Bottling's pricing be too high?

12         MR. QUINN:  Object to the form of the

13       question.

14         THE WITNESS:  I don't know enough about the

15       marketplace to make that determination.  I don't --

16       I don't -- there's -- there's marketshare

17       differences.  There's class of trade differences.

18       There's portfolio differences.  There's so much

19       involved with doing an assessment on that, there's

20       no way, without even understanding their business,

21       make a determination on whether or not they're --

22       if I just give them one optic [sic] saying, are

23       they competitive or not, that's impossible for

24       anybody to do without, you know, a hell of lot more

25       information.

Page 103

1  BY MR. RAGAIN:

2      Q.   Generally speaking, sir, if you're beating

3  Coke in your territory, isn't that a -- a pretty good

4  indicator that your pricing is not too high?

5          MR. QUINN:  Objection to the form of the

6       question.

7          THE WITNESS:  What's beating Coke mean?

8  BY MR. RAGAIN:

9      Q.   Selling more product, having the largest

10  marketshare in your territory vis-a-vis Coke.

11         MR. QUINN:  Same objection.

12         THE WITNESS:  Okay.  And I'm trying to

13       determine, you have a higher marketshare than them,

14       okay, and that leads to what, that you're --

15  BY MR. RAGAIN:

16      Q.   That leads you to having a larger marketshare

17  than Coke?

18      A.   Yeah.

19      Q.   And would you say that if somebody, generally

20  speaking --

21      A.   It's a good thing, by the way, to have a

22       higher marketshare than Coke.  That's a really good

23       thing.

24  BY MR. RAGAIN:

25      Q.   Thank you.

Page 104

1          Now, in that situation, generally speaking,

2  would you say that the pricing structure of that

3  independent bottler is good or bad?

4      A.   Well, hey --

5          MR. QUINN:  Object to the form of the

6       question.

7          THE WITNESS:  Yeah, pricing is not an area

8       that it's -- it's black or white.  You can't -- you

9       can't -- no one can give me a price, say, well,

10       here's a look at pricing, is that the right thing

11       or not?  There is so much analytics that go into

12       the business proposition here that I -- I cannot

13       begin to make an assessment on his pricing relative

14       to his marketshare off of this conversation.

15       That's not -- that's -- the analytics go much

16       deeper than that.  I'm sorry.

17  BY MR. RAGAIN:

18      Q.   Explain them to me because --

19      A.   I need -- I need a lot more time than time in

20  here today to do that.  It's a lot more -- it's not my

21  business, by the way, for one, so I don't know -- that's

22  not my business.  I don't work in that geography, so

23  you're asking me about his business, I don't know about

24  his business.

25      Q.   Let's talk about your business?



Page 105

1    A.  Okay.

2    Q.  Why is it that distributors are able to buy
3  PBC product in PBC territories so much cheaper than it
4  is being sold by independent bottlers in their
5  territories?

6        MR. QUINN:  Object to the form of the
7    question.  Lack of foundation.

8        THE WITNESS:  I don't know -- I don't know
9    what set of facts you're referring to.

10 BY MR. RAGAIN:

11    Q.  You're not aware, as we sit here today,
12  that -- that you can buy PBC bottle and can CSD products
13  in, for example, PBC territories in the southeast and
14  other places, 22 other places, in fact, pay the money to
15  ship those to North Dakota and still make a profit and
16  still charge less than what Mr. Gokey is selling them
17  for?

18        What -- what factors would be present in those
19  PBC territories that would cause the prices to be so
20  cheap?

21        MR. QUINN:  Object to the form of the
22    question.  Lack of foundation.

23        THE WITNESS:  Well --

24        MR. RAGAIN:  If he doesn't know, he can tell
25    me.

Page 106

1        MR. QUINN:  Well, I can object to your
2    question.  That's what I did, Jim.

3        THE WITNESS:  Yeah, I'm trying to follow your
4    much, much cheaper -- but I'll go back to, I talked
5    a lot about pricing.  I talked a lot about the
6    complexity in the market that happens and bottlers
7    all have their right to set the pricing of their
8    marketplace.

9  BY MR. RAGAIN:

10    Q.  Including PBC?

11    A.  Including PBC.  And we also have to recognize
12  there is a -- there are competitors who want to go after
13  our business day in and day out.  So it's not just me
14  looking at, well, where is a PBC price in this geography
15  and where is an IB price in this geography and making
16  assumptions on that.  There is a local competitor that
17  is trying to go after our -- the business in this
18  marketplace and it's our job to go out and defend,
19  responsibly defend our position in the marketplace that
20  we compete in.  No different than what the IBs try to go
21  do in their markets.

22        With that, you are going to have different
23  prices.  I would imagine there is IB markets where the
24  pricing is lower than the pricing in Northern Bottling
25  situation.  So it's not just a -- it's not just a PBC

Page 107

1  thing.  This is a -- a system thing and we -- we, in
2  some territories, have more.  There's a luxury, if he's
3  got not to worry about Coke in his market, he or she
4  bottler, fantastic, that's great, I'm really happy for
5  you.

6        In this market, the competitive landscape is
7  dynamic and we have to be sensitized of that.  And
8  that's what, when you put that in a mixing bowl, drives
9  a lot of the decisions are made with pricing.  Sure the
10  higher the price, the more money you make.  We would
11  love to be, everybody would be love to be priced as high
12  as they possibly could be.  But the fact is, we have
13  competitors who don't look at it the same way, who will
14  take our business from us in a heartbeat, if we allow
15  them to and it's our jobs to defend our business
16  responsibly while also holding the policies that the
17  companies outline for us.

18    Q.  Do you believe that the local competitor in --
19  that Mr. Gokey has in North Dakota or that Northern
20  Bottling has, is working less hard to beat Northern
21  Bottling or Pepsi in -- in that territory than -- than
22  your competitors are in your territories?

23        MR. QUINN:  Object to the form of the
24    question.

25        THE WITNESS:  I -- I can't make that assertion

Page 108

1    at all one way or the other.

2  BY MR. RAGAIN:

3    Q.  In the context of this case, have you ever
4  asked anybody about that?

5    A.  About the Coke -- about the way the Coke
6  bottler is operating his territory?

7    Q.  Sure.

8    A.  No, I haven't.

9    Q.  I'm sure you've seen bad Coke competitors,
10  right?  In certain territories there might be a weak
11  Coke competitor by your standards?

12    A.  Compared to the strongest ones, perhaps, yes.

13    Q.  Perhaps or yes, which is it?

14        MR. QUINN:  Well, object to the form of the
15    question.  Argumentative.

16        MR. RAGAIN:  It's my job.

17        MR. QUINN:  No, it's not.

18        THE WITNESS:  Again, it's all relevant.  I
19    don't -- you know, you say "weak," weak compared to
20    what?  I mean, the trademark --

21  BY MR. RAGAIN:

22    Q.  So you're telling me --

23        MR. QUINN:  Let him finish his answer.

24        MR. RAGAIN:  You stick that finger up again,
25    it's going to get struck by lightning, Tom.

Page 109

1     MR. QUINN:  Now, the witness is in the middle
2  of an answer, Jim.  You interrupted.  Let the
3  witness finish his answer.
4  BY MR. RAGAIN:
5     Q.   Go ahead.
6     A.   I forgot what I was --
7     MR. RAGAIN:  Would you read it back, Ms. Court
8  Reporter?
9     (The requested portion of testimony was read
10    back by the reporter.)
11    THE WITNESS:  I'm sorry, now I've, like, lost
12    track of what I was --
13  BY MR. RAGAIN:
14    Q.   In your experience, have you seen independent
15  Pepsi bottlers that are better marketers in their
16  territories than other Pepsi bottlers are?
17    A.   Some bottlers stand out greater than others,
18  yes.
19    Q.   How about with respect to Coke bottlers or
20  distributors in their territories?  Have you seen
21  stronger ones and weaker ones?
22    A.   I've seen stronger ones than the base, yes.
23    Q.   And are all of the -- how many PBC territories
24  are there, Mr. Lewis?
25    A.   We have eight U.S. regions and approximately

Page 110

1  60 operating markets within those eight regions.
2     Q.   I'm sorry, 60?
3     A.   Sixty.
4     Q.   Okay.  Are all 60 of those, by your standard,
5  beating their competitors in their territories?
6     A.   If I use marketshare as a data point, I would
7  say no, there's opportunities out there.  So the answer
8  is no, they're not all beating -- all 60 are not beating
9  the --
10    Q.   How many are and how many aren't, by your
11  standards?
12    A.   Mixed.
13    Q.   That goes without saying, if -- if they're not
14  all doing one way or the other, sir.
15    How many are and how many aren't?
16    MR. QUINN:  Objection.
17    THE WITNESS:  Yeah, this -- I mean, is your
18    question in the last three months?  Is it in the
19    last year?  Is it in the last five years?  I mean,
20    it's -- we look at the business in -- in many
21    different ways, so the question is, was it
22    yesterday?
23  BY MR. RAGAIN:
24    Q.   Last five years.
25    A.   We've won the majority of the markets.

Page 111

1     Q.   You've won the majority of the markets?
2     A.   We have won -- we have outperformed in the
3  majority of our markets, so that would be 31 or more.
4     Q.   Wouldn't that allow you, all other things
5  being equal, to raise the price of -- of bottle and can
6  CSD products in those territories?
7     MR. QUINN:  Objection.  Lack of foundation.
8     THE WITNESS:  I -- that I cannot -- like, I
9  can't even make a case.  Just because you have a
10    market, you -- you're executing better, how that
11    leads to you be able to -- no, this is -- they're
12    out for our blood in these markets and it's our job
13    to defend our -- our business responsibly,
14    effectively day in and day out.  So we don't want
15    to give an inch.  We tell our people, don't give an
16    inch to Coke.  Go out there and fight to keep
17    business, to get new business so that we can grow
18    our sales and our profits responsibly year in and
19    year out and do it within all the confines of
20    the -- the policies that have been outlined to you.
21  BY MR. RAGAIN:
22    Q.   Generally speaking, what factors would exist
23  in a marketplace in a territory that would allow an
24  independent bottler such as Northern Bottling to charge
25  a higher price for their bottle and can CSD products?

Page 112

1     A.   Marketshare -- marketshare is -- is -- you
2  know, certainly is a big one.  Portfolio advantage, we
3  get ties into marketshare.  Brand equity, you know, the
4  healthier brands play a role.  So to me, it goes back to
5  portfolio strength and healthier portfolio.
6     Q.   And does the --
7     A.   Compared to your competition, by the way.  I'm
8  sorry, I didn't mean to cut you off.
9     Q.   Yeah.
10    Does the quality of the job of the independent
11  bottler factor into how much marketshare they enjoy?
12    A.   It plays a role in everybody's ability to
13  assist with the portfolio strength, yes.
14    Q.   Has PBC, sir, set its sales goals too high at
15  times so that the transshipment of Pepsi B and C CSD
16  products into the exclusive territories of independent
17  bottlers is encouraged?
18    A.   Never.
19    Q.   Have you ever heard anyone that works for PBC
20  or PepsiCo make that assertion?
21    A.   No.
22    Q.   Do you know whether anyone at PepsiCo or PBC
23  is currently looking at revising sales goals numbers as
24  a way to disincentivize the fact that PBC is the largest
25  source of transshipped product in the territories of



DEREK LEWIS  Confidential                                           June 19, 2017
NORTHERN BOTTLING vs PEPSICO                                        113—116

Page 113

1 independent bottlers?
2      A.   No, I've not heard that.
3      Q.   What are some of the ways that PBC uses to
4 increase or attempt to increase its marketshare in a
5 territory where perhaps it's not as strong as you think
6 it should be?
7      A.   Brand building, innovation, execution.
8      Q.   Okay.  What's brand building?
9      A.   Marketing, it's marketing, local marketing.
10     Q.   Making the product more available, would that
11 be part of brand building?
12     A.   Making it more relevant for the consumers that
13 are in the marketplace, yeah.  Using, you know, for
14 example, here we're affiliated with the Orlando Magic,
15 so throughout the year you create programs with the
16 Orlando Magic in the community to help draw people
17 closer in your portfolio, so that gives us an advantage
18 with retailers during the NBA season where they would
19 promote Orlando Magic/PepsiCo together and it gives us
20 an advantage at the point of sale.  So that would be one
21 example of, you know, brand building with taking your
22 trademarks, linking them with properties and marketing
23 them locally to make them very relevant.  That's one
24 example.
25         Innovation, taking new products like Mountain

Page 114

1 Dew Kickstart or a new tea product, knowing that you
2 have a certain development category strength, so in this
3 case in the southeast, tea is a highly developed
4 category, so your ability to push a little harder and
5 execute a little stronger gives you more leverage with
6 the new products you bring to market.  And execution is
7 the day-in/day-out battle where you show up and you
8 fight for display space and more cooler space and you
9 provide great services and use that to get, you know,
10 more opportunities to, you know, get more inventory in
11 the -- in the stores.  So those are ways that -- you
12 know, those are certainly several of the ways to help,
13 you know, take -- take your business and move it to
14 another level.
15     Q.   You want to sell more, right, the bottom line,
16 you want to sell?
17     A.   Sell more profitably, yep.  That's right.
18     Q.   Is it more difficult for PepsiCo or PBC to
19 police transshipping where PBC is the source of the
20 transshipped product than it is to police transshipping
21 where an independent bottler is the source of the
22 transshipped product?
23     A.   I would think that it's -- you know, it's --
24 it would be more difficult -- I mean, when it's -- when
25 it's inside your boundaries, it's a little easier

Page 115

1 probably to chase it down faster than if it's crossing
2 your boundaries, crossing boundaries, but it's complex
3 either way.  I don't -- I don't -- on the surface, for
4 me to see it necessarily as -- as, you know, easier, but
5 if I'm in a market -- I don't go -- I don't -- it's
6 hard, but I don't walk in franchise bottling markets too
7 often unless I'm on a specific invite or coming in.  So
8 I can only relate to when I come across it in our own
9 territory.  And again, usually we're able to -- you
10 know, once we know where it's from, try to go back, find
11 out what happened, usually we have a pretty quick answer
12 and we put some resolution in place to stop it.
13         Usually through the independent process you
14 find out about it through the investigative loop and it
15 takes a lot more time for it to make its way in.  So you
16 lose time from a -- from an investigative -- from a
17 quick, sort of, standpoint, so that's the only thing, I
18 think, that separates the two --
19         (Brief interruption.)
20         THE WITNESS:  So I'm sorry, I've got to get
21     back to my train of thought.
22         I don't know if it's easier or not, but it
23     takes less time in the PBC situations.  So you feel
24     like, at least, you're acting quicker.  Because I
25     see it, I can act on it immediately.  Where in the

Page 116

1     franchise system it just -- it just takes a little
2     bit more time because the nature of the way the
3     process works, that's part of one of the things I,
4     you know, wanted to recommend as a faster -- the
5     ability to close the loop faster even through
6     technology, a way we can find out somehow when
7     things are found, there's some type of code that
8     may go in a system or a portal and there are alerts
9     or things like that, there's an app or something
10    that we could all interact with that we would be
11    able to find out a little faster, and we can get
12    right back to the customer and take the corrective
13    action and put those things in place as quickly as
14    possible, so that we can prevent that from
15    happening any -- any further versus maybe a number
16    of days or weeks go by and you can have another
17    occurrence or two.  We want to try to minimize any
18    frequency of it, so -- I don't know if I answered
19    your question, but...
20     Q.   My -- my question was, or I intended it to be,
21 and perhaps I didn't ask it very well, but are you
22 saying that it should be or in your experience it is
23 less difficult for PBC to police itself than it is
24 for -- for PepsiCo to police the independent bottlers?
25     A.   I think the policing is about equal.  It's



DEREK LEWIS  Confidential
NORTHERN BOTTLING vs PEPSICO

June 19, 2017
117–120

Page 117

1  just in my mind it's quicker.  I want to get to things
2  quickly as possible, so my mind policing -- speed, to
3  me, is a part of policing.  And so how we increase the
4  speed of compliance or noncompliance or the speed of
5  resolution, I think is what's real important.  And
6  clearly, I think that speed today is different just
7  because of, you know, the process that's involved for
8  one system versus another system.
9        I'd like to see the speed generally be the
10  same for both systems and -- and technology is a way,
11  hopefully, that that can -- that can create itself to be
12  faster.  You know, I'm not -- we're not expecting people
13  to have to do any heavy lifting on the independent side,
14  it's just a matter of -- of -- codes are put into a
15  system or an app and that generates a level of
16  visibility and transparency for the enterprise that
17  people now can go act upon pretty quickly to problem
18  solve and resolve as fast as possible.
19      Q.  And if I understand you correctly, sir, the
20  quicker the processing of the -- of the transshipment
21  reports would or should lead to a lesser amount of
22  transshipping; is that right?
23      A.  I think it has a chance.  The minute you find
24  out something, the faster you can react to it, the more
25  you will -- you'll get to the bottom of it faster, which

Page 118

1  means you'll either have to take consequences,
2  reprimand, cut off, whatever you have to have, but yeah,
3  the faster we get information, the faster you can react.
4  I just believe that speed is a real critical -- a real
5  critical point here on us.  And I think technology has
6  to play a role in this and I think that's what the
7  system is trying to -- this Blue Council is trying to
8  work on, is how do we create technological advancements
9  that help the speed of resolution, speed of information,
10  speed of resolution with this process so that we can,
11  you know, act faster on both ends.  I mean, this is not
12  just PBC to independents.  It could be PBC to PBC.  It
13  could be independents to independents.  It could
14  independents to PBC.  It could work holistically, not
15  just, you know, one versus the other.
16      Q.  Just so I'm clear, where do you believe now
17  the -- the communication is quicker?  With PBC to PBC?
18      A.  From my own, it's -- the only reason I believe
19  it's quicker is that if I see product in a market, you
20  could pick up a phone and call somebody like that and
21  say, hey, I found a few cases, you ask a few questions,
22  for the most part you can it get a -- not in all cases.
23  Not in all cases because again, I'm not in every market
24  every day to know what people are finding.  But
25  generally, when I'm in the market and we come across

Page 119

1  that situation, which is -- which is rare, but we come
2  across a situation, we ask a few questions inside the --
3  where we are.  We make a couple phone calls and then we
4  typically, by the end of that day or some time, you
5  know, in the next 24 to 48 hours have a pretty good feel
6  of what happened, where it happened and then we can
7  begin to put an action plan to do that.
8        So those are -- those are my circumstances.
9  Now, I imagine that there's a lot of people that aren't
10  reporting anything and aren't calling each other when
11  they find something.  Either they don't know it's there
12  or they do it and they realize that, you know, in the
13  scheme of things it may not be worth their effort, who
14  knows what they're thinking.  There are probably a
15  number of things that are going on out there.  But when
16  I'm out there, I do find it quicker to at least be able
17  to get a handle on it and -- again, that's not perfect
18  either.  I want technology where if I were to walk in
19  the store, I see codes that are not from the existing
20  marketplace, I go to some app or I go to some website
21  that I can drop those codes in with some information,
22  brief information, that generates visibility to the
23  enterprise that now leads to specific people addressing
24  the problem, taking it on face-on, head-on and bringing
25  quick resolution to matters.

Page 120

1      Q.  Mr. Lewis, for the past five years, who has
2  been the person at PBC most responsible, in your view,
3  for addressing the fact that PBC is the largest source
4  of transshipped product?
5        MR. QUINN:  Object to the form of the
6      question.
7        THE WITNESS:  I don't know if there is a
8      single person.  I think it's a collective team.
9      Everybody on the North America Beverage team that
10      reports in to Kirk Tanner is responsible for sales
11      has vested interest in resolving this problem and
12      addressing this problem.  So I look at it as a
13      horizontal group of executives who all have skinned
14      the game on getting this resolved and there are
15      various functions that have pieces of helping to
16      solve, but holistically, you know, there --
17      everybody that sits on Kirk Tanner's team
18      essentially is responsible for this topic.
19  BY MR. RAGAIN:
20      Q.  And who are those persons in the last five
21  years?
22      A.  It would be myself.  It would be --
23        (Brief interruption.)
24        MR. RAGAIN:  That's my phone.  It will stop.
25



Page 121

1    THE WITNESS:  Okay.
2  BY MR. RAGAIN:
3    Q.   Who are those people?
4    A.   Myself, Anne Fink, Rich Tompkins, Kirk Tanner,
5  those are mainly the sales executives that are in play
6  here.
7    Q.   Mr. Lewis, would you agree that if a bottler
8  is doing a good job of enforcing the transshipment
9  rules, that bottler's percentage of transshipment fines
10  would be roughly proportionate to the percentage of
11  sales that that bottler enjoys?
12    MR. QUINN:  Object to the form of the
13  question.  Lack of foundation.
14    THE WITNESS:  Yeah, I don't know I necessarily
15  would -- would agree.  I don't believe that's
16  the -- you certainly could look at it that one way,
17  but I wouldn't necessarily look at it that way.
18  Again, there's various degrees of complexity that
19  exist throughout the footprint of the country and
20  one bottler -- you could argue -- you could argue
21  the other way.  In a low complex environment, you
22  could argue bottler would be way lower than their
23  fair share in some cases.  And in some cases where
24  there's a greater degree of complexity, higher, but
25  I would say that most of this problem, again, sits

Page 122

1  in the northeast.  A significant amount of it sits
2  in the northeast where, no surprise, there's the
3  most complexity.
4    So I think the complexity links directly to
5  percentages here, high degree of complexity, high
6  degree of problem.  Low degree of complexity
7  environments, low degree of problem.
8  BY MR. RAGAIN:
9    Q.   Describe a low complex territory for me.
10    A.   One -- so in this case, we talked about all
11  the factors that go in.  You may not have a -- a large
12  network of these type of operators in the market, for
13  one.  You may have just a lower number of distributors
14  in the market.  The distributor sizes can vary in
15  certain markets.  Your pricing structure could vary.
16  The things -- whereas bottle bills or taxes varies a lot
17  throughout the footprint of the country.  So it's
18  just -- it's not one single thing to say low complex or
19  noncomplex.  Everybody has complexity, so I don't
20  certainly mean to suggest there's no complexity.  But
21  let's face it, the northeast has a much higher degree of
22  complexity even amongst the independent bottlers up
23  there.  They face the same battles that my guys do up in
24  that geography.  It's just a -- it's a complex
25  geography.  It is -- just always has been.  And that

Page 123

1  geography is certainly more, you know, subject to the
2  type of things we've been talking about today than
3  others to a greater -- just to a greater extent.  And so
4  therefore, we've got to work harder certainly in
5  those -- all markets, but certainly in that territory
6  where that seems to be the biggest problem for us by and
7  large.  It has been for -- for years.
8    Q.   Well, first of all, would you agree with me
9  that the transshipment problem that Northern Bottling is
10  facing is every bit as important to PBC and PepsiCo as
11  the transshipment problem faced by any independent
12  bottler in the northeast?
13    A.   One hundred percent of the transshipment
14  challenges that occur absolutely are a problem, all a
15  big problem.
16    Q.   Would you characterize Northern Bottling's
17  territory as a less complex or a low complex
18  territory --
19    A.   I don't know enough about the market to make
20  that determination one way or the other.  I don't have
21  enough information on that geography.
22    Q.   Do you believe, generally speaking, that --
23  that a territory in North Dakota would be less complex
24  than any of the PBC territories that you're in charge
25  of?

Page 124

1    A.   I don't --
2    MR. QUINN:  Objection to the form of the
3  question.
4    THE WITNESS:  Yeah, I don't -- I can't make
5  that determination either.  What I would -- what I
6  would say on the surface is that most of those
7  territories, outside of northeast, have less
8  complexity to deal with in this case of source
9  product moving from authorized to unauthorized.
10  The northeast has greater complexity than most of
11  the other geographies in the U.S.
12  BY MR. RAGAIN:
13    Q.   Why?
14    A.   We talked about some of these things.  We
15  talked about competitors.  We talked about bottle bills.
16  You've got taxes now that are out there.  There are a
17  number of things that are just inherently more
18  complicated in that corridor than they are in other
19  parts of the country.  Not that those parts don't exist
20  in other places, you know, but in that corridor --
21  that's a historical thing.  That's not something that I
22  created.  We have to deal with that reality.  We care
23  about all the transshipment that goes on throughout the
24  country.  We care about it happening at Northern
25  Bottling.  We care about it happening wherever it



Page 125

1 happens.  But most of the problem is centralized in
2 the -- in the northeast.  And if we could -- we can
3 knock it out everywhere and do it overnight, we'd love
4 to do it.  We'd absolutely be a fan of it because it
5 hurts our P and L.
6      Our guys wake up every day and when those
7 fines come through, they're frustrated.  It hurts their
8 performance.  It's a morale booster [sic] and we know we
9 lose business because we've got to go back and basically
10 reprimand the customer or execute consequences.  So it's
11 a negative for everybody when we wake up.  So no matter
12 who gets the fines, people are unhappy with the nature
13 of this challenge that we have in our business.
14    Q.   Am I correct, am I understanding you correctly
15 that it's -- it's more difficult to prevent
16 transshipping in a complex territory as opposed to a
17 noncomplex territory?
18    A.   I don't -- I don't know if I would say it's --
19 what I would say is that, when you have a -- the more
20 complexity, the more challenging it can become.  It
21 doesn't mean that's it not challenging everywhere.  I
22 don't -- there's not one place I would say they ain't
23 got to worry about it.  It's easy.  You wake up every
24 day, you don't have any problems.  There's not one
25 geography in the country and I could -- I could speak

Page 126

1 for IBs, probably, on that matter too.  Nobody wakes up
2 every day and has it easy.  Everybody's got it tough.
3      Some geographies have it tougher than others
4 for circumstances that we talked about, marketshare,
5 pricing competitiveness, key competitors, regulatory
6 things that are in place that -- that were, you know, in
7 place for years and years at a time and when you start
8 adding more and more of those things in play, you know,
9 I'll even look at the Philadelphia thing where -- the
10 tax situation, that absolutely inherently adds another
11 level of complexity to that market that most other
12 markets don't have to deal with.
13      Now Cook County, Chicago has got to deal with
14 that.  Now Seattle is going to have to deal with that,
15 so this thing is, you know, adding another level of
16 complexity to the marketplace that we have to be
17 sensitized to so that we can assure that, number one, we
18 still have a right to do business and do it in a
19 competitive way and still win.  But also, not ensure
20 that, you know, it gets off track on some of the
21 policies that we're trying to execute against to protect
22 and defend our business as well as our independent
23 bottlers' businesses.
24    Q.   Generally speaking, Mr. Lewis, would you
25 expect if everyone is doing a good job of enforcing the

Page 127

1 transshipment rules, that every bottler's percentage of
2 transshipment fines would be roughly proportionate to
3 their percentage of the sales that they enjoy?
4      MR. QUINN:  Object to the form of the
5   question.
6 BY MR. RAGAIN:
7    Q.   For example, I can give you an example, if
8 you'd like.
9      If -- if Northern Bottling, or another
10 independent bottler, has, let's say, five percent of the
11 B and C sales in the United States, wouldn't you expect,
12 if they're doing a good job, that their share of
13 transshipment fines out of the total fines would be
14 five percent or less?
15      MR. QUINN:  Object to the form of the
16   question.
17      THE WITNESS:  I -- I can't -- I can't
18   generally make that statement.  The businesses are
19   all different.  Marketshares are different.
20   Complexities are different.  It could be a case
21   where his could be higher for some reason.  I
22   don't -- I'm not here to say his -- should be on
23   the average --
24 BY MR. RAGAIN:
25    Q.   My question is:  If it's lower --

Page 128

1      MR. QUINN:  Let him finish his answer, please,
2   Jim.
3      MR. RAGAIN:  I don't want him to rephrase the
4   question.
5 BY MR. RAGAIN:
6    Q.   I'm just trying to save you some time, Mr.
7 Lewis.  So I apologize.
8    A.   Can I talk?
9    Q.   I would -- I would like you to answer the
10 question I asked --
11      MR. QUINN:  Well, he was.
12 BY MR. RAGAIN:
13    Q.   -- not create a different one.  And I'm trying
14 to do it so you can get out of here.  That's up to you
15 and  Mr. Quinn.
16      MR. QUINN:  And it is true that he gets to
17   finish his answer.
18      Please go ahead.
19      THE WITNESS:  It feels like you want me to
20   answer whether or not his should be on the average
21   or not and my -- my -- my point back is, I don't
22   feel good about answering that question because
23   there's so many things that come into play that
24   could make it higher on the average or lower.  I
25   don't think -- I don't think you can look at this



Page 129

1  as something that could be spread like a peanut
2  butter approach.  I just don't.  I think it is a
3  far more complex issue.  Just like marketshare, do
4  I -- if I wake up and everybody does the same job
5  and everybody goes after it and fights with
6  tenacity in the market, would their marketshares be
7  the same?  Well, no.  There's different degrees of
8  things that go into play that marketshare is going
9  to be different around the country or profits or
10  sales, for that matter.
11      If -- you know, I'm sorry, I don't -- I
12  can't -- I'm not trying to be evasive.  I just
13  don't feel good about saying, well, yeah, generally
14  that should be the case.  I don't -- I don't feel
15  good about answering it that way.
16  BY MR. RAGAIN:
17  Q.   I appreciate that.
18      Now, do you know -- and -- and I -- I really
19  do apologize, is it senior vice president of --
20  A.   Field operations.
21  Q.   -- field operations?
22      As the senior vice president of field
23  operations for Pepsi Bottling Company --
24  A.   Beverage Company.
25  Q.   Beverage Company.

Page 130

1      Has PBC or PepsiCo ever studied that
2  relationship between --
3      MR. QUINN:  Object to the form.
4  BY MR. RAGAIN:
5  Q.   -- between the sales that a given bottler
6  enjoys and their percentage of transshipment fines?
7      MR. QUINN:  Object to the form of the
8  question.
9      THE WITNESS:  I have not seen any analysis
10  done in that manner.  It doesn't mean that it's
11  not -- has not been done.  I've not personally seen
12  it or been part of any conversations discussing it.
13  BY MR. RAGAIN:
14  Q.   At any time since you've been employed by
15  PepsiCo, has PepsiCo, PBC or PepsiCo Food Service ever
16  sold PepsiCo bottle and can CSD products directly to
17  Core-Mark?
18  A.   Not that I'm aware of.
19  Q.   Has -- same question, but -- and with respect
20  to the same period of time, but has Core-Mark, to your
21  knowledge, ever distributed bottle and can products
22  under any kind of an arrangement with PepsiCo?
23  A.   Not that I'm aware of.
24  Q.   I apologize for going back, but when we were
25  talking about the low complexity territories and perhaps

Page 131

1  territories with more complexity to them, one of the
2  things you mentioned was perhaps they don't have these
3  types of customers.
4      What -- what were you referring to when you
5  said "these types of customers"?
6  A.   I'm sorry if I said it that way.  What I meant
7  is the amount or scale of distributors in the market
8  varies geography to geography.  There's not necessarily
9  the same -- you know, even in Florida, for example,
10  South Florida has a greater concentration of
11  distributors than, let's say, Central Florida, so that's
12  what I meant by that.
13  Q.   And what do you mean by "distributors," sir?
14  A.   The 3PO, third-party operators.
15  Q.   And am I correct that third-party operators
16  are where the problem lies more than with other kinds of
17  customers in terms of diverting product out of the
18  territories?
19  A.   On the surface -- yeah, most -- most of the
20  situations, again, where you sell to -- yeah,
21  third-party operator, the -- the likelihood of moving
22  product from an area authorized to unauthorized, there's
23  a -- there's a greater, certainly, risk of that than,
24  let's say, a Wal-Mart, yes.
25  Q.   So what is a third-party operator?  Can you

Page 132

1  give me an example or some examples --
2  A.   We sell --
3  Q.   -- of third-party operators?
4  A.   -- well, Canteen.  These are people that
5  operate vending machines for us and they'll have --
6  they'll have the -- the bid for the office buildings.
7  So Canteen was awarded for -- making it up, awarded the
8  vending contract for this facility.  The owner facility
9  said you can't -- you guys, individually, can't decide
10  who goes in here.  We decide who goes in here.  As a
11  licensee, we're going to award that contract to Canteen.
12  Canteen, in turn, then has the business here for food
13  and for beverages and they decide from a beverage
14  standpoint who they want to leverage in this facility.
15      So we sell them product.  They in turn put it
16  on their vending routes and they sell it through their
17  vending machines or if this was a hospital, through a
18  servery.  If it was an airport, through the concessions.
19  So a number of different ways to resell the product, but
20  product goes to them and then product goes directly to
21  consumer through vending or through a retail price
22  point.
23  Q.   But if you've identified third-party
24  distributors or operators as more likely than other
25  types of customers to create diversion or



DEREK LEWIS  Confidential
NORTHERN BOTTLING vs PEPSICO

June 19, 2017
133–136

Page 133

1  transshipment --
2      A.  Yeah.
3      Q.  -- why sell to them at all?
4      A.  Because I want the business in the office
5  building and I want the business at the airport and I
6  want the business in the hospital.  I want that
7  business.
8      Q.  Thank you.
9          How many employees do you have at PBC?
10     A.  There are 48,000.
11     Q.  If there are independent bottlers -- well,
12  first let me ask you:  Are there regions within PBC that
13  are larger sources of transshipped products than other
14  regions?  In other words, could you give me a ranking?
15     A.  Northeast.
16     Q.  Okay.  And then who would be second?
17     A.  Northeast would be number one by a long shot.
18  From there, probably southeast.  After that, pretty
19  low.  I mean, you're talking about -- you know, I'm
20  talking about small amounts.
21     Q.  So the common denominator is the half of the
22  country where Mr. Quinn lives.
23         MR. QUINN:  Actually I live in the midwest,
24     the great midwest.
25  BY MR. RAGAIN:

Page 134

1      Q.  Okay.  So have you ever thought to call
2  Mr. Gokey or other bottlers like him that enjoy
3  virtually zero in transhipment fines and say, we should
4  do it like you do it, how do you do it?
5          Have you thought about doing that?
6      A.  I think that -- that exists with the Blue
7  Council System right now.
8      Q.  And that was started a year ago?
9      A.  Yeah.  And I think before that, it was more
10  informal than formal.  Now, it's more formal, then it
11  was less informal.  It was certainly more -- less formal
12  and yeah, those -- you would sit and have those
13  conversations.  The Carolinas group was very passionate
14  about the topic.  We partner with them a lot.  I know
15  they talk about it in the northeast.  What's a real big
16  issue for not just us, but every- -- I mean, all the
17  operators up there have to deal with the challenge.
18         So we have.  I think it's that -- those
19  conversations were much more GMA centric before.  Now --
20  you know, now the council has it they're going to be
21  more national and you're going to have a very good
22  cross-section of bottlers that have the problems versus
23  bottlers that don't that have pretty clean environments,
24  so getting the input in the collaboration from the
25  entire group, it should be a plus for the -- for the

Page 135

1  system as a whole.
2      Q.  My question, I hoped, was:  Have you ever
3  personally called any bottlers and said, how do you do
4  it, how do you keep from paying transshipping fines?
5      A.  I have.
6      Q.  And who would those be?
7      A.  Buffalo Rock, worked with them very closely.
8      Q.  Who did you speak with there?
9      A.  Matthew Dent and Warren Austin.  In the
10  Carolinas, GMA.  There are many, you know, executives,
11  Pepsi Bottling, PBV or CCI --
12     Q.  Now, what's PBV?  I'm sorry.
13     A.  Pepsi Bottling Ventures.
14     Q.  Is this a company-owned or --
15     A.  No, franchise.
16     Q.  -- a franchise.
17     A.  Yeah, it's independent.  Yeah.
18         So I've dealt with -- you know, again, the
19  nature of my job in -- in those markets with those
20  executives from territories that run right up against
21  RSI, which is up in Tallahassee, is another group that I
22  spent time with in trying to, again, resolve the --
23  resolve the problems that we had, you know, over the
24  years that we tried to just communicate and the
25  watch-outs, and hey, we heard this guy is opening up a

Page 136

1  new business, you know, let's put a watch out for him.
2  So they were proactive -- all the conversations weren't
3  just reactive conversations on, hey, we found product.
4  There were conversations even around people opening up
5  new businesses in the geographies and we all just wanted
6  to make each other aware that hey, there's some new folks
7  in town.  Let's be on the lookout for things that may --
8  may come up that we need to be aware of.
9          So it was very much a collaborative
10  relationship in that regard and I think we've got to
11  keep doing that, plus use the best of this council to
12  extend out greater ideas from the entire system, not
13  just the people that are affected.
14     Q.  Now, were these bottlers that you just spoke
15  of in that fairly lengthy answer, were these all
16  bottlers that you identified as good examples in terms
17  of paying low transshipment fines, and so you wanted to
18  find out how they did things to keep their product out
19  of other bottlers' territories?
20     A.  It was a combination.  Yeah, it was that and
21  there also were -- I mean, they're business partners, so
22  how do you learn from what they do, how do you learn
23  from how to communicate better, how you learn from
24  information that some of their people are getting on the
25  ground to -- to help stem some of the issues that were



Page 137

1 going on. It was all of the above. But yeah, part of
2 it was, let's talk about the things that are going on
3 that you guys see that we can sort of adopt as best
4 practice. Best practice sharing is absolutely a
5 critical piece of this, yes.
6    Q.  So could you tell me which of those bottlers,
7 that you sought out for that advice, gave you some of
8 information that has helped PBC in terms of lowering
9 transshipment fines?
10    A.  Well, I'd spoken earlier about the southeast
11 having a reduction over that window of time that you
12 asked about. And a lot -- a lot of that was due large
13 in part to the ability to collaborate with those group
14 of independent bottlers in the territory and then acting
15 swiftly and responsibly in the marketplace. So there
16 was direct correlation with that collaborative work,
17 corrective action, quick action to get the fines down in
18 the Southeastern United States and direct benefit of
19 those conversations. They played a big role in helping
20 out the -- the cause.
21    Q.  Did any of these bottlers that you sought out
22 for advice have any kind policies that were different or
23 additional than what PBC has been doing over the years
24 to -- try and cut back on transshipment fines?
25    A.  No, I didn't notice anything different about

Page 138

1 the policy. I think what was more important was
2 understanding, again, the competitive landscape they
3 were dealing with and also getting information on who
4 some of the players were in their market and making us
5 mindful of that, so we could start to easily trace back
6 relationships and -- and identify, early in the cycle,
7 where there could be a problem, we could get in front of
8 it a lot more faster than we were able to in the past.
9    So just information sharing was -- was alone
10 highly beneficial. From a policy standpoint, it was
11 pretty consistent. In some cases, I think they actually
12 took our policy and used it, you know, maybe, and just
13 reworded it a bit, but it was our policy. So I think
14 the policy side of it felt pretty similar, but the
15 communication and -- and the intelligence that we would
16 get was -- was extremely valuable from -- from them.
17    MR. RAGAIN:  That's all I have. Thank you,
18 sir.
19    CROSS-EXAMINATION
20 BY MR. QUINN:
21    Q.  Okay. I have just a couple of quick follow-up
22 questions, Mr. Lewis.
23    The first one really relates to this issue of
24 the northeast. A number of times, in the course of
25 Mr. Ragain's questioning, you talked about PBC being the

Page 139

1 source -- a producer of the largest amount of fines in
2 the system.
3    Do you recall those questions?
4    A.  Yes.
5    Q.  Were most of those fines relating to
6 transshipments that occurred in the northeast?
7    A.  Yes.
8    Q.  Has that been true for the entire time that
9 you've been with PBC?
10    A.  Yes.
11    Q.  Mr. Ragain was also asking you about factors
12 that go into building a marketshare in the territory.
13    Can you explain for us how important customer
14 satisfaction is in terms of building marketshare and
15 promoting the Pepsi brand?
16    A.  Well, really you can't get there without the
17 customer. The customer relationships are extremely
18 critical, especially in cases where it's a highly
19 competitive environment and your relationship with the
20 customer can give you, I'll call it, those jump balls
21 that give you more of an advantage, whether it's on
22 promotions or inventory or space, those kind of things.
23    So if -- if you, you know, you don't have a good
24 relationship with the customer, no matter what your
25 marketing or advertising is or new products are,

Page 140

1 you're -- they're not going to make their way on the
2 floor if you don't have a good relationship with the
3 store manager, the assistant managers, those kind of
4 folks.
5    Q.  So is it -- is it -- is it a good practice for
6 a bottler to insist on a customer taking a certain
7 amount of shelf space when the customer doesn't want the
8 shelf space for Pepsi products?
9    A.  Say that again. Repeat the question.
10    Q.  I said, is it a good practice in terms of
11 building customer relationships for a bottler to insist
12 that a customer accept a certain amount of shelf space
13 when the customer says, no, I can't take that much?
14    A.  I think --
15    MR. RAGAIN:  Object to the form.
16 BY MR. QUINN:
17    Q.  You can answer.
18    A.  I think you've got to sell hard as you
19 possibly can to maximize your opportunities, but at the
20 end of the day, you're going to have to come out with a
21 win/win scenario so that we're able to still grow our
22 sales and the customer is able to still grow their
23 sales. At no case would we completely walk away from
24 trying to make a customer's business work for us as long
25 as it worked for us and worked for them. We always



DEREK LEWIS  Confidential
NORTHERN BOTTLING vs PEPSICO

June 19, 2017
141—144

Page 141

1  strive to try to get to a win/win scenario and there's
2  going to be give and take in those conversations, but we
3  would -- we would not completely walk away because it
4  would just compromise our business position and they
5  would end up giving all that space to competition.
6      Q.   And if the customer says, I'm -- I'm not going
7  to let you sell any Pepsi product if you insist on me
8  taking more shelf space than I want, what would you do
9  in that scenario?
10        MR. RAGAIN:  Object to the form.
11        THE WITNESS:  Say it one more time.
12  BY MR. QUINN:
13     Q.   I said, if a customer tells you as a bottler,
14  if you insist that I take this amount of shelf space,
15  I'm going to stop buying product from you, what do you
16  do?
17     A.   I'm going to work hard to find some common
18  ground so we can retain a good relationship so we can
19  keep -- keep product moving through to satisfy the
20  consumers, because I know ultimately the consumers that
21  are walking in their stores or his or her store to buy
22  our products and we're not going to let that opportunity
23  go by, we're going to find a way to reach a compromise
24  with the customer that gets us what we need and gets
25  them what they need.

Page 142

1        MR. QUINN:  No further questions.
2        REDIRECT EXAMINATION
3  BY MR. RAGAIN:
4      Q.   I didn't ask you, Mr. Lewis, is -- is Northern
5  Bottling a good bottler?  Has it been a good bottler
6  over the years?
7      A.   I believe so, yeah.  I mean, we -- we're --
8  yeah.
9      Q.   Successful bottler?
10     A.   (Nods head.)
11     Q.   Is it known for making customers unhappy over
12  the years?
13     A.   I've never heard of the reputation where they
14  haven't.  I mean, you know, but they've been a good
15  bottler, yes.
16        MR. RAGAIN:  Thank you.  Nothing further.
17        THE WITNESS:  Okay.
18        THE VIDEOGRAPHER:  This concludes the video
19  recorded deposition of Derek Lewis on June 19, 2017
20  at 11:53 a.m.
21        THE COURT REPORTER:  Are you having this
22  transcribed?
23        MR. RAGAIN:  Yes.
24        THE COURT REPORTER:  Would you like a copy?
25        MR. QUINN:  Yes, please.

Page 143

1   (The deposition concluded at 11:53 a.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 144

1              CERTIFICATE OF REPORTER
2  STATE OF FLORIDA
3  COUNTY OF ORANGE
4
5      I, DAYNA JONES, FPR, Shorthand Reporter and Notary
6  Public, State of Florida, HEREBY CERTIFY that I was
7  authorized to and did stenographically report the
8  deposition of DEREK LEWIS; that a review of the
9  transcript was requested; and the foregoing transcript,
10  pages 1 through 143, is a true and accurate record of my
11  stenographic notes.
12      I FURTHER CERTIFY that I am not a relative,
13  employee, attorney or counsel of any of the parties, nor
14  am I a relative or employee of any of the parties'
15  attorneys or counsel connected with the action, nor am I
16  financially interested in the action.
17      Dated this 3rd day of July, 2017.
18
19
20
21
22
23  Dayra Jones
    _____
24  DAYNA JONES, FPR, Notary Public
    State of Florida at Large
25



DEREK LEWIS  Confidential
NORTHERN BOTTLING vs PEPSICO

June 19, 2017
145–146

Page 145

```
1                    DEPOSITION ERRATA SHEET
2   Our Assignment No.:  J0597746
3   Case No.:  4:150-cv-133
4
5           DECLARATION UNDER PENALTY OF PERJURY
6           I declare under penalty of perjury that I have
7   read the entire transcript of my Deposition taken in the
8   captioned matter or the same has been read to me, and
9   the same is true and accurate, save and except for
10  changes and/or corrections, if any, as indicated by me
11  on the DEPOSITION ERRATA SHEET hereof, with the
12  understanding that I offer these changes as if still
13  under oath.
14          Signed on the _____ day of_____,
15  20___.
16
17          _____
                    DEREK LEWIS
18
19
20
21
22
23
24
25
```

Page 146

```
1                    DEPOSITION ERRATA SHEET
2   Page No._____Line No._____Change to:_____
3   _____
4   Reason for change:_____
5   Page No._____Line No._____Change to:_____
6   _____
7   Reason for change:_____
8   Page No._____Line No._____Change to:_____
9   _____
10  Reason for change:_____
11  Page No._____Line No._____Change to:_____
12  _____
13  Reason for change:_____
14  Page No._____Line No._____Change to:_____
15  _____
16  Reason for change:_____
17  Page No._____Line No._____Change to:_____
18  _____
19  Reason for change:_____
20  Page No._____Line No._____Change to:_____
21  _____
22  Reason for change:_____
23
24  SIGNATURE:_____DATE:_____
25
```

