# Exhibit 5

(Confidential – Subject to Protective Order [25])

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **NORTHERN BOTTLING CO., INC.,** <br><br> **Plaintiff,** <br><br> **v.** <br><br> **PEPSICO, INC.,** <br><br> **Defendant.** | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | **Case No. 4:15-CV-00133** <br><br><br> **Judge Daniel L. Hovland** <br> **Magistrate Judge Charles S. Miller, Jr.** |

**SUPPLEMENTAL DECLARATION OF LARRY BOWERS IN SUPPORT OF PEPSICO'S MOTION FOR SUMMARY JUDGMENT**

I, Larry Bowers, make the following declaration pursuant to 28 U.S.C. § 1746:

1. I am a Franchise Development Manager at PepsiCo, Inc. ("PepsiCo"), with responsibility for working with independent bottlers in the Mountain Region, including Plaintiff Northern Bottling Co., Inc. ("Northern"), to grow their sales of PepsiCo beverage products, among other things.

2. In my role as Franchise Development Manager, I am familiar with the various Exclusive Bottling Appointments ("EBAs") between PepsiCo and Northern. The manufacture, sale and distribution of each PepsiCo CSD product that Northern sells is the subject of a separate EBA.

3. Attached hereto as Exhibit A is a true and correct copy of Northern's EBA for the manufacture, sale and distribution of Diet Pepsi Cola.

4. Attached hereto as Exhibit B is a true and correct copy of Northern's PepsiCo EBA for the manufacture, sale and distribution of Mountain Dew.

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

5. Attached hereto as Exhibit C is a true and correct copy of Northern's EBA for the manufacture, sale and distribution of Diet Mountain Dew.

6. As part of my duties, I regularly receive data from Northern regarding its sale of PepsiCo beverage products. Northern reports the total case sales of PepsiCo carbonated soft drink ("CSD") bottle and can products (such as Pepsi, Diet Pepsi, Mountain Dew, and Diet Mountain Dew). Northern also reports the total case sales for all PepsiCo bottle and can products, both CSD and non-carbonated beverages (such as Aquafina bottled water and Gatorade).

7. The chart below reflects Northern's reported total case sales of (1) PepsiCo CSD bottle and can products; and (2) all PepsiCo bottle and can products, both CSDs and non-carbonated beverages, for January 1, 2017 through September 30, 2018.

| Year | **Total Case Sales (PepsiCo CSDs)** | **Total Case Sales (All PepsiCo Beverage Products)** |
|---|---|---|
| 2017 | [redacted] | [redacted] |
| 2018 (YTD) | [redacted] | [redacted] |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 17, 2018

By: [signature]
Larry Bowers

# Exhibit A







# *Exclusive Bottling Appointment*

Issued under date of February 1, 1972

PepsiCo, Inc., a corporation organized under the laws of the State of Delaware, with general offices in Purchase, New York (herein called the "Company"), hereby appoints:

Name NORTHERN INVESTMENT CO. OF FARGO

Address HETTINGER, NORTH DAKOTA

(herein called the "Bottler"), as its exclusive bottler, to bottle and distribute the dietetic carbonated beverage (herein called the "Beverage"), sold under the trademarks Pepsi and Pepsi-Cola (herein collectively called the "Beverage trademark"), as Diet Pepsi and Diet Pepsi-Cola in the territory (herein referred to as the "Territory"), described in the Company's Bottling Appointment issued to the Bottler for the bottling of regular Pepsi-Cola, dated February 1, 1972, as amended or modified.

The Appointment being upon the following terms and conditions:

1. That in the event of any change in the "territory" covered by the Bottler's Pepsi-Cola Bottling Appointment referred to above, the Territory hereunder shall thereupon be automatically similarly changed without the necessity of any further action on the part of the Company or the Bottler except as otherwise provided in Paragraph 12 hereof. This Appointment shall automatically terminate without the necessity of any further action on the part of the Company or the Bottler upon the termination of the Bottler's Exclusive Bottling Appointment to bottle, sell and distribute regular Pepsi-Cola in the Territory, whether such termination results from cancellation by the Company or otherwise. In the event that the Company, in its absolute and unqualified discretion, should decide to discontinue the manufacture, sale and distribution of the Beverage, the Company may, upon six months' written notice to the Bottler, terminate this Appointment, and from and after the termination date as specified in the said notice, this Appointment shall be void and of no further force and effect, without any liability by either party to the other arising out of such termination.

2. That the Bottler will not bottle, distribute or sell, directly or indirectly, any other cola beverage or any other beverage with the name Cola (other than products of the Company), or any other beverage which could be confused with the Beverage.

3. That the Bottler will operate one or more thoroughly clean and sanitary bottling plants in the Territory approved by the Company for the bottling of the Beverage and of sufficient productive capacity to enable the Bottler to meet fully his obligations hereunder.

DPC-B-1 12/70
PC-7091

The equipment of each plant shall contain such water treatment and other equipment as the Company may prescribe. The Bottler will maintain each plant at all times in good operating condition, and will comply with any and all local, City, County, State and Federal laws and regulations now in effect or which may hereafter be enacted pertaining to the operation of bottling plants, bottling, selling and handling of soft drinks.

4. That the Bottler will make no representation as to the Beverage not previously authorized by the Company in writing, and the Beverage shall be sold and distributed under its own name and on its own merits, and not compared with any other Beverage without the Company's consent.

5. That the Company will sell to the Bottler, and the Bottler will purchase, at the Company's then price or prices therefor at the time of each sale, the Bottler's requirements of Beverage concentrates, syrups, or other beverage bases (hereinafter called "Beverage concentrates"), for the bottling of the Beverage hereunder, payment for same to be made by the Bottler in advance of shipment; and all Beverage concentrates so purchased will be used by the Bottler for the bottling of the Beverage in the Territory and for no other purpose.

6. That the Bottler will keep on hand for the bottling of the Beverage hereunder bottles in number adequate to meet peak seasonal demands, and of size or sizes and design or designs prescribed by the Company; will purchase bottles and crowns only from manufacturers approved by the Company; will use no other bottle or crown for the bottling of the Beverage; and will use said bottles and crowns for no other purpose. The Bottler will also keep on hand in similar adequate supply cases, cartons and other delivery packages of size or sizes and design or designs prescribed by the Company, and will use same only for the marketing of the Beverage.

7. That in the use, handling and processing of Beverage concentrates, the bottling of the Beverage, and the filling, crowning, labeling, packaging and selling of the Beverage the Bottler will follow precisely the instructions of the Company given from time to time and such instructions are hereby made terms and conditions of this Appointment as though fully set forth herein. The Bottler will never distribute or permit the sale of any Beverage which is in any way below the Company's requirements or standards.

8. That the Bottler will sell the Beverage in the Territory at the Bottler's price per case plus the deposit charge for bottles and case. The Company may from time to time suggest to the Bottler the price per case to be charged by him and the deposit charge.

9. That the Bottler will push vigorously the sale of the Beverage throughout the entire Territory in the 10 -oz. size bottle and/or in any other size bottle prescribed by the Company for the Territory. Without in any way limiting the Bottler's obligation under this Paragraph 9, the Bottler must fully meet and increase the demand for the Beverage throughout the Territory and secure full distribution up to the maximum sales potential therein through all distribution channels or outlets available to soft drinks, using any and all equipment reasonably necessary to secure such distribution; must service all accounts with frequency adequate to keep them at all times fully supplied with the Beverage; must use his own salesmen and trucks, (or salesmen and trucks of independent distributors, of whom the Company approves), in quantity adequate for all seasons; and must fully cooperate in and vigorously push the Company's cooperative advertising and sales promotion programs and campaigns for the Territory. In addition the Bottler will actively advertise, in all reasonable media including adequate point-of-purchase advertising, and vigorously engage in sales promotion of, the Beverage throughout the Territory at his own cost and expense. The Bottler will carry Products Liability Insurance on his operation in such amounts as the Company may recommend. All advertising copy and media shall be subject to the Company's approval.

10. That the Bottler will at all times cooperate to the full extent required by the Company with the Company's Product Control programs, field laboratories, and field, territorial and other representatives; will permit the Company's agents to conduct field checks in the Territory and to enter the Bottler's plant or plants at any time during working hours and inspect the facilities, equipment and materials used in preparing, bottling, selling and distributing the Beverage; and to check operations and methods, and take with them samples of the Beverage, water and Beverage concentrates. The Bottler will submit to the Company products and water samples as required by the Company, and upon any request by the Company for specific information concerning his bottling and distribution of the Beverage will immediately furnish same in the form requested.

B-(2)-4/71
PC-7294

11. That upon the happening of any one or more of the following events, in addition to all other rights and remedies, including the Company's right to damages sustained, if any, the Company shall have the right to cancel and terminate this Appointment by written notice to the Bottler:

(a) The failure of the Bottler to perform or comply with any one or more of the terms or conditions of this Appointment;

(b) Any sale, transfer or other disposition, without the prior written consent of the Company, including any such transfer by operation of law:

(i) Of all or part of the Bottler's bottling business; or

(ii) Of more than ten per cent (10%) of the stock of the Bottler, if the Bottler be a corporation; or of any of its stock, if sold in a public offering; or

(iii) Of any interest in a partnership or the withdrawal of a partner, if the Bottler be a partnership;

(c) The discontinuance by the Bottler for any reason of the bottling of the Beverage for a period of thirty days except as provided in Paragraph 18 hereof; or

(d) The insolvency of the Bottler; or an assignment by the Bottler for the benefit of creditors; or the filing of a voluntary bankruptcy or reorganization petition by the Bottler; or the failure of the Bottler to vacate an involuntary bankruptcy or reorganization petition filed against him, within sixty (60) days from the date of such filing; or the failure of the Bottler to vacate the appointment of a receiver or a trustee for the Bottler, or any part or interest of his business, within sixty (60) days from the date of such appointment; or the merger or consolidation of the Bottler with any other Company; or the dissolution of the Bottler.

Upon the happening of any one or more of the foregoing events the Company shall also have the right to discontinue supplying the Bottler with Beverage concentrates and/or other Beverage materials, for such length of time as the Company may in its sole judgment deem necessary, without thereby cancelling or terminating this Appointment and without thereby prejudicing the Company's other rights and remedies including the right to terminate this Appointment for the same cause or for any one or more other causes.

12. That, in addition to and not in limitation of the foregoing, if, in the reasonable opinion of the Company, the Bottler should at any time fail to push vigorously the sale of the Beverage or secure full coverage therefor in any segment of the Territory, whether defined geographically or by type of market or outlet, the Company may call the Bottler's attention to such failure by written notice to the Bottler, specifying the segment of the Territory involved, and suggest remedial steps therefor. If, in the reasonable opinion of the Company, said failure shall not have been corrected within three months after the giving of such written notice the Company shall thereupon have the right, upon written notice to the Bottler to that effect, to remove such segment from the Territory covered by this Appointment and deal with it as the Company sees fit, without thereby cancelling or terminating this Appointment and without thereby prejudicing the Company's other rights and remedies hereunder.

13. That upon the death of the Bottler, if the Bottler is not incorporated, this Appointment will be transferable to the heirs of the deceased, provided the active management of the bottling operation continues satisfactory to the Company. Upon the death of the largest stockholder, if the Bottler is incorporated, this Appointment will continue in effect provided the active management of the bottling operation continues satisfactory to the Company.

14. That the Bottler will pay and discharge, at his own expense, any and all expenses, charges, fees and taxes arising out of or incidental to the carrying on of his business, including, without limiting the generality of the foregoing, all workmen's compensation, unemployment insurance, and social security taxes levied or assessed with respect to the employees of the Bottler, and the Bottler will indemnify and save harmless the Company, against any and all claims for such expenses, charges, fees and taxes.

15. That the Company is the owner of the Beverage trademark and will defend and protect same and save harmless the Bottler in the use of same, except for such acts as shall be the fault of the Bottler. Nothing herein contained shall be construed as conferring upon the Bottler any right or interest in said trademark, or any designs, copyrights, patents, trade names, signs, emblems, insignia, symbols and slogans, or other marks, used in connection with the Beverage.

16. That the Bottler shall not have the right to use the Beverage trademark as part of a trade name or the name of a partnership or corporation unless he first obtains the written consent of the Company, which reserves the right to specify the terms and conditions under which such name may be used.

17. That immediately upon the cancellation or termination of this Appointment, however caused, the Bottler will eliminate the Beverage trademark from his company or firm name, if it is there, and will cease using in any manner whatsoever, the Beverage trademark and any of the Company's trade names, symbols, slogans, emblems, insignia or other designs used in connection with the Beverage. The Company shall have the right to elect to purchase from the Bottler, and the Bottler will, upon such election by the Company, sell to the Company, any or all of the Bottler's Beverage bottles, cases and Beverage concentrates at the invoice price thereof to the Bottler, and other articles bearing the Beverage trademark, less a reasonable allowance for depreciation on the bottles and cases.

18. That neither party to the Appointment shall be held liable for failure to comply with any of the terms of this Appointment when such failure has been caused solely by fire, labor dispute, strike, war, insurrection, government restrictions, force majeure or act of God beyond the control and without fault on the part of the party involved, provided such party uses due diligence to remedy such default.

19. That this Appointment is personal. It cannot be transferred, assigned, pledged, mortgaged or otherwise disposed of by the Bottler, in whole or in part.

20. That this Appointment expresses fully the understanding, and that all prior understandings are hereby cancelled, and no future changes in the terms of this Appointment shall be valid, except when and if reduced to writing and signed by both the Bottler and the Company, by legally authorized officials.

21. That the failure by the Company to enforce at any time or for any period of time any one or more of the terms or conditions of this Appointment, shall not be a waiver of such terms or conditions or of the Company's right thereafter to enforce each and every term and condition of this Appointment.

22. That this Appointment and all its terms and conditions shall be governed by and interpreted under the laws of the State of New York.

WITNESS the signature of PepsiCo, Inc., this the date above written.

PEPSICO, INC.

BY ............................................
Vice-President

This Appointment accepted
and agreed to:

Name NORTHERN INVESTMENT CO. OF FARGO

By ............................................

Title President

Address Hettinger, North Dakota

B-(4)—7/66
PC-5083

# Exhibit B




"SB CONCENTRATE"




# *Exclusive Bottling Appointment*

Issued under date of February 24, 1967

PepsiCo, Inc., a corporation organized under the laws of the State of Delaware, with general offices in New York, New York (herein called the "Company"), hereby appoints:

Name NORTHERN BOTTLING CO.

Address MINOT, NORTH DAKOTA

(herein called the "Bottler"), as its exclusive bottler, to bottle and distribute the carbonated beverage (herein called the "Beverage"), sold under the trademark Mountain Dew (herein called the "Beverage trademark"), in the territory (herein referred to as the "Territory"), described in the Company's Bottling Appointment issued to the Bottler for the bottling of Pepsi-Cola, dated November 14, 1955, as amended or modified.

The Appointment being upon the following terms and conditions:

1. That in the event of any change in the "territory" covered by the Bottler's Pepsi-Cola Bottling Appointment referred to above, the Territory hereunder shall thereupon be automatically similarly changed without the necessity of any further action on the part of the Company or the Bottler except as otherwise provided in Paragraph 12 hereof. This Appointment shall automatically terminate without the necessity of any further action on the part of the Company or the Bottler upon the termination of the Bottler's Exclusive Bottling Appointment to bottle, sell and distribute Pepsi-Cola in the Territory, whether such termination results from cancellation by the Company or otherwise. In the event that the Company, in its absolute and unqualified discretion, should decide to discontinue the manufacture, sale and distribution of the Beverage, the Company may, upon six months' written notice to the Bottler, terminate this Appointment, and from and after the termination date as specified in the said notice, this Appointment shall be void and of no further force and effect, without any liability by either party to the other arising out of such termination.

2. That the Bottler will not bottle, distribute or sell, directly or indirectly, any other beverage with a name similar to Mountain Dew or any other Beverage which could be confused with the Beverage.

3. That the Bottler will operate one or more thoroughly clean and sanitary bottling plants in the Territory approved by the Company for the bottling of the Beverage and of sufficient productive capacity to enable the Bottler to meet fully his obligations hereunder.

MD-8-(1)—12/65

The equipment of each plant shall contain such water treatment and other equipment as the Company may prescribe. The Bottler will maintain each plant at all times in good operating condition, and will comply with any and all local, City, County, State and Federal laws and regulations now in effect or which may hereafter be enacted pertaining to the operation of bottling plants, bottling, selling and handling of soft drinks.

4. That the Bottler will make no representation as to the Beverage not previously authorized by the Company in writing, and the Beverage shall be sold and distributed under its own name and on its own merits, and not compared with any other beverage without the Company's consent.

5. That the Company will sell to the Bottler, and the Bottler will purchase, at the Company's then price or prices therefor at the time of each sale, the Bottler's requirements of Beverage concentrates, syrups, or other beverage bases (hereinafter called "Beverage concentrates"), for the bottling of the Beverage hereunder, payment for same to be made by the Bottler in advance of shipment; and all Beverage concentrates so purchased will be used by the Bottler for the bottling of the Beverage in the Territory and for no other purpose.

6. That the Bottler will keep on hand for the bottling of the Beverage hereunder bottles in number adequate to meet peak seasonal demands, and of size or sizes and design or designs prescribed by the Company; will purchase bottles and crowns only from manufacturers approved by the Company; will use no other bottle or crown for the bottling of the Beverage; and will use said bottles and crowns for no other purpose. The Bottler will also keep on hand in similar adequate supply cases, cartons and other delivery packages of size or sizes and design or designs prescribed by the Company, and will use same only for the marketing of the Beverage.

7. That in the use, handling and processing of Beverage concentrates, the bottling of the Beverage, and the filling, crowning, labeling, packaging and selling of the Beverage the Bottler will follow precisely the instructions of the Company given from time to time and such instructions are hereby made terms and conditions of this Appointment as though fully set forth herein. The Bottler will never distribute or permit the sale of any Beverage which is in any way below the Company's requirements or standards.

8. That the Bottler will sell the Beverage in the Territory at the Bottler's price per case plus the deposit charge for bottles and case. The Company may from time to time suggest to the Bottler the price per case to be charged by him and the deposit charge.

9. That the Bottler will push vigorously the sale of the Beverage throughout the entire Territory in the 10 -oz. size bottle and/or in any other size bottle prescribed by the Company for the Territory. Without in any way limiting the Bottler's obligation under this Paragraph 9, the Bottler must fully meet and increase the demand for the Beverage throughout the Territory and secure full distribution up to the maximum sales potential therein through all distribution channels or outlets available to soft drinks, using any and all equipment reasonably necessary to secure such distribution; must service all accounts with frequency adequate to keep them at all times fully supplied with the Beverage; must use his own salesmen and trucks, (or salesmen and trucks of independent distributors, of whom the Company approves), in quantity adequate for all seasons; and must fully cooperate in and vigorously push the Company's cooperative advertising and sales promotion programs and campaigns for the Territory. In addition the Bottler will actively advertise, in all reasonable media including adequate point-of-purchase advertising, and vigorously engage in sales promotion of, the Beverage throughout the Territory at his own cost and expense. The Bottler will carry Products Liability Insurance on his operation in such amounts as the Company may recommend. All advertising copy and media shall be subject to the Company's approval.

10. That the Bottler will at all times cooperate to the full extent required by the Company with the Company's Product Control programs, field laboratories, and field, territorial and other representatives; will permit the Company's agents to conduct field checks in the Territory and to enter the Bottler's plant or plants at any time during working hours and inspect the facilities, equipment and materials used in preparing, bottling, selling and distributing the Beverage; and to check operations and methods, and take with them samples of the Beverage, water and Beverage concentrates. The Bottler will submit to the Company' products and water samples as required by the Company, and upon any request by the Company for specific information concerning his bottling and distribution of the Beverage will immediately furnish same in the form requested.

11. That upon the happening of any one or more of the following events, in addition to all other rights and remedies, including the Company's right to damages sustained, if any, the Company shall have the right to cancel and terminate this Appointment by written notice to the Bottler:

    (a) The failure of the Bottler to perform or comply with any one or more of the terms or conditions of this Appointment;

    (b) Any sale, transfer or other disposition, without the prior written consent of the Company, including any such transfer by operation of law:

        (i) Of all or part of the Bottler's bottling business; or

        (ii) Of more than ten per cent (10%) of the stock of the Bottler, if the Bottler be a corporation; or of any of its stock, if sold in a public offering; or

        (iii) Of any interest in a partnership or the withdrawal of a partner, if the Bottler be a partnership;

    (c) The discontinuance by the Bottler for any reason of the bottling of the Beverage for a period of thirty days except as provided in Paragraph 18 hereof; or

    (d) The insolvency of the Bottler; or an assignment by the Bottler for the benefit of creditors; or the filing of a voluntary bankruptcy or reorganization petition by the Bottler; or the failure of the Bottler to vacate an involuntary bankruptcy or reorganization petition filed against him, within sixty (60) days from the date of such filing; or the failure of the Bottler to vacate the appointment of a receiver or a trustee for the Bottler, or any part or interest of his business, within sixty (60) days from the date of such appointment; or the merger or consolidation of the Bottler with any other Company; or the dissolution of the Bottler.

    Upon the happening of any one or more of the foregoing events the Company shall also have the right to discontinue supplying the Bottler with Beverage concentrates and/or other Beverage materials, for such length of time as the Company may in its sole judgment deem necessary, without thereby cancelling or terminating this Appointment and without thereby prejudicing the Company's other rights and remedies including the right to terminate this Appointment for the same cause or for any one or more other causes.

12. That, in addition to and not in limitation of the foregoing, if, in the reasonable opinion of the Company, the Bottler should at any time fail to push vigorously the sale of the Beverage or secure full coverage therefor in any segment of the Territory, whether defined geographically or by type of market or outlet, the Company may call the Bottler's attention to such failure by written notice to the Bottler, specifying the segment of the Territory involved, and suggest remedial steps therefor. If, in the reasonable opinion of the Company, said failure shall not have been corrected within three months after the giving of such written notice the Company shall thereupon have the right, upon written notice to the Bottler to that effect, to remove such segment from the Territory covered by this Appointment and deal with it as the Company sees fit, without thereby cancelling or terminating this Appointment and without thereby prejudicing the Company's other rights and remedies hereunder.

13. That upon the death of the Bottler, if the Bottler is not incorporated, this Appointment will be transferable to the heirs of the deceased, provided the active management of the bottling operation continues satisfactory to the Company. Upon the death of the largest stockholder, if the Bottler is incorporated, this Appointment will continue in effect provided the active management of the bottling operation continues satisfactory to the Company.

14. That the Bottler will pay and discharge, at his own expense, any and all expenses, charges, fees and taxes arising out of or incidental to the carrying on of his business, including, without limiting the generality of the foregoing, all workmen's compensation, unemployment insurance, and social security taxes levied or assessed with respect to the employees of the Bottler, and the Bottler will indemnify and save harmless the Company, against any and all claims for such expenses, charges, fees and taxes.

15. That the Company is the owner of the Beverage trademark and will defend and protect same and save harmless the Bottler in the use of same, except for such acts as shall be the fault of the Bottler. Nothing herein contained shall be construed as conferring upon the Bottler any right or interest in said trademark, or any designs, copyrights, patents, trade names, signs, emblems, insignia, symbols and slogans, or other marks, used in connection with the Beverage.





16. That the Bottler shall not have the right to use the Beverage trademark as part of a trade name or the name of a partnership or corporation unless he first obtains the written consent of the Company, which reserves the right to specify the terms and conditions under which such name may be used.

17. That immediately upon the cancellation or termination of this Appointment, however caused, the Bottler will eliminate the Beverage trademark from his company or firm name, if it is there, and will cease using in any manner whatsoever, the Beverage trademark and any of the Company's trade names, symbols, slogans, emblems, insignia or other designs used in connection with the Beverage. The Company shall have the right to elect to purchase from the Bottler, and the Bottler will, upon such election by the Company, sell to the Company, any or all of the Bottler's Beverage bottles, cases and Beverage concentrates at the invoice price thereof to the Bottler, and other articles bearing the Beverage trademark, less a reasonable allowance for depreciation on the bottles and cases.

18. That neither party to the Appointment shall be held liable for failure to comply with any of the terms of this Appointment when such failure has been caused solely by fire, labor dispute, strike, war, insurrection, government restrictions, force majeure or act of God beyond the control and without fault on the part of the party involved, provided such party uses due diligence to remedy such default.

19. That this Appointment is personal. It cannot be transferred, assigned, pledged, mortgaged or otherwise disposed of by the Bottler, in whole or in part.

20. That this Appointment expresses fully the understanding, and that all prior understandings are hereby cancelled, and no future changes in the terms of this Appointment shall be valid, except when and if reduced to writing and signed by both the Bottler and the Company, by legally authorized officials.

21. That the failure by the Company to enforce at any time or for any period of time any one or more of the terms or conditions of this Appointment, shall not be a waiver of such terms or conditions or of the Company's right thereafter to enforce each and every term and condition of this Appointment.

22. That this Appointment and all its terms and conditions shall be governed by and interpreted under the laws of the State of New York.

WITNESS the signature of PepsiCo, Inc., this the date above written.

PEPSICO, INC.

BY ..............................

Executive Vice-President

This Appointment accepted
and agreed to:

Name NORTHERN BOTTLING CO.

By ..............................

Title President

Address Minot, North Dakota

B-(4)-11/65

# Exhibit C




PEPSICO, INC.
A Delaware Corporation
Executive Offices
Purchases, New York 10577

DIET MOUNTAIN DEW

EXCLUSIVE BOTTLING APPOINTMENT

Issued under date of July 9, 1986

PEPSICO, INC., a corporation organized under the laws of the State of Delaware, with general offices in Purchase, New York (herein called the "Company"), hereby appoints:

Name: NORTHERN BOTTLING CO.

Address: MINOT, NORTH DAKOTA

(herein called the "Bottler"), as its exclusive bottler, to bottle and distribute the dietetic carbonated beverage (herein called the "Beverage"), sold under the trademark DIET MOUNTAIN DEW (herein called the "Beverage Trademark") in the territory (herein referred to as the "Territory"), described in the Company's Bottling Appointment issued to the Bottler for the bottling of MOUNTAIN DEW, dated February 24, 1967, as amended or modified.

The Appointment being upon the following terms and conditions:

1. That in the event of any change in the "Territory" covered by the Bottler's MOUNTAIN DEW Bottling Appointment referred to above, the Territory hereunder shall thereupon be automatically similarly changed without the necessity of any further action on the part of the Company or the Bottler except as otherwise provided in Paragraph 12 hereof. This Appointment shall automatically terminate without the necessity of any further action on the part of the Company or the Bottler upon the termination of the Bottler's Exclusive Bottling Appointment to bottle, sell and distribute MOUNTAIN DEW in the Territory, whether such termination results from cancellation by the Company or otherwise. In the event that the Company, in its absolute and unqualified discretion, should decide to discontinue the manufacture, sale and distribution of the Beverage, the Company may, upon six months' written notice to the Bottler, terminate this Appointment, and from and after the termination date as specified in the said notice, this Appointment shall be void and of no further force and effect, without any liability by either party to the other arising out of such termination.

2. That the Bottler will not bottle, distribute or sell, directly or indirectly, any other beverage with a name similar to the beverage MOUNTAIN DEW or any other beverage which could be confused with the Beverage.

3. That the Bottler will operate one or more thoroughly clean and sanitary bottling plants in the Territory approved by the Company for the bottling of the Beverage and of sufficient productive capacity to enable the Bottler to meet fully his obligations hereunder.

The equipment of each plant shall contain such water treatment and other equipment as the Company may prescribe. The Bottler will maintain each plant at all times in good operating condition, and will comply with any and all local, City, County, State and Federal laws and regulations now in effect or which may hereafter be enacted pertaining to the operation of bottling plants, bottling, selling and handling of soft drinks.

4. That the Bottler will make no representation as to the Beverage not previously authorized by the Company in writing, and the Beverage shall be sold and distributed under its own name and on its own merits, and not compared with any other beverage without the Company's consent.

5. That the Company will sell to the Bottler, and the Bottler will purchase, at the Company's then price or prices therefor at the time of each sale, the Bottler's requirements of Beverage concentrates, syrups, or other beverage bases (hereinafter called "Beverage concentrates"), for the bottling of the Beverage hereunder, payment for same to be made by the Bottler in advance of shipment; and all Beverage concentrates so purchased will be used by the Bottler for the bottling of the Beverage in the Territory and for no other purpose.

6. That the Bottler will keep on hand for the bottling of the Beverage hereunder, bottles in number adequate to meet peak seasonal demands, and of size or sizes and design or designs prescribed by the Company; will purchase bottles and crowns only from manufacturers approved by the Company; will use no other bottle or crown for the bottling of the Beverage; and will use said bottles and crowns for no other purpose. The Bottler will also keep on hand in similar adequate supply, cases, cartons and other delivery packages of size or sizes and design or designs prescribed by the Company, and will use same only for the marketing of the Beverage.

7. That in the use, handling and processing of Beverage concentrates, the bottling of the Beverage, and the filling, crowning, labeling, packaging and selling of the Beverage, the Bottler will follow precisely the instructions of the Company given from time to time and such instructions are hereby made terms and conditions of this Appointment as though fully set forth herein. The Bottler will never distribute or permit the sale of any Beverage which is in any way below the Company's requirements or standards.

8. That the Bottler will sell the Beverage in the Territory at the Bottler's price per case plus the deposit charge for bottles and case. The Company may from time to time suggest to the Bottler the price per case to be charged by him and the deposit charge.

9. That the Bottler will push vigorously the sale of the Beverage throughout the entire Territory in such bottle size or sizes prescribed by the Company for the Territory. Without in any way limiting the Bottler's obligation under this Paragraph 9, the Bottler must fully meet and increase the demand for the Beverage throughout the Territory and secure full distribution up to the maximum sales potential therein through all distribution channels or outlets available to soft drinks, using any and all equipment reasonably necessary to secure such distribution; must

service all accounts with frequency adequate to keep them at all times fully supplied with the Beverage; must use his own salesmen and trucks (or salesmen and trucks of independent distributors), in quantity adequate for all seasons; and must fully cooperative in and vigorously push the Company's cooperative advertising and sales promotion programs and campaigns for the Territory. In addition, the Bottler will actively advertise, in all reasonable media including adequate point-of-purchase advertising, and vigorously engage in sales promotion of the Beverage throughout the Territory at his own cost and expense. The Bottler will carry Products Liability Insurance on his operation in such amounts as the Company may recommend. All advertising copy and media shall be subject to the Company's prior approval.

10. That the Bottler will at all times cooperate to the full extent required by the Company with the Company's product Control programs, field laboratories, and field, territorial and other representative; will permit the Company's agents to conduct field checks in the Territory and to enter the Bottler's plant or plants at any time during working hours and inspect the facilities, equipment and material used in preparing, bottling, selling and distributing the Beverage; and to check operations and methods, and take with them samples of the Beverage, water and Beverage concentrates. The Bottler will submit to the Company products and water samples as required by the Company, and upon any request by the Company for specific information concerning his bottling and distribution of the Beverage will immediately furnish same in the form requested.

11. That on the happening of any one or more of the following events, in addition to all other rights and remedies, including the Company's right to damages sustained, if any, the Company shall have the right to cancel or terminate this Appointment by written notice to the Bottler:

(a) The failure of the Bottler to perform or comply with any one or more of the terms or conditions of this Appointment;

(b) Any sale, transfer or other disposition, without prior written consent of the Company, including any such transfer by operation of law:

(i) Of all or part of the Bottler's bottling business; or

(ii) Of more than ten per cent (10%) of the stock of the Bottler, if the Bottler be a corporation; or of any stock, if sold in a public offering; or

(iii) Of any interest in a partnership or the withdrawal or a partner, if the Bottler be a partnership;

(iv) The merger or consolidation of the Bottler with any other company; or the dissolution of the Bottler.

(c) The discontinuance by the Bottler for any reason of the bottling of the Beverage for a period of thirty days, except as provided in Paragraph 18 hereof; or

(d) The insolvency of the Bottler as that term is defined in either the bankruptcy or equity sense; or an assignment by the Bottler for the benefit of creditors; or the filing of a voluntary petition under any Chapter of the Bankruptcy Act, as now enacted or as may hereafter be amended; or the failure of the Bottler to vacate an involuntary bankruptcy or reorganization petition filed against him, within sixty (60) days from the date of such filing; or the failure of the Bottler to vacate the appointment of a receiver or a trustee for the Bottler, or any part or interest of his business, within sixty (60) days from the date of such appointment.

Upon the happening of any one or more of the foregoing events the Company shall also have the right to discontinue supplying the Bottler with Beverage concentrates and/or other Beverage materials, for such length of time as the Company may in its sole judgment deem necessary, without thereby cancelling or terminating this Appointment and without thereby prejudicing the Company's other rights and remedies including the right to terminate this Appointment for this same cause or for any one or more other causes.

12. That, in addition to and not in limitation of the foregoing, if, in the reasonable opinion of the Company, the Bottler should at any time fail to push vigorously the sale of the Beverage or secure full coverage therefore in any segment of the Territory, whether defined geographically or by type of market or outlet, the Company may call the Bottler's attention to such failure by written notice to the Bottler, specifying the segment of the Territory involved, and suggest remedial steps therefor. If, in the reasonable opinion of the Company, said failure shall not have been corrected within three months after the giving of such written notice, the Company shall thereupon have the right, upon written notice to the Bottler to that effect, to remove such segment from the Territory covered by this Appointment and deal with it as the Company sees fit, without thereby cancelling or terminating this Appointment and without thereby prejudicing the Company's other rights and remedies hereunder.

13. That upon the death of the Bottler, if the Bottler is not incorporated, this Appointment will be transferable to the heirs of the deceased, provided the active management of the bottling operation continues satisfactory to the Company. Upon the death of the largest stockholder, if the Bottler is incorporated, this Appointment will continue in effect provided the active management of the bottling operation continues satisfactory to the Company.

14. That the Bottler will pay and discharge, at his own expense, any and all expenses, charges, fees and taxes arising out of or incidental to the carrying on of his business, including, without limiting the generality of the foregoing, all workmens' compensation, unemployment insurance, and social security taxes levied or assessed with respect to the employees of the Bottler, and the Bottler will indemnify and save harmless the Company, against any and all claims for such expenses, charges, fees and taxes.

15. That the Company is the owner of the Beverage trademark and will defend and protect same and save harmless the Bottler in the use of same, except for such acts as shall be the fault of the Bottler. Nothing herein contained shall be construed as conferring upon the Bottler any right or interest in said trademark, or any designs, copyrights, patents, trade names, signs, emblems, insignia, symbols and slogans, or other marks, used in connection with the Beverage.

16. That the Bottler shall have not the right to use the Beverage trademark as part of a trade name or the name of a partnership or corporation unless the first obtains the written consent of the Company, which reserves the right to specify the terms and conditions under which such name may be used.

17. That immediately upon the cancellation or termination of this Appointment, however caused, the Bottler will eliminate the Beverage trademark from his company or firm name, if it is there, and will cease using in any manner whatsoever, the Beverage trademark and any of the Company's trade names, symbols, slogans, emblems, insignia or other designs used in connection with the Beverage. The Company shall have the right to elect to purchase from the Bottler, and the Bottler will, upon such election by the Company, sell to the Company, any or all of the Bottler's Beverage bottles, cases and Beverage concentrates at the invoice price thereof to the Bottler, and other articles

bearing the Beverage trademark, less a reasonable allowance for depreciation on the bottles and cases.

18. That neither party to the Appointment shall be held liable for failure to comply with any of the terms of this Appointment when such failure has been caused solely by fire, labor dispute, strike, war, insurrection, government restrictions, force majeure or act of God beyond the control and without fault on the part of the party involved, provided such party uses due diligence to remedy such default.

19. That this Appointment is personal. It cannot be transferred, assigned, pledged, mortgaged or otherwise disposed of by the Bottler, in whole or in part.

20. That this Appointment expresses fully the understanding, and that all prior understandings are hereby cancelled, and no future changes in the terms of this Appointment shall be valid, except when and if reduced to writing and signed by both the Bottler and the Company, by legally authorized officials.

21. That the failure by the Company to enforce at any time, for any period of time, any one or more of the terms or conditions of this Appointment, shall not be a waiver of such terms or conditions or of the Company's right thereafter to enforce each and every term and condition of this Appointment.

22. That this Appointment and all its terms and conditions shall be governed by and interpreted under the laws of the State of New York.

WITNESS the signature of PepsiCo, Inc., this the date above written.

PEPSICO, INC.

By [signature]
Vice President

This Appointment accepted and agreed to:

NORTHERN BOTTLING CO.

By [signature]

Title Vice President

Address [handwritten]