# Exhibit 8

Page 1

1  IN THE UNITED STATES DISTRICT COURT
2       FOR THE DISTRICT OF NORTH DAKOTA
3              NORTHWESTERN DIVISION
4
5  NORTHERN BOTTLING CO., INC., )
6        Plaintiff,      )
7   vs.              ) No. 4:150-cv-133
8  PEPSICO, INC.,        )
9        Defendant.     )
10
11      The videotaped 30(b)(6) deposition of
12  PEPSICO, INC., by DARRIN MORRIS, called for
13  examination, taken pursuant to the Federal Rules of
14  Civil Procedure of the United States District
15  Courts pertaining to the taking of depositions,
16  taken before KRISTIN C. BRAJKOVICH, a Certified
17  Shorthand Reporter, CSR. No. 84-3810, of said
18  state, at Suite 2900, Three First National Plaza,
19  70 West Madison Street, Chicago, Illinois, on the
20  22nd day of March, A.D. 2018, at 9:39 a.m.
21
22
23
24

Page 2

1  PRESENT:
2
3     RAGAIN & COOK, PC,
4     (3936 Avenue B, Suite A-2,
5     Billings, Montana 59102,
6     1-406-206-4831), by:
7     MR. JAMES M. RAGAIN,
8     jim@lawmontana.com,
9        -and-
10    SULLIVAN MILLER LAW,
11    (3860 Avenue B, Suite C East,
12    Billings, Montana 59102,
13    1-406-403-7066), by:
14    MS. MICHELLE SULLIVAN,
15    michelle.sullivan@sullivanmiller.com,
16       appeared via video teleconference on
17       behalf of the Plaintiff;
18
19
20
21
22
23
24

Page 3

1  PRESENT (Continued):
2     RILEY SAFER HOLMES & CANCILA LLP,
3     (Three First National Plaza,
4     70 West Madison Street,
5     Chicago, Illinois 60602,
6     1-312-471-8770), by:
7     MR. THOMAS B. QUINN,
8     tquinn@rshc-law.com, and
9     MS. PATRICIA MATHY,
10    pmathy@rshc-law.com,
11       appeared on behalf of the Defendant.
12
13  ALSO PRESENT:
14    MR. CHARLES S. BIENER, PepsiCo, Inc., Senior
15  Counsel;
16    MS. ANA M. McCARRON, PepsiCo, Inc., Senior
17  Legal Specialist;
18    MR. MARIO MERCURIO, PepsiCo, Inc., Senior
19  Vice President, GM, Franchise Business Unit;
20    MS. ELIZABETH VAN HOUTEN, Director, Franchise
21  Development, Transshipping Mitigation.
22    MR. DAVID LEHMAN, Legal Videographer.
23
24  REPORTED BY:  KRISTIN C. BRAJKOVICH, No. 84-3810.

Page 4

1       THE VIDEOGRAPHER:  I'm the videographer on
2   March 22, 2018, for the recording of the deposition
3   of Darrin Morris at the time of 9:39 a.m.
4       MR. QUINN:  Yes.  This is Thomas Quinn on
5   behalf of PepsiCo.  As I indicated to Mr. Ragain at
6   the break, Mr. Morris is going to testify to the
7   subject matter of Topics 1, 2, 4, and 6 of the
8   Rule 30(b)(6) deposition notice with respect to the
9   time period going back in time from approximately
10  midsummer, July of 2016, to the earlier points in
11  time.
12      MR. RAGAIN:  Tom, just so that I'm clear, then
13  you are proffering another witness for roughly
14  mid-July of 2016 forward to the present to the
15  extent the time period in the topic calls for --
16  well, to whatever time period that is the end of
17  the time period for each topic?
18      MR. QUINN:  That's right.
19      MR. RAGAIN:  Okay.  Thanks.
20          DARRIN MORRIS,
21  called as a witness herein, having been first duly
22  sworn, was examined and testified as follows:
23
24

Page 5

1   EXAMINATION
2   BY MR. RAGAIN:
3       Q.   Good morning, Mr. Morris.
4       A.   Good morning.
5       MR. RAGAIN:  Has the witness been sworn?
6       THE REPORTER:  No.
7            (WHEREUPON, the witness was duly
8            sworn.)
9   BY MR. RAGAIN:
10      Q.   Mr. Morris, we have met before, correct?
11      A.   We did, that's correct.
12      Q.   Is it okay if I call you Darrin?
13      A.   Sure.
14      Q.   All right.  Thank you.  Darrin, would
15  you agree with me that you have been proffered by
16  the company, PepsiCo, to testify with respect to
17  the first topic, which is administration of the
18  PepsiCo Transshipment Enforcement Program, the
19  types of documentation that are kept or not kept,
20  and any changes to the PepsiCo PTEP for the time
21  period 2008 through mid-July of 2016?
22      A.   That's correct.
23      Q.   And is the -- what is the reason for
24  the -- the time period that we asked for was for

Page 6

1   all of the way to 2017, and what is the reason why
2   your knowledge stops in July?
3       A.   Because in April, May of 2016, I
4   transferred into a different position out of the
5   transshipping role.
6       Q.   Okay.  And it's my understanding that
7   you have that same limitation with respect to each
8   of the other three topics that you are going to
9   testify to today.  Just for the sake of expediency,
10  would the reason be the same?
11      A.   That's correct.
12      Q.   Okay.  Thanks.  What is the PepsiCo
13  Transshipment Enforcement Program?
14      A.   Well, that program is -- that acronym is
15  used both for the program that governs the
16  unauthorized movement of product from one territory
17  to another, and it also refers to the database or
18  software program that we use to manage that
19  process.
20      Q.   Just for frame of reference, when was
21  the -- am I correct that the administration of
22  the -- scratch that.
23           As of 2008 how did the transshipment
24  enforcement program operate?

Page 7

1       A.   Well, as of 2008 the general process for
2   the program was that if product was found in a
3   bottler's territory that was not sold or
4   distributed by that bottler, they would report
5   findings to the transshipping department.  The
6   transshipping department would dispatch an
7   investigator to go out and validate such product.
8   We would then process a fine to the source bottler
9   for that product, and we would issue a credit to
10  the -- what we refer to as the infringed bottler.
11      Q.   And for the time period that we are
12  talking about for your testimony, 2008 through
13  2016, how many --
14      MR. QUINN:  Jim, just to correct, say early --
15  mid-2016 --
16      MR. RAGAIN:  Okay.
17      MR. QUINN:  -- so as long as we understand
18  that, I won't keeping interrupting, but -- and I
19  think if you say 2016 to Darrin, then we are
20  talking about through the period that he was in
21  that position, and that will be fine, if it's okay
22  with you.
23      MR. RAGAIN:  Okay.  Yeah, I'll try to qualify,
24  but if I slip up, we have that understanding, that

Page 8

1   it's through mid-July of 2016.
2   BY MR. RAGAIN:
3       Q.   Darrin, how many -- for the time period
4   that we are talking about, how many people at
5   PepsiCo -- and I mean companywide -- worked in the
6   transshipment enforcement program?
7       A.   Let me answer that this way.  So there
8   were -- there were three people -- I'm sorry -- two
9   people in -- in the immediate transshipping
10  department who interacted with -- with that process
11  on a day-to-day basis.  Of course, there's a
12  hierarchy that included several others which
13  would -- which would be a senior director that had
14  broader responsibility, so that would be three on
15  PepsiCo's team.
16           And then if we extended that to PBC,
17  there was a team of people that would be
18  involved on -- in the transshipping process on a
19  day-to-day basis.  And I couldn't tell you how many
20  that would include, but it was several.
21      Q.   Could you generally tell me what the
22  roles of these various people were?
23      A.   Well, so we -- I would start with --
24  start with myself, and that role was to manage the

Page 9

1  program, which included ensuring the -- you know,
2  the efficient investigation of any claims that were
3  brought forward by a bottler.  It would include the
4  efficient disbursement of fines and credits to the
5  impacted bottlers, and then I would say it also
6  included developing and working within the
7  organization to develop strategies for how we might
8  mitigate some of those issues.
9          Reporting to me at that time, there was
10 an analyst who would handle more of the
11 administrative side of the process, which included
12 database management.
13     Q.   And who was the third person at PepsiCo?
14     A.   The third person was the person that I
15 reported into.  At the time it was Jim Foderaro.
16     Q.   And what was Mr. Foderaro's role or
17 responsibility with respect to the transshipment
18 enforcement program?
19     A.   Jim spent a lot of his time working at a
20 senior level within -- across the bottler
21 organizations in addition to helping to strategize
22 on, you know, mitigation of the infringements that
23 I referred to earlier.
24     Q.   And can you give me an idea of what some

Page 10

1  of the PBC people that you referred to earlier,
2  what their role was in the process?
3      A.   So on the PBC side, the starting point
4  would be, I guess, receiving the information that
5  we produced through PTEP, through the database
6  PTEP.  They would take information received from
7  our department, process that through something we
8  call LTTS or the lot tracing and transshipment
9  program, which helped them to identify who the
10 product was initially sold to.
11         And from that, reports would be
12 generated, information would be shared with
13 respective regions and bottler units or bottling
14 units, and from there there would be various
15 actions taken that would have been contained within
16 the PBC organization, some of which we may have
17 access to in terms of updates.  Many times we would
18 not.
19     Q.   What changes were made to the
20 transshipment enforcement program, if any, because
21 of the -- scratch that.
22         When PBC began operating in 2010, did
23 that require -- or did that result in any changes
24 to the PepsiCo Transshipment Enforcement Program?

Page 11

1      A.   No.  The only change that triggered
2  would have been the combining of PBG and PAS
3  organizations to reflect the new organization being
4  PBC.
5      Q.   So under the program were independent
6  bottlers required to notify the company if they
7  found product of another bottler in their
8  territory?
9      A.   If they desired to be compensated for
10 that infringement, yes.  More broadly speaking, no,
11 they were not required to report that.  They were
12 certainly encouraged to report it if it did occur.
13     Q.   And what about PBC bottlers, were they
14 required to report if they found product that was
15 manufactured by an independent bottler in their PBC
16 territory?
17         MR. QUINN:  Let me just object to the form of
18 the question with respect to the reference to PBC
19 bottlers as vague and ambiguous.
20 BY THE WITNESS:
21     A.   The same principles would apply.  Our
22 department treated bottlers, whether they were
23 independent or PBC, agnostically.
24

Page 12

1  BY MR. RAGAIN:
2      Q.   What documentation was generated during
3  the time period that you are familiar with with
4  regard to the enforcement of the transshipment
5  enforcement program?
6      A.   That would include the claim details
7  that were generated from investigations as well as
8  the invoices associated with the fines and credits
9  distributed to the impacted bottlers.
10     Q.   Was the data maintained -- I mean, was
11 it continued -- or excuse me.
12         Was the information kept on a historical
13 basis, or was it deleted after a time?
14     A.   It was archived after a time, so we
15 would generally have access to data which could be
16 included in reporting going back to a certain
17 period.  Generally, we would look back over a
18 three- to -- three- to four-year period to look at
19 trends, but at some point that data would be
20 archived just for the sake of, you know, data
21 storage.
22     Q.   And can you tell me what kind of uses
23 that PepsiCo made of that data or that historical
24 data from time to time?

Page 13

1  A.  Primarily to share it with bottlers.  We
2  would often have meetings with various bottler
3  committee groups and we would share that
4  information to update the organizations on sort of
5  the state of transshipping and what the trends
6  were.
7      Q.  And what were the discernible trends
8  over the time period that we are talking about?
9      A.  As I recall, there was a -- sort of a
10 peak in transshipping maybe in 2011.  There was
11 sort of a gradual trend upwards going back to --
12 well, as far back as probably 2007 or '08.  And
13 then there was a reduction, a trend downward, for
14 several years, and then it has gone up and down,
15 and that has different causals but it can tend to
16 go up and down.
17     Q.  What kind of causes?
18     A.  One in particular that comes to mind is
19 a change in the fine.  So in 2008 or '09, there was
20 a -- there was an increase in the fine rate for
21 20 ounce, and that fine increased from $7 per case
22 to $11 per case, which would have naturally
23 resulted in, you know, higher fines after that
24 period.

Page 14

1      Q.  And you say that increasing that fine
2  caused a discernible trend downward in
3  transshipping?
4      A.  No, actually just the opposite.  It
5  caused an upward trend in the fines associated with
6  transshipping.
7      Q.  Okay.  What changes have been made to
8  the program since 2008?
9      A.  There really haven't been a lot -- well,
10 let me -- let me ask for some clarification on
11 that.  Are you referring to the administration of
12 the program or the database that is used to manage
13 that program?
14     Q.  Both.
15     A.  There really haven't been material
16 changes to the guidelines.  I did mention the fine
17 increase in 2008 or '09.  Outside of that, the only
18 real material changes have been an increase in the
19 allotment of vending fines or the allocation of
20 vending fines, so we expanded that to include
21 more -- more SKUs.
22         As far as the database PTEP portion of
23 it, we have improved the automation quite a bit and
24 improved the capabilities of the programming so

Page 15

1  that we could turn over the processing quicker,
2  which we believed would enable source bottlers of
3  any transshipped product to be able to act more
4  quickly on information they received from our
5  department.
6      Q.  And what do you mean by improved the
7  automation of it?
8      A.  Well, so a lot of the process used to be
9  manual, and over time we were able to allocate some
10 IT resources to just improve the capabilities of
11 the program.  So our reporting was more efficient,
12 our invoice processing became more efficient, and
13 just to give you an example, from the point of an
14 investigation to the time a bottler would be
15 compensated for an infringement could take as many
16 as -- you know, upwards of 18 weeks in some cases,
17 depending on what market we were talking about.
18 Generally speaking, I would say that was in the
19 eight- to ten-week time frame, and we have been
20 able to reduce that down to somewhere between two
21 to three weeks.
22     Q.  Let's go to Topic No. 2, which is -- do
23 you have a copy of the deposition exhibit -- or
24 deposition notice?

Page 16

1      MR. QUINN:  Jim, I think we can get one in
2  front of Darrin in a second.
3      MR. RAGAIN:  Thank you.
4      MR. QUINN:  Yeah, he has got it now.  Just
5  give him two seconds to take a look at it real
6  quickly.
7  BY THE WITNESS:
8      A.  Okay.
9  BY MR. RAGAIN:
10     Q.  And Topic No. 2 is one that you have
11 also been proffered to testify by PepsiCo today?
12     A.  That's correct.
13     Q.  And what other -- other than the
14 transshipment enforcement program, what other
15 policies, procedures, rules, regulations, plans,
16 and actions have been promulgated and/or
17 implemented by PepsiCo for the purpose of
18 preventing transshipment into the territories of
19 independent bottlers outside of the northeastern
20 United States?
21     A.  So as far as guidelines and policies, of
22 course you mentioned the transshipment enforcement
23 program.  In addition to that, PBC has an employee
24 and customer policy that was, I believe, originally

Page 17

1  written in 2010 and then updated in 2016.  We also
2  have a companywide code of conduct that includes
3  language that prohibits any type of trade stuffing
4  or overselling of accounts.  And as far as
5  additional contracts, I would say our customer
6  contracts have language that prohibits a customer
7  from selling product outside of its intended
8  channel or territory.
9      Q.   Anything else?
10     A.   Well, as far as policies or guidelines,
11 I think that covers the majority of those.  The
12 other actions, I would say, would include sort of
13 the work involved in the day-to-day management of
14 the program and then the mitigation efforts that we
15 put forth, and I would probably start with -- you
16 specified outside the northeast, right?  Did I hear
17 that correctly?
18     Q.   Yeah.  For the purpose of preventing
19 transshipment into the territories of independent
20 bottlers located outside of the northeastern United
21 States.
22     A.   Okay.  So, you know, a lot of our
23 mitigation effort would depend on the specific
24 scenario.  The one that relates most closely to the

Page 18

1  Northern situation, we actually set up a -- what we
2  refer to as a sting operation, so we suspected a
3  certain customer of being the source of product
4  that made its way into Northern's territory, and we
5  set up an operation whereby we quarantined a
6  certain run of product.  And any time the suspected
7  customer ordered that particular SKU, then we would
8  only pull from that lot of product to supply that
9  customer.  And we then waited for the product to be
10 found in other territories and measured whether or
11 not they were, in fact, the culprit.
12     Q.   And what did you find in that particular
13 case?
14     A.   In that case we found that they were the
15 source of transshipped product but that product did
16 not make its way up to Northern, or at least at
17 that point it had -- if at one point it was the
18 Northern product, then at least in this scenario it
19 was not found to be making its way to Northern.  In
20 fact, it stopped.  The product came out of South
21 Florida, and it stopped in the Tennessee area.
22     Q.   Mr. Morris, Topic No. 6 for today was
23 PepsiCo's product tracking system for the period
24 January 2010 to the present, and it's my

Page 19

1  understanding that subject to the time limitations
2  we talked about earlier, you have been proffered to
3  testify on that topic as well?
4      A.   That's correct.
5      Q.   Okay.  Can you explain how PepsiCo's
6  soft drink product tracking system works?
7      A.   So every container receives a production
8  code on that container.  On cans, it's on the
9  bottom of the can.  On bottles, it's typically on
10 the shoulder of the bottle.  Those individual
11 bottles or cans are then packaged into a case.  In
12 many cases it's 24 units to a case, and then those
13 cases are palletized further down the production
14 process.
15          At the end of that production process,
16 where those cases are then palletized, a -- what we
17 call a license plate or a pallet tag is applied to
18 that pallet, which is intended to represent the
19 collection of production codes on that pallet.
20 From that point, whenever that pallet moves from
21 that facility or into the mass storage, the
22 forklift operator that handles that product is to
23 scan that pallet tag and indicate where that
24 product is moving to next.

Page 20

1           The purpose of that program is to be
2  able to track the pallet one step removed from the
3  threshold of the facility.
4      Q.   And what do you mean by that?
5      A.   Well, so the program originated as part
6  of the -- I think it was the 2010 Bioterrorism Act,
7  which required food and beverage manufacturers to
8  be able to track its product one step beyond its
9  door.  So the original intent was to be able to do
10 that, and we were able to use that same program for
11 aiding the tracking of product as it related to
12 transshipments.
13     Q.   So prior to 2010 you didn't have any
14 tracking system?
15     A.   No, there were tracking systems.  They
16 just weren't as sophisticated as the current
17 system.
18     Q.   Okay.  And I'm going to just -- again,
19 for the sake of expediency, I think you have
20 testified before that with the LTT -- and this is
21 the LTTS system that you are referring to?
22     A.   That's correct.
23     Q.   How accurate is the system?
24     A.   Well, it's as accurate as the input, so

Page 21

1  as long as the -- as long as the pallets are tagged
2  and the codes are read with a fair amount of
3  accuracy, then I would say there's between a -- I
4  would say that there's up to a 60 percent chance
5  that if the product -- if an individual bottle or
6  can is found in the market somewhere, we have about
7  at least a 60 percent chance of being able to
8  identify where that product was first sold to.
9      Q.   Okay.  And how did you arrive at the
10 60 percent figure, and how do you go about the
11 process of determining where the product came from?
12     A.   Well, it's based on information shared
13 with me from PBC, so as we have tried to compare
14 some of the data that we have in PTEP with some of
15 the data that may have been shared with us from
16 PBC, what we have generally found is that there's
17 anywhere from 40 to, you know, 50 or 60 percent
18 that is considered nontraceable.  And, again, this
19 is product that has made its way through the value
20 chain and we have now identified it in the market
21 somewhere and we are trying to backtrack through
22 the system to identify where it was first sold.
23     Q.   And why would this 40 percent be
24 nontraceable?

Page 22

1      A.   Well, because of the -- it has a lot to
2  do with the production process, so I mentioned
3  earlier that each container receives its own
4  production code and that is done in single file
5  fashion.  But further down the production process,
6  those codes are commingled, so we have what is
7  called a warmer, which is a very large table that
8  accumulates product on it.  We also have an
9  accumulation table that allows for a certain amount
10 of commingling of those production codes.
11         So once that -- once those individual
12 containers are packaged into a case and then
13 subsequently collected onto a pallet, there is
14 quite a bit of commingling of production codes on
15 that pallet.
16     Q.   What does the license plate that goes on
17 the pallet purport to represent?
18     A.   So it represents -- the operator looks
19 at a production code on the bottom of that pallet
20 as well as one on the top of the pallet, and the
21 assumption is that the production minutes
22 between -- or the production minutes between the
23 top and the bottom represent what is on that
24 pallet.

Page 23

1      Q.   And is that true or not true?
2      A.   I would say it's generally true, but
3  there could be variances to it.
4      Q.   And explain to me these variances.
5      A.   Well, again, it's driven by the
6  commingling of product.  So as an example, if
7  there's any amount of line stoppage or anything
8  that causes any amount of accumulation on either
9  the accumulation table that I mentioned or the
10 warmer, you are going to have commingling of
11 product.
12     Q.   Are we talking about commingling of ten
13 bottles and cans, or are we talking commingling of
14 a thousand or what?
15     A.   Thousands.  So as an example, bottle
16 fillers can run at speeds anywhere from 600 bottles
17 per minute up to 1,200 bottles per minute, and
18 these would be fed initially single file but then
19 eventually they would be commingled on one of those
20 accumulation points that I mentioned.
21     Q.   So how do you take the data -- when
22 Northern makes a complaint, how do you take the
23 data, and just run me through the process of how
24 you try and figure out where the product was first

Page 24

1  sold?
2      A.   Okay.  So in Northern's case, it would
3  have started with a complaint.  That complaint
4  would have been investigated by a third-party
5  investigator who would send that production code
6  information to our transshipping department.  We
7  would then share that information through the claim
8  details that I mentioned with PBC and -- or any
9  other bottler that may have been the source of that
10 initial product, and we can tell who the source is
11 by a plant code.  It's a two-letter plant code that
12 is a part of the production code.
13         So that is the starting point, and from
14 there we can look at the time and date stamps and
15 try to tie that back to product that was palletized
16 and either sent to a customer or sent to another
17 warehouse, whether internal or external to another
18 bottler, or it could have been put into mass
19 storage and shipped out at some point later.
20     Q.   Well, if it's put into mass storage,
21 it's still tracked, correct?
22     A.   Still tracked until it is then moved
23 from mass storage out to one of those other
24 destinations, be it direct to a customer -- and,

Page 25

1  generally speaking, your customers who are going to
2  receive full pallet quantities are going to be
3  larger customers like in the club channel, in some
4  cases grocery, but generally it's going to be your
5  larger customers. It could be a third-party
6  operator. It could be another PBC or independent
7  bottler plant.
8      Q.   So in Northern's case, what information
9  would you need about the product to determine at
10 what stage in the sales and distribution process
11 that the product was diverted?
12     A.   I'm sorry. Can you restate that? The
13 video broke up just a little bit.
14     Q.   I'm sorry. In Northern's case, knowing
15 what you know about it, what information would you
16 have to have to be able to determine where the
17 product -- at what point in the product process the
18 product was diverted?
19     MR. QUINN: Jim, it broke up again for some
20 reason when you got to product and the word
21 "process."
22     MR. RAGAIN: I think it didn't -- yeah, it
23 didn't break up. My question broke up.
24     MR. QUINN: Oh, okay.

Page 26

1  BY MR. RAGAIN:
2      Q.   In Northern's case, what information
3  would you need to be able to determine at what
4  point in the sales and distribution process that
5  the product was diverted?
6      A.   Let me answer it this way. So we would
7  start with the production code. In fact, we would
8  have to have several production codes in hopes that
9  they would all tie back to the same customer that
10 the product was originally sold to.
11          From there it can be very difficult to
12 figure out the lane that the product took to make
13 its way to Northern's territory. So in the example
14 of the South Florida product, we determined that
15 the product was produced at a particular plant, and
16 we collected enough data points that suggested it
17 was sold to a particular customer.
18     Q.   Okay. Now, what is a data point?
19     A.   A data point would be any number of
20 production codes. So if over the course of, say,
21 two months we collected, you know, 30 cases of
22 production codes, we would try to tie those back to
23 a particular customer.
24     Q.   I'm sorry. It broke up there. Tie that

Page 27

1  back to what?
2      A.   Back to a particular customer.
3      Q.   Okay. What else?
4      A.   So from that point, you know, we had the
5  starting point of the product and we had the end
6  point of the product, which was Northern's
7  territory. Nothing in between is transparent to
8  us.
9           So the starting point -- let's say in
10 this case it was PBC that had the customer contact.
11 They would investigate the likelihood that that
12 customer was selling the product outside of its
13 territory, and, you know, typically you would hear
14 that they were not, that they were not selling it
15 outside of their territory or the intended channel.
16          So from there it's very difficult to
17 track where the product went and how it got to
18 Northern's territory.
19     Q.   Okay. What is a channel -- well, what
20 is a channel, just so we have that?
21     A.   Well, a channel would be a segment of
22 the business -- of our business, so we have -- as
23 an example, we have the convenience and gas channel
24 or the C&G channel, often referred to as small

Page 28

1  format. We have the drug channel, which is going
2  to include your stores like Walgreens, CVS,
3  et cetera. We have a grocery channel, which would
4  include your grocery accounts.
5      Q.   Just to -- I guess because we are going
6  to start running into this topic as well. You have
7  also been proffered to testify with respect to
8  Topic No. 4, PepsiCo, Inc.'s, investigation of all
9  transshipping complaints made by plaintiff and the
10 result thereof for the time period January 2012 --
11     A.   Okay.
12     Q.   -- through mid-July of 2016?
13     A.   Sure.
14     Q.   Is that correct?
15     A.   That's correct.
16     Q.   Okay. Thank you.
17          So let's -- rather than talk about this
18 in the abstract, let's talk about it in terms of
19 Northern's complaints. How many complaints did
20 Northern make?
21     A.   I don't recall the exact number, but I
22 do recall that initially there were only, I think,
23 two or three in a year. That may have been -- that
24 may have actually been 2015. I believe prior to

Page 29

1  that if there were -- there was maybe one
2  complaint, if even that, going back to 2012.
3     Q.   So how do you characterize what is a
4  complaint?  I mean, is every time -- every time
5  they update you with respect to what is going on in
6  their territory, or what is a complaint?
7     A.   Yes.  We consider a complaint when
8  there's an official request for an investigation to
9  take place in the market.
10    Q.   And with respect to the time period that
11 we are talking about here, can you tell me when
12 those complaints were made by Northern?
13    A.   When they were made?  Can you be more
14 specific?
15    Q.   What date they were made.
16    A.   No, I could -- we could probably produce
17 that information, but I wouldn't know that.
18    Q.   Okay.  Let's start from the other end
19 then.  As we sit here today, have you ever -- has
20 PepsiCo ever been able to determine where the
21 product and by whom the product was diverted that
22 was sold in Northern territory?
23    A.   Can I confer with counsel briefly?
24        MR. QUINN:  If you are worried that it relates

Page 30

1  to privileged information, then we can discuss it.
2       THE WITNESS:  Yeah, it was privileged.
3       MR. QUINN:  Okay.  Just take a quick break
4  then to make sure that we don't divulge any
5  privilege.
6       THE VIDEOGRAPHER:  We are off the record.  The
7  time is 10:25 a.m.
8          (WHEREUPON, a recess was had.)
9       THE VIDEOGRAPHER:  We are back on the record.
10 The time is 10:26 a.m.
11 BY THE WITNESS:
12    A.   Jim, could you repeat that question,
13 please.
14 BY MR. RAGAIN:
15    Q.   I think what it was was, have you ever
16 been able to determine at what -- have you ever
17 been able to determine the diverter of the product
18 or diverters of the product that ended up in
19 Northern's territory?
20    A.   Yeah.  I actually learned who that
21 diverter was as a result of reviewing a deposition
22 from, I believe it was Nick Frisone -- Nick or
23 Vinny Frisone with L&V Distributors.
24    Q.   Okay.  Have you -- but using -- using

Page 31

1  the tools that you have and the information that
2  you have through the LTTS system, the PTEP program,
3  were you ever able to determine who you believed
4  the diverter of the product or diverters of the
5  product was?
6     A.   We were not.
7     Q.   I realize you may have already said some
8  of this when we were talking about the system in
9  the abstract, but can you tell me why not?  In
10 Northern's specific case, why you were not able to
11 make that determination?
12    A.   Well, I would say for a couple of
13 reasons.  One was that even when we quarantined
14 product and sold it to the customer that we
15 believed to be the source of the transshipped
16 product, it didn't prove out.  And so, again, we
17 knew that that customer was the source of
18 transshipped product in other territories, but it
19 wasn't in Northern's or at least at that point in
20 time it was no longer in Northern's.
21       The other thing that happened is that
22 the production source of product that made its way
23 into Northern's territory changed, so it moved from
24 a South Florida production site to other production

Page 32

1  sites, some of which were in the Midwest.  I
2  believe some came out of the northeast, so the
3  transshipping lane itself changed at some point.
4     Q.   So as we sit here today, if I'm correct,
5  using the tools at your disposal, you have never
6  been able to determine who the diverter or
7  diverters were of the product that was sold in
8  Northern's territory, correct?
9        MR. QUINN:  Objection, mischaracterizes his
10 testimony.
11 BY THE WITNESS:
12    A.   How would you define "the diverter"?
13 BY MR. RAGAIN:
14    Q.   Good question.  And I apologize for not
15 making that clear.
16       The first purchaser that sold the
17 product outside of his territory or -- outside of
18 their territory or channel.
19    A.   I think we had compelling evidence to
20 identify certain customers or at least during the
21 time that is in question here.  We felt strongly
22 that certain customers were likely sources of that
23 product, but we still couldn't identify how it made
24 its way to Northern's territory.

Page 33

1  Q.  Well, did you ever discuss that with --
2  who was the customer that you thought -- or
3  customers that you felt were responsible?
4  A.  So Vistar in Florida was the customer
5  that we believed to be the source.
6  Q.  Is that the only one?
7  A.  At the time that is where the most
8  compelling evidence was, was with Vistar.
9  Q.  So what did you do with respect to
10 Vistar?
11 A.  Well, so my role was to make sure that
12 the impacted bottlers had the information, you
13 know, through the claim detail process that we
14 talked about earlier, and then working directly
15 with PBC, we shared the findings of this sting
16 operation.  And then the region leadership in the
17 southeast region, and specifically South Florida,
18 took it upon themselves to have a discussion with
19 Vistar.  They did take actions that resulted in
20 price increases, allocations, and I believe for a
21 period of time they were actually shut off from
22 receiving product.
23 Q.  Do you believe they were?
24 A.  Yeah.  The actual details of the

Page 34

1  allocations, I would not have had direct privy to
2  that information, but there was -- I know there was
3  a significant reduction in shipments that went to
4  Vistar.
5  Q.  For how long?
6  A.  That I don't know.
7  Q.  Anybody else besides Vistar that you
8  determined to any reasonable degree of certainty
9  was a diverter of the product that ended up in
10 Northern's territory?
11 A.  Not that we identified, but the region
12 leadership with PBC did take similar actions with
13 another customer by the name of Culinary Ventures,
14 and I couldn't speak to the findings they used to,
15 you know, support that action.  But I do know
16 similar action was taken around the same time as
17 Vistar's.
18 MR. RAGAIN:  Let's take a quick break, Tom, if
19 that is okay.
20 MR. QUINN:  Sure.
21 MR. RAGAIN:  Let me look at my notes a little
22 bit and talk to Michelle.
23 MR. QUINN:  Sounds good.  Come back in five or
24 ten?

Page 35

1  MR. RAGAIN:  Yes.
2  THE VIDEOGRAPHER:  We are off the record.  The
3  time is 10:34 a.m.
4        (WHEREUPON, a recess was had.)
5  THE VIDEOGRAPHER:  We are back on the record.
6  The time is 10:48 a.m.
7  BY MR. RAGAIN:
8  Q.  Mr. Morris, just a clean-up matter here.
9  Topic No. 2 on the deposition notice actually had
10 two parts to it, and I asked you about the first
11 part.  And I'll read it all here for you, but --
12 I'll just read it now, Other than the transshipment
13 enforcement program, any and all policies,
14 procedures, rules, regulations, plans, and actions
15 promulgated and/or implemented by PepsiCo, Inc.,
16 during the specified time period that, one, are for
17 the purpose of preventing transshipment into the
18 territories of independent bottlers who are outside
19 of the northeastern United States or, two, that
20 will otherwise be offered by PepsiCo at trial.
21     I asked you to list off for me the items
22 that were included in the first parenthetical
23 there, and I'm assuming they are the same, but tell
24 me if I'm wrong.

Page 36

1     Are you aware of any policy, procedure,
2  rule, regulation, plan, or action promulgated or
3  implemented by PepsiCo that you -- that the company
4  intends to offer at the trial of this case that you
5  have not listed off for me?
6  A.  I don't think that I have.  The only
7  thing that I may have not spelled out is that
8  the -- while the policy -- the transshipping
9  guidelines exist, we did communicate those
10 guidelines to the bottling system, which would have
11 included PBC.  So, you know, the policy, as I said,
12 it exists, but we also would share or reiterate
13 that policy with the bottling system periodically.
14 MR. RAGAIN:  Okay.  Thank you.
15 MR. QUINN:  Jim, I have a couple --
16 MR. RAGAIN:  That is all I have.
17 MR. QUINN:  Okay.  I have just a couple of
18 clarification questions with respect to Darrin's
19 testimony.
20       EXAMINATION
21 BY MR. QUINN:
22 Q.  I would like to direct you back to the
23 whole description that you had of the process of
24 tagging pallets at plants, PBC bottling plants,

Page 37

1  with the labels that are then used to -- through
2  the LTTS system to try to determine the first
3  purchaser of product from a PBC region.
4      A.   Uh-huh.
5      Q.   And I know you talked about the
6  commingling that can occur.  Would you also
7  describe for us what pallets actually get tagged
8  with these labels and which pallets do not?
9      A.   So any full pallet would be tagged.
10 Once that pallet was disassembled and used for,
11 let's say, a conventional route, which would be a
12 delivery that would be made to a, you know, small
13 format store that I mentioned earlier, those
14 products would not have a tag associated with it.
15     Q.   What about a pallet that contains a
16 mixture of different products such as Mountain Dew,
17 Pepsi Cola or the like or diet products, would
18 those pallets that have mixed products receive a
19 tag?
20     A.   They would not.  So that would be
21 considered a mixed pallet or a -- that sounds like
22 what we consider a bulk order that is going to be
23 shipped to a customer.  Those would not have a
24 pallet tag.

Page 38

1      Q.   And how about in the case of a pallet
2  that contained products that would be going to more
3  than one customer on a route, would that be tagged?
4      A.   So it's possible to actually have two
5  pallet tags that were similar that went to two
6  different customers.
7      Q.   Okay.
8      A.   And, again, that ties back into the --
9  kind of the commingling nature of the process.  So
10 it's not an exact science, but it's currently the
11 best that's available.
12     Q.   Okay.  You also testified in response to
13 Mr. Ragain's question regarding the process of
14 investigation that nothing between the starting
15 point of -- if you know who is the first purchaser
16 from a PBC plant to the end point of actual
17 transshipment into a bottler territory, that
18 nothing in between is really transparent.  Could
19 you explain what you meant by that?
20     A.   Yeah, sure.  So once the product leaves
21 the PBC doorstep or any bottler's doorstep, for
22 that matter, they would have visibility to the next
23 destination.  From there there's no required
24 tracking or reporting from the customer to report

Page 39

1  back to PBC or the independent bottler that tells
2  them where that product was going next.
3           And so if product is subsequently found
4  in a territory where it shouldn't be, really all we
5  have access to is the starting point and the ending
6  point, and typically the bottler in the infringed
7  territory will have some idea of who delivered that
8  product to that account.
9           In this case, it was Core-Mark.  So,
10 again, we know the beginning point and we know the
11 ending point, but everything in between, there
12 could be multiple hands that touch that product
13 before it made its way to the final destination.
14     Q.   In your experience, do customers that
15 purchase product from PBC and then -- whether it's
16 a third-party operator or club store or others, do
17 customers have systems for tracking sales to
18 subsequent customers down the line typically or
19 not?
20     A.   I have heard that some do, and I would
21 say your -- what I would consider a more
22 sophisticated customers, that might have a larger
23 supply chain itself, but, generally speaking, I
24 would say no.

Page 40

1      Q.   So in your experience, what has happened
2  when a PBC person or a key account manager contacts
3  a customer that may show up as a source of
4  transshipped product, when the topic of who did you
5  sell it to comes up?
6      A.   In many cases they will say, I have no
7  idea, if they are asked.  It depends on how the
8  question is phrased.  If the question is, Did you
9  sell product outside of the territory, that is
10 going to be generally a yes or no question, and I
11 would say more often than not the answer is no.
12 And they may be telling the truth, that they sold
13 it within the territory.  They may also suggest
14 that they did not sell it outside of a channel that
15 they were not permitted to sell it.
16          So we just -- we lose visibility to how
17 that product moves around once it gets into the
18 customer's possession.
19     Q.   Now, you also mentioned, in response to
20 one of Mr. Ragain's questions, that you had a
21 chance to read the Frisone deposition in this case.
22 Did that deposition offer any insights to you
23 regarding the manner in which diverters like
24 Frisone or L&V actually come to acquire the Pepsi

Page 41

1  product that ultimately gets transshipped?
2     A.   Yeah, absolutely.  Absolutely.  I would
3  have never guessed that two large companies like a
4  Vistar and a Core-Mark would have worked with an
5  intermediary like a Nick Frisone or L&V
6  Distributors to acquire and assemble product.  That
7  just wasn't something that we would have expected.
8     Q.   And what about the quantities of
9  products that Frisone was able to assemble to
10 ultimately meet the orders for product?
11    A.   So I gathered from his deposition that
12 it wasn't always easy.  He would often have to go
13 to different sources on what is often referred to
14 as the wire to find this product and assemble it,
15 enough to put together an order for Core-Mark.  Or,
16 in fact, I think there was another party between
17 L&V Distributors and Core-Mark that touched the
18 product, so it was a very labor intensive effort,
19 it appeared.
20    Q.   Okay.  So does that complexity add any
21 degree of difficulty to the whole process of trying
22 to detect and prevent transshipment?
23    A.   Sure, sure.  Absolutely.  So, again, we
24 have access to the beginning point and the end

Page 42

1  point, but once the product is out in the open
2  market, it is very difficult to track, especially
3  when you are talking about individual containers or
4  cases because in many cases -- in many situations,
5  the product is not moving in pallet quantities,
6  which is what we are able to best -- best track.
7     MR. QUINN:  No further questions.
8     THE WITNESS:  Okay.
9     MR. RAGAIN:  Nothing else.  Thank you,
10 Mr. Morris.
11    THE WITNESS:  Thank you.
12    MR. QUINN:  So Jim -- off the record.
13    THE VIDEOGRAPHER:  This marks the end of
14 today's deposition.  The time is 10:59 a.m.  We are
15 now off the record.
16         FURTHER DEPONENT SAITH NOT.

Page 43

1  STATE OF ILLINOIS )
2                    ) SS:
3  COUNTY OF C O O K )
4         I, KRISTIN C. BRAJKOVICH, a Certified
5  Shorthand Reporter of said state, do hereby
6  certify:
7         That previous to the commencement of the
8  examination of the witness, the witness was duly
9  sworn to testify the whole truth concerning the
10 matters herein;
11        That the foregoing deposition transcript
12 was reported stenographically by me,
13 was thereafter reduced to typewriting under my
14 personal direction and constitutes a true record
15 of the testimony given and the proceedings had;
16        That the said deposition was taken
17 before me at the time and place specified;
18        That I am not a relative or employee
19 or attorney or counsel, nor a relative or
20 employee of such attorney or counsel for any of
21 the parties hereto, nor interested directly or
22 indirectly in the outcome of this action.
23        IN WITNESS WHEREOF, I do hereunto set my
24 hand and affix my seal of office at Chicago,

Page 44

1  Illinois, this 3rd day of April, 2018.

7        C.S.R. Certificate No. 84-3810.

Page 45

```
 1              I N D E X
 2  WITNESS                    EXAMINATION
 3  DARRIN MORRIS
 4      By Mr. Ragain            5
 5      By Mr. Quinn            36
 6
 7
 8
 9          E X H I B I T S
10  NUMBER                       PAGE
11  NONE.
12
...
24
```

Page 46

```
 1         DEPOSITION ERRATA SHEET
 2
 3  Our Assignment No. J0595213
 4  Case Caption:  Northern Bottling Co., Inc., vs.
 5        PepsiCo, Inc.
 6
 7     DECLARATION UNDER PENALTY OF PERJURY
 8
 9      I declare under penalty of perjury that
10  I have read the entire transcript of my deposition
11  taken in the captioned matter or the same has been
12  read to me, and the same is true and accurate, save
13  and except for changes and/or corrections, if any,
14  as indicated by me on the DEPOSITION ERRATA SHEET
15  hereof, with the understanding that I offer these
16  changes as if still under oath.
17
18     Signed on the _____ day of
19     _____, 20_____.
20
21
22
23  _____
24        DARRIN MORRIS
```

Page 47

```
 1         DEPOSITION ERRATA SHEET
 2
 3  Page No. _____Line No._____Change To:_____
 4  Reason for Change:_____
 5  Page No. _____Line No._____Change To:_____
 6  Reason for Change:_____
 7  Page No. _____Line No._____Change To:_____
 8  Reason for Change:_____
 9  Page No. _____Line No._____Change To:_____
10  Reason for Change:_____
11  Page No. _____Line No._____Change To:_____
12  Reason for Change:_____
13  Page No. _____Line No._____Change To:_____
14  Reason for Change:_____
15  Page No. _____Line No._____Change To:_____
16  Reason for Change:_____
17  Page No. _____Line No._____Change To:_____
18  Reason for Change:_____
19  Page No. _____Line No._____Change To:_____
20  Reason for Change:_____
21  Page No. _____Line No._____Change To:_____
22  Reason for Change:_____
23  SIGNATURE:_____DATE:_____
24        DARRIN MORRIS
```

Page 48

```
 1         DEPOSITION ERRATA SHEET
 2
 3  Page No. _____Line No._____Change To:_____
 4  Reason for Change:_____
 5  Page No. _____Line No._____Change To:_____
 6  Reason for Change:_____
 7  Page No. _____Line No._____Change To:_____
 8  Reason for Change:_____
 9  Page No. _____Line No._____Change To:_____
10  Reason for Change:_____
11  Page No. _____Line No._____Change To:_____
12  Reason for Change:_____
13  Page No. _____Line No._____Change To:_____
14  Reason for Change:_____
15  Page No. _____Line No._____Change To:_____
16  Reason for Change:_____
17  Page No. _____Line No._____Change To:_____
18  Reason for Change:_____
19  Page No. _____Line No._____Change To:_____
20  Reason for Change:_____
21  Page No. _____Line No._____Change To:_____
22  Reason for Change:_____
23  SIGNATURE:_____DATE:_____
24        DARRIN MORRIS
```

```
1              DEPOSITION ERRATA SHEET
2
3    Our Assignment No. J0595213
4    Case Caption:   Northern Bottling Co., Inc., vs.
5                    PepsiCo, Inc.
6
7         DECLARATION UNDER PENALTY OF PERJURY
8
9              I declare under penalty of perjury that
10   I have read the entire transcript of my deposition
11   taken in the captioned matter or the same has been
12   read to me, and the same is true and accurate, save
13   and except for changes and/or corrections, if any,
14   as indicated by me on the DEPOSITION ERRATA SHEET
15   hereof, with the understanding that I offer these
16   changes as if still under oath.
17
18         Signed on the ___27th___ day of
19   __April__, 20_18_.
20
21
22                    [signature]
23   _____
24         DARRIN MORRIS
```



ERRATA SHEET

CASE: NORTHERN BOTTLING VS. PEPSICO INC.

DATE: MARCH 22, 2018

WITNESS: DARRIN MORRIS

| **PAGE** | **LINES** | **FROM** | **TO** | **REASON FOR CHANGE** |
|---|---|---|---|---|
| 9 | 15 | reported into. | reported to. | mistranscription |
| 39 | 21 | I would consider a more | I would consider more | mistranscription |