# Exhibit 9

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF NORTH DAKOTA
 3                 NORTHWESTERN DIVISION
 4
 5   NORTHERN BOTTLING CO., INC.,  )
 6         Plaintiff,              )
 7   vs.                           ) No. 4:150-cv-133
 8   PEPSICO, INC.,                )
 9         Defendant.              )
10
11        The videotaped 30(b)(6) deposition of
12   PEPSICO, INC., by ELIZABETH VAN HOUTEN, called for
13   examination, taken pursuant to the Federal Rules of
14   Civil Procedure of the United States District
15   Courts pertaining to the taking of depositions,
16   taken before KRISTIN C. BRAJKOVICH, a Certified
17   Shorthand Reporter, CSR. No. 84-3810, of said
18   state, at Suite 2900, Three First National Plaza,
19   70 West Madison Street, Chicago, Illinois, on the
20   22nd day of March, A.D. 2018, at 11:02 a.m.
21
22
23
24
```

Page 2

```
 1   PRESENT:
 2
 3        RAGAIN & COOK, PC,
 4        (3936 Avenue B, Suite A-2,
 5        Billings, Montana 59102,
 6        1-406-206-4831), by:
 7        MR. JAMES M. RAGAIN,
 8        jim@lawmontana.com,
 9          -and-
10        SULLIVAN MILLER LAW,
11        (3860 Avenue B, Suite C East,
12        Billings, Montana 59102,
13        1-406-403-7066), by:
14        MS. MICHELLE SULLIVAN,
15        michelle.sullivan@sullivanmiller.com,
16          appeared via video teleconference on
17          behalf of the Plaintiff;
18
19
20
21
22
23
24
```

Page 3

```
 1   PRESENT (Continued):
 2        RILEY SAFER HOLMES & CANCILA LLP,
 3        (Three First National Plaza,
 4        70 West Madison Street,
 5        Chicago, Illinois 60602,
 6        1-312-471-8770), by:
 7        MR. THOMAS B. QUINN,
 8        tquinn@rshc-law.com, and
 9        MS. PATRICIA MATHY,
10        pmathy@rshc-law.com,
11          appeared on behalf of the Defendant.
12
13   ALSO PRESENT:
14        MR. CHARLES S. BIENER, PepsiCo, Inc., Senior
15   Counsel;
16        MS. ANA M. McCARRON, PepsiCo, Inc., Senior
17   Legal Specialist;
18        MR. MARIO MERCURIO, PepsiCo, Inc., Senior
19   Vice President, GM, Franchise Business Unit;
20        MR. DARRIN MORRIS, Director, Franchise
21   Development - Southeast Region;
22        MR. DAVID LEHMAN, Legal Videographer.
23
24   REPORTED BY:  KRISTIN C. BRAJKOVICH, No. 84-3810.
```

Page 4

```
 1        THE VIDEOGRAPHER:  I'm the videographer on
 2   March 22, 2018, for the recording of the deposition
 3   of Elizabeth Van Houten at the time of 11:02 a.m.
 4        Will the reporter please swear in the
 5   witness.
 6             (WHEREUPON, the witness was duly
 7              sworn.)
 8        MR. QUINN:  Jim, just for the record, then
 9   Ms. Van Houten is going to address the Topics 1, 2,
10   4, and 6 for the periods from approximately
11   mid-2016 to the end point of the subject periods
12   for each of those questions.
13        MR. RAGAIN:  And can we just stipulate -- and
14   feel free to review them, Ms. Van Houten, but so I
15   don't have to read each of the topics, Tom?
16        MR. QUINN:  Yeah, sure.  She's going to put in
17   front of her the Rule 30(b)(6) deposition notice,
18   so she has that.
19             ELIZABETH VAN HOUTEN,
20   called as a witness herein, having been first duly
21   sworn, was examined and testified as follows:
22             EXAMINATION
23   BY MR. RAGAIN:
24        Q.   Okay.  And, Ms. Van Houten -- is it
```

Page 5

1  Houten with an H?
2      A.   Correct.
3      Q.   Okay.  Thank you.  Would you take a look
4  at Topics 1, 2, 4, and 6?
5      A.   Okay.
6      Q.   And I'll just ask you, so the record is
7  clear, you have been proffered by PepsiCo, Inc., to
8  testify as a company witness on each of those
9  topics?
10     A.   Correct.
11     Q.   Okay.  Thank you.  Could you state your
12 name and your business address for me, please?
13     A.   Sure.  It's Elizabeth Van Houten,
14 business address is 1111 Westchester Avenue in
15 White Plains, New York.
16     Q.   And what is your current position with
17 PepsiCo, Inc.?
18     A.   I'm director of franchise development
19 responsible for transshipping mitigation currently.
20     Q.   Okay.  And how long have you been in
21 that position?
22     A.   Just about two years.
23     Q.   And what did you do before that?  Did
24 you work in some other capacity for the company?

Page 6

1      A.   Yeah.  Previously, most of the time in a
2  franchise development manager role, calling on
3  franchise bottlers in the northeast, a variety of
4  different ones at different points in time.
5      Q.   Okay.  Did you have anything to do with
6  transshipping -- well, anything to do with
7  transshipping enforcement prior to two years ago?
8      A.   Not directly, no.  Bottlers that I would
9  call on may file claims, but I didn't get directly
10 involved in it.
11     Q.   Okay.  Why did you move into your
12 current position?  Was it a step up for you?
13     A.   Yeah.  It was career development, a
14 natural progression into, you know, an escalating
15 responsibility role.
16     Q.   Okay.  And is your position essentially
17 the same position that was held by Mr. Morris prior
18 to two years ago?
19     A.   Yes.
20     Q.   Okay.  Any significant differences that
21 you are aware of --
22     A.   No.
23     Q.   -- in terms of your day-to-day
24 activities and his?

Page 7

1      A.   No.
2      Q.   Okay.  And were you present during his
3  testimony earlier today?
4      A.   I was.
5      Q.   Okay.  And have you read Mr. Morris'
6  previous deposition that was taken more or less a
7  year ago in this case?
8      A.   I have.
9      Q.   Okay.  What else have you -- what other
10 deposition transcripts have you reviewed in this
11 case?
12     A.   I reviewed Derek Lewis' deposition.  I
13 reviewed the -- I don't remember the individual's
14 names, but the Enerbase and Envision depositions.
15 That is all that I can recall in terms of
16 depositions, that is.
17     Q.   I know this is a difficult question, a
18 very broad question, but I'll ask it.  Anything
19 that you have read in this case really stand out to
20 you as inaccurate testimony or testimony that you
21 would disagree with?
22          MR. QUINN:  I'm going to object to that on the
23 grounds it's vague, ambiguous, and overbroad.
24

Page 8

1  BY THE WITNESS:
2      A.   Nothing that I'm aware of.
3  BY MR. RAGAIN:
4      Q.   Okay.  How about with Mr. Morris'
5  testimony earlier today?
6          MR. QUINN:  Same objection.
7  BY THE WITNESS:
8      A.   No.
9  BY MR. RAGAIN:
10     Q.   Okay.  So could you explain to me from
11 your perspective how the PepsiCo Transshipment
12 Enforcement Program works?
13     A.   Sure.  The PepsiCo transshipment
14 enforcement guidelines, it really lays out the
15 steps that a bottler would take if they find
16 transshipped product within their marketplace and
17 want to report it.  It just articulates the steps
18 for them filing a claim, to submit to a spa box.
19 It goes through the process of that claim then
20 being dispatched to an outside investigator, and
21 then it articulates through the details, where the
22 bottlers -- both source bottler and complaining
23 bottler will receive the claim details and kind of
24 goes through that process.

Page 9
1   Q.   Okay. So the -- I think in the past we
2   have used the term "offended bottler" and the
3   "transshipping bottler," just as an example. The
4   transshipping bottler would be the bottler that
5   manufactured the product, and we're primarily
6   talking about CSDs in this case, that ended up in
7   the territory of another bottler. Does that make
8   sense to you?
9        MR. QUINN: Let me just object, first, Jim, to
10  the characterization of the bottler as the
11  transshipping bottler. I believe we have talked
12  about source bottler, so I'm just going to object
13  to that characterization.
14  BY THE WITNESS:
15  A.   That is what I was going to say. I
16  wouldn't identify it as a transshipping bottler. I
17  don't think that's accurate. I think it should be
18  considered a source bottler.
19  BY MR. RAGAIN:
20  Q.   Okay. We'll use your label then for
21  today, source bottler. And the offended bottler
22  would be the bottler that is in the position, as in
23  this case, of Northern Bottling, where product
24  manufactured by another bottling entity ends up in

Page 10
1   his exclusive territory.
2   A.   Yes.
3   Q.   Okay. So does the transshipping
4   enforcement program apply in situations where one
5   independent bottler has product that ends up in
6   another independent bottler's territory?
7   A.   You are referring to the PepsiCo
8   Transshipment Enforcement Program, the guidelines?
9   Q.   Yes.
10  A.   Yeah, it articulates the steps and the
11  actions that would go through the process if they
12  requested to file a claim.
13  Q.   Okay. And in that case the offended
14  bottler receives compensation, correct?
15  A.   Correct.
16  Q.   Okay. And the source bottler pays a
17  fine?
18  A.   In addition to investigation fees,
19  correct.
20  Q.   So does it also apply to a PBC facility
21  that finds product from another PBC facility in its
22  territory?
23  A.   It does not.
24  Q.   Okay. And why not?

Page 11
1   A.   Within the PTEP application, PBC is
2   identified as one bottler, so claims are paid based
3   upon whether it's a debit or a credit for
4   infringement or for a credit back for the fines.
5   Identified by an SAP number and a bottler account
6   number and within the PTEP application, PBC is
7   identified as one.
8   Q.   And does an individual PBC facility or
9   manufacturing unit, whatever you want to refer to
10  it as, that has a territory, is it required to
11  report when it finds product manufactured by
12  another PBC facility in its territory?
13  A.   I wouldn't use the word "required."
14  Within there it is normally an internal process
15  that they would address with whichever other region
16  was applicable.
17  Q.   But are they required to report it if
18  they find product from another PBC bottler in their
19  territory?
20      MR. QUINN: Jim, you need to repeat the
21  question because you broke up in the middle of it.
22  BY MR. RAGAIN:
23  Q.   Okay. Are PBC facility managers
24  required to report if they find PBC products from

Page 12
1   another region or territory in their territory?
2   A.   I wouldn't say required. In my
3   experience, it's certainly encouraged, so they can
4   vet that through internally and address anything
5   necessary from that.
6   Q.   So I take it then the answer is, no,
7   they are not required to do that?
8        MR. QUINN: Objection, asked and answered.
9   BY MR. RAGAIN:
10  Q.   Correct?
11  A.   I would not use the word "required." I
12  would use the word "encouraged."
13  Q.   Have there -- from your perspective,
14  have there been any significant changes to the
15  program since 2008?
16  A.   I can't speak back to 2008. I would
17  have to speak from mid-year 2016. And, no, there
18  has not been in my time period in the role.
19  Q.   Other than the transshipment enforcement
20  program, what other policies, procedure, rules,
21  regulations, plans, and actions has PepsiCo
22  promulgated and/or implemented that are for the
23  purpose of preventing transshipment into
24  territories of independent bottlers outside of the

Page 13
1  northeastern United States?
2     A.   In terms of policies, there's the PBC
3  transshipping policy for employees.  There's the
4  PBC customer agreements that also have language
5  addressing transshipping within those.  There's
6  also -- in terms of actions taken, I would consider
7  the actions that, you know, I have taken since I
8  have been in the role to address issues and
9  identifying situations that we work with the PBC
10 regions on, and I would also include cease and
11 desist letters that have been sent out in regards
12 to any potential sources, whether it be PBC
13 customers or otherwise, that were potentially
14 identified.
15    Q.   What do you mean by actions you have
16 taken?
17    A.   I'll go specific --
18    Q.   Could you give me --
19    A.   Yeah, absolutely.  I would go specific
20 to Northern, where through reviewing claim details
21 and utilizing the LTTS system, identifying
22 potential sources and then working with the
23 relevant PBC region teams to follow the steps
24 articulated in the customer agreement and have the

Page 14
1  communications with the bottlers through that, so
2  through those steps where I have been involved and
3  engaged with them in attempts to mitigate.
4     Q.   Tell me what actions you have taken or
5  what you have done to investigate the transshipping
6  complaints made by Northern that are the subject of
7  this litigation.
8     A.   Sure.  So I'll actually refer back to
9  what I was just previously referencing.  Through
10 reviewing Northern's claim details when they settle
11 out, checking the production codes through LTTS to
12 try to potentially identify sources and then
13 identifying which region those potential sources
14 would be -- which regions would be responsible for
15 them, and then working with those region teams to
16 understand actions that they are taking, again,
17 pursuant to the PBC customer agreement that they
18 have with them to address the mitigation or -- to
19 address the mitigation and work through the steps
20 that are articulated in the customer agreement.  I
21 wouldn't personally get involved in that, but I
22 would engage in conversation to understand where we
23 stood in the process.
24    Q.   As we sit here today, have you been able

Page 15
1  to determine, through the information and data
2  available to you with the PTEP and LTTS programs,
3  who the diverter or diverters were with respect to
4  the product that has ended up in Northern's
5  territory?
6     A.   Could you be more specific in regards to
7  what you mean by "diverter" and which portion of
8  the path?
9     Q.   Which portion of the what?
10    A.   Diverter, the product could change hands
11 more than once, so I'm not sure which aspect of
12 diverter you are referring to.
13    Q.   Okay.  I'm talking about the first time
14 it's diverted from the territory or the channel,
15 first customer, first purchaser.
16       MR. QUINN:  Let me just object to the
17 question, in the sense that it lacks foundation
18 with respect to the first purchaser.
19 BY THE WITNESS:
20    A.   I'll answer your question this way.  We
21 could potentially identify, based upon the
22 production codes in Northern's claims, potentially
23 a PBC customer, based upon the LTTS data that the
24 product may have been sold to.  Post that sale, not

Page 16
1  able to identify the path that it may have taken to
2  Northern's territory.
3  BY MR. RAGAIN:
4     Q.   Okay.  So for -- with respect to the
5  complaints made, the product identified by Northern
6  in its complaints to you, have you been able to
7  determine who the first purchaser was for all of
8  that product?
9     A.   There were potentially identified
10 sources, and I say potentially because, to Darrin's
11 point about LTTS, product could be commingled
12 codes, so it's based upon the direction of what
13 LTTS -- the data that we have reviewed with that.
14       Through that we were able to potentially
15 identify three sources in my time, in my experience
16 with it, that may have been the source of product
17 into Northern's territory.
18    Q.   And who were those three possible
19 sources?
20    A.   There were three customers, Master
21 Wholesale, Chicago Vending, and M&P Vending.
22    Q.   Master Wholesale and M&P Vending?
23    A.   Correct.  And Chicago Vending.
24    Q.   And do all three of those entities

Page 17

1  have -- or did they have customer agreements with
2  PepsiCo or PBC?
3     A.   To my knowledge, they each had an
4  agreement with PBC.
5     Q.   And what was done with respect to
6  those -- those three possible sources to get them
7  to stop diverting product?
8     MR. QUINN:  Objection, lack of foundation.
9  BY THE WITNESS:
10    A.   So just so I understand what you are --
11    MR. QUINN:  You can go ahead.
12 BY THE WITNESS:
13    A.   Just so I understand what you are
14 asking, you want to know for each of those
15 customers independently, what actions were taken
16 with each of those by PBC region team?
17 BY MR. RAGAIN:
18    Q.   Sure.
19    A.   So in regard to Master Wholesale, again,
20 all based upon the steps within the customer
21 agreement, they were actually shut off on sourcing
22 Pepsi, Dew, regular and diet, 20 ounce, and 1 liter
23 product.
24         And then in regard to Chicago Vend and

Page 18

1  M&P, they were placed on allocation and had impacts
2  to their funding.
3     Q.   And where is Master Wholesale located?
4     A.   To be honest, I'm not sure of their
5  exact location.
6     Q.   Generally speaking, do you know where
7  they are located?
8     A.   Midwest.
9     Q.   Okay.  Chicago area?
10    A.   Possibly.  I'm not sure of the exact --
11 I don't call directly on the customer, so I'm not
12 sure exactly where.
13    Q.   Okay.  How about M&P Vending?
14    A.   Again, I would have to say Midwest
15 region for all three because I'm not sure of exact
16 locations.
17    Q.   Okay.  Do you know what channels
18 these -- these three sources operate in?
19    A.   Between wholesale and vending.
20    Q.   Do you know how long each of them has
21 done business with PepsiCo?
22    A.   I do not.
23    Q.   Do you know whether PepsiCo has had
24 problems with these customers diverting product

Page 19

1  other than the product that ended up in Northern's
2  territory?
3     A.   Again, to my knowledge, for each of
4  them, they had been identified through the standard
5  reporting that comes out that is part of PBC's
6  process for managing transshipping claim results,
7  so they were each at their individual points.  That
8  is why Master Wholesale was actually shut off,
9  based upon the three-step policy within PBC's
10 customer agreement and also why Chicago Vend and
11 M&P were put on allocation.
12    Q.   And why was Master Wholesale shut off as
13 opposed to put on allocation like the other two
14 were?
15    A.   Because of where they were in the steps
16 of the PBC customer agreement to manage
17 transshipping.
18    Q.   Okay.  And do you know for how long they
19 were shut off, Master Wholesale?
20    A.   Three months.
21    Q.   And how was that determined?
22    A.   To be honest, I'm not sure.  I wasn't
23 involved in that process, determining the time
24 period.

Page 20

1     Q.   And how -- describe for me the
2  allocation terms that M&P Vending were put under.
3     A.   I don't recall the exact allocation
4  percentage that they were put on.
5     Q.   How about Chicago Vending?
6     A.   No, I don't recall that percentage
7  either.
8     Q.   And how long were they put on allocation
9  for?
10    A.   To my knowledge, the allocation stayed
11 in place.  They didn't come back off of that.
12    Q.   Okay.  So describe for me what this
13 allocation consists of.  When you say somebody is
14 put on allocation, what does that mean?
15    A.   The quantity of product that they can
16 purchase is reduced.
17    Q.   And do you know by how much
18 M&P Vending's product allocation was reduced?
19    A.   No.  As I just said, I don't know for
20 either one of them.
21    Q.   How about Chicago Vending?
22    A.   No.
23    MR. RAGAIN:  That is all I have.  Thank you.
24    MR. QUINN:  Let's take a short break, Jim, and

Page 21

1  we'll be right back.  I may have a couple of
2  clean-up questions for Liz, so no more than five
3  minutes.  Just give us a quick one.
4       MR. RAGAIN:  Sounds good.
5       THE VIDEOGRAPHER:  We are off the record.  The
6  time is 11:26 a.m.
7            (WHEREUPON, a recess was had.)
8       THE VIDEOGRAPHER:  We are back on the record.
9  The time is 11:29 a.m.
10            EXAMINATION
11 BY MR. QUINN:
12      Q.   Ms. Van Houten, I just have a couple of
13 follow-up questions.  Mr. Ragain asked you earlier
14 what depositions you had reviewed, and I just want
15 to ask, did you also have a chance to review the
16 deposition of Vincent Frisone of L&V?
17      A.   I did.  Yes, I did review his.
18      Q.   And he was also asking you a question
19 about whether or not PBC reports transshipments
20 through the PTEP, PepsiCo Transshipment Enforcement
21 Program, to you or to your team, and I believe you
22 indicated that PBC did not, that it's treated as
23 one bottler?
24      A.   Correct.

Page 22

1       Q.   Now, there are also independent bottlers
2  that may have more than one legacy territory within
3  their particular franchise, correct?
4       A.   Correct.
5       Q.   Do those bottlers report as one or as
6  multiple bottlers?
7       A.   They report as one.
8       Q.   Okay.  In your experience, have any of
9  those independent bottlers ever reported as a
10 transshipment through PTEP sales from one legacy
11 territory to another?
12      A.   No.
13      Q.   Okay.  And then finally, right before we
14 broke Mr. Ragain was asking you some questions
15 about the steps that PBC had taken with respect to
16 Master Wholesale, M&P Vending, and Chicago Vending.
17 Do you recall that testimony?
18      A.   Yes.
19      Q.   Since those steps were taken, do you
20 know whether any of those three entities have shown
21 up as possible sources of transshipped product into
22 Northern Bottling's territory?
23      A.   They have not.
24      MR. QUINN:  Okay.  No further questions.

Page 23

1       MR. RAGAIN:  Nothing further.  Thank you.
2       MR. QUINN:  So, Jim, we also have one
3  additional representative to testify regarding
4  Topic No. 2, and that is Mario Mercurio, and what
5  he would testify about are plans or actions
6  relating to his interactions with the independent
7  bottling community to address the issue of
8  transshipment and steps that could be taken to
9  preclude or to prevent or to mitigation
10 transshipment.  So it's topic -- it's a portion of
11 Topic No. 2.  Mr. Mercurio, would you come over?
12           Okay.  The court reporter has indicated
13 that he needs to go off the record and start up
14 again, like he did with Ms. Van Houten.
15      MR. RAGAIN:  That's great.
16      THE VIDEOGRAPHER:  This marks the end of
17 today's deposition.  The time is 11:33 a.m.  We are
18 now off the record.
19           FURTHER DEPONENT SAITH NOT.

Page 24

1  STATE OF ILLINOIS )
2                    ) SS:
3  COUNTY OF C O O K )
4       I, KRISTIN C. BRAJKOVICH, a Certified
5  Shorthand Reporter of said state, do hereby
6  certify:
7       That previous to the commencement of the
8  examination of the witness, the witness was duly
9  sworn to testify the whole truth concerning the
10 matters herein;
11      That the foregoing deposition transcript
12 was reported stenographically by me,
13 was thereafter reduced to typewriting under my
14 personal direction and constitutes a true record
15 of the testimony given and the proceedings had;
16      That the said deposition was taken
17 before me at the time and place specified;
18      That I am not a relative or employee
19 or attorney or counsel, nor a relative or
20 employee of such attorney or counsel for any of
21 the parties hereto, nor interested directly or
22 indirectly in the outcome of this action.
23      IN WITNESS WHEREOF, I do hereunto set my
24 hand and affix my seal of office at Chicago,

Page 25

1  Illinois, this 3rd day of April, 2018.
2
3
4
5
6
7            C.S.R. Certificate No. 84-3810.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 26

1                I N D E X
2  WITNESS                        EXAMINATION
3  ELIZABETH VAN HOUTEN
4       By Mr. Ragain              4
5       By Mr. Quinn               21
6
7
8
9           E X H I B I T S
10 NUMBER                          PAGE
11 NONE.
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 27

1       DEPOSITION ERRATA SHEET
2
3  Our Assignment No. J0595213
4  Case Caption:  Northern Bottling Co., Inc., vs.
5            PepsiCo, Inc.
6
7      DECLARATION UNDER PENALTY OF PERJURY
8
9       I declare under penalty of perjury that
10 I have read the entire transcript of my deposition
11 taken in the captioned matter or the same has been
12 read to me, and the same is true and accurate, save
13 and except for changes and/or corrections, if any,
14 as indicated by me on the DEPOSITION ERRATA SHEET
15 hereof, with the understanding that I offer these
16 changes as if still under oath.
17
18    Signed on the _____ day of
19 _____, 20_____.
20
21
22
23    _____
24        ELIZABETH VAN HOUTEN

Page 28

1       DEPOSITION ERRATA SHEET
2
3  Page No. _____Line No._____Change To:_____
4  Reason for Change:_____
5  Page No. _____Line No._____Change To:_____
6  Reason for Change:_____
7  Page No. _____Line No._____Change To:_____
8  Reason for Change:_____
9  Page No. _____Line No._____Change To:_____
10 Reason for Change:_____
11 Page No. _____Line No._____Change To:_____
12 Reason for Change:_____
13 Page No. _____Line No._____Change To:_____
14 Reason for Change:_____
15 Page No. _____Line No._____Change To:_____
16 Reason for Change:_____
17 Page No. _____Line No._____Change To:_____
18 Reason for Change:_____
19 Page No. _____Line No._____Change To:_____
20 Reason for Change:_____
21 Page No. _____Line No._____Change To:_____
22 Reason for Change:_____
23 SIGNATURE:_____DATE:_____
24       ELIZABETH VAN HOUTEN

Page 29

1      DEPOSITION ERRATA SHEET
2
3  Page No. _____Line No._____Change To:_____
4  Reason for Change:_____
5  Page No. _____Line No._____Change To:_____
6  Reason for Change:_____
7  Page No. _____Line No._____Change To:_____
8  Reason for Change:_____
9  Page No. _____Line No._____Change To:_____
10 Reason for Change:_____
11 Page No. _____Line No._____Change To:_____
12 Reason for Change:_____
13 Page No. _____Line No._____Change To:_____
14 Reason for Change:_____
15 Page No. _____Line No._____Change To:_____
16 Reason for Change:_____
17 Page No. _____Line No._____Change To:_____
18 Reason for Change:_____
19 Page No. _____Line No._____Change To:_____
20 Reason for Change:_____
21 Page No. _____Line No._____Change To:_____
22 Reason for Change:_____
23 SIGNATURE:_____DATE:_____
24       ELIZABETH VAN HOUTEN

|    |                                                      |
|----|------------------------------------------------------|
| 1  | DEPOSITION ERRATA SHEET                              |
| 2  |                                                      |
| 3  | Our Assignment No. J0595213                          |
| 4  | Case Caption:  Northern Bottling Co., Inc., vs.      |
| 5  |                PepsiCo, Inc.                         |
| 6  |                                                      |
| 7  | DECLARATION UNDER PENALTY OF PERJURY                 |
| 8  |                                                      |
| 9  | I declare under penalty of perjury that              |
| 10 | I have read the entire transcript of my deposition   |
| 11 | taken in the captioned matter or the same has been   |
| 12 | read to me, and the same is true and accurate, save  |
| 13 | and except for changes and/or corrections, if any,   |
| 14 | as indicated by me on the DEPOSITION ERRATA SHEET    |
| 15 | hereof, with the understanding that I offer these    |
| 16 | changes as if still under oath.                      |
| 17 |                                                      |
| 18 | Signed on the ___9th___ day of                       |
| 19 | ___APRIL___, 20_18_.                                 |
| 20 |                                                      |
| 21 |                                                      |
| 22 |                                                      |
| 23 |                                  |
| 24 | ELIZABETH VAN HOUTEN                                 |

ERRATA SHEET

CASE: NORTHERN BOTTLING VS. PEPSICO INC.

DATE: MARCH 22, 2018

WITNESS: ELIZABETH VAN HOUTEN

| PAGE | LINES | FROM | TO | REASON FOR CHANGE |
|---|---|---|---|---|
| 15 | 24 | that sale, not | that sale, we are not | mistranscription |
| 16 | 11-12 | product could be commingled codes, so | product codes could be commingled, so | mistranscription |