# Exhibit 12

### Page 1

```
 1         IN THE UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF NORTH DAKOTA
 3                   NORTHWESTERN DIVISION
 4
 5   NORTHERN BOTTLING CO., INC., )
 6            Plaintiff,          )
 7       vs.                      ) No. 4:150-cv-133
 8   PEPSICO, INC.,               )
 9            Defendant.          )
10
11            The videotaped 30(b)(6) deposition of
12   PEPSICO, INC., by JIM DOYLE, called for
13   examination, taken pursuant to the Federal Rules of
14   Civil Procedure of the United States District
15   Courts pertaining to the taking of depositions,
16   taken before KRISTIN C. BRAJKOVICH, a Certified
17   Shorthand Reporter, CSR. No. 84-3810, of said
18   state, at Suite 2900, Three First National Plaza,
19   70 West Madison Street, Chicago, Illinois, on the
20   22nd day of March, A.D. 2018, at 9:08 a.m.
```

### Page 2

```
 1   PRESENT:
 2
 3       RAGAIN & COOK, PC,
 4       (3936 Avenue B, Suite A-2,
 5       Billings, Montana 59102,
 6       1-406-206-4831), by:
 7       MR. JAMES M. RAGAIN,
 8       jim@lawmontana.com,
 9          -and-
10       SULLIVAN MILLER LAW,
11       (3860 Avenue B, Suite C East,
12       Billings, Montana 59102,
13       1-406-403-7066), by:
14       MS. MICHELLE SULLIVAN,
15       michelle.sullivan@sullivanmiller.com,
16          appeared via video teleconference on
17          behalf of the Plaintiff;
```

### Page 3

```
 1   PRESENT (Continued):
 2       RILEY SAFER HOLMES & CANCILA LLP,
 3       (Three First National Plaza,
 4       70 West Madison Street,
 5       Chicago, Illinois 60602,
 6       1-312-471-8770), by:
 7       MR. THOMAS B. QUINN,
 8       tquinn@rshc-law.com,
 9       MS. SONDRA HEMERYCK,
10       shemeryck@rshc-law.com, and
11       MS. PATRICIA MATHY,
12       pmathy@rshc-law.com,
13          appeared on behalf of the Defendant.
14
15   ALSO PRESENT:
16
17       MR. CHARLES S. BIENER, PepsiCo, Inc., Senior
18   Counsel;
19       MS. ANA M. McCARRON, PepsiCo, Inc., Senior
20   Legal Specialist;
21       MR. MARIO MERCURIO, PepsiCo, Inc., Senior
22   Vice President, GM, Franchise Business Unit;
23       MR. DARRIN MORRIS, Director, Franchise
24   Development - Southeast Region;
```

### Page 4

```
 1   PRESENT (Continued):
 2
 3   ALSO PRESENT:
 4       MS. ELIZABETH VAN HOUTEN, Director, Franchise
 5   Development, Transshipping Mitigation.
 6       MR. DAVID LEHMAN, Legal Videographer.
23   REPORTED BY:  KRISTIN C. BRAJKOVICH,
24          CSR No. 84-3810.
```



Page 5

1  THE VIDEOGRAPHER: My name is David Lehman,
2  certified legal video specialist with Esquire
3  Solutions located at 20 North Clark Street,
4  Chicago, Illinois 60602. I'm the videographer on
5  March 22, 2018, for the recording of the deposition
6  of Jim Doyle being taken at 70 West Madison Street,
7  Chicago, Illinois at the time of 9:08 a.m. in the
8  matter of Northern Bottling Company, Inc., versus
9  PepsiCo Inc., Case No. 15 CV 00133.
10      Will counsel please identify themselves
11  for the record beginning with the plaintiff's
12  counsel.
13     MR. RAGAIN: My name is Jim Ragain. I'm in
14  Billings, Montana. I represent the plaintiffs, and
15  with me here today is Michelle Sullivan, my
16  co-counsel.
17     MS. HEMERYCK: Sondra Hemeryck on behalf of
18  Defendant, PepsiCo, Inc.
19     MR. QUINN: Thomas Quinn also on behalf of the
20  PepsiCo, Inc., and our colleague, Patricia Mathy.
21        (WHEREUPON, the witness was duly
22        sworn.)
23
24

Page 6

1        JIM DOYLE,
2  called as a witness herein, having been first duly
3  sworn, was examined and testified as follows:
4        EXAMINATION
5  BY MR. RAGAIN:
6   Q.   Good morning, Mr. Doyle.
7   A.   Good morning.
8   Q.   Can you hear me okay?
9   A.   It's fine, yes.
10  Q.   Okay. Could you state your name and
11  your position with PepsiCo for the record, please?
12  A.   Sure. My name is Jim Doyle, and I am
13  the senior director of commercial finance for the
14  North American nutrition business.
15  Q.   And what is the North American nutrition
16  business?
17  A.   It is the business that encompasses the
18  Quaker business unit, the Tropicana business unit,
19  as well as the Naked Juice business unit.
20  Q.   Thank you. And you have been proffered
21  by PepsiCo to testify today regarding negotiation
22  of all contracts/agreements entered into between
23  PepsiCo and Core-Mark; is that correct?
24  A.   That is correct.

Page 7

1   MS. HEMERYCK: Objection. Just to clarify,
2  there's a time frame limitation on that topic.
3   MR. RAGAIN: Yes. Thank you.
4  BY MR. RAGAIN:
5   Q.   January 2012 through December 2016?
6   A.   Yes.
7   Q.   Okay. So how many contracts are we
8  talking about?
9   A.   Over the course of the year, we are
10  talking about one contract per year.
11  Q.   So we have '12, '13, '14, '15 -- five of
12  them?
13  A.   Yes, that's correct.
14  Q.   Okay. And what are the dates of these
15  contracts?
16  A.   They would be for the full year 2012,
17  the full year 2013, the full year 2014, full year
18  2015, and full year 2016.
19  Q.   So do they run calendar year to calendar
20  year?
21  A.   They do, yes.
22  Q.   And when do you usually start your
23  negotiations for the following year?
24  A.   Typically, the negotiations would begin

Page 8

1  in the fall time frame of the previous year.
2   Q.   And who on the other side do you
3  negotiate with?
4   A.   Generally, it would be a buyer or a vice
5  president of marketing from the Core-Mark
6  organization.
7   Q.   And is that person typically located in
8  the San Francisco area?
9   A.   Yes, they are.
10  Q.   For example, this past -- well, for the
11  most recent one, 2016, what was the person's name
12  that you negotiated with?
13  A.   I believe it was Jon Bratta.
14  Q.   How about the year before that?
15  A.   I believe it would have been Jon Bratta
16  as well. There might be multiple -- there might be
17  multiple people from Core-Mark that we are speaking
18  to.
19  Q.   How long does the process usually take?
20  A.   It can vary from year to year.
21  Q.   From what to what?
22  A.   I don't know that there's a set time
23  frame per se. In many cases we'll start
24  negotiating in the early part of the fall, reaching



Page 9
1  an agreement in the late part of the year previous
2  to the next contract year.  In some cases it
3  stretches into the next contract year.
4      Q.   For the time period that we are talking
5  about, is the subject matter of the contracts for
6  each year all the same?
7      MS. HEMERYCK:  Objection, vague and ambiguous.
8  BY MR. RAGAIN:
9      Q.   Go ahead.
10     A.   I was going to say, could you clarify,
11  when you mean "the subject matter is all the same"?
12     Q.   Yeah.  I mean, are we talking about kind
13  of a standard contract for something, be it
14  distribution of certain products or whatever it is?
15  Are we talking about a contract that from year to
16  year is just renegotiated for certain terms but we
17  are talking about essentially the same contract, or
18  are we talking about unique agreements on different
19  subject matters?  I'm just trying to speed this up.
20     A.   I believe that the contracts year to
21  year would be fairly similar in scope of the QSDI
22  product portfolio as well as the terms of the
23  agreement between PepsiCo and between Core-Mark and
24  the terms of performance required from the

Page 10
1  distributor as well as, therefore, the engagement
2  from PepsiCo into that contract.
3      Q.   Okay.  So starting with the one for the
4  year January 2012 through December of 2012, what is
5  this contract about?
6      A.   So the contract would define the terms
7  for Core-Mark to purchase QSDI product from
8  PepsiCo.  Again, that would be across the
9  Tropicana, the Naked Juice, and the Quaker
10  portfolios as well as Gatorade protein recovery
11  shakes.  It would then specify rates to be paid to
12  Core-Mark by PepsiCo on a per case basis, and it
13  would spell out the legal terms and conditions of
14  the transaction between PepsiCo and Core-Mark.
15     Q.   What are QSDI products?
16     A.   Quaker -- it would be Tropicana
17  beverages, so chilled Tropicana orange juice
18  products as well as ambient Tropicana juice
19  products.  It would be Naked Juice smoothie
20  products as well as IZZE as well as Quaker food
21  products, cereals, hot cereals as well as cold
22  cereals, ready to eat, as well as Quaker snack
23  products, Quaker snack bars, and then Gatorade
24  recovery shakes, as I said.

Page 11
1      Q.   Did this contract contain any provisions
2  regarding the purchase and sale of CSDs?
3      A.   It did not.  The contract was between
4  QSDI and Core-Mark.
5      Q.   Okay.  Did any of the contracts during
6  this time period between PepsiCo, Inc., and
7  Core-Mark International have anything to do with
8  CSDs?
9      MS. HEMERYCK:  And just a point of
10  clarification.  Are you talking about contracts
11  entered into or just negotiated?
12     MR. RAGAIN:  Both.
13  BY THE WITNESS:
14     A.   Okay.  Yes.  We -- in 2015 and 2016 we
15  included language that would exclude diverting of
16  any PepsiCo product into the contracts for the
17  negotiation of the contracts.
18  BY MR. RAGAIN:
19     Q.   What did that language say?
20     A.   It said -- and I'm trying to recall
21  exactly, but it said that the contract explicitly
22  precluded diverting of any PepsiCo product either
23  inbound or outbound.
24     Q.   And what does "diverting" mean?

Page 12
1      A.   Diverting would be to the procurement of
2  PepsiCo product directly from PepsiCo for
3  distribution and sale in a channel not authorized
4  by PepsiCo.
5      MS. HEMERYCK:  Sorry.  Could you read that
6  back?
7          (WHEREUPON, the record was read by
8           the reporter.)
9  BY MR. RAGAIN:
10     Q.   Why did you insert that language into
11  your contract with Core-Mark for 2015 and 2016?
12     A.   We inserted the language into the
13  contract.  We were aware of the discussions ongoing
14  with Northern Bottling with regards to
15  transshipment into their territory.  We were aware
16  of the fact that Core-Mark was bringing that
17  product into the territory, and as a result, we
18  added the wording into the contract.
19     Q.   What other language in that -- in those
20  two contracts related to transshipping or
21  diverting?
22     A.   There would not have been other language
23  in the contract related to it.
24     Q.   Was there any type of penalty or



Page 13
1  anything put in either of these contracts with
2  respect to diverting or transshipping?
3      A.   There was language in the contract.
4  And, again, I'm not a lawyer, so I can't speak to
5  the legalese of it.  But there was language in the
6  contract that said not necessarily a penalty if
7  this would happen but something that would say,
8  PepsiCo could take certain actions if diverting of
9  QSDI was or PepsiCo product was found to be in the
10 marketplace.
11     Q.   Okay.  Are carbonated soft drinks QSDI
12 products?
13     A.   They are not, no.
14     Q.   So did this language have to do with
15 carbonated soft drinks or QSDI products?
16     A.   When the language was added into -- in
17 the latter years that we discussed, it was for any
18 PepsiCo product.
19     Q.   And what were the -- per the contract,
20 what were the ramifications if PepsiCo learned that
21 CSDs were being diverted by Core-Mark?
22     A.   So I don't think it culled out
23 specifically that if we learned that CSDs were
24 being diverted by Core-Mark, but if we learned that

Page 14
1  any PepsiCo product was being diverted, we could
2  take such actions such as withholding trade
3  payments, stopping to ship product to Core-Mark,
4  and cancelling the contract itself.
5      MR. RAGAIN:  Why don't you give me a minute,
6  Tom, or I'm sorry --
7      MS. HEMERYCK:  Sondra.
8      MR. RAGAIN:  -- Sondra.  Sorry about that.  I
9  might be done.
10     MS. HEMERYCK:  Okay.  Let's go off the record.
11     THE VIDEOGRAPHER:  We are off the record.  The
12 time is 9:22 a.m.
13        (WHEREUPON, a recess was had.)
14     MR. RAGAIN:  We are back on the record.  The
15 time is 9:24 a.m.
16 BY MR. RAGAIN:
17     Q.   Mr. Doyle, could you tell me what -- you
18 mentioned the Northern Bottling situation whenever
19 I asked you why this language was put into the 2015
20 and 2016 contracts with Core-Mark.  Was that the
21 only reason?
22     A.   It was the -- yes, I would say it was
23 the only reason.  Well, not the only reason.  I
24 mean, it was the compelling reason that we put it

Page 15
1  in for that particular situation but then the
2  broader implications across the business.
3      Q.   And what would those be?
4      A.   Just the -- I think the notion of if
5  this is happening in one territory, it could be
6  happening in many territories, so we wanted to
7  enter the language into the contract for all
8  territories.
9      MR. RAGAIN:  Okay.  Thank you.  That is all I
10 have.
11     MS. HEMERYCK:  Thanks, Jim.  I have just a few
12 questions to clarify a few things.
13           EXAMINATION
14 BY MS. HEMERYCK:
15     Q.   So, Mr. Doyle, I think you identified --
16 you talked about five years of contracts, 2012,
17 2013, 2014, 2015, 2016; is that right?
18     A.   That's correct.
19     Q.   Okay.  So can you tell us -- tell the
20 jury in which of those years was there an actual
21 signed contract between Core-Mark and PepsiCo?
22     A.   There was a signed contract in 2012,
23 2013, and 2014.
24     Q.   So was there a signed contract in 2015?

Page 16
1      A.   There was not.
2      Q.   Was there a signed contract in 2016?
3      A.   There was not.
4      Q.   And you also talked about language that
5  PepsiCo wanted to insert in the agreement that
6  would have prohibited diverting of any PepsiCo
7  product, and I think you at least suggested that
8  might have been in the 2015 contract.
9       What year, in fact, did PepsiCo seek to
10 introduce that language into its agreement with
11 Core-Mark?
12     A.   We put that language specifically into
13 the 2016 contract.
14     Q.   So was it in the 2015 contract?
15     A.   It was not.
16     Q.   It was not.  And when you proposed that
17 language for the 2016 contract with Core-Mark, did
18 Core-Mark accept it?
19     A.   They did not.
20     MS. HEMERYCK:  No further questions.
21         FURTHER EXAMINATION
22 BY MR. RAGAIN:
23     Q.   And just to clarify, my request for
24 someone to testify was for contracts entered into



Page 17
1  between Core-Mark and PepsiCo, so I apologize for
2  the -- not asking you about ones that weren't
3  entered into.  But now that the topic has been
4  broached, what was the reason, to your knowledge,
5  why Core-Mark did not enter into the 2016 contract?
6      MS. HEMERYCK:  Objection, calls for
7  speculation.
8  BY MR. RAGAIN:
9      Q.   Go ahead.
10     A.   So can you clarify exactly?
11     Q.   Do you know why Core-Mark did not enter
12 into the 2016 contract?
13     MS. HEMERYCK:  Same objection.
14 BY THE WITNESS:
15     A.   I don't -- I can't speak on behalf of
16 Core-Mark.  I can tell you what they told us, but I
17 can't speak on behalf of Core-Mark.
18 BY MR. RAGAIN:
19     Q.   That's fine.  What did they tell you?
20     A.   They told us they were not willing to
21 sign that language, and they weren't -- they
22 weren't able to sign it with that language, and
23 that was not something that they were willing to
24 enter into with us.

Page 18
1      Q.   So how about -- have you been operating
2  without a contract then since that time with
3  Core-Mark?
4      A.   We have been operating without the
5  contracts, yes.
6      MR. RAGAIN:  That is all I have.  Thank you.
7      MS. HEMERYCK:  Take just a quick break to make
8  sure we are good.
9          (WHEREUPON, there was a short
10            interruption.)
11     MS. HEMERYCK:  No further questions.
12     THE VIDEOGRAPHER:  This marks the end of
13 today's deposition.  The time is 9:20- --
14     MR. RAGAIN:  I'm sorry.
15     MR. QUINN:  We are going to go to another
16 topic.
17     THE VIDEOGRAPHER:  I'm sorry?
18     MR. QUINN:  We have another witness.
19     THE VIDEOGRAPHER:  I have to close this one
20 out.  This marks the end of today's deposition.
21 The time is 9:30 a.m.  We are now off the record.
22     THE REPORTER:  Signature?
23     MR. QUINN:  Yes, we'll want to.
24          FURTHER DEPONENT SAITH NOT.

Page 19
1  STATE OF ILLINOIS )
2                    ) SS:
3  COUNTY OF C O O K )
4        I, KRISTIN C. BRAJKOVICH, a Certified
5  Shorthand Reporter of said state, do hereby
6  certify:
7        That previous to the commencement of the
8  examination of the witness, the witness was duly
9  sworn to testify the whole truth concerning the
10 matters herein;
11       That the foregoing deposition transcript
12 was reported stenographically by me,
13 was thereafter reduced to typewriting under my
14 personal direction and constitutes a true record
15 of the testimony given and the proceedings had;
16       That the said deposition was taken
17 before me at the time and place specified;
18       That I am not a relative or employee
19 or attorney or counsel, nor a relative or
20 employee of such attorney or counsel for any of
21 the parties hereto, nor interested directly or
22 indirectly in the outcome of this action.
23       IN WITNESS WHEREOF, I do hereunto set my
24 hand and affix my seal of office at Chicago,

Page 20
1  Illinois, this 3rd day of April, 2018.



          C.S.R. Certificate No. 84-3810.

Page 21

```
 1              I N D E X
 2   WITNESS                        EXAMINATION
 3   JIM DOYLE
 4        By Mr. Ragain              5, 15
 5        By Ms. Hemeryck             14
 6
 7
 8              E X H I B I T S
 9   NUMBER                               PAGE
10   NONE.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 22

```
 1         DEPOSITION ERRATA SHEET
 2
 3   Our Assignment No. J0595213
 4   Case Caption:  Northern Bottling Co., Inc., vs.
 5                  PepsiCo, Inc.
 6
 7      DECLARATION UNDER PENALTY OF PERJURY
 8
 9          I declare under penalty of perjury that
10   I have read the entire transcript of my deposition
11   taken in the captioned matter or the same has been
12   read to me, and the same is true and accurate, save
13   and except for changes and/or corrections, if any,
14   as indicated by me on the DEPOSITION ERRATA SHEET
15   hereof, with the understanding that I offer these
16   changes as if still under oath.
17
18      Signed on the _____ day of
19   _____, 20_____.
20
21
22
23   _____
24         JIM DOYLE
```

Page 23

```
 1         DEPOSITION ERRATA SHEET
 2
 3   Page No. _____Line No._____Change To:_____
 4   Reason for Change:_____
 5   Page No. _____Line No._____Change To:_____
 6   Reason for Change:_____
 7   Page No. _____Line No._____Change To:_____
 8   Reason for Change:_____
 9   Page No. _____Line No._____Change To:_____
10   Reason for Change:_____
11   Page No. _____Line No._____Change To:_____
12   Reason for Change:_____
13   Page No. _____Line No._____Change To:_____
14   Reason for Change:_____
15   Page No. _____Line No._____Change To:_____
16   Reason for Change:_____
17   Page No. _____Line No._____Change To:_____
18   Reason for Change:_____
19   Page No. _____Line No._____Change To:_____
20   Reason for Change:_____
21   Page No. _____Line No._____Change To:_____
22   Reason for Change:_____
23   SIGNATURE:_____DATE:_____
24         JIM DOYLE
```

Page 24

```
 1         DEPOSITION ERRATA SHEET
 2
 3   Page No. _____Line No._____Change To:_____
 4   Reason for Change:_____
 5   Page No. _____Line No._____Change To:_____
 6   Reason for Change:_____
 7   Page No. _____Line No._____Change To:_____
 8   Reason for Change:_____
 9   Page No. _____Line No._____Change To:_____
10   Reason for Change:_____
11   Page No. _____Line No._____Change To:_____
12   Reason for Change:_____
13   Page No. _____Line No._____Change To:_____
14   Reason for Change:_____
15   Page No. _____Line No._____Change To:_____
16   Reason for Change:_____
17   Page No. _____Line No._____Change To:_____
18   Reason for Change:_____
19   Page No. _____Line No._____Change To:_____
20   Reason for Change:_____
21   Page No. _____Line No._____Change To:_____
22   Reason for Change:_____
23   SIGNATURE:_____DATE:_____
24         JIM DOYLE
```



```
 1                DEPOSITION ERRATA SHEET
 2
 3    Our Assignment No. J0595213
 4    Case Caption:  Northern Bottling Co., Inc., vs.
 5                   PepsiCo, Inc.
 6
 7           DECLARATION UNDER PENALTY OF PERJURY
 8
 9              I declare under penalty of perjury that
10    I have read the entire transcript of my deposition
11    taken in the captioned matter or the same has been
12    read to me, and the same is true and accurate, save
13    and except for changes and/or corrections, if any,
14    as indicated by me on the DEPOSITION ERRATA SHEET
15    hereof, with the understanding that I offer these
16    changes as if still under oath.
17
18         Signed on the   21st    day of
19        May         , 20 18  .
20
21
22
23    
24        JIM DOYLE
```