Exhibit 14

**Page 1**

```
 1              IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF NORTH DAKOTA
 3                     NORTHWESTERN DIVISION
 4
 5   NORTHERN BOTTLING CO., INC., )
 6             Plaintiff,        )
 7        vs.                    ) No. 4:150-cv-133
 8   PEPSICO, INC.,              )
 9             Defendant.        )
10
11             The videotaped 30(b)(6) deposition of
12   PEPSICO, INC., by MARIO MERCURIO, called for
13   examination, taken pursuant to the Federal Rules of
14   Civil Procedure of the United States District
15   Courts pertaining to the taking of depositions,
16   taken before KRISTIN C. BRAJKOVICH, a Certified
17   Shorthand Reporter, CSR. No. 84-3810, of said
18   state, at Suite 2900, Three First National Plaza,
19   70 West Madison Street, Chicago, Illinois, on the
20   22nd day of March, A.D. 2018, at 11:36 a.m.
21
22
23
24
```

**Page 2**

```
 1   PRESENT:
 2
 3        RAGAIN & COOK, PC,
 4        (3936 Avenue B, Suite A-2,
 5        Billings, Montana 59102,
 6        1-406-206-4831), by:
 7        MR. JAMES M. RAGAIN,
 8        jim@lawmontana.com,
 9           -and-
10        SULLIVAN MILLER LAW,
11        (3860 Avenue B, Suite C East,
12        Billings, Montana 59102,
13        1-406-403-7066), by:
14        MS. MICHELLE SULLIVAN,
15        michelle.sullivan@sullivanmiller.com,
16             appeared via video teleconference on
17             behalf of the Plaintiff;
18
19
20
21
22
23
24
```

**Page 3**

```
 1   PRESENT (Continued):
 2        RILEY SAFER HOLMES & CANCILA LLP,
 3        (Three First National Plaza,
 4        70 West Madison Street,
 5        Chicago, Illinois 60602,
 6        1-312-471-8770), by:
 7        MR. THOMAS B. QUINN,
 8        tquinn@rshc-law.com, and
 9        MS. PATRICIA MATHY,
10        pmathy@rshc-law.com,
11             appeared on behalf of the Defendant.
12
13   ALSO PRESENT:
14        MR. CHARLES S. BIENER, PepsiCo, Inc., Senior
15   Counsel;
16        MS. ANA M. McCARRON, PepsiCo, Inc., Senior
17   Legal Specialist;
18        MR. DARRIN MORRIS, Director, Franchise
19   Development - Southeast Region;
20        MS. ELIZABETH VAN HOUTEN, Director, Franchise
21   Development, Transshipping Mitigation;
22        MR. DAVID LEHMAN, Legal Videographer.
23
24   REPORTED BY:  KRISTIN C. BRAJKOVICH, No. 84-3810.
```

**Page 4**

```
 1        THE VIDEOGRAPHER:  I'm the videographer on
 2   March 22, 2018, for the recording of the deposition
 3   of Mario Mercurio at the time of 11:36 a.m.  Will
 4   the reporter please swear in the witness.
 5             (WHEREUPON, the witness was duly
 6             sworn.)
 7             MARIO MERCURIO,
 8   called as a witness herein, having been first duly
 9   sworn, was examined and testified as follows:
10             EXAMINATION
11   BY MR. RAGAIN:
12        Q.   Good morning, Mr. Mercurio.  Could you
13   state your name and your business address, please?
14        A.   So my name is Mario Mercurio.  I'm the
15   senior vice president, general manager for the
16   franchise business units.  My address is
17   1111 Westchester Avenue, White Plains, New York.
18        Q.   And you have been proffered as a company
19   witness with respect to the second topic in the
20   deposition notice set for today?
21        A.   That's correct.
22        Q.   And what is it that you have been asked
23   to testify about?
24        A.   Well, I just want to talk to you about,
```



Page 5

1   you know, our relationship with the bottlers and
2   how we do implement the transshipment policy.  It's
3   a very important program, so I'll chat with you a
4   little bit about that.  I would like to chat with
5   you a little bit about -- you know, at a higher
6   level how we work with our bottlers.
7          We have something called Blue System
8   Council, where we have -- we meet quarterly.  It's
9   about 14 bottlers that participate on that
10  committee.  It's a great council to articulate some
11  of the issues in the system and then how do we
12  together as one blue system work together on
13  solving those problems.
14     Q.   Okay.  Go ahead.
15          MR. QUINN:  Well, could we have a question
16  that focuses on a particular item?  I'll just
17  object, but that's -- you can answer.
18  BY THE WITNESS:
19     A.   So, Jim, one -- may I call you Jim?
20  BY MR. RAGAIN:
21     Q.   Oh, yeah, absolutely.  We know each
22  other from prior dealings.
23     A.   Yeah, it's been a long time.  I think it
24  was February of 2016 when we were in Minot

Page 6

1   together.
2          So, you know, one of the things that is
3   very important to the system is that, you know, we
4   go to market as one unified system because,
5   obviously, customers don't really appreciate when
6   we call on them and have, you know, different
7   variations of how we go to market.
8          So one of the things that we created
9   about three years ago was this thing called Blue
10  System Council.  There's usually 13 company
11  employees that come to this meeting.  There are
12  always 12 bottlers that come to this meeting.
13  There's large bottlers, small bottlers.  And one of
14  the reasons why we created this council was that,
15  we have to work closer, we have to work in unison
16  on issues that are in the marketplace, so that is
17  one of the things that we have established and
18  implemented about three years ago.
19     Q.   Is Northern Bottling on that?
20     A.   No, they are not.
21     Q.   How were the people selected that are on
22  the blue -- Blue System Council, is that what it is
23  called?
24     A.   That's correct.  So, you know, in the

Page 7

1   system there's two associations, there's the IBA,
2   Independent Bottler Association, and there's the
3   PCBA, the PepsiCo Bottler Association.  We worked
4   directly with both of the leads of those
5   associations and created the roster for who would
6   participate on those -- who would participate in
7   those meetings.  By the way, the two association
8   directors also participate in those meetings.
9      Q.   Is Northern Bottling welcome to come to
10  these meetings when they happen?
11     A.   What we do, Jim, we -- it's very
12  important for us to have continuity of bottlers and
13  to have a mix and match of bottlers coming in
14  because then you don't really -- you are not really
15  entrenched in the subject matter, if you come in
16  and out at different times, so, no, we do not.  But
17  what we do is, we have terms in our governance
18  where there is eight bottlers that participate all
19  of the time, and then after a two-year term, other
20  bottlers can participate on the Blue System
21  Council.  So some people will come off of that
22  council, some people will go on the council.
23          The other important thing that I would
24  like to add with you is that, we do a very -- a

Page 8

1   very nice job providing minutes of all of those
2   meetings, so it's not like the independent, smaller
3   bottlers are not seeing what goes on in those
4   meetings.
5      Q.   And with respect to -- I mean, is
6   transshipment one of things that the Blue System
7   Council is presently discussing?
8      A.   Yes.
9      Q.   And what are you trying to accomplish?
10     A.   So working with the bottlers, it's just
11  very -- it's a very important topic for us because,
12  obviously, it causes a lot of friction within the
13  system.  So, again, it's very important to me, it's
14  very important to PepsiCo.  So there's been a lot
15  of discussion about changing the process for how we
16  implement the transshipment program, and it's a
17  great opportunity to you, know, listen to the
18  bottlers and hear their concerns and see how we
19  could do things possibly a little bit differently.
20     Q.   Like what?
21     A.   Taking the fines up.
22     Q.   Taking the fines up?
23     A.   Yes.
24     Q.   Okay.  To what?  What has been



Page 9

1  suggested?

2      A.   So what I want to talk to you about,

3  it's been suggested, this is not done yet because

4  we are still discussing this with the bottlers.

5  But, once again, at the last BSC meeting, which was

6  just recently last week in Utah -- i was not at

7  that meeting.  As you know, for the record, I'm

8  retiring, so my replacement was there.  But he's --

9  we are moving forward on taking the 20-ounce fines

10  from $11 up to $17.

11     Q.   I'm not sure what to ask you,

12  Mr. Mercurio, because you have been offered to

13  testify as to Topic No. 2.  Do you have any

14  knowledge of any policies, procedures, rules,

15  regulations, plans, and actions promulgated and/or

16  implemented by PepsiCo, Inc., for the purpose of

17  preventing transshipment into the territories of

18  independent bottlers outside of the northeastern

19  United States?

20     A.   Well, I would tell you that as Darrin

21  spoke, you know, we have made an investment in

22  improving our pallet tracing.  We put that in

23  place.  That was about a $300,000 investment.  We

24  also enabled bottlers -- again, coming out of the

Page 10

1  Blue System Council, some of the feedback was the

2  claims took too long to process.  We enabled that.

3  That cost another $110,000 into the system.  We cut

4  off source transship of product from Vistar,

5  Culinary Ventures, and please keep in mind that we

6  work very closely with our regional vice presidents

7  in the field to do that.  Just those two customers

8  in the southeast, that was about a $4.5 million

9  loss to PBC.

10         Also in the Midwest, I know Liz spoke a

11  little bit about it, but there's a number of

12  customers in the Midwest that we reduced programs,

13  we stopped sales, we increased price.  That was a

14  $2 million hit to the Midwest region, and basically

15  on how we are going about it and cutting off more

16  customers, there's about a $6 million headwind in

17  2018.  We revised the PBC employee transshipment

18  policy.  We had each employee at each different

19  function go through that new policy.  They had to

20  sign off on that new policy.

21         And we also, as Jim spoke about this

22  morning, included, you know, Tropicana and Quaker

23  distributors, new language that prevents them from

24  transshipping or diverting product into different

Page 11

1  areas.

2      Q.   Have you made Northern Bottling aware of

3  all of these items?

4      A.   Well, through the Blue System Council

5  and through the minutes, he's very aware of it

6  because the minutes are very well written, they are

7  done two weeks after each meeting, and they are

8  circulated to the entire bottling system.  So, yes,

9  he is aware.

10     Q.   So he's going to know the details of

11  each of the items that you just listed off.  I

12  don't have to go over them with you on the record

13  today?

14     A.   Yes, he should.

15     Q.   Okay.  Thanks.  Anything else?

16     A.   No.  I would just say the other thing

17  that is a little frustrating for me and I think for

18  the team here is that I'm very disappointed that

19  the bottler in Minot, North Dakota, did not go on

20  the offensive.  We put in place an unbelievable

21  program to help him.  As you know, I flew out there

22  personally because I feel I have an obligation to

23  do that bottler to try to help and solve this

24  thing.

Page 12

1          I didn't even get the courtesy of going

2  out to the stores to have that group go out into

3  the stores with me.  And I went out to Enerbase, I

4  went out to Envision, I talked to the store

5  managers, and actually even when I read the

6  deposition, the thing that was really troubling to

7  me, the customer deposition was, it wasn't about

8  price.  It was about the way in which the bottler

9  went after this account.  And, quite frankly, they

10  were quite arrogant on how they handled that, and

11  as a result of that, we lost all of that business.

12         And what Langer basically said to me

13  when I was in the meeting with him, he basically

14  said, Well, we have lost customer in the past.

15  We'll just take our time and they'll come back.

16         Well, here we are.  You know, some of

17  them came back but some of them didn't come back,

18  and it's just a little disappointing.  I have other

19  bottlers that do not give diverters or anybody else

20  a chance of selling product into their marketplace,

21  not one little inch, and I feel that in Minot, they

22  did not do that, and we are in the situation that

23  we are in.

24     Q.   And -- okay.  Anything else?  And



Page 13

1  legitimately, I want to hear about it.
2      A.    No.  I just -- again, I would say that
3  we take transshipment very seriously.  Again, if --
4  you know, it's very important because, again, it
5  has a -- you have to work with the bottlers.  We do
6  consider them our business partners, and in order
7  to get alignment, we have to make sure that we do
8  the right thing on that front, and that is what we
9  are doing.
10     MR. RAGAIN:  That's all I have, Tom.
11     MR. QUINN:  Okay.  Let me just ask one or two
12  follow-up questions.
13            EXAMINATION
14  BY MR. QUINN:
15     Q.    On this issue of customer relations and
16  the role that a bottler, such as Northern's,
17  relations with its customer, plays in transshipping
18  occurring and then in mitigating transshipping,
19  could you tell us in a little more detail what it
20  is that can cause a customer to actually kick a
21  Pepsi bottler like Northern out of its stores.
22     A.    Yeah.  Let me just -- I'll just talk
23  Northern specifically.  So Northern is a high share
24  bottler.  Northern has a very aggressive CDA,

Page 14

1  customer distribution agreement.  Northern was
2  asking for the moon, and, quite frankly, the
3  customer had enough of it.  It doesn't say Northern
4  Bottling Beverages on the front of those stores,
5  and as a result of that, you have got to be
6  flexible in terms of what you can provide to that
7  customer.
8         And we see that from a local standpoint
9  and we see it from a national standpoint, and you
10  have to be flexible, you have to listen, and you
11  have to be selective on how you can get things done
12  with those customers.
13     Q.    Did you have a chance to read the
14  depositions of the general manager of Enerbase and
15  the general manager of Envision, and the --
16     A.    I did.
17     Q.    -- general manager of the Devils Lake
18  stores?
19     A.    I did.
20     Q.    And in reading those, did you form any
21  views regarding the rationale or the reasons why
22  those general managers actually kicked Northern out
23  of the stores?
24     A.    Yeah, I think it was -- again, I think

Page 15

1  Northern wasn't listening.  I don't think that
2  Northern was flexible, and I think the customer
3  just had enough.  And they -- and they went to any
4  means -- and reading the deposition, Core-Mark
5  said, Look, we did not approach the customer.  The
6  customer approached us because it's not a high
7  margin item for us and it's not something that we
8  really want to carry on our trucks.
9         And the other problem was, I went out
10  into the stores personally, there was a limited --
11  the distribution was limited, so there was some
12  Mountain Dew, there was some Pepsi.  Some stores
13  had Diet Pepsi, some stores didn't have Diet Pepsi,
14  so these customers really wanted Langer to come
15  back in and service his stores.  But,
16  unfortunately, couldn't come to terms with how they
17  could make that CDA work in that case.
18     Q.    Now, you also mentioned in your
19  testimony about the need to go on offense.  Has
20  PepsiCo from time to time, whether it's Northern or
21  otherwise, also attempted to help bottlers
22  recapture accounts that may have kicked them out
23  because of issues like the ones that you just
24  testified about?

Page 16

1      A.    Absolutely.  You know, PBC is faced with
2  some of the same issues, and they become flexible
3  and try to make it work.  You know, I worked in a
4  high share market in Michigan, and, you know, it
5  was important for us to align with the customer in
6  order -- so both sides would have a successful
7  outcome at the end of the year.  That is the way
8  that we did it, and it worked very, very well.
9         I will tell you that I personally went
10  out to see Langer.  Larry Bowers was his franchise
11  manager.  We put together a very comprehensive
12  program, including media, including merchandising
13  that, you know, we could share with you, Jim.  I
14  don't know if you have seen it, but I could not
15  believe when Langer came back and said, No thank
16  you.  I mean, it was just very comprehensive.
17         So, yes, my role is to work with
18  bottlers to drive their sales, to drive PepsiCo's
19  sales, and to help them maneuver in their
20  marketplace.
21     Q.    So is going on offense a part of the
22  effort to prevent or to mitigate transshipment?
23     A.    Absolutely.  I think if we would have
24  implemented that program, I think we would have



1   had -- we would have been back in those stores.

2       Q.   One last question regarding this issue

3   of transshipment outside of the northeast, but for

4   the rest of the country, to kind of put it in

5   perspective if you can for us.

6           What percent, if you know, of case sales

7   in independent bottler territories are transshipped

8   cases?

9       A.   Less than 1 percent.  It's very, very

10  minimal, a very small amount.  And, again, I'll go

11  back to what happened in Minot was, the customer

12  was so -- so angry and the Minot bottler was just

13  so arrogant, that it just never worked, and they

14  found a way to go find that product.

15      MR. QUINN:  No further questions.

16          FURTHER EXAMINATION

17  BY MR. RAGAIN:

18      Q.   Mr. Mercurio, what did Mr. Gokey -- when

19  you said that you were flabbergasted or something

20  about that he turned down this marketing program --

21      A.   Uh-huh.

22      Q.   -- assistance?  What did he tell you?

23      A.   He just said, No thank you.  He said, I

24  have been in this situation before.  I don't really

1   want any help.  They'll come back.  I said, Really,

2   Langer?  I mean, it's a very comprehensive program.

3   Larry Bowers is an excellent franchise development

4   manager who works with Langer.  He's probably one

5   of the best franchise managers that I have out

6   there, and we both worked on the program.

7           So I'm not just a guy in New York

8   saying, Okay, this is what is going to work in

9   Minot, North Dakota.  Larry put it together and did

10  a really nice job of that, so we went to Langer and

11  his team, which is -- I guess at the time was Bruce

12  and Todd, and they just said, No thank you.

13  They'll come back.  I was just like, Okay.

14      Q.   That is all they said, they'll come

15  back?

16      A.   Langer said, I have had this issue

17  before, when I have been thrown out of accounts,

18  and they will come back.  I'm not going to give up

19  my shelf space.  And I said, Well, I'm not

20  recommending you give up your shelf space, but you

21  are going to have to be flexible on something in

22  order to get this going.  And then over time,

23  hopefully you can get back to where you were.

24      MR. RAGAIN:  Okay.  Thank you.

1       THE WITNESS:  Thank you.

2       MR. QUINN:  No further questions.

3       THE VIDEOGRAPHER:  This marks the end of

4   today's deposition.  The time is 11:54 a.m.  We are

5   now off the record.

6       THE REPORTER:  And all of these are reserved

7   signature?

8       MR. QUINN:  Yes.

9           FURTHER DEPONENT SAITH NOT.

1   STATE OF ILLINOIS )

2                     ) SS:

3   COUNTY OF C O O K )

4           I, KRISTIN C. BRAJKOVICH, a Certified

5   Shorthand Reporter of said state, do hereby

6   certify:

7           That previous to the commencement of the

8   examination of the witness, the witness was duly

9   sworn to testify the whole truth concerning the

10  matters herein;

11          That the foregoing deposition transcript

12  was reported stenographically by me,

13  was thereafter reduced to typewriting under my

14  personal direction and constitutes a true record

15  of the testimony given and the proceedings had;

16          That the said deposition was taken

17  before me at the time and place specified;

18          That I am not a relative or employee

19  or attorney or counsel, nor a relative or

20  employee of such attorney or counsel for any of

21  the parties hereto, nor interested directly or

22  indirectly in the outcome of this action.

23          IN WITNESS WHEREOF, I do hereunto set my

24  hand and affix my seal of office at Chicago,

Page 21

1   Illinois, this 3rd day of April, 2018.

2

3

4

5

6

7           C.S.R. Certificate No. 84-3810.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 22

1                   I N D E X

2   WITNESS                        EXAMINATION

3   MARIO MERCURIO

4        By Mr. Ragain              4, 17

5        By Mr. Quinn               13

6

7

8

9              E X H I B I T S

10  NUMBER                            PAGE

11  NONE.

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 23

1               DEPOSITION ERRATA SHEET

2

3   Our Assignment No. J0595213

4   Case Caption:  Northern Bottling Co., Inc., vs.

5                  PepsiCo, Inc.

6

7        DECLARATION UNDER PENALTY OF PERJURY

8

9        I declare under penalty of perjury that

10  I have read the entire transcript of my deposition

11  taken in the captioned matter or the same has been

12  read to me, and the same is true and accurate, save

13  and except for changes  and/or corrections, if any,

14  as indicated by me on the DEPOSITION ERRATA SHEET

15  hereof, with the understanding that I offer these

16  changes as if still under oath.

17

18        Signed on the _____ day of

19  _____, 20_____.

20

21

22

23  _____

24        MARIO MERCURIO

Page 24

1               DEPOSITION ERRATA SHEET

2

3   Page No. _____Line No._____Change To:_____

4   Reason for Change:_____

5   Page No. _____Line No._____Change To:_____

6   Reason for Change:_____

7   Page No. _____Line No._____Change To:_____

8   Reason for Change:_____

9   Page No. _____Line No._____Change To:_____

10  Reason for Change:_____

11  Page No. _____Line No._____Change To:_____

12  Reason for Change:_____

13  Page No. _____Line No._____Change To:_____

14  Reason for Change:_____

15  Page No. _____Line No._____Change To:_____

16  Reason for Change:_____

17  Page No. _____Line No._____Change To:_____

18  Reason for Change:_____

19  Page No. _____Line No._____Change To:_____

20  Reason for Change:_____

21  Page No. _____Line No._____Change To:_____

22  Reason for Change:_____

23  SIGNATURE:_____DATE:_____

24        MARIO MERCURIO



PEPSICO INC
NORTHERN BOTTLING vs PEPSICO

March 22, 2018
25

Page 25

```
 1              DEPOSITION ERRATA SHEET

 2

 3      Page No. _____Line No._____Change To:_____

 4      Reason for Change:_____

 5      Page No. _____Line No._____Change To:_____

 6      Reason for Change:_____

 7      Page No. _____Line No._____Change To:_____

 8      Reason for Change:_____

 9      Page No. _____Line No._____Change To:_____

10      Reason for Change:_____

11      Page No. _____Line No._____Change To:_____

12      Reason for Change:_____

13      Page No. _____Line No._____Change To:_____

14      Reason for Change:_____

15      Page No. _____Line No._____Change To:_____

16      Reason for Change:_____

17      Page No. _____Line No._____Change To:_____

18      Reason for Change:_____

19      Page No. _____Line No._____Change To:_____

20      Reason for Change:_____

21      Page No. _____Line No._____Change To:_____

22      Reason for Change:_____

23      SIGNATURE:_____DATE:_____

24              MARIO MERCURIO
```



```
 1              DEPOSITION ERRATA SHEET

 2

 3    Our Assignment No. J0595213

 4    Case Caption:  Northern Bottling Co., Inc., vs.

 5                   PepsiCo, Inc.

 6

 7         DECLARATION UNDER PENALTY OF PERJURY

 8

 9              I declare under penalty of perjury that

10    I have read the entire transcript of my deposition

11    taken in the captioned matter or the same has been

12    read to me, and the same is true and accurate, save

13    and except for changes  and/or corrections, if any,

14    as indicated by me on the DEPOSITION ERRATA SHEET

15    hereof, with the understanding that I offer these

16    changes as if still under oath.

17

18         Signed on the ____10____ day of

19    April_____, 2018____.

20

21

22

23    _____

24         MARIO MERCURIO
```



ERRATA SHEET

CASE: NORTHERN BOTTLING VS. PEPSICO INC.

DATE: MARCH 22, 2018

WITNESS: MARIO MERCURIO

| PAGE | LINES | FROM | TO | REASON FOR CHANGE |
|------|-------|------|-----|-------------------|
| 10 | 22 | you know, Tropicana | you know, for Tropicana | mistranscription |
| 11 | 23 | do that bottler to try | do that for the bottler, to try | clarification |
| 12 | 14 | lost customer in | lost customers in | mistranscription |
| 15 | 16 | unfortunately couldn't | unfortunately they couldn't | clarification |