**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Northern Bottling Co., Inc., | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING DEFENDANT'S** |
| | ) | **MOTION FOR SUMMARY JUDGMENT** |
| vs. | ) | |
| | ) | |
| PepsiCo, Inc., | ) | Case No. 4:15-cv-133 |
| | ) | |
| Defendant. | ) | |

Before the Court is the Defendant's motion for summary judgment filed on October 19, 2018.
See Doc. No. 86. The Plaintiff filed a response in opposition to the motion on November 30, 2018.
See Doc. No. 95. The Defendant filed a reply on December 21, 2018. See Doc. No. 111. The Court
granted amici leave to brief the motion. See Doc. No. 106. Pepsi-Cola Bottlers' Association filed
an amicus brief in opposition to the motion on December 13, 2018. See Doc. No. 108. Independent
Bottlers' Association filed an amicus brief in opposition to the motion on December 14, 2018. See
Doc. No. 110. The Defendant filed a response to the amicus briefs on January 9, 2019. See Doc.
No. 114. For the reasons set forth below, the motion for summary judgment is granted.

I.      **BACKGROUND**

   A.    **The Parties and Their Contracts**

Northern Bottling Co., Inc. ("Northern") is an independent bottler operating out of Minot,
North Dakota. Northern sells beverage and snack products to more than 2000 customers in a variety
of channels, including convenience and gas outlets, in North Dakota and South Dakota. The
beverage products that Northern sells include PepsiCo carbonated soft drinks ("CSDs"), other

PepsiCo products such as Gatorade, and non-PepsiCo products, including Dr. Pepper, Klarbrunn Sparkling Water, brewed coffee, brewed tea, cappuccino, and slushies.

PepsiCo is a global food and beverage company. Among other things, PepsiCo distributes and sells PepsiCo CSDs through its own bottling subsidiary, Pepsi Beverages Company ("PBC"), as well as through independent bottlers, such as Northern. PBC accounts for approximately 75-80% of PepsiCo CSD sales in the United States, and independent bottlers account for the remaining 20-25% of such sales.

PepsiCo and Northern are parties to a series of agreements, called Exclusive Bottling Appointments ("EBA" or "EBAs"). See Doc. Nos. 1-1 and 88-5. Each EBA pertains to a certain PepsiCo CSD–specifically, Pepsi, Diet Pepsi, Mountain Dew, and Diet Mountain Dew—but are materially similar otherwise. Each EBA appoints Northern as PepsiCo's "exclusive bottler, to bottle and distribute" a specific PepsiCo CSD in a designated geographic territory (the "exclusivity provision"). Each EBA provides that PepsiCo will sell Northern its requirements of concentrate or syrup for a particular CSD product and protect the trademark for that product. The EBAs require Northern to produce and bottle the finished product from the concentrate or syrup, and then sell the product at its own price in its designated territory. Each EBA also provides a number of terms and conditions with which Northern must comply; however, those are not at issue here. Finally, each EBA provides it "shall be governed by and interpreted under the laws of the State of New York," that the EBA "expresses fully the [parties'] understanding," that "all prior understandings are hereby cancelled," and that "no future changes in the terms of this Appointment shall be valid, except when and if reduced to writing and signed by both" Northern and PepsiCo. Of significance is the undisputed fact that none of the EBAs mention transshipment of PepsiCo CSDs, nor impose an

obligation on PepsiCo to prevent transshipment of CSDs into Northern's exclusive territory by third parties.

PepsiCo first issued an EBA to Northern on November 14, 1955, for the designated territory of Wells, Sheridan, Pierce, McHenry, Bottineau, Renville, Ward, Burke, and Mountrail County in the State of North Dakota. <u>See</u> Doc. No. 1-1. The EBA provided in relevant part as follows:

1. That the Bottler will operate a thoroughly clean and sanitary bottling plant at Minot, North Dakota[.] The Bottler will at all times have available sufficient productive capacity at the plant or plants above listed or at other plants in the Territory approved by the Company to enable the Bottler to fully meet his obligations under this Appointment. It is recognized that under the foregoing it may be necessary from time to time for the Bottler to increase the present productive capacity of the plant or plants above listed, or to establish additional plants in the Territory.

The equipment of each plant shall contain such water treatment and other equipment as the Company may prescribe. The Bottler will maintain each plant at all times in good operating condition, and will comply with any and all local, City, County, State and Federal laws and regulations now in effect or which may hereafter be enacted pertaining to the operation of bottling plants, bottling, selling and handling of soft drinks.

2. That the Bottler will not bottle, distribute or sell, directly or indirectly, any other cola beverage or any other beverage with the name Cola and/or any beverage which could be confused with Pepsi-Cola.

. . . .

4. That the Company will sell to the Bottler, and the Bottler will purchase, at the Company's then price or prices therefor at the time of each sale, the Bottler's requirements of Pepsi-Cola concentrate or syrup for the bottling of Pepsi-Cola hereunder, payment for same to be made by the Bottler in advance of shipment; and all Pepsi-Cola concentrate or syrup so purchased will be used by the Bottler for the bottling of Pepsi-Cola in the Territory and for no other purpose.

. . . .

7. That the Bottler will sell the bottled Pepsi-Cola in the Territory at the Bottler's price per case plus the deposit charge for bottles and case. The Company may from time to time suggest to the Bottler the price per case to be charged by him and the deposit charge.

8. That the Bottler will push vigorously the sale of bottled Pepsi-Cola throughout the entire territory in the 12-oz. size bottle and in any other size bottle prescribed by the Company for the Territory. Without in any way limiting the Bottler's obligation under this Paragraph 8, the Bottler must fully meet and increase the demand for Pepsi-Cola throughout the Territory and secure full distribution up to the maximum sales potential therein through all distribution channels or outlets available to soft drinks, using any and all equipment reasonably necessary to secure such distribution; must service all accounts with frequency adequate to keep them at all times fully supplied with Pepsi-Cola; must use his own salesmen and trucks . . . in quantity adequate for all seasons; and must fully cooperate in and vigorously push the Company's cooperative advertising and sales promotion programs and campaigns for the Territory. In addition the Bottler will actively advertise, in all reasonable media including adequate point-of-purchase advertising, and vigorously engage in sales promotion of, bottled Pepsi-Cola throughout the Territory at his own cost and expense. The Bottler will carry Products Liability Insurance on his operation in such amounts as the Company may recommend. All advertising copy and media shall be subject to the Company's approval.

. . . .

19. That this Appointment expresses fully the understanding, and that all prior understandings are hereby cancelled, and no future changes in the terms of this Appointment shall be valid, except when and if reduced to writing and signed by both the Bottler and the Company, by legally authorized officials.

20. The failure by the Company to enforce at any time or for any period of time any one or more of the terms or conditions of this Appointment, shall not be a waiver of such terms or conditions or of the Company's right thereafter to enforce each and every term and condition of this Appointment.

21. That this Appointment and all its terms and conditions shall be governed by and interpreted under the laws of the State of New York.

See Doc. No. 1-1.


**B.      Transshipment and PepsiCo's Policies**

Northern alleges in its complaint that PepsiCo breached the EBAs' exclusivity provision by

failing to prevent "transshipping," *i.e.*, the sale of PepsiCo CSDs into Northern's exclusive territory

by third-party distributors. PepsiCo denies it has a duty to prevent third-party transshipment of

PepsiCo CSDs. PepsiCo alleges, however, that despite the absence of any contractual duty to do so, it created and implemented a program, the PepsiCo Transshipment Enforcement Program ("PTEP"), to deter transshipment and compensate injured bottlers. PepsiCo describes the PTEP in its brief:

> Under the PTEP, if a bottler discovers or suspects PepsiCo CSDs have been transshipped into its territory, it can report the transshipment to the PepsiCo Transshipment Department. PepsiCo then assigns an independent investigator to verify the presence of transshipped product in the bottler's territory. The appointed investigator visits the store location, checks the production codes that appear on the PepsiCo CSDs in the store, and identifies the quantity of the potentially transshipped PepsiCo CSDs.

> Once PepsiCo identifies the bottler who produced the transshipped product (based on the production codes), a fine is imposed and collected from this "source bottler." The fine amount—which is based on the number of transshipped cases discovered by the investigator—is paid to the bottler in whose territory the transshipped product was discovered. The source bottler is also required to pay the investigation costs. The fine and investigation costs are assessed whether or not the source bottler initiated, knew about, or condoned the transshipment; in other words, the penalty is imposed on a no fault/strict liability basis.

> The frequency with which an investigator visits a location suspected of selling transshipped product is determined by the bottler whose exclusive territory is being infringed. There are no limitations on the number of transshipment investigations a bottler may request. PepsiCo encourages bottlers to request that an investigator be dispatched with the same frequency at which a bottler services a customer account. As a result, a bottler such as Northern can choose to have an investigator check the stores to which it distributes Pepsi CSD products every week, or even multiple times per week, if it believes such frequency is necessary to detect the presence of transshipped product in its territory.

See Doc. No. 90, pp. 12-13 (citations omitted). Northern does not dispute this description. See Doc. No. 95, p. 13.

The PTEP applies to Pepsi Beverages Company (PBC), PepsiCo's bottling and sales subsidiary, just as it does to independent bottlers. As a result, PBC must pay fines to infringed independent bottlers when PBC is the source of transshipped product and it must also pay the cost of the independent investigators. To this end, PBC has also adopted policies to prevent

transshipping. Northern does not dispute PepsiCo's description of PBC's transshipment enforcement

policies, which PepsiCo states are as follows:

> To prevent and curtail transshipping, therefore, PBC put in place a series of internal policies and procedures beginning in 2010, which were updated in 2016. PBC's written transshipment policy (the "PBC Transshipment Policy") clearly states that PBC employees should not sell or distribute any PBC product outside of the intended PBC Territory for that product. The PBC Transshipment Policy also provides that any PBC employee found to have violated the Policy, whether directly or through retaliation against another employee who reports a violation, is subject to discipline up to and including termination of employment on the first offense.

> The PBC Transshipment Policy requires PBC employees to educate customers regarding PBC's territorial boundaries and the potential consequences to customers if they resell PBC products outside of the PBC Territory. To that end, PBC's customer agreements expressly prohibit PBC's customers from reselling PepsiCo CSD products to unauthorized accounts or to parties outside the territory of purchase.

> The PBC Transshipment Policy provides for a variety of actions that PBC may take if it discovers that a PBC customer is violating the provision restricting CSD resales outside the territory of purchase. For example, the Policy includes a three-step customer communication protocol, which provides recommended steps of increasing severity to follow when a customer is identified as a source of transshipped product. First, there is an initial notice to the customer advising it of transshipped product and discussing how to stop such sales. Second, if the notice does not curtail unauthorized sales, a customer meeting and remedial actions take place. The remedial actions can include placing a customer on "allocation" (i.e., reducing the quantity of PepsiCo CSDs the customer can purchase) and/or reducing the funding that the customer receives from PBC, thereby effectively raising the price of the product. Finally, if the remedial actions are unsuccessful, PBC can suspend or terminate sales of PepsiCo CSDs to the customer.

> It is very difficult to discover whether a PBC customer has sold product outside of the territory of purchase. As noted above, PepsiCo's PTEP group learns, through product code information reported by independent investigators, when a PBC bottling plant (or an independent bottler) is the source—i.e. the original manufacturer—of product found to be transshipped. If PBC is the source bottler, PBC attempts to determine, through its Lot Tracing Transshipment System ("LTTS"), the identity of the PBC customer purchasing the product that was ultimately transshipped into another bottler's territory. The LTTS system, however, can only identify the customer who purchased the transshipped CSD product from PBC if (i) the purchaser has purchased a full pallet of the product and (ii) all the

product codes on the pallet are properly sequential. As Darrin Morris, PepsiCo's former Director of Franchise Strategy responsible for administering the PTEP has testified, the LTTS system cannot trace approximately 40-60% of PBC's CSD sales to a particular PBC customer due to product commingling or purchases of less than full pallets.

Moreover, even in those instances where PBC can determine the identity of its customer that purchased a CSD product that was subsequently transshipped, PBC frequently cannot determine whether that customer properly sold the product within the designated territory (or not) because PBC's customers typically do not keep sales records, by PepsiCo product code, showing the identity of the parties to whom they subsequently sold the PepsiCo CSDs. As a result, there is no transparency in the chain of custody after PBC sells its CSDs to customers; indeed, PBC's customers typically deny selling product outside the designated territory when put on notice that a PepsiCo CSD product sold to them has been transshipped. PBC cannot simply disregard such customer denials because CSDs can be bought and sold in the open market several times before landing in the hands of the entity that actually transships the product.

As a result, PepsiCo and PBC must typically develop evidence—such as LTTS reports showing that a customer has repeatedly purchased material amounts of CSDs that are subsequently transshipped into another bottler's territory or evidence that a customer has actually sold product to a known diverter—before triggering the remedial measures provided for in PBC's customer agreements.

See Doc. No. 90, pp. 14-17 (citations omitted).

The number of transshipped cases of PepsiCo CSDs discovered in Northern's territory from January 1, 2008 through July 19, 2017 (by year) is as follows: 2008 – 715 cases; 2009 – 100 cases; 2010 – 91 cases; 2011 – 10 cases; 2012 – 56 cases; 2013 – 8 cases; 2014 – 30 cases; 2015 – 6,577 cases; 2016 – 5,085 cases; 2017 (through July 19, 2017) – 2,039 cases. See Doc. Nos. 60-1 and 111-1.

### C.     PepsiCo's Efforts to Prevent Transhipping into Northern's Territory

Between February 2015 and early 2017, four of Northern's customers—Enerbase, FUO Cenex Devil's Lake, Envision, and Cenex Harley's—stopped buying PepsiCo CSDs from Northern.

The parties disagree as to the reason these customers terminated their business relationships. Northern alleges it was due to PBC overselling PepsiCo CSDs in its own territories, in an attempt to improve its own revenues and, in turn, the revenues of PepsiCo, as the parent company. Northern states, "When PBC sells more product than its own territories can absorb, the excess product finds its way into the 'gray market,' and is moved by third parties from lower-cost PBC territories into higher-cost exclusive territories of the remaining independent bottlers, including Northern." See Doc. No. 95, p. 12. PepsiCo contends Northern's customers stopped buying from Northern because of their "dissatisfaction with Northern's service and business practices." See Doc. No. 90, p. 9.

After terminating their business relationships with Northern, Enerbase, FUO Cenex Devil's Lake, Envision, and Cenex Harley's each turned to an alternative source, Core-Mark International ("Core-Mark"), to supply them with PepsiCo CSDs. Core-Mark is a national distributor of a variety of products—including cigarettes, candy, snacks, fast food, dairy products and beverages—to convenience and other stores. Northern filed claims with PepsiCo pursuant to the PTEP requesting an investigation into Core-Mark's transshipping of PepsiCo CSDs to Enerbase, FUO Cenex Devil's Lake, Envision, and Cenex Harley's. PepsiCo investigated each complaint, ascertained the identity of the bottler whose product had been transshipped into Northern's territory, assessed and collected fines from each bottler, and credited those payments to Northern. PepsiCo also sent a letter to Core-Mark demanding that it cease and desist its unauthorized sale of PepsiCo CSDs to Northern's customers. Northern does not dispute that PepsiCo followed the PTEP with respect to each and every transshipment claim submitted by Northern.

Discovery in this case reveals that Core-Mark had obtained the PepsiCo CSD products that it sold to Northern's customers in the open market from brokers and diverters, not from PepsiCo or

PBC.  The PepsiCo CSDs at issue had been purchased and sold multiple times in the open market before reaching Core-Mark's hands.  PBC was able to identify three customers of its Midwest Region that had made material amounts of unauthorized sales of PepsiCo CSD products that ultimately ended up in Core-Mark's hands: Master Wholesale, Chicago Vending, and M&P Vending.  PBC then took specific steps to curtail further transshipment by those customers by suspending the sales of certain CSDs to Master Wholesale for several months and by cutting the sales of certain CSDs to Chicago Vending and M&P Vending by fifty percent.  These steps cost PBC millions of dollars in lost sales that otherwise would have occurred in authorized portions of PBC's territory.  Since those steps were taken, these entities have not shown up as possible sources of transshipped PepsiCo CSDs in Northern's territory.  Further, three of the four customers who stopped doing business with Northern—Enerbase, Envision, and Cenex Harley's—have now resumed purchasing PepsiCo CSDs from Northern.

In September 2015, Northern brought suit against PepsiCo, alleging breach of contract (Count One), tortious breach of implied covenant of good faith and fair dealing (Count Two), constructive fraud (Count Three), tortious interference with contract and economic advantage (Count Four), unfair competition and deceptive trade practices (Count Five), punitive damages (Count Six), and injunctive relief (Count Seven).  PepsiCo now moves for summary judgment on all claims.

II.     **STANDARD OF REVIEW**

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law.  Davison v. City of Minneapolis, Minn., 490 F.3d 648, 654

(8th Cir. 2007); see Fed. R. Civ. P. 56(a). Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party. Id. The purpose of summary judgment is to assess the evidence and determine if a trial is genuinely necessary. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The Court must inquire whether the evidence presents a sufficient disagreement to require the submission of the case to a jury or whether the evidence is so one-sided that one party must prevail as a matter of law. Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005). The moving party bears the responsibility of informing the court of the basis for the motion and identifying the portions of the record which demonstrate the absence of a genuine issue of material fact. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011). The non-moving party may not rely merely on allegations or denials in its own pleading; rather, its response must set out specific facts showing a genuine issue for trial. Id.; Fed. R. Civ. P. 56(c)(1). If the record taken as a whole and viewed in a light most favorable to the non-moving party could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial and summary judgment is appropriate. Matsushita, 475 U.S. at 587.


III.    **CHOICE OF LAW**

A.    **New York Law Governs Northern's Claim for Breach of Contract (Count One)**

Because this Court is sitting in diversity jurisdiction, North Dakota choice-of-law rules apply in this case. Chapman v. Hiland Partners GP Holdings, LLC, 862 F.3d 1103, 1108 (8th Cir. 2017).

Each EBA provides: "this Appointment and all of its terms and conditions shall be governed by and interpreted under the laws of the State of New York." North Dakota courts honor contractual choice-of-law provisions with respect to questions of interpretation or construction of a contract unless doing so would violate a fundamental public policy of North Dakota. Chapman, 862 F.3d at 1108; John T. Jones Constr. Co. v. Hoot Gen'l Const. Co., 613 F.3d 778, 782-83 (8th Cir. 2010). No such policy is implicated here, so New York law governs the interpretation and construction of the EBAs. The parties agree New York law governs the breach of contract claim.

### B. North Dakota Law Governs Northern's Tort Claims (Counts Two Through Five)

The Court's exercise of jurisdiction over this dispute is predicated upon the parties' diversity of citizenship. Consequently, to determine which substantive law applies, the Court must apply North Dakota's choice of laws rules. See Perkins v. Clark Equip. Co., 823 F.2d 207, 208 (8th Cir. 1987) ("In diversity of citizenship cases the district court must apply the choice of laws rules of the state in which it sits.").

In determining which state law applies, North Dakota courts employ the "significant contacts test." Id.; see Daley v. American States Preferred Ins. Co., 587 N.W.2d 159, 161 (N.D. 1998). "The significant contacts test authorizes a court to look at all of the significant factors which might logically influence it in deciding which law to apply and choose the law of the state that has the greatest contacts with the case." Daley, 587 N.W.2d at 161. The specific contacts to be considered in tort cases are:

> the place where the injury occurred; the place where the conduct causing the injury occurred; the domicile, nationality, residence, place of business, or place of incorporation of the parties; and the place where the relationship, if any, between the

parties is centered.

Id. at 162 n. 3.

As to the first contact, Northern alleges its injuries occurred in North Dakota. See Sura v. Nat'l Oilwell Varco, L.P., No. 1:15-cv-127, 2016 WL 4217766, at *4 (D.N.D. Apr. 6, 2016) (noting that "the location of the injury, while not the exclusive consideration, remains an important consideration in a choice of law analysis"). The other contacts do not overcome this first contact. The place where the conduct causing the injury occurred is unclear because, while the transhipped CSDs appeared in North Dakota, they originated from elsewhere. Further, Northern is located in North Dakota, while PepsiCo is incorporated in North Carolina and has its principal place of business in New York. Finally, the place where the relationship between the parties is centered is similarly unclear, as the parties' relationship is governed by the EBAs, which are subject to New York law; however, the essence of the parties' relationship is the distribution of CSDs in Northern's territory, which is primarily North Dakota. On balance, North Dakota's significant contacts test weighs in favor of applying North Dakota law to Northern's tort claims. The parties agree.


IV.    **LEGAL DISCUSSION**

    A.    **Breach of Contract**

Northern alleges PepsiCo breached the EBAs by failing to prevent the transshipment of PepsiCo CSDs into Northern's territory. Under New York law, to establish a claim for breach of contract a plaintiff must prove the following elements: (i) the existence of a contract; (ii) breach by the other party; and (iii) damages suffered as a result of the breach. RIJ Pharm. Corp. v. Ivax Pharm., Inc., 322 F. Supp. 2d 406, 412 (S.D.N.Y. 2004).

"[I]f 'a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence.'" Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co., 650 F. Supp. 2d 314, 323 (S.D.N.Y. 2009) ("CEPSA") (quoting Postlewaite v. McGraw-Hill, Inc., 411 F.3d 63, 67 (2d Cir. 2005)); see also Chapman v. N.Y. State Div. for Youth, 546 F.3d 230, 236 (2d Cir. 2008) ("the presence or absence of ambiguity is determined by looking within the four corners of the document, without reference to extrinsic evidence."). Whether an ambiguity exists in a contract is a threshold question of law for resolution by the trial court. Brass v. American Film Tech., Inc., 987 F.2d 142, 149 (2d Cir. 1993). "An ambiguity exists where the terms of a contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." British Int'l Ins. Co. Ltd. v. Seguros La Republica, S.A., 342 F.3d 78, 82 (2d Cir. 2003) (internal quotes omitted). Silence per se on a particular issue does not render a contract ambiguous. Jacobs v. Carsey–Werner Dist., Inc., No. 93 Civ. 6825, 1994 WL 116077, at *2 (S.D.N.Y. Mar. 30, 1994). Silence only creates an ambiguity where the contract is silent on issues necessary to construe the agreement's written provisions. Id.

### 1. **Absolute Obligation**

Each EBA appoints Northern as PepsiCo's "exclusive bottler, to bottle and distribute" a specific PepsiCo CSD in the designated territory. Northern and PepsiCo disagree as to meaning of this exclusivity provision. Northern contends the exclusivity provision obligates PepsiCo to prevent "transshipping," *i.e.*, the sale of PepsiCo CSDs into Northern's exclusive territory by third-party

distributors. PepsiCo denies it has a duty to prevent third-party transshipment of PepsiCo CSDs. The Court agrees with PepsiCo.

The EBAs expressly and unambiguously appoint Northern as PepsiCo's exclusive bottler to bottle and distribute PepsiCo CSDs within a designated territory. Thus, the EBAs prohibit PepsiCo from appointing another bottler to bottle and distribute PepsiCo CSDs within Northern's territory. However, it is undisputed that the EBAs are silent as to PepsiCo's duty to prevent transshipping by third parties. It is unlikely transshipment was ever contemplated by the parties at the time of the first EBA in November 1955. None of the EBAs mention transshipment of PepsiCo CSDs; and none of the contracts impose an affirmative duty or obligation on PepsiCo to prevent transshipment of CSDs into Northern's territory by third parties. Finding the EBAs unambiguous, the Court declines to read a duty to prevent transshipping by PepsiCo into the EBAs. See CEPSA, 650 F. Supp. 2d at 323 (finding a materially-similar EBA between PepsiCo and its exclusive bottler for certain parts of Peru did not "contain any express language" requiring PepsiCo to take affirmative steps "to prevent other bottlers and third-parties" from selling PepsiCo products in that territory, and declining "to read such obligations into the EBA."). In summary, the Court concludes as a matter of law that the Exclusive Bottling Appointments (EBAs) between Northern and PepsiCo are unambiguous and do not contain any express language which creates an affirmative duty to protect Northern's territory by preventing all transshipment of CSDs, directly or indirectly, in Northern's territory from any source. PepsiCo did not breach any duty allegedly owed to Northern when a third party purchased PepsiCo CSDs from brokers and dealers in the open market, and then turned around and sold those same products in Northern's territory without PepsiCo's authorization.

Going beyond the four corners of the contract, Northern relies on extrinsic evidence of the

parties' intent. First, Northern argues the parties' course of performance demonstrates PepsiCo had an obligation to prevent transshipping. Because the Court found the EBAs unambiguous, the Court need not review the parties' course of performance. Second, Northern argues that applying industry custom or "trade usage" to the exclusivity provision reveals PepsiCo's obligation to prevent transshipping. Although evidence of trade practice and custom may assist the court in determining whether a contract provision is ambiguous in the first instance, see Sompo Japan Ins. Co. of America v. Norfolk Southern Ry. Co., 762 F.3d 165, 180 (2d Cir. 2014), Northern fails to offer adequate evidence that an "exclusive bottler" had a unique or specialized meaning in the soft drink or bottling industry. See id.; see also British Int'l, 342 F.3d at 84 (noting trade usage must be "so well settled, so uniformly acted upon, and so long continued as to raise a fair presumption that it was known to both contracting parties and that they contracted in reference thereto.").

### 2. **Reasonable Steps**

Alternatively, Northern argues that under *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241 (10th Cir. 2005) ("Pittsburg Bottling"), PepsiCo has a duty to take reasonable steps to prevent transshipments by third-party distributors. In *Pittsburg Bottling*, an independent bottler of PepsiCo products sued PepsiCo and PepsiCo's subsidiary-anchor bottler, alleging among other claims that PepsiCo had breached its EBA for failing to enforce the PTEP against transshipment. The EBA in *Pittsburg Bottling* was materially-similar to the EBAs in this case, including the exclusivity provision. In reversing the district court's entry of summary judgment in favor of PepsiCo on the transshipment claim, the Tenth Circuit Court of Appeals held that PepsiCo "had a duty to take reasonable steps to prevent competing bottlers from encroaching on [the

independent bottler's] exclusive territory." Id. at 1259.  In reaching that conclusion, however, the Tenth Circuit relied on its finding that the Uniform Commercial Code ("UCC"), rather than New York common law, governed the EBA.  Id. at 1255 n. 7.  In particular, the Tenth Circuit held that, under the UCC, the court could consider the parties' post-contract conduct "[i]n analyzing the obligations and rights the [EBA's] exclusive dealings clause imposed."  Id. at 1258.  Thus, the *Pittsburg Bottling* Court did not analyze whether the contract was ambiguous and whether extrinsic evidence was admissible.

Under New York law, the test for determining whether a contract is governed by the common law or the UCC is whether the contract is "predominantly" one for the sale of goods or for the provision of services.  Alesayi Beverages Corp. v. Canada Dry Corp., 947 F. Supp. 658, 667 (S.D.N.Y. 1996).  If the provision of services or rendering of other performance predominates and is not merely incidental or collateral to the sale of goods, then the UCC does not apply.  Id.  PepsiCo contends the common law applies, and Northern does not dispute PepsiCo's contention.  The Court agrees with the parties and finds the EBAs at issue here are predominantly for the provision of services, which are not merely incidental or collateral to the sale of goods.  Accordingly, New York common law, not the UCC, governs the EBAs.  As discussed above, under New York common law, the Court finds the EBAs unambiguous.  The EBAs are silent on PepsiCo's duty to prevent transshipping, and the Court declines to read a duty to take reasonable steps to prevent transshipping by PepsiCo into the EBAs.

Even assuming a duty to take reasonable steps to prevent transhipping exists, the Court finds PepsiCo has not breached such a duty.  In *Pittsburg Bottling*, the Tenth Circuit noted that "evidence that PepsiCo failed to enforce the [PTEP], while simultaneously taking no other action to prevent

transshipment, would tend to prove that PepsiCo failed to perform its contractual obligations." 431 F.3d at 1259. Northern filed claims with PepsiCo pursuant to the PTEP requesting an investigation into Core-Mark's transshipping of PepsiCo CSDs to Enerbase, FUO Cenex Devil's Lake, Envision, and Cenex Harley's. PepsiCo investigated each complaint, ascertained the identity of the bottler whose product had been transshipped into Northern's territory, assessed and collected fines from each bottler, and credited those payments to Northern. PepsiCo also sent a letter to Core-Mark demanding that it cease and desist its unauthorized sale of PepsiCo CSDs to Northern's customers. Northern does not dispute that PepsiCo followed the PTEP with respect to each and every transshipment claim submitted by Northern. PBC also took specific steps to curtail further transshipment by suspending the sales of certain CSDs to its customer Master Wholesale for several months and by cutting the sales of certain CSDs to customers Chicago Vending and M&P Vending by fifty percent. These steps cost PBC millions of dollars in lost sales that otherwise would have occurred in authorized portions of PBC's territory. The record reveals that since those steps were taken, these entities have not shown up as possible sources of transshipped PepsiCo CSDs in Northern's territory. Thus, even if PepsiCo has a duty to take reasonable steps to prevent transhipping, the Court finds that no reasonable jury could find PepsiCo breached that duty based on the evidence in this record.

### B.   Implied Covenant of Good Faith and Fair Dealing

Northern alleges PepsiCo breached the implied covenant of good faith and fair dealing. Under New York law, every contract carries with it an implied duty of good faith and fair dealing. Dalton v. Educ. Testing Serv., 663 N.E.2d 289, 291 (N.Y. 1995). "This covenant embraces a pledge

that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." 511 West 232nd Owners Corp. v. Jennifer Realty Co., 773 N.E.2d 496, 500 (N.Y. 2002) (internal quotation omitted). "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." Dalton, 663 N.E.2d at 291. "Encompassed within the implied obligation of each promisor to exercise good faith are any promises which a reasonable person in the position of the promisee would be justified in understanding were included." Id. (internal quotation omitted). "The covenant is violated when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other of the right to receive the benefits under their agreement." Don King Prod., Inc. v. Douglas, 742 F.Supp. 741, 767 (S.D.N.Y. 1990). The covenant cannot be used to impose "obligations that were not explicitly part of the agreement . . . or to create, in essence, new, affirmative duties (such as a duty to stop third-party transshipping) that were not expressly set forth in the contract." CEPSA, 650 F. Supp. 2d at 324; see also Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P., 936 F. Supp. 2d 376, 409 (S.D.N.Y. 2013) ("The scope of potential liability is narrow; the covenant does not create new contractual rights or impose additional duties.").

The Court agrees with the reasoning in *CEPSA* that because the EBAs do not impose any affirmative duty on PepsiCo to prevent transhipping, any attempt to read such a duty into the EBAs would create "new, unbargained-for obligations that extend well past any implied duty of good faith and fair dealing." CEPSA, 650 F. Supp. 2d at 325. Further, for the reasons stated above, even if the implied covenant of good faith and fair dealing required PepsiCo to take reasonable steps to prevent transhipping, see Pittsburg Bottling, 431 F.3d at 1261-62, no reasonable jury could find PepsiCo

breached that duty based on the record before the Court.

### C.     Tort Claims

In its brief in opposition to the motion for summary judgment, Northern states "it is no longer pursuing its claims for tortious breach of the implied covenant of good faith and fair dealing [Count Two] (but it is still relying on the implied covenant for its breach of contract claim), constructive fraud [Count Three], or tortious interference with contract [one of the two claims under Count Four]." See Doc. No. 95, p. 18 n. 2.  Accordingly, the Count grants summary judgment on Count Two, Count Three, and the claim of tortious interference with contract under Count Four.

Northern maintains its claim of tortious interference with economic advantage (second claim under Count Four), asserting PepsiCo interfered with the business relationships with its customers. North Dakota recognizes a common law tort claim for unlawful interference with business.  Trade 'N Post, L.L.C. v. World Duty Free Americas, Inc., 628 N.W.2d 707, 716 (N.D. 2001).  In order to prevail on such a claim, the plaintiff must prove the following essential elements: (1) the existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an independently tortious or otherwise unlawful act of interference by the interferer; (4) proof that the interference caused the harm sustained; and (5) actual damages to the party whose relationship or expectancy was disrupted.  Id. at 717.

Northern claims PepsiCo committed the tortious act of deceit, see N.D. Cent. Code § 9-10-02, stating, "PepsiCo promised Northern an exclusive territory; with its actions since 2010, and by the very words of its moving brief on the instant motion, PepsiCo has made it clear it has no intention of keeping that promise."  See Doc. No. 95, p. 45.  "If the parties have a contractual

relationship, it is possible, in only very limited circumstances, to assert both a breach of contract claim and a deceit claim." <u>Bakke v. Magi-Touch Carpet One Floor & Home, Inc.</u>, 920 N.W.2d 726, 733 (N.D. 2018). Northern has alleged no facts that there was deceit separate from the parties' contract. <u>See id.</u>

Northern has also failed under element four to provide proof that the alleged interference caused the harm sustained. Northern states, "After its acquisition of 80% of the U.S. bottling capacity, PepsiCo embarked on a campaign of deceit, which resulted in a marked increase in transshipment of products from PBC territories and the destruction of relationships between Northern and some of its customers." <u>See</u> Doc. No. 95, p. 44. The relevant evidence, however, does not support Northern's conclusion. Transshipments into Northern's territory did not increase in the years immediately following the 2010 PBC transaction. The number of transshipped cases of PepsiCo CSDs discovered in Northern's territory from January 1, 2008 through July 19, 2017 (by year) is as follows: 2008 – 715 cases; 2009 – 100 cases; 2010 – 91 cases; 2011 – 10 cases; 2012 – 56 cases; 2013 – 8 cases; 2014 – 30 cases; 2015 – 6,577 cases; 2016 – 5,085 cases; 2017 (through July 19, 2017) – 2,039 cases. <u>See</u> Doc. Nos. 60-1 and 111-1. Thus, transhipping actually decreased in Northern's territory immediately following the PBC transaction, undermining Northern's causation argument.

The increase in transshipments in Northern's territory starting in 2015 is consistent with PepsiCo's contention that in late 2014 Northern began asking its convenience and gas outlets to sign a new Customer Development Agreement ("CDA") for 2015 that "aggressively sought to gain additional shelf space for Northern products in its customers' stores." <u>See</u> Doc. No. 90, p. 18. The 2015 CDA increased the minimum number of shelves required for a customer to receive a price

discount on products sold by Northern, and reduced the amount of that discount, resulting in an effective price increase for Northern's customers. See Doc. Nos. 88-1, pp. 32-33, and 88-6, p. 17. Accordingly, Northern has failed to show that PepsiCo caused Northern's customers to terminate their business relationships with Northern. For these reasons, Northern's claim of unlawful interference with business (Count Four) cannot survive summary judgment.

Northern's claim of unfair competition and deceptive trade practices under the state common law (Count Five) likewise fails. "The essential elements are generally the same for Lanham Act and common law claims of unfair competition." Burris Carpet Plus, Inc. v. Burris, 785 N.W.2d 164, 178 (N.D. 2010). "Both common law and the Lanham Act require the plaintiff to have a valid and protectable mark." Id. Northern has not alleged that PepsiCo infringed a valid and protectable trademark or service mark.

In its brief in opposition to the motion, Northern abandons its common law claim of unfair competition and deceptive trade practices and argues PepsiCo violated North Dakota's Consumer Fraud Act, which, in part, provides:

> The act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is declared to be an unlawful practice.

N.D. Cent. Code § 51-15-02. The Court rejects Northern's attempt to amend the complaint through its brief opposing summary judgment. See Thomas v. United Steelworkers Local 1938, 743 F.3d 1134, 1140 (8th Cir. 2014). Further, the Court finds Northern has not identified with specificity any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation in connection with the sale of concentrate by PepsiCo.

Counts Six and Seven of Northern's complaint seek, respectively, punitive damages and injunctive relief. Because PepsiCo is entitled to judgment as a matter of law on each of Northern's substantive claims, Northern is not entitled to relief of any kind, including punitive damages or injunctive relief. See N.D. Cent. Code § 32-03.2-11(1) (providing that "when the defendant has been guilty by clear and convincing evidence of oppression, fraud, or actual malice, the court or jury, in addition to the actual damages, may give damages for the sake of example and by way of punishing the defendant"); N.D. Cent. Code § 32-03.2-11(4) (providing that "no award of exemplary damages may be made if the claimant is not entitled to compensatory damages"); Oglala Sioux Tribe v. C & W Enters., Inc., 542 F.3d 224, 229 (8th Cir. 2008) ("A permanent injunction requires the moving party to show actual success on the merits . . . .").

## V.     CONCLUSION

For the reasons set forth above, the Defendant's motion for summary judgment (Doc. No. 86) is **GRANTED**. The Plaintiff's motion for hearing (Doc. No. 112) is **FOUND AS MOOT**. Let judgment be entered accordingly.

     **IT IS SO ORDERED**.

Dated this 13th day of December, 2019.

                              */s/ Daniel L. Hovland*
                              Daniel L. Hovland, District Judge
                              United States District Court